**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**CONSUMER FINANCIAL PROTECTION
BUREAU**                                                         **PLAINTIFF**

**v.**                                    **CIVIL ACTION NO. 3:16-cv-356-WHB-JCG**

**ALL AMERICAN CHECK CASHING, INC.,
MID-STATE FINANCE, INC., and
MICHAEL E. GRAY, individually**                        **DEFENDANTS**

## ORDER GRANTING PLAINTIFF'S FIRST MOTION TO COMPEL DISCOVERY RESPONSES (ECF NO. 50) AND GRANTING PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY RESPONSES (ECF NO. 58)

Before the Court are two Motions to Compel Discovery Responses (ECF No. 50); (ECF No. 58) filed by Plaintiff, the Consumer Financial Protection Bureau. The matter is fully briefed: Defendants All American Check Cashing, Inc., Mid-State Finance, Inc., and Michael E. Gray filed Responses in Opposition (ECF No. 54); (ECF No. 66), and Plaintiff filed Replies (ECF No. 55); (ECF No. 67). Having considered the submissions of the parties and relevant legal authority, the Court finds that Plaintiff's First Motion to Compel Discovery Responses (ECF No. 50) should be GRANTED and Plaintiff's Second Motion to Compel Discovery Responses (ECF No. 58) should be GRANTED. However, because the requested date of production – February 10, 2017 – has since passed, a later date by which production must be complete will be set as part of an amended case management order.

## I. BACKGROUND

Plaintiff, the Consumer Financial Protection Bureau ("the Bureau" or the "CFPB") – which is an independent agency of the Federal Government – filed its

Complaint (ECF No. 1) on May 11, 2016. The Complaint alleges that Defendants All American Check Cashing Inc., Mid-State Finance, Inc., and Michael E. Gray violated the Consumer Financial Protection Act ("CFPA") "by engaging in unfair, deceptive, and abusive acts and practices in connection with their offering and providing of payday loans and check cashing services to consumers." (ECF No. 14, at 1).

On July 26, 2016, the Bureau served Defendants with its First Request for Production of Documents. (ECF No. 25). Defendants sent their first responses to the Bureau's Request on September 7, 2016 and sent their first supplemental responses on September 15, 2016. (ECF No. 34); (ECF No. 37). In an attempt to resolve Defendants' objections to many of these requests and to discuss the Bureau's perceived deficiencies in Defendants' productions, the parties conducted a meet and confer on October 13, 2016. The Bureau agreed to narrow some requests and defense counsel agreed to speak with their client regarding the production of additional documents. Defendants produced a second supplemental response on November 4, 2016, but ultimately refused to produce certain documents in response to some of the Bureau's requests. (ECF No. 48).

On October 7, 2016, the Bureau served Defendants with its Second Request for Production of Documents. (ECF No. 42). Defendants produced documents in response to one of the two included demands, but refused to produce documents responsive to the other demand. On October 18, 2016, the Bureau served Defendants with its First Set of Interrogatories. (ECF No. 43). In responding to

these eighteen interrogatories, Defendants objected to providing certain information. (ECF No. 53). The parties were unable to resolve these objections at a meet and confer held on December 8, 2016.

On November 21, 2016, the Bureau filed its First Motion to Compel Discovery Responses (ECF No. 50), and the Bureau filed its Second Motion to Compel Discovery Responses (ECF No. 58) on January 3, 2017.

## II. <u>DISCUSSION</u>

A.  Legal Standard

In reviewing a motion to compel, courts must take into account that discovery rules "are to be accorded a broad and liberal treatment to effect their purpose of adequately informing litigants in civil trials." *Herbert v. Lando,* 441 U.S. 153, 176 (1979). "At some point, however, discovery yields diminishing returns, needlessly increases expenses, and delays the resolution of the parties' dispute." *Willis v. City of Hattiesburg*, No. 2:14-cv-89-KS-MTP, 2016 WL 918038, at *2 (S.D. Miss. Mar. 10, 2016). Indeed, "[d]iscovery is not a license for the plaintiff to 'go fishing' and is limited to information that 'is relevant to any party's claim or defense.'" *Barnes v. Tumlinson*, 597 F. App'x 798, 799 (5th Cir.), *cert. denied,* 136 S. Ct. 485 (2015) (citing *Marshall v. Westinghouse Elec. Corp.,* 576 F.2d 588, 592 (5th Cir. 1978); Fed. R. Civ. P. 26(b)(1)). "Finding a just and appropriate balance in the discovery process" is thus one of the Court's key responsibilities. *Willis*, 2016 WL 918038, at *2. "It hardly bears repeating that control of discovery is committed to the sound discretion of the trial court...." *Van Duzer v. U.S. Bank Nat. Ass'n*, 582 F. App'x

279, 283 (5th Cir. 2014) (quoting *Williamson v. U.S. Dep't of Agric.,* 815 F.2d 368, 382 (5th Cir. 1987)).

In addition to relevance, Federal Rule of Civil Procedure 26(b)(1) requires that matters be "proportional to the needs of the case" in order to be discoverable. Considerations include "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). However, "[i]nformation within [Rule 26's] scope of discovery need not be admissible in evidence to be discoverable." *Id.*

B. Analysis

1. The Bureau's First Motion to Compel Discovery Responses

The Bureau's First Motion to Compel Discovery Responses (ECF No. 50) seeks to compel Defendants to produce (1) "audio records of voicemail messages from consumers concerning Defendants' services," (2) documents from various requests "that were created prior to May 11, 2013," and (3) documents Defendants have previously produced to the Bureau, but in a different format than requested. (ECF No. 51, at 5).

i. Voicemails containing consumer complaints

Document Request 3 from the Bureau's First Request for Production of Documents read as follows: "All phone messages or other audio recordings concerning complaints or inquiries by consumers in connection with check cashing

services, consumer loans, overpayments, or refunds." (ECF No. 50-1, at 15). After initially objecting to the request as "overly broad and unduly burdensome, vague and ambiguous," unparticularized, and "unreasonable," *Id.* at 26, Defendants supplemented with the following response:

> All American is producing a complaint log that is bates-stamped All American 003032 – All American 003042. The complaint log identifies complaints from 2014-2016. All American believes that the CFPB already has information regarding complaints from prior years through its Civil Investigative Demand ("CID"). The procedures for handling written complaints is contained in the Compliance Program bates-stamped All American 003043 – All American 003058. Page 7 of the Program has a section entitled "Customer Complaints" as well as Exhibit C of the Program. Audio Files from the All American Customer HotLine recordings are classified as three types: complaints, praises, and other non-complaint and non-praise messages. There is currently no written policy or procedure for the record retention of the audio files.
>
> The following is the current process for handling recorded calls from the All American Hot Line:
> - Complaints- after documenting in the Complaint Log the recording is forwarded to a District Manager via email. The recording is then deleted from the system, but still resides in a "deleted" email file.
> - Praises- are sent to the stores and District Managers then deleted from the system, but still resides in a "deleted" email file.
> - Other Calls – If store is identified, the recording is sent to the store then deleted but still resides in a "deleted" email file.
>
> Given that there has been no system for the record retention of audio files, any audio recordings *may* be attached to deleted emails. There are audio recordings attached to 6,205 "deleted" email files from May 2013 to October 2016. These emails are not separated into "Complaints" or "Praises." Reviewing all 6,205 deleted emails to determine whether the audio recording is a complaint or praise would cost All American, and counsel for All American, an exorbitant amount of time and

> expense and does not appear necessary for the CFPB's prosecution of its claims in this case. Given that All American has produced all written complaints, a complaint log, and the process by which audio recordings are reviewed and retained, All American maintains the position that Requests Nos. 1, 2, and 3 have been sufficiently supplemented. All responsive documents have been produced, excepting the review and production of the 6,205 emails which may contain audio recordings of complaints.

*Id.* at 56-57.

The Bureau argues that "[t]he audio recordings at issue are central to this case and there is no basis for Defendants to withhold them." (ECF No. 51, at 7). "The audio files sought by the Bureau are recordings of consumer complaints regarding Defendants' services…which concern the impact of Defendants' marketing and sales techniques on consumers." *Id.* at 8. Further, says the Bureau, it "is entitled to investigate whether consumers have experienced – and raised with Defendants – specific instances of what the Bureau alleges are Defendants' unfair, deceptive and abusive practices." *Id.* In order to avoid the purported burden asserted by Defendants, the Bureau proposed that Defendants produce all of the audio files in their possession for the relevant time period, and the Bureau would sort through the files on its own. (ECF No. 51, at 8). Defendants rejected this proposal.

Defendants argue that the complaint log provided to the Bureau – which "is comprehensive, identifying in detail the date and time [each] complaint was received, the store that received the complaint, the employee that addressed the

complaint and the employee's supervisor, the customer's name, the manner the complaint was received, and the subject matter and resolution of the complaint" – is sufficient in response to the Bureau's request and that production of the 6,205 audio files "is disproportionate to the needs of the case." (ECF No. 54, at 5-6). Defendants state that "two All American employees spent 16 hours each" searching for these deleted emails that contain audio recordings of phoned-in Hotline messages. *Id.* at 6. Thus, Defendants' conservative estimate for the amount of time it would take Defendants to "listen to the audio recordings and produce any recordings that are complaints" is "several weeks or months." *Id.*

In support of their argument, Defendants cite to *Gilead Scis. Inc. v. Merck & Co, Inc.*, No. 5:13-cv-4057-BLF, 2016 WL 146574 (N.D. Cal. Jan. 13, 2016) a patent infringement case over the invention of certain pharmaceutical compounds. Gilead said "it was the one to conceive and reduce to practice the inventions, in 2003, in a compound named PSI-6130…[a]nd so a key issue in this case is what did Gilead synthesize and when did it know it." *Id.* at 1. In discovery, Gilead produced photographs of various tubes of compounds. A label on one of the photographed tubes indicated that the compound in the tube was of the same weight as PSI-6130. Seeking to determine what substance was in that tube, Merck demanded production of further information about the tubes and their contents, including the tubes themselves.

The *Gilead* court denied Merck's motion to compel. Merck had "long had information from Gilead that confirm[ed] that the test tubes in question held…two

entirely different nucleosides from PSI-6130" and had offered "no real evidence"

that this information was false or concocted. *Id.* at 1-2. Thus, the court explained

that "[w]ithout more specific information triggering some reason for doubt, the

Court must take the producing party…at its word." *Id.* at 2 (alteration in original)

(quoting *Aristocrat Techs. v. Int'l Game Tech.*, No. C 06-03717 RMW (RS), 2009 WL

3573327, at *3 (N.D. Cal. Oct. 30, 2009)). The court found Merck's demand to be

disproportionate to the needs of the case because it would have left Gilead "in the

position of having to produce discovery on all sorts of compounds that bear no

indication of any nexus to the disputes in this case." *Id.*

   Defendants assert that their audio recordings of Hotline messages are akin to

the contents of the photographed tubes, in that (1) the complaint log already

produced is like the evidence had by Merck that already identified the contents of

the tubes, (2) Defendants should be taken at their word as to the accuracy of the log,

and (3) having to produce the actual recordings is disproportionate to the needs of

this case. *See* (ECF No. 54, at 6-7).

   Though appealing at first glance, this analogy sours upon further inspection.

First, Merck sought the tubes solely for the purpose of confirming that the

compound in the tubes was in fact what other evidence identified; the relevance of

the tubes was otherwise naught. Here, the Bureau seeks the audio recordings

because customer complaints are highly relevant to allegations that Defendants

engaged in unfair, deceptive, and abusive acts and practices in violation of the

CFPA. Second, a complaint log does not provide the same information as the actual

complaints themselves, unless the log includes a transcript of the audio (and neither party has indicated that the log does). Third, the Bureau has identified at least one significant instance in which a relevant consumer complaint was omitted from a previously produced complaint log. *See* (ECF No. 55, at 7-8).

Finally, Defendants' general assertion as to the burden of having to review and produce these audio files is unavailing.[1] The thirty-two man-hours Defendants assert having spent searching for these audio files is in no way indicative of a disproportional discovery request.[2] The claims in this case are complex and the case is necessarily document intensive. Rather than having Defendants review the audio files in order to determine which are complaints, the Bureau has offered for Defendants to produce all 6,205 audio files. This solution would seemingly eliminate any additional burden for the Defendants since the Hotline messages have already been identified. Whether Defendants prefer to first review the files or not, they will be required to produce recordings of Hotline complaints. Additionally, Defendants' alternative request – that their review of the recordings be at the Bureau's cost – is denied.[3]

---

[1] Defendants also off-handedly assert that the audio recordings may contain "information violative of a particular customer's privacy." (ECF No. 54, at 7). However, Defendants cite no case law and give no further explanation as to what privacy interest their current and former customers might have in the recordings of their Hotline messages. The Court will not entertain such an unsubstantiated assertion.

[2] If anything, it seems to suggest that Defendants' files are poorly organized. Such a self-created burden should not act to limit the discoverability of information.

[3] Defendants' reliance upon *Zubulake v. UBS Warburg*, 216 F.R.D. 280 (S.D.N.Y. 2003), in arguing for cost-shifting is misplaced. The fee-shifting test outlined in *Zubulake* applies to the cost of making inaccessible material accessible, such as the restoration of backup hard disks. Contrary to Defendants' characterization of *Zubulake*, the court clearly stated that "[a]s a general rule, where cost-shifting is appropriate, only the costs of restoration and searching should be shifted…. However, the responding party should *always* bear the cost of reviewing and producing electronic data once it has been converted to an accessible form." *Id.* at 290 (emphasis in original). Defendants have already

ii.   <u>Documents created prior to May 11, 2013</u>

Instruction I to the Bureau's First Request for Production of Documents provides, "Unless otherwise specified, the relevant time period for which production of documents is requested shall be from July 21, 2011 to the present." (ECF No. 50-1, at 10). Defendants issued a general objection, stating that this instruction "impermissibly attempt[s] to expand the scope of discovery" because the Mississippi Check Cashers Act only requires a licensee "to preserve the books, accounts, and records of its business for a period of two (2) years." *Id.* at 24, 39 (citing Miss. Code. Ann. § 75-67-515). Defendants later clarified their objection at a meet and confer in October 2016, stating that they objected to producing documents from prior to May 2013 based upon the applicable statute of limitations.  *See id.* at 47.

The Bureau argues that "[t]here is no basis to limit the discovery time period to May 2013 to the present (Defendants' verbal objection), or July 2014 to the present (Defendants' written objection)," because "[t]he law governing discovery in this matter is not, as Defendants contend, Mississippi licensing law, but rather federal law." (ECF No. 51, at 11). Further, says the Bureau, "[e]ven if the statute of limitations [invoked by Defendants] did limit this action to the three years prior to the filing of the Complaint in May 2016…, the Defendants' objection would still fail." This is because "'[i]nformation concerning events that substantially preceded the occurrence of the incident that is the basis for the suit…may shed important light on the facts directly relevant to a claim or defense, and thus may be relevant

---

identified and can access all of the potentially-relevant audio files. All that is left is to review and/or produce them.

for discovery purposes.'" *Id.* at 13 (quoting 6 James Wm. Moore et al., *Moore's Federal Practice* § 26.41[12] (3d ed.)).

Defendants do not directly address the Bureau's contentions and instead assert that (1) "Title X of the Dodd-Frank Act provides that 'no action may be brought under this title more than three years after the date of discovery of the violation to which an action relates," and (2) "[t]he CFPB points to only two allegations in the entire Complaint to justify seeking documents from June 2011 forward: paragraphs 42 and 55." (ECF No. 54, at 9) (citing 12 U.S.C. § 5564(g)(1)). Defendants then remind the Court of the voluminous document production already made: "over 4,000 documents to the CFPB in response to the Requests, and over 12,000 documents total[, which] are in addition to the 2,000,000 (two million) documents[4] that the CFPB already has in its possession from All American." *Id.* at 11. Defendants assert that "May 2013 is the appropriate starting date for the production of documents" and, alternatively, that if the CFPB is entitled to documents from prior to May 2013, "the CFPB may only obtain documents from 2011 forward as it relates to paragraph 55." *Id.*

Defendants do not support their argument that statutes of limitations serve as decisive cut-offs for discovery with any case law. This is likely because case law is contrary to their position:

> The fact that some of the information sought concerns events occurring outside the prescriptive limit for actionable claims is not a bar [to discoverability] in light of

---

[4] The Bureau has repeatedly corrected Defendants' assertion of having produced 2,000,000 documents during the Civil Investigation Demand, stating that it was in fact 2,000,000 pages of documents.

> the Supreme Court's observation that "[a] discriminatory
> act which is not made the basis for a timely charge ... may
> constitute relevant background evidence in a proceeding in
> which the status of a current practice is at issue."

*Trevino v. Celanese Corp.*, 701 F.2d 397, 405 (5th Cir. 1983) (second alteration in

original) (quoting *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977),

*abrogated on other grounds by* Lilly Ledbetter Fair Pay Act of 2009 §3, 42 U.S.C. §

2000e-5(e)(3)); *see also N.L.R.B. v. Line*, 50 F.3d 311, 315 (5th Cir. 1995)

(determining that a subpoena seeking documents from five years prior was relevant

and not overly broad, even though the statute of limitations related to the

underlying charge was six months). Additionally, Defendants' argument – that

documents dating back to 2011 are not proportional to the needs of the case because

only two paragraphs of the Bureau's Complaint reference activity reaching back to

2011 – mischaracterizes the Bureau's Complaint.[5] Paragraphs 41-53 specifically

elaborate upon the allegations in paragraph 42, and paragraphs 54-61 specifically

elaborate upon the allegations in paragraph 55. Moreover, nothing in the remainder

of the Complaint limits the scope of inquiry to dates since May 2013.

    The Court would remind Defendants that – as benefitted Defendants in

challenging the protective order sought by the Bureau – "relevance for purposes of

discoverability is nonetheless much broader than for purposes of admissibility."

(ECF No. 49, at 13) (citing Fed. R. Civ. P. 26(b)(1)). The Court need not address

---

[5] This argument also poses the question how many paragraphs specifically referencing back to 2011 would satisfy Defendants? Is there an absolute threshold Defendants have in mind, or do they seek a minimum percentage of the number of paragraphs in the Complaint? This strikes the Court as yet another instance in which Defendants have relied upon D.I.Y. legal standards. *See* (ECF No. 24, at 4).

arguments over to what extent any statute of limitations applies, for statutes of limitations do not act to bar discovery. This is especially so where, as here, the Complaint alleges conduct constituting unlawful patterns and practices. Defendants will therefore be required to produce responsive non-privileged documents dating back to July 21, 2011.

iii.   The format of Defendants' production of documents

The Case Management Order (ECF No. 21) entered July 7, 2016 states that the parties "agree to produce [electronically stored information ('ESI')] in either native format or in a reasonably usable and searchable pdf format." (ECF No. 21, at 3). This language follows the instruction of Federal Rule of Civil Procedure 34(b)(2)(E)(ii).[6] The Bureau asserts that "Defendants have failed to comply with this simple, yet fundamental requirement governing the form of document production between parties." (ECF No. 51, at 15). Defendants first production was provided in the form of a single 2,505-page PDF, which lacked (1) demarcation between documents, (2) an accompanying index, or (3) any indication whether a given document is an attachment to a preceding email. *Id.* This PDF was also unsearchable and, as a compilation of different discrete documents, lacked metadata. *Id.* Defendants later provided text-searchable PDFs, but refused to address any of the Bureau's other concerns. *Id.* Because "Defendants' method of production strips away critical information" – such as the author, creation date, and

---

[6] "If a request does not specify a form for producing electronically stored information, a party must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms." Fed. R. Civ. P. 34(b)(2)(E)(ii).

the existence of any inter-document affiliation – and removes the ability to use features available in Excel, the Bureau asserts that this is the very sort of obstacle-raising production against which Federal Rule of Civil Procedure 34's ESI provisions were intended to protect. *Id.* at 17.

Defendants tell a very different tale. In response to the Bureau's wide-ranging requests, Defendants "produced documents in PDF format, bates-stamping each document," and "designated which bates-numbered documents corresponded to [each] Request." (ECF No. 54, at 12). After the Bureau expressed concerns regarding the searchability of Defendants' production, defense counsel "spent several hours configuring the documents to make the PDF production text-searchable…so that the CFPB could search the document using any search term it desired."[7] *Id.* Moreover, "responsive documents were produced in electronic folders labeled with the request number to which they were responsive and each page within those folders was assigned a bates number." *Id.* Defendants state that they spent "approximately 80-90 hours producing documents…in a way that the CFPB could use efficiently in preparation of litigation." *Id.* at 12-13. Accordingly, Defendants maintain that they have complied with the requirements of the Case Management Order and assert that the Court should deny the Bureau's demand that Defendants produce all documents in native format. *Id.* at 13.

---

[7] Defendants' bold portrayal of the great efforts expended in order to mollify the Bureau's concerns notwithstanding, this is, of course, what making a document searchable does – it allows one to search the document *using any search term one desires*. Additionally, while it may take a program like Adobe Acrobat a long time to make a PDF text-searchable, this is not a process that otherwise necessitates the attention of any persons.

In the opinion of the Court, these hours spent converting files into PDFs stripped of metadata were, at best, an overly burdensome and ill-advised method of document production and, at worst, an obstructive attempt to make these files less useful to the Bureau. Whatever the plain language of the Case Management Order may mean in a cognitive vacuum, in its proper context it clearly does not mean that one party may alter readily-available and easily identifiable documents into a format that renders them less useful and more cumbersome. *See* Fed. R. Civ. P. 34(b) advisory committee's note to 2006 amendment ("[T]he option to produce in a reasonably usable form does not mean that a responding party is free to convert electronically stored information from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome for the requesting party to use the information efficiently in the litigation."); *Aguilar v. U.S. Dep't of Homeland Sec.*, 255 F.R.D. 350, 355 (S.D.N.Y. 2008) ("In particular, if the ESI is kept in an electronically-searchable form, it 'should not be produced in a form that removes or significantly degrades this feature.'" (citations omitted)).

Defendants wasted their own time and resources converting documents from their native format into a single, giant PDF.  They will be ordered to reproduce documents already produced in response to the First and Second Requests for Production of Documents in either their native format or – if good reason exists for producing a document in PDF format – in a manner that (1) demarcates between different documents, (2) indicates whether a document is an attachment to an

email, (3) is searchable, and (4) includes the important information contained in metadata, such as creation date and author.

2. <u>The Bureau's Second Motion to Compel Discovery Responses</u>

The Bureau's Second Motion to Compel Discovery Responses (ECF No. 58) seeks to compel (1) Defendants' production of documents responsive to (a) requests 4, 5, 6, 12, and 13 from the Bureau's First Set of Requests for Production of Documents, and (b) request 2 from the Bureau's Second Set of Requests for Production of Documents; (2) Defendants' responses to Interrogatories 4, 7, and 17; and (3) the identification by Bates number of responsive documents already produced by Defendants.[8] (ECF No. 59, at 1). The Bureau also seeks to compel production of these documents by a now-passed date, February 10, 2017.

i. <u>Requests for production of documents</u>

a. <u>Request 12 of the First Set of Requests for Production</u>

The Bureau's Request 12 in its First Set of Requests for Production of Documents originally sought "[a]ll documents generated in connection with Defendants' corporate retreats, manager meetings, manager training sessions, manager trainee meetings, manager trainee training sessions, and other company-wide meetings." (ECF No. 58-1, at 19). Defendants responded with the following boilerplate objection:

> All American objects to this Request on the grounds that it is overly broad and unduly burdensome, vague and ambiguous, and fails to describe with reasonable

---

[8] The Bureau also makes redundant requests for discovery dating back to July 21, 2011 and for ESI to be produced in native or reasonably usable formats. The Court has already addressed these requests *supra* § II(B)(1)(i)-(ii).

> particularity each item or category of items to be inspected
> pursuant to F.R.C.P. 34(b)(1)(A). All American further
> objects to Request No. 12 as attempting to impermissibly
> expand the scope of discovery permitted under F.R.C.P.
> 26(b)(1).

*Id.* at 33-34. The Bureau made two subsequent modifications to this request in an

attempt "to minimize the purported burden on Defendants." (ECF No. 59, at 7).

After the first modification, Defendants produced agendas, minutes, and attendee

lists in connection with company-wide meetings, but did not otherwise address

other types of documents listed in the request. (ECF No. 66, at 4).

The Bureau's second modification, which was made after this production,

seeks the following:

> [I]n addition to the agendas, minutes, and attendees lists…
> (1) all agendas, minutes, and summaries of planning
> meetings; (2) all final presentations; (3) all documents
> distributed to attendees at any point before, during, or
> after the meeting; (4) all questionnaires, evaluations, or
> surveys completed before, during, or after the meeting; (5)
> all video or audio recordings shown during the meeting; (6)
> all video or audio recordings of the meeting; and (7) all post-
> meeting summaries or recaps.

(ECF No. 58-1, at 192). Defendants did not respond to this modified request but now

make three specific objections: (1) the requested documents "may never have been

in All American's possession" because "[t]he employee who presented the

information may no longer be with All American," (2) the request for all final

presentations is "overly broad and disproportionate" because "these presentations

were often the product of store-level employees…and not reflective of company

policy," and (3) the request for all documents distributed to attendees at any point

before, during, or after the meetings is "far too broad" because it "would cover everything from hotel reservations to driving directions." (ECF No. 66, at 4-5). Defendants state that these three articulated objections "appl[y] to the CFPB's other requests" and maintain that responding to Request 12 "would subject All American to unneeded costs, which have already exceeded six figures." *Id.* at 5.

The Bureau responds that the requested documents plainly "relate to how Defendants instructed their employees to interact with customers and how to implement policies and procedures at issue in this case." (ECF No. 67, at 3). Moreover, the Bureau asserts that the actual burden of production cannot be so great because Defendants' discovery responses indicate the presence of only nineteen meetings since May 2013, which, if indicative of the frequency with which these meetings occurred, reflects a manageable number of relevant documents for meetings dating back to July 2011. (ECF No. 59, at 9).

The Bureau also notes that Defendants never noted their specific concerns regarding the irrelevant documents (such as hotel reservations) necessarily subsumed within the Bureau's request, but that the Bureau would have agreed to exclude these documents from the request. (ECF No. 67, at 3). In addressing Defendants' assertion that certain responsive documents may reside only with former employees, the Bureau states that it has not asked for production of documents "that are solely in the custody and control of former employees." *Id.* at 4. Therefore, Defendants will not be required to "query each former employee who may hold such documents." *Id.* (quoting (ECF No. 66, at 4-5)).

Defendants do not specifically object to the relevance of the documents sought (and rightly so). The Court finds Defendants' objections as to the breadth of the requests and the related burden of production to be without merit. Defendants are not required to produced irrelevant documents (such as hotel reservations and driving directions) and are not required to produce documents "solely in the custody of former employees." Of course, they never would have been required to do so in the first place. To the extent that Defendants have non-privileged documents responsive to Request 12 in their possession, they will be required to produce them.

b. <u>Requests 4, 5, and 6 of the First Set of Requests for Production</u>

Requests 4, 5, and 6 seek emails sent by, received by, or copied to Michael E. Gray, Jeremy Hoskinson, Lisa Reed, William M. Hendrix II, Dianne Valladares, Amanda M. Hearn, Jason Scott Cain, Laura Faulkner, and Jason Stabbs. *See* (ECF No. 58-1, at 17-18). The requests seek emails not already produced in response to the September 3, 2013 Civil Investigative Demand that concern "check cashing services, consumer loans, overpayments, or refunds." *Id.* Defendants responded (1) stating boilerplate objections regarding broadness, burdensomeness, ambiguity, particularity, privilege, and scope, and (2) characterizing these requests as "essentially…blanket request[s] for every email of the parties named." *Id.* at 29-31. Defendants asked the Bureau to "further define and narrow the emails that it is seeking." *Id.* at 31.

The Bureau and Defendants conferred in an attempt to resolve this dispute, the result of which was proposed search terms, crafted by the Bureau, compatible

with Defendants' search system, and not objected to by Defendants. *See* (ECF No. 59, at 11); (ECF No. 66, at 6-7). In their Response in Opposition, Defendants do not object to the production of these emails but lament that providing the requested emails "promises…to be an exceedingly time consuming and expensive undertaking. One estimate indicates that the process might take All American two months to complete." (ECF No. 66, at 7). Defendants then suggest that the Court should consider shifting the costs of this production to the Bureau[9] because "All American's resources are stretched beyond the point of breakage" due to having only "8 employees in its home office in Madison, Mississippi."[10]

The Court declines Defendants' proposal to shift the financial burden of producing admittedly relevant emails to the Bureau. As noted by the Bureau, it is entirely unclear "why performing pre-defined searches on a limited number of email accounts would take two months." (ECF No. 67, at 5). Defendants will be required to produce all non-privileged emails responsive to Requests 4, 5, and 6 at their own cost.

c.  <u>Request 13 of the First Set of Requests for Production</u>

Request 13 seeks documents concerning former employees and twenty-one consumers. (ECF No. 58-1, at 54). At issue is Defendants' production of emails concerning the twenty-one consumers. (ECF No. 59, at 12-13). Defendants state

---

[9] Defendants again misapply upon *Zubulake*, 217 F.R.D. 280, to bolster their position. *See supra*, note 3.

[10] At various points in this litigation, Defendants have managed to paint All American as a company that is simultaneously woefully understaffed in its corporate office and its legal representation, yet unwieldly in size and scope at store-level. In both cases, the circumstances serve to explain Defendants' inability or unwillingness to comply with the Bureau's discovery requests. The convenience of these seemingly contradictory assertions is not lost on the Court.

that "[t]he challenges facing All American in responding to Request No. 13 are the same challenges discussed in Requests 4-6." (ECF No. 66, at 8). The Bureau agreed to limit the scope of the request by allowing Defendants to produce only emails that reference the specific consumers by name, which would allow for these emails to be easily identified through targeted searches. (ECF No. 67, at 7). Defendants do not dispute the relevance of these emails. There is no reason why this request should be treated differently from Requests 4, 5, and 6. Defendants will therefore be ordered to produce emails concerning these twenty-one consumers.

### d.  Request 2 of the Second Set of Requests for Production

Request 2 of the Bureau's Second Set of Requests for Production seeks "[a]ll documents concerning Defendants' efforts in 2014 and 2015 to provide Refunds to consumers who had made an Overpayment but were not previously provided with a refund…." (ECF No. 58-1, at 54). Defendants objection stated that they believed they had already produced any responsive documents to the Bureau and asked for additional clarification if this was not the case. *Id.* at 141. In an email dated November 7, 2016, the Bureau clarified that it was seeking "all internal documents" relating to these efforts, "whether they are internal communications, meeting notes, meeting agendas, spreadsheets, etc." *Id.* at 148. The Bureau asserts – and Defendants do not dispute – that Defendants never asked for this clarified request to be narrowed in scope. (ECF No. 59, at 14). On December 8, 2016, Defendants stated that they would not produce any documents responsive to this request. (ECF No. 58-1, at 183).

Defendants now assert that the request is "quite broad" and an "unreasonable request." (ECF No. 66, at 9). Defendants again request that the Court deny this Request or shift the costs of production to the Bureau. *Id.* at 9-10. The Court again disagrees with Defendants characterization of the request and declines their request to shift costs. This request seeks documents that are plainly relevant to the Bureau's allegations in the Complaint, and Defendants' unsubstantiated assertions that the request is overly broad do not convince the Court that it is so.

ii.   Responses to interrogatories

Because Defendants' objections to Interrogatories 4, 7, and 17 make the same arguments, the Court will address Defendants' objections all at once.

Interrogatory 4 states, "Identify all of Defendants' full-time employees whose employment ceased on or after September 1, 2014, and state his or her position, the dates of his or employment, and the reason(s) for the departure." (ECF No. 58-1, at 89). Defendants objected as to the relevance of the request. *Id.* at 168.

Interrogatory 7 states, "Identify and describe, in detail, all employee bonus policies in place from July 21, 2011 to the present, including any changes in the policies." *Id.* at 89. Defendants objected as to the temporal scope of the request on the basis of applicable statues of limitations and to the relevance of the request. *Id.* at 170.

Interrogatory 17 states,

> Identify all of Defendants' store locations that operated from July 21, 2011 to present in Mississippi, Louisiana,

and Alabama, including (i) the address of the store, (ii) the
date the store opened, (iii) the date the store permanently
closed, if applicable, (iv) all store managers employed at the
location from July 21, 2011 to the present, including the
dates of their employment as store manager for the
location, (v) the area supervisor overseeing the location
from July 21, 2011 to the present, including the dates that
they oversaw the location.

*Id.* at 92. Defendants objected as to the temporal scope of the request on the basis of

applicable statues of limitations and to the relevance of parts (iv) and (v) of the

request. *Id.* at 176. Defendants responded to parts (i), (ii), and (iii).

As an initial matter, Defendants' objections as to the temporal scope of the

requests on the basis of statutes of limitations have already been addressed and

overruled. *See supra* § II(B)(1)(ii). Defendants also argue in their Response in

Opposition that the privacy interests of former employees should bar disclosure in

response to Interrogatory 4. (ECF No. 66, at 11). In support, Defendants reference

state law privacy torts. It is unclear whether Defendants insinuate that they risk

exposing themselves to tortious liability, or whether this somehow translates into

implied confidentiality. Regardless, neither would act as a bar to discovery. *See*

*DIRECTV, Inc. v. Puccinelli*, 224 F.R.D. 677, 684-85 (D. Kan. 2004) ("[A] general

concern for protecting confidentiality does not equate to privilege. Thus information

and documents are not shielded from discovery merely because they are

confidential.")

Finally, Defendants objections as to relevance will be overruled. Former

employees are likely to possess highly pertinent information to the allegations in

this law suit. They will likely be able to provide testimony that would shed light on

All American's policies and practices. For the same reason, the identities of store managers employed at each location, as well as the area supervisor for each location, are relevant and discoverable. The existence of and description of any bonus policies may similarly indicate the presence or absence of the policies and practices Defendants are alleged to have maintained.

    iii.    <u>The identification of responsive documents already produced</u>

Instruction K to the Bureau's Requests for Production of Documents states,

> If a Document Request seeks responsive documents that Defendants have previously produced to the Bureau pursuant to any Civil Investigation Demand, Defendants are not expected to re-produce such documents but may instead respond by designating the relevant document(s) with reference to the appropriate Bates number.

(ECF No. 58-1, at 12-13, 50-51). Defendants objected to the extent that the instruction "seeks documents that are readily or more accessible to the Government or requests documents previously produced" because "[r]esponding to such requests is unduly burdensome and designed to burden All American with unnecessary expense." *Id.* at 25. Defendants similarly maintain in their Response in Opposition that the Bureau now "requests that many of the same documents [already produced in response to the Civil Investigation Demand] be produced again." (ECF No. 66, at 15). Defendants also add that "All American is not in possession of the documents produced in the CID" because "[t]hose disclosures occurred under previous counsel." *Id.*

Defendants' interpret Instruction K to mean exactly what it does not. The Bureau asks Defendants to simply identify already-produced documents rather

than re-produce them. Defendants' assertion that they no longer possess the documents produced in the Civil Investigation Demand is immediately contradicted by their subsequent assertion that "[i]t is fundamentally unfair for the CFPB to demand documents through its CID process, and then to expect All American to…go through the arduous process of wading through the countless documents that the CFPB previously demanded. *Id.* Additionally, Defendants' explanation that they lack the previously-disclosed documents because previous counsel oversaw the process does not make sense.

As the Bureau has pointed out, it is not unusual for a responding party to be required to identify previously produced documents by Bates number. *See* (ECF No. 59, at 20) (citing *Clapper v. Am. Realty Invr's, Inc.*, No. 3:14-CV-2970-D (BF), 2015 WL 11023596, at *1 (N.D. Tex. Sept. 24, 2015); *Burdette v. Panola Cty.*, No. 3:13-CV-286-MPM-SAA, 2015 WL 1433462, at *5 (N.D. Miss. Mar. 31, 2015); *Herring v. Univ. of S. Miss.*, No. 2:09CV179-KS-MTP, 2010 WL 3023093, at *3 (S.D. Miss. July 29, 2010); *Raytheon Co. V. Indigo Sys. Corp.*, No. 4:07-CV-109, 2008 WL 5378044, at *3 (E.D. Tex. Dec. 23, 2008)). Defendants will be required to identify responsive documents previously produced by the Bates number previously assigned.

## III. <u>CONCLUSION</u>

Throughout the course of this litigation, Defendants have crafted and relied upon two primary narratives: they have been David to the Bureau's Goliath, and they have been the naïve victim of the Bureau's unchecked abuses. Defendants have repeatedly protested – and continue to protest – that they are devoid of the

necessary man-power, funds, and resources to adequately defend themselves against the relentless barrage of investigation and litigation brought by the Bureau. But perhaps we have reached a point in this production where it is fair to say that Defendants do "protest too much," of course without the same irony implicit in Queen Gertrude's oft-quoted line.

Indeed, Defendants' self-portrait is belied by the scope of the motion practice in which Defendants have engaged, and the enthusiasm with which Defendants have argued at every opportunity. Defendants filed and fully briefed an unmeritorious Motion for More Definite Statement (ECF No. 10); Defendants filed and fully briefed an unmeritorious – and entirely unnecessary – Motion for In-Person Case Management Conference (ECF No. 16); Defendants wholly contested the Bureau's Motion for Protective Order, despite the obviously privileged nature of some of Defendants' intended areas of deposition inquiry (ECF No. 36); Defendants unsuccessfully and unnecessarily moved for leave to file a surreply to the Bureau's First Motion to Compel Discovery Responses – replete with over 140 pages of proposed exhibits – in order to protest alleged "ethical accusations" against defense counsel (ECF No. 56); and Defendants most recently refused to produce clearly relevant documents and information on the basis of boilerplate objections. It is time for Defendants to discard their obfuscating narratives and reconsider their approach to the instant litigation.

The February 10, 2017 deadline for production requested by the Bureau has passed and Discovery is set to close April 21, 2017. Given the extensive discovery

that Defendants must now produce, an extension of case management deadlines is unfortunately necessary. These extensions will necessitate a continuance of the trial date; therefore, an amended case management order will follow this Order via separate docket entry. Included will be a deadline by which Defendants must comply with court-ordered discovery responses.

Accordingly, **IT IS HEREBY ORDERED** Plaintiff's First Motion to Compel Discovery Responses (ECF No. 50) is **GRANTED** and Plaintiff's Second Motion to Compel Discovery Responses (ECF No. 58) is **GRANTED**. An amended case management order – which will include a deadline by which Defendants must comply with court-ordered discovery responses – will follow via separate docket entry.

**SO ORDERED AND ADJUDGED**, this the 16th day of March, 2017.

/s/ *John C. Gargiulo*

JOHN C. GARGIULO
UNITED STATES MAGISTRATE JUDGE