# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### Northern Division

CONSUMER FINANCIAL PROTECTION BUREAU,

     Plaintiff,

v.

ALL AMERICAN CHECK CASHING, INC.;
MID-STATE FINANCE, INC.; and
MICHAEL E. GRAY, individually,

     Defendants.

Case No. 3:16-cv-356-WHB-JCG

ORAL ARGUMENT REQUESTED

---

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A JUDGMENT ON THE PLEADINGS

---

Theodore B. Olson, *pro hac vice* (DC 367456)
Helgi C. Walker, *pro hac vice* (DC 454300)
Joshua S. Lipshutz, *pro hac vice* (DC 1033391)
Lochlan F. Shelfer, *pro hac vice* (DC 1029799)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9575
Email: tolson@gibsondunn.com
hwalker@gibsondunn.com
jlipshutz@gibsondunn.com
lshelfer@gibsondunn.com

Robin H. Rasmussen (MSB 104729)
Peter D. Baskind, *pro hac vice* (TN 019962)
DINKELSPIEL RASMUSSEN & MINK, PLLC
1669 Kirby Parkway, Suite 106
Memphis, TN 38120
Telephone: (901) 754-7770
Facsimile: (901) 756-7772
Email: rrasmussen@drmlawmemphis.com

Dale Danks, Jr. (MS 5789)
DANKS, MILLER & CORY
213 S. Lamar Street
P.O. Box 1759
Jackson, MS 39215-1759
Telephone: (601) 957-3101
Facsimile: (601) 957-3160
Email: ddanks@dmc-law.net

Bentley E. Conner (MS 6465)
164 E. Center Street
P.O. Box 563
Canton, MS 39046
Telephone: (601) 859-6306
Facsimile: (601) 589-6307
Email: bentleyeconner@gmail.com

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ......................................................................................................... 1

BACKGROUND ......................................................................................................... 2

     A.     The Consumer Financial Protection Bureau ........................................ 2

     B.     Factual And Procedural Background ................................................... 3

ARGUMENT ............................................................................................................. 5

I.     The CFPB's Structure Is Unconstitutional ........................................... 5

II.     This Enforcement Action Violates Due Process Because All American Lacks Fair Notice Of What Conduct Is Prohibited ......................................................... 15

III.     Section 5531 Violates The Non-Delegation Doctrine ................................... 19

IV.     The CFPB's Interpretation Of Section 5536 Violates Principles Of Federalism ............ 20

CONCLUSION.......................................................................................................... 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L.A. Schechter Poultry Corp. v. United States*,
  295 U.S. 495 (1935)...................................................................................19

*In re Aiken Cty.*,
  645 F.3d 428 (D.C. Cir. 2011) .......................................................................8

*Am. Power & Light Co. v. SEC*,
  329 U.S. 90 (1946)......................................................................................19

*Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*,
  480 F.3d 470 (7th Cir. 2007) ..............................................................16, 22

*Bond v. United States*,
  134 S. Ct. 2077 (2014)....................................................................20, 22, 23

*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012).........................................................................15, 18

*Connally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926)....................................................................................18

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012).........................................................................15, 18

*FEC v. Legi-Tech, Inc.*,
  75 F.3d 704 (D.C. Cir. 1996) ......................................................................14

*FEC v. NRA Political Victory Fund*,
  6 F.3d 821 (D.C. Cir. 1993) ........................................................................14

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010).....................................................................6, 7, 8, 11

*Garcia v. San Antonio Metro. Transit Auth.*,
  469 U.S. 528 (1985)....................................................................................13

*Gates & Fox Co. v. OSHRC*,
  790 F.2d 154 (D.C. Cir. 1986) ....................................................................18

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)....................................................................................20

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993)................................................................................16

*Heater v. FTC*,
    503 F.2d 321 (9th Cir. 1974) ..............................................................9

*Humphrey's Executor v. United States*
    295 U.S. 602 (1935)..............................................................................7

*INS v. St. Cyr*,
    533 U.S. 289 (2001)............................................................................23

*Landry v. FDIC*,
    204 F.3d 1125 (D.C. Cir. 2000) ........................................................15

*Machete Prods., LLC v. Page*,
    809 F.3d 281 (5th Cir. 2015) ..............................................................5

*Mistretta v. United States*,
    488 U.S. 361 (1989)............................................................................19

*Morrison v. Olson*
    487 U.S. 654 (1988)....................................................................7, 9, 10

*Myers v. United States*,
    272 U.S. 52 (1926)................................................................................7

*N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*,
    458 U.S. 50 (1982)..............................................................................14

*National Petroleum Refiners Ass'n v. FTC*,
    482 F.2d 672 (D.C. Cir. 1973) ............................................................9

*Nguyen v. United States*,
    539 U.S. 69 (2003)..............................................................................14

*NLRB v. Noel Canning*,
    134 S. Ct. 2550 (2014)..........................................................................8

*Noel Canning v. NLRB*,
    705 F.3d 490 (D.C. Cir. 2013) ..........................................................11

*Panama Ref. Co. v. Ryan*,
    293 U.S. 388 (1935)............................................................................19

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016) ....................................1, 6, 10, 12, 13

*Ryder v. United States,*
    515 U.S. 177 (1995) ........................................................................14, 20

*Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs,*
    531 U.S. 159 (2001) ...............................................................................20

*SW General, Inc.,*
    796 F.3d 67 (D.C. Cir. 2015) .................................................................14

*Synar v. United States,*
    626 F. Supp. 1374 (D.D.C.) ......................................................................9

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ...............................................................................19

**Statutes**

12 U.S.C. §§ 243–244 .....................................................................................11

12 U.S.C. § 5481 .........................................................................................2, 10

12 U.S.C. § 5491 ...........................................................................................2, 8

12 U.S.C. § 5492(c)(4) ...................................................................................11

12 U.S.C. § 5497 .........................................................................................2, 11

12 U.S.C. § 5511 .............................................................................................22

12 U.S.C. § 5512 .............................................................................................10

12 U.S.C. § 5531 ....................................................................2, 3, 10, 16, 17, 22

12 U.S.C. § 5536 .....................................................2, 3, 5, 10, 15, 20, 22

12 U.S.C. § 5581 ...............................................................................................2

15 U.S.C. § 41 ...................................................................................................9

15 U.S.C. § 1692f ...........................................................................................22

Ala. Code § 5-18A-12(b) ..................................................................................3

Ala. Code § 5-18A-13(c) ..................................................................................3

La. Rev. Stat. § 9:3578.4 ..................................................................................3

Miss. Code Ann. § 75-67-517 ..........................................................................3

Miss. Code Ann. § 75-67-519(5) ...................................................................................3

**Other Authorities**

Administrative Order, *In re All American Check Cashing, Inc.*, Cause No. 2016-001, Mississippi Department of Banking & Consumer Finance (May 11, 2017) ..............................................................................................................4, 21

CFPB Supervision and Examination Manual, at UDAAP 2 (Oct. 2012), http://files.consumerfinance.gov/f/201210_cfpb_ supervision-and-examination-manual-v2.pdf ...............................................................17

*The Federalist No. 47*, at 301 (Madison) (Clinton Rossiter ed., 1961) ...........................................6

Financial Report of the CFPB, Fiscal Year 2016, at 61 (Nov. 15, 2016), https://tinyurl.com/z2s7m28 .....................................................................11

*How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Financial Services and Bailouts of Public and Private Programs*, 112th Cong. 112-107, at 69 (2012) ........................................16

Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 Geo. Wash. L. Rev. 856, 918 (2013) ..............................................18

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................................5

**Constitutional Provisions**

U.S. Const. art. I, § 9, cl. 7................................................................................11

U.S. Const. art. II ..............................................................................................6

**INTRODUCTION**

The Consumer Financial Protection Bureau ("CFPB") brings this civil enforcement action against All American Check Cashing, Inc., Mid-State Finance, Inc., and their president, Michael Gray (collectively, "All American"), seeking enterprise-crippling penalties, disgorgement, damages, and injunctions. But the CFPB is an unconstitutionally structured agency that aggregates sweeping legislative, executive, and judicial power into the hands of a single person who lacks constitutional accountability and is removable by the President only for cause—a direct violation of the Constitution's guarantee of separation of powers. As the D.C. Circuit recently put it in declaring the CFPB unconstitutional, "when measured in terms of unilateral power, the Director of the CFPB is the single most powerful official in the entire U.S. Government, other than the President." *PHH Corp. v. CFPB*, 839 F.3d 1, 17 (D.C. Cir. 2016), *reh'g en banc granted* (Feb. 16, 2017). This "concentration of massive, unchecked power in a single Director" is unconstitutional because it "threaten[s] the individual liberty protected by the Constitution's separation of powers." *Id.* at 17, 26.

As an all-too-predictable result of the Director's unprecedented autonomy and authority, this action tramples the Constitution's guarantees of due process and fair notice by subjecting All American to liability for conduct that allegedly violates vague and undefined standards such as "abusive," which the agency has refused to clarify despite a Congressional directive to do so. And it violates core state sovereignty and federalism principles by seeking to bootstrap state laws into federal offenses, even though the state regulatory authorities are capable of ensuring that All American and other consumer lenders comply with the relevant state laws. As a result of the CFPB's *ultra vires* and unconstitutional status, this action is void *ab initio*. This Court should join the D.C. Circuit in declaring the CFPB unconstitutional and dismiss this enforcement action.

# BACKGROUND

## A.     The Consumer Financial Protection Bureau

The Consumer Financial Protection Act ("CFPA") established the CFPB as an "independent" agency responsible for overseeing 19 different consumer-protection statutes, 18 of which were previously administered by other agencies. *See* 12 U.S.C. §§ 5481(12), 5491(a), 5581. (The 19th is the CFPA itself.)  The CFPB is headed by a single Director who serves a five-year term and may not be removed by the President except "for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(b), (c).  The Director's five-year term can be extended indefinitely until a replacement is confirmed by the Senate. *Id.* § 5491(c)(2).

The Director may unilaterally request over half a billion dollars a year in funds from the Federal Reserve without any review by Congress. *See id.* § 5497(a).  The President has no input on the CFPB's funding either, since the Office of Management and Budget lacks "any jurisdiction or oversight over the affairs or operations of the Bureau." *Id.* § 5497(a)(4)(E).

In addition to its enforcement authority under the 18 statutes transferred from other agencies, the CFPA authorizes the CFPB to bring enforcement actions "to prevent a covered person or service provider from committing or engaging in an unfair, deceptive, or abusive act or practice under Federal law." *Id.* § 5531(a); *see also id.* § 5536(a).  The CFPA further provides that "[t]he Bureau may prescribe rules applicable to a covered person or service provider identifying as unlawful unfair, deceptive, or abusive acts or practices in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service." *Id.* § 5531(b).  To date, the CFPB has not used its authority under Section 5531(b) to identify what constitutes prohibited conduct under Sections 5531 and 5536.

## B. Factual And Procedural Background

All American has offered check cashing and lending services to consumers in Mississippi, Louisiana, and Alabama for nearly two decades. *See* Defs.' Answer, Dkt. 26, at 1. Its business practices are heavily regulated by state law. *See, e.g.*, Miss. Code Ann. § 75-67-517 (establishing check-cashing fees); *id.* § 75-67-519(5) (establishing loan fees); La. Rev. Stat. § 9:3578.4 (regulating short-term consumer loans); Ala. Code §§ 5-18A-12(b), 5-18A-13(c) (same).

On May 11, 2016, the CFPB brought this enforcement action against All American for allegedly engaging in "unfair," "deceptive," and "abusive" acts and practices. *See* Compl., Dkt. 1; 12 U.S.C. § 5531(a). Among other things, the CFPB alleges that All American "formulated and carried out a program aimed at subverting . . . consumer protections" under Mississippi and Louisiana law. Compl. ¶ 19. Specifically, the CFPB says that All American sought to hide its check-cashing fees from consumers despite a Mississippi law requiring consumers to sign an acknowledgment of the fee they were charged, and laws in Mississippi and Louisiana requiring All American to display signs prominently listing its fees. *Id.* ¶¶ 20–21.

The CFPB does not allege that All American failed to display the signs required by state law, or that its customers did not sign receipts acknowledging the fees they paid. Rather, the CFPB contends that All American distracted customers from the signs and receipts by, for example, "direct[ing] customers to a seat in the lobby" or "count[ing] money out over the receipt." *Id.* (internal quotation marks omitted). The CFPB also alleges that All American made it difficult for customers to cancel or reverse completed check-cashing transactions, by, for example, endorsing the checks. *Id.* ¶¶ 24–28.

In addition, the CFPB alleges that All American offers so-called "rollover" loans in violation of Mississippi, Louisiana, and Alabama law. *See* Compl. ¶¶ 36–53. A "rollover" loan occurs when a consumer uses a new loan to repay an outstanding loan from the same lender.

3

According to the CFPB, All American allowed its customers to rollover their loans by "provid[ing] monthly consumers with one or more two-week loans during the course of a single month," instead of offering only 30-day loans. *Id.* ¶¶ 41–47. The CFPB also alleges that All American deceived its customers because, in the CFPB's view, "1st and 3rd lending is not more financially beneficial for monthly consumers compared to a 30-day loan." *Id.* ¶¶ 48–49. Finally, the CFPB alleges that All American "did not take affirmative steps to notify consumers when they made an overpayment or to refund overpayments to consumers," and that All American improperly "deleted the credit balances from consumers' accounts." *Id.* ¶¶ 54–58.

Many of these allegations are the subject of ongoing state proceedings involving an enforcement action brought by the Mississippi Department of Banking and Finance ("Department"). *See* Cause No. 25CH1:17-cv-000699, Chancery Court of the First Judicial District of Hinds County, Mississippi. On May 11, 2017, the Department revoked All American's licenses and ordered All American to pay more than $1.7 million in refunds to consumers and civil penalties. Administrative Order, *In re All American Check Cashing, Inc.*, Cause No. 2016-001, Mississippi Department of Banking & Consumer Finance (May 11, 2017). The next day, a Mississippi state court entered a temporary restraining order allowing All American to remain open until May 30, 2017. Cause No. 25CH1:17-cv-000699, Chancery Court of the First Judicial District of Hinds County, Mississippi.

Discovery in this federal litigation is ongoing. On March 20, 2017, the Court ordered discovery to be completed by June 16, 2017, and dispositive motions to be filed by July 14, 2017. Case Management Order (Mar. 20, 2017). The pretrial conference, with a proposed pretrial order, is set for December 7, 2017, and a four-week trial is scheduled to start on January 2, 2018. *Id.* In early May, All American retained new additional counsel and moved to stay further proceedings,

including discovery, pending the Court's resolution of this motion for judgment on the pleadings. Dkt. 116, 117. The Magistrate Judge denied the motion for a stay on May 10. Dkt. 125. All American is filing its objections to that decision concurrently with this motion.

## ARGUMENT

"A motion brought pursuant to Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015) (internal quotation marks and alterations omitted). The Court "accept[s] all well-pleaded facts in the complaint as true and view[s] them in the light most favorable to the nonmovant." *Id.* A motion for judgment on the pleadings is timely if it is brought "early enough not to delay trial." Fed. R. Civ. P. 12(c). Here, All American's motion is timely because trial is still more than seven months away, and because the deadline for dispositive motions is July 14, 2017.

The Court should grant All American judgment on the pleadings for four reasons. First, the CFPB's structure is unconstitutional, and the CFPB thus lacks authority to bring this enforcement action. Second, All American lacked fair notice of the conduct prohibited by Section 5536, especially in light of the CFPB's refusal to exercise its express statutory authority to give meaning to the vague terms "abusive" and "unfair." Third, the CFPB's authority to interpret those vague and expansive terms violates the non-delegation doctrine. Finally, the CFPB's application of Section 5536's prohibition on "unfair, deceptive, or abusive act[s] or practice[s]" exceeds the agency's authority by improperly intruding on state and local law.

## I.     The CFPB's Structure Is Unconstitutional.

In a thorough and well-reasoned opinion by Judge Kavanaugh, a panel of the D.C. Circuit recently found the CFPB to be unconstitutionally structured due to the CFPB Director's

unprecedented lack of accountability to the President. *See PHH Corp. v. CFPB*, 839 F.3d 1 (D.C. Cir. 2016), *reh'g en banc granted* (Feb. 16, 2017). The CFPA places sweeping legislative, executive, and judicial power all "in the same hands" of a single person—"the very definition of tyranny." *The Federalist No. 47*, at 301 (Madison) (Clinton Rossiter ed., 1961). While the CFPB's single Director has unprecedented power and discretion, he is subject to no restraints from the representative branches: Congress sharply restricted the President's ability to remove the Director and also surrendered its own power of the purse, allowing the Director to fund his own agenda by demanding up to 12% of the Federal Reserve's budget. Indeed, the United States *agrees* that the CFPB is unconstitutional as presently structured. *See* U.S. Amicus Br., *PHH Corp. v. CFPB*, No. 15-1177, 2017 WL 1035617, at *15 (D.C. Cir. Mar. 17, 2017) ("Vesting such power in a single person not answerable to the President constitutes a stark departure from [the constitutional] framework."). The CFPB's action against All American is therefore the product of an invalid agency and is void *ab initio*.

"The executive Power" of the United States is "vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, §§ 1, 3. The President cannot "take Care that the Laws be faithfully executed" unless he is able to "oversee the faithfulness of the officers who execute them"—by removal if necessary. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 484 (2010). The President's at-will removal power ensures that he can hold executive "officers accountable," thus allowing the people to hold the President "fully accountable for discharging his own responsibilities." *Id.* at 509, 514. If the President were powerless to remove a faithless subordinate, that officer would effectively be operating outside the executive department, without any constitutional accountability. This is why the Supreme Court has long recognized that "the Constitution vests certain powers in the President"—such as "a power to

oversee executive officers through removal"—that "the Legislature has no right to diminish or modify." *Id.* at 492, 500 (internal quotation marks omitted); *see Myers v. United States*, 272 U.S. 52, 134–35 (1926) (President "must have the power to remove [executive officers] without delay").

To be sure, the Supreme Court has "under certain circumstances" countenanced two "limited restrictions" on the President's removal power. *Free Enterprise Fund*, 561 U.S. at 483, 495. First, in *Humphrey's Executor v. United States*, the Supreme Court permitted Congress to establish the Federal Trade Commission ("FTC"), an independent agency headed by a multi-member commission appointed by the President but removable only for cause. 295 U.S. 602, 624, 628 (1935). The FTC was designed to be a "body of experts" that would be "non-partisan" and would "act with entire impartiality," without "suspicion of partisan direction." *Id.* at 624–25 (internal quotation marks omitted). The FTC did not wield any policymaking authority, being "charged with the enforcement of no policy except the policy of the law." *Id.* at 624. Instead, this "administrative body" would act "in part quasi legislatively and in part quasi judicially," but would "exercise[] no part of the executive power," which is "vested by the Constitution in the President." *Id.* at 628. Second, in *Morrison v. Olson*, the Supreme Court allowed Congress to insulate an inferior officer from at-will removal where she had "limited jurisdiction and tenure and lack[ed] policymaking or significant administrative authority." 487 U.S. 654, 691 (1988).

As the Supreme Court confirmed in *Free Enterprise Fund*, outside of these two exceptions the Constitution generally forbids limitations on the President's at-will removal power. 561 U.S. at 483, 513–14. There, the Court examined the Public Company Accounting Oversight Board's ("PCAOB") "novel structure" of two layers of for-cause removal: The board members were removable only for cause by the SEC commissioners, whom the Supreme Court assumed the President could remove only for cause. *Id.* at 486–87. The Court read *Humphrey's Executor* and

*Morrison* narrowly, declining to apply either because the PCAOB's structure was not squarely controlled by its "precedents"; instead the Supreme Court was asked "to consider a new situation not yet encountered by the Court." *Id.* at 483. Because "the President could not be held fully accountable for discharging his own responsibilities," the Court struck down as unconstitutional the unprecedented structure of the PCAOB. *Id.* at 514. Thus, *Free Enterprise Fund* stands for the proposition that, if an Executive Branch agency presents a new situation that "limit[s] the President's control and political accountability," the agency is unconstitutional. *NLRB v. Noel Canning*, 134 S. Ct. 2550, 2569 (2014) (citing *Free Enterprise Fund*, 561 U.S. at 497–98).[1]

The CFPB is precisely such a "new situation," and its structure is antithetical to the separation of powers and unlike any that the Supreme Court has ever condoned. Congress has combined the most democratically unaccountable and power-centralizing features of the federal government's administrative agencies into one all-powerful body. The CFPB is headed by a single, autonomous Director appointed by the President and confirmed by the Senate, who serves a lengthy five-year term that may extend indefinitely "until a successor has been appointed and qualified," 12 U.S.C. § 5491(b)(1)–(2), (c)(1)–(2), thus allowing the Senate to prevent the President from appointing a new Director for as long as it wants. The President, moreover, is barred from removing the Director except "for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(c)(3). There is no official anywhere in the government with authority to supervise the Director's exercise of his vast discretion.

---

[1] *Free Enterprise Fund*'s logic is in tension with both *Humphrey's Executor* and *Morrison*. *See, e.g.*, *In re Aiken Cty.*, 645 F.3d 428, 444, 446 (D.C. Cir. 2011) (Kavanaugh, J., concurring). This Court should therefore read both cases narrowly and decline to extend either, as the Supreme Court did in *Free Enterprise Fund*. Defendants also respectfully preserve the argument that the Supreme Court should overturn *Humphrey's Executor* and the relevant portion of *Morrison*.

This structure contrasts sharply with the version of the FTC upheld in *Humphrey's Executor*, which was (and still is) headed by a multi-member commission. As the United States has argued, "[f]or a multi-headed commission with staggered terms, the President is generally assured to have an opportunity to appoint at least some of its members, and the bipartisan-membership requirement that is common for such commissions further increases the likelihood that at least some of the holdover members share the President's views." U.S. Amicus Br., *supra*, at 15. The President can also unilaterally designate the FTC's chair. 15 U.S.C. § 41. The President will thus always be able to have *some* influence on a multi-member commission like the FTC. By contrast, a President could serve an entire term—or, given a sufficiently recalcitrant Senate, even two terms—powerless to remove the CFPB's Director or name a successor.

The CFPB's powers also far exceed those exercised by the FTC in 1935. It is true that the powers of the FTC in 1935 "would at the present time be considered 'executive,' at least to some degree." *Morrison*, 487 U.S. at 690 n.28. But the FTC had nothing like the power the CFPB wields. "[T]he 'quasi-legislative' powers referred to in *Humphrey's Executor* were not substantive rulemaking powers, which the [FTC] itself did not assert it possessed until 1962." *Synar v. United States*, 626 F. Supp. 1374, 1397 n.24 (D.D.C.) (per curiam, Scalia, Johnson, & Gasch, J.J.), *aff'd sub nom. Bowsher v. Synar*, 478 U.S. 714 (1986) (citation omitted) (citing *National Petroleum Refiners Ass'n v. FTC,* 482 F.2d 672, 693 (D.C. Cir. 1973)). Instead, the FTC of *Humphrey's Executor* had "the responsibility to conduct investigations for the purpose of recommending legislation to Congress." *Id.* In addition to lacking rulemaking powers, the FTC in 1935 also had only "non-retroactiv[e]" authority and could not order any "retrospective" remedy, such as fines, penalties, disgorgement, or damages. *See Heater v. FTC*, 503 F.2d 321, 321–26 (9th Cir. 1974).

The CFPB, on the other hand, possesses vast rulemaking and enforcement authority, 12 U.S.C. §§ 5512, 5531(b), with the power to impose refunds, restitution, disgorgement, damages, and penalties, *id.* § 5565. And the CFPB has sweeping jurisdiction: The Dodd-Frank Act transfers to the Director authority over 18 preexisting consumer-protection laws previously administered by seven different agencies. *Id.* § 5481(12), (14). It also gives the CFPB new authority, including broad powers to regulate and prosecute acts it considers "unfair, deceptive, or abusive." *Id.* § 5531(a). The Director's jurisdiction thus touches nearly every person who offers or uses financial products or services. *Id.* §§ 5481(6), (26), 5536(a).

Within his vast realm, the Director wields unchecked legislative, executive, and judicial powers—including the power to punish businesses and individuals by adjudicating enforcement actions in the CFPB's in-house court. *See* 12 U.S.C. § 5563 (adjudicative authority); *id.* § 5564 (independent litigation and enforcement authority). And if the Director and the President disagree on the interpretation of federal consumer finance law, the Director's view controls. *Id.* § 5512(b)(4). Thus, the CFPB's organic statute even purports to give the Director *greater* power than the President in the execution of federal consumer finance law. Never before has so much federal power been concentrated in the hands of one individual so thoroughly shielded from constitutional accountability.

The Director's sweeping authority and lengthy tenure differentiates him from the independent counsel in *Morrison*. The Director is not an "inferior officer," and does not have "limited jurisdiction and tenure" or "lac[k] policymaking or significant administrative authority." *Morrison*, 487 U.S. at 691. These features also differentiate the CFPB from the few anomalous agencies that are headed by a single individual removable only for cause. *See PHH*, 839 F.3d at 18–20 (distinguishing the Social Security Administration, Office of Special Counsel, and Federal

Housing Finance Agency). And the CFPB possesses other characteristics that further remove it from presidential oversight. For example, the Dodd-Frank Act prohibits the President from exercising *any* authority to control the CFPB's communications with Congress, with respect to legislation or testimony. 12 U.S.C. § 5492(c)(4).

Not only is the Director unaccountable to the President, he is also unaccountable to Congress. The Constitution grants Congress the exclusive power of the purse, including by providing that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. This measure was included "in large part because the British experience taught that the appropriations power was a tool with which the legislature could resist" executive power. *Noel Canning v. NLRB*, 705 F.3d 490, 510 (D.C. Cir. 2013), *aff'd*, 134 S. Ct. 2550 (2014).

In the Dodd-Frank Act, however, Congress abdicated this responsibility by allowing the CFPB to fund itself entirely outside the appropriations process. The Director may claim as much as 12% of the Federal Reserve System's assessed fees, 12 U.S.C. § 5497(a)(2)(A)(iii), a percentage which amounted to $632 million in fiscal year 2016, Financial Report of the CFPB, Fiscal Year 2016, at 61 (Nov. 15, 2016), https://tinyurl.com/z2s7m28. Moreover, the Federal Reserve is itself funded outside the appropriations process, meaning that Congress cannot even reduce the CFPB's funding by reducing appropriations to the Federal Reserve. *See* 12 U.S.C. §§ 243–244 (funding the Federal Reserve through bank fees). The CFPB therefore has an unprecedented two layers of insulation from the appropriations process. *Cf. Free Enterprise Fund*, 561 U.S. at 497.

In making these self-funding decisions, the Director is not subject to review by either of Congress's committees on appropriations, 12 U.S.C. § 5497(a)(2)(C), and is not required to "obtain the consent or approval of the Director of the Office of Management and Budget," which

along with the Board of Governors lacks "any jurisdiction or oversight over the affairs or operations of the Bureau," *id.* § 5497(a)(4)(E). This process also spares the Director from the need to coordinate with the President for assistance in negotiating appropriations from Congress, thus further diminishing the President's influence over the CFPB.

As the D.C. Circuit noted, "[t]o supervise and direct executive officers, the President must be able to remove those officers at will. Otherwise, a subordinate could ignore the President's supervision and direction without fear, and the President could do nothing about it." *PHH*, 839 F.3d at 13 (citation omitted). The D.C. Circuit then held that the constitutional violation was particularly egregious in the CFPB's case, because the agency wields "massive power" which "is lodged in one person—the Director—who is not supervised, directed, or checked by the President or by other directors." *Id.* at 16. And the Director's unaccountability is particularly concerning because he alone is responsible for deciding "how to enforce, when to enforce, and against whom to enforce the law; and what sanctions and penalties to impose on violators." *Id.* at 6, 16. Indeed, "when measured in terms of unilateral power, the Director of the CFPB is the single most powerful official in the entire U.S. Government, other than the President." *Id.* at 17. "In essence," the D.C. Circuit stated, "the Director is the President of Consumer Finance." The court found that "[t]he concentration of massive, unchecked power in a single Director marks a departure from settled historical practice." *Id.* Moreover, the D.C. Circuit held, the CFPB "lacks" the "critical check" of a multimember commission and "structural constitutional protection," thereby "threaten[ing] the individual liberty protected by the Constitution's separation of powers." *Id.* at 26. The D.C. Circuit therefore concluded that "the CFPB is unconstitutionally structured." *Id.* at 36.

That case has been called en banc, and during the en banc briefing the United States government *itself* argued that the CFPB is unconstitutional. That the federal government and the

CFPB—a federal entity—are at odds in that case underscores the extent to which the CFPB exists outside the Constitution's design. As the United States put it, the "single-headed agencies" like the CFPB "are meaningfully different from the type of multi-member regulatory commission addressed in *Humphrey's Executor*." U.S. Amicus Br., *supra*, at 2. And the "exception recognized in *Humphrey's Executor*" for multi-member commissions is the "only . . . restriction with respect to principal officers who head agencies" that "the Supreme Court has upheld." *Id.* at 8. This "exception does not apply to the CFPB's Director, and it should not be so extended." *Id.* The United States concluded that "a removal restriction for the Director of the CFPB is an unwarranted limitation on the President's executive power" and that "the exception established by the Supreme Court in *Humphrey's Executor*" should not be extended "to undermine the general constitutional rule that the President may remove principal officers at will." *Id.* at 19.

In addition to the numerous bases for declaring the CFPB unconstitutional that the D.C. Circuit and the United States have recognized, the CFPB's unconstitutional structure also threatens state sovereignty by reducing the barriers to federal aggrandizement. "Apart from the limitation on federal authority inherent in the delegated nature of Congress's Article I powers, the principal means chosen by the Framers to ensure the role of the States in the federal system lies in the structure of the Federal Government itself." *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 550 (1985). Ordinarily, "the national political process systematically protects States" from federal overreach. *Id.* at 555. But here, the CFPB's unconstitutional insulation from that process upends the political safeguards of federalism. As explained below, *see infra* Section IV, the CFPB is attempting to hijack state proceedings, and to enforce state laws against All American. This inexorable expansion of federal power to the point of usurping state law threatens to overtake the critical *vertical* separation of powers too.

Because the CFPB is unconstitutionally structured, this enforcement action is *ultra vires*, void, and must be dismissed. When an agency's structure "violates the constitution," then the agency "lacks authority to bring [an] enforcement action," *FEC v. NRA Political Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993). *See FEC v. Legi-Tech, Inc.*, 75 F.3d 704, 706–07 (D.C. Cir. 1996) (agency's structural infirmities mean that it "had no authority to bring an enforcement action"). Moreover, "one who makes a timely challenge to the constitutional validity of" a government official's authority "is entitled to a decision on the merits of the question and whatever relief may be appropriate if a violation indeed occurred." *Ryder v. United States*, 515 U.S. 177, 182–83 (1995). In *Ryder*, the Supreme Court noted that, in an earlier case, it had held that a statute granting authority to bankruptcy judges was unconstitutional, and that "in doing so, [the Court] affirmed the judgment of the District Court, which had dismissed petitioner's bankruptcy action and afforded respondent the relief requested pursuant to its constitutional challenge." *Id.* at 184 n.3 (citing *N. Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)); *see also Nguyen v. United States*, 539 U.S. 69, 82 (2003) (vacating judgment entered by an improperly constituted court of appeals).

This case is an enforcement action, and when parties "raise [a] constitutional challenge as a defense to an enforcement action, . . . we are aware of no theory that would permit us to declare the [agency's] structure unconstitutional without providing relief to the appellants in this case." *NRA Political Victory Fund*, 6 F.3d at 828. Unconstitutional statutes "have some impact . . . on how the [unconstitutionally structured entity] decides matters before it," and a plaintiff "need not show that" a particular entity "would have acted differently if it were constitutionally composed." *Id.* at 825. The D.C. Circuit has likewise emphasized that "'issues of separation of powers' are structural errors" that require "automatic reversal." *SW General, Inc.*, 796 F.3d 67, 79–80 (D.C.

Cir. 2015) (quoting *Landry v. FDIC*, 204 F.3d 1125, 1131 (D.C. Cir. 2000)), *aff'd*, 137 S. Ct. 929 (2017).

The CFPB's numerous constitutional defects have infected every action the agency has taken. The Court should therefore grant All American judgment on the pleadings and dismiss this enforcement action.

## II. This Enforcement Action Violates Due Process Because All American Lacks Fair Notice Of What Conduct Is Prohibited.

The CFPB's complaint against All American is also deficient because it deprives All American of its constitutional right to fair notice. The CFPB asserts that All American has engaged in "unfair," "deceptive," and "abusive" acts. *See* 12 U.S.C. § 5536(a)(1)(B). These terms fail to provide fair notice of prohibited conduct. Worse, the CFPB has not even tried to provide clarity by interpreting these words in regulations, despite Congress's express intent that the agency do so. This agency silence also violates All American's right to fair notice. *See Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012).

It is a "fundamental principle in our legal system" that regulatory laws "must give fair notice of conduct that is forbidden." *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A law violates the constitutional guarantee of fair notice when it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Id.* (internal quotation marks omitted).

The opaque prohibition of "abusive" acts provides no meaningful guidance. The CFPA states that an "abusive" act or practice, in relevant part, is one that "takes unreasonable advantage of . . . the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service, or . . . the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d). The definition does not help

matters:  Its dependence on the consumer's subjective experience adds still more uncertainty to an already vague standard.  *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 24 (1993) (Scalia, J., concurring) ("'Abusive' . . . does not seem to me a very clear standard—and I do not think clarity is at all increased by adding the adverb 'objectively' or by appealing to a 'reasonable person['s]' notion of what the vague word means.").

The Director himself has acknowledged the vagueness of the term "abusive."  In 2012, the Director testified that the term "abusive" is "a little bit of a puzzle because it is a new term," and that the CFPB "ha[s] been looking at it, trying to understand it, and we have determined that that is going to have to be a fact and circumstances issue."  It was "[p]robably not useful to try to define a term like that in the abstract; we are going to have to see what kind of situations may arise where that would seem to fit the bill under the prongs."  *How Will the CFPB Function Under Richard Cordray: Hearing Before the Subcomm. on TARP, Financial Services and Bailouts of Public and Private Programs*, 112th Cong. 112-107, at 69 (2012).  This "I-know-it-when-I-see-it" approach conveniently maximizes the Director's power at the expense of his targets, and violates fundamental principles of fair notice.

The prohibition against "unfair" conduct, meanwhile, is "as vague as they come."  *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 474 (7th Cir. 2007) (Easterbrook, J.).  And the CFPA goes further by providing that the CFPB cannot declare an act or practice "unfair" unless there is a "reasonable basis to conclude" that the act causes or is likely to cause "substantial injury to consumers" that cannot be reasonably avoided, and the "substantial injury is not outweighed by countervailing benefits to consumers or to competition."  12 U.S.C. § 5531(c)(1).  What constitutes "substantial injury" or is "reasonably avoidable" or "outweighed by countervailing benefits" is as amorphous—and subjective—as the term "unfair."  Indeed, Section

5531(c) makes the term "unfair" even more ambiguous by stacking on concepts that are just as vague and abstract in their own right. The CFPB's Enforcement Guideline fails to add any clarity, stating for example that "substantial injury" may take the form of "monetary harm," but also some "emotional impacts may amount to or contribute to substantial injury." CFPB Supervision and Examination Manual, at UDAAP 2 (Oct. 2012), http://files.consumerfinance.gov/f/201210_cfpb_ supervision-and-examination-manual-v2.pdf.

The statute, recognizing that these terms were under-defined, to put it charitably, empowered the CFPB to "prescribe rules" that "identif[y]" what "acts or practices" qualify as "unfair" or "abusive." 12 U.S.C. § 5531(b). Congress mandated that, in prescribing these rules, the CFPB "shall consult with" the relevant federal agencies "as appropriate." *Id.* § 5531(e). But the CFPB has short-circuited Congress's directions, relying instead on ad hoc and retroactive enforcement actions instead of ex ante rules to define "unfair" and "abusive" practices one act at a time.

The CFPB's claims here demonstrate the statute's plasticity. For instance, the CFPB claims that All American "represented"—either "direct or indirectly, expressly or by implication"—that a particular method of borrowing "was more financially beneficial than or equivalent to" another practice, whereas, according to the CFPB, it was no "more financially beneficial" or "equivalent." Compl. ¶¶ 81–82. The CFPB merely replaces one protean term, "benefits to consumers," with another, "financially beneficial." And the CFPB defines "financially beneficial" by mere ipse dixit, summarily asserting that consumers are worse off for having allegedly chosen a certain financial product.

This practice is indicative of the CFPB's larger failure to even attempt to provide meaningful guidance through regulation, despite its express statutory authority. Instead, the CFPB

has merely asserted that its interpretation of "unfair" practices "may" be informed by case law, enforcement actions, and ad hoc policy statements. *See* CFPB Supervision and Examination Manual, *supra*, at UDAAP 1 n.2. This generic reference—which is not even binding on the CFPB—provides no warning of what is prohibited, especially considering that the CFPB has "the power to redefine those terms as it sees fit going forward." Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace?*, 81 Geo. Wash. L. Rev. 856, 918 (2013); *see also* CFPB Supervision and Examination Manual, *supra*, at UDAAP 3 ("Public policy, as established by statute, regulation, judicial decision, or agency determination, *may be considered with all other evidence* to determine whether an act or practice is unfair.") (emphasis added).

As the Supreme Court stated in *Christopher*, "[i]t is one thing to expect regulated parties to conform their conduct to an agency's interpretations once the agency announces them; it is quite another to require regulated parties to divine the agency's interpretations in advance or else be held liable when the agency announces its interpretations for the first time in an enforcement proceeding." 132 S. Ct. at 2168–69. Here, the CFPB has chosen to remain silent on what constitutes "unfair" or "abusive" acts or practices, and instead seeks to enforce those vague provisions despite All American's lack of notice of what conduct federal law prohibits. The CFPB has not, and cannot, identify any agency guidance or other warning signs that could have put All American on notice that the practices at issue here violated federal law. The CFPB's approach leaves regulated entities to "guess at" the "meaning" and "application" of these words, thus "violat[ing] the first essential of due process of law." *Connally v. Gen. Constr. Co*., 269 U.S. 385, 391 (1926); *see also Fox Television*, 132 S. Ct. at 2317. Accordingly, the CFPB cannot use its newly minted standards to punish All American for past conduct in this enforcement action. *Gates*

& *Fox Co. v. OSHRC*, 790 F.2d 154, 156 (D.C. Cir. 1986) (Scalia, J.) (reversing agency's application of unconstitutionally vague regulation).

In short, Congress and the CFPB failed to provide fair notice of the conduct that Sections 5531 and 5536 prohibit. Thus, All American cannot be held liable for violating those provisions. Those are the only statutes that the CFPB alleges All American violated, so All American is entitled to judgment on the pleadings.

## III.  Section 5531 Violates The Non-Delegation Doctrine.

Congress's grant of power to the CFPB to define for itself the meaning of "unfair" and "abusive" also violates the non-delegation doctrine. The non-delegation doctrine "is rooted in the principle of separation of powers that underlies our tripartite system of Government," and Congress generally "cannot delegate its legislative power to another [b]ranch." *Mistretta v. United States*, 488 U.S. 361, 371–72 (1989); *see Panama Ref. Co. v. Ryan*, 293 U.S. 388, 430 (1935). Thus, when Congress delegates power to an administrative agency, it must "clearly delineate[] the general policy" and "the boundaries of this delegated authority." *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). Here, Congress has done neither.

Notions of "unfairness" and "abusiveness" fail to lay down "'an intelligible principle to which the [CFPB] is directed to conform.'" *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472 (2001) (citation omitted). For example, when Congress purported to confer on an agency "authority to regulate the entire economy on the basis of no more precise a standard than . . . assuring 'fair competition,'" that delegation was impermissibly defined and thus unconstitutional. *Id*. at 474 (citing *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 531 (1935)). The charge to counter "unfair" and "abusive" practices in consumer finance is no less standardless and sweeping.

The CFPA's grant of authority to the CFPB to define the malleable terms "unfair" and "abusive" as it sees fit violates the Constitution's nondelegation doctrine. Thus, the CFPB lacks authority to enforce those provisions, which provides yet another basis for granting All American judgment on the pleadings. *See Ryder*, 515 U.S. at 182–84 & n.3.

## IV. The CFPB's Interpretation Of Section 5536 Violates Principles Of Federalism.

All American is entitled to judgment on the pleadings for the additional reason that the CFPB's overbroad interpretation of 12 U.S.C. § 5536(a)'s prohibition on "unfair, deceptive, or abusive act[s] or practice[s]" improperly intrudes on traditional areas of state law. Where, as here, a federal statutory prohibition uses "expansive language," courts should "refer to basic principles of federalism embodied in the Constitution" to determine the statute's scope. *Bond v. United States*, 134 S. Ct. 2077, 2090 (2014). In *Bond*, the Supreme Court held that "it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides the usual constitutional balance of federal and state powers." *Id.* at 2089 (internal quotation marks omitted).

This principle is especially important since the Supreme Court "has left primarily to the political process the protection of the States against intrusive exercises of Congress' Commerce Clause powers," meaning that courts "must be absolutely certain that Congress intended such an exercise." *Gregory v. Ashcroft*, 501 U.S. 452, 464 (1991). For administrative agencies specifically, courts must assume "that Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional authority." *Solid Waste Agency of N. Cook Cty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). And "[t]his concern is heightened" where, as here, the agency's "interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Id.* at 173.

In short, where possible, courts must interpret statutes to avoid intruding on state and local law, especially when, as here, Congress delegates broad enforcement authority to an administrative agency. All the more so when, as here, Congress purports to delegate Executive power to an agency that, as shown above, lacks any democratic accountability and the other political safeguards of federalism.

In this case, the CFPB's interpretation of its authority under Sections 5531 and 5536 intrudes on state law in Mississippi, Louisiana, and Alabama. The CFPB's allegations center on its argument that All American is acting inconsistently with those states' laws regulating the check-cashing industry. For example, Counts I and III are based on the CFPB's allegation that All American prevents customers from learning the fees for cashing a check, by "carr[ying] out a program aimed at subverting" state law that "provides for certain disclosures related to fees for check cashing services." *See* Compl. ¶ 19; *id.* ¶¶ 21–23, 29–31, 67, 73(a), 74(a). Likewise, Count V is based on the CFPB's allegation that All American's two-week loans violate statutes in Mississippi, Louisiana, and Alabama regulating "roll over loans." *See id.* ¶¶ 36–53, 81–83.

These allegations intrude on state law in several ways. If All American's conduct violates the laws of Mississippi, Louisiana, or Alabama, then it should be up to those states, not a federal agency, to say so. By bringing this enforcement action based on the CFPB's theory that All American is "subverting" state law, the CFPB intrudes on those states' rights to determine how far their laws should reach and how they should be enforced. The CFPB's allegations also intrude on state authority by regulating purely local conduct that is already subject to extensive regulation at the state level. Indeed, the conduct at issue in this case is the subject of ongoing proceedings in Mississippi state court under Mississippi law, as the CFPB is well aware. *See In re All American Check Cashing, Inc.*, Cause No. 2016-001, Mississippi Department of Banking & Consumer

Finance. The CFPB's initiation of duplicative proceedings under federal law exemplifies the extent to which its broad interpretation of Section 5536 "alter[s] sensitive federal-state relationships" by "intrud[ing] upon the police power of the States." *Bond*, 134 S. Ct. at 2091–92.

Given these problems, Sections 5531 and 5536 should not be interpreted in a way that allows the CFPB to bootstrap local, state-law issues—*e.g.*, where to place mandatory signs listing check-cashing fees, and whether customers may borrow money more than once a month—into violations of federal law. Instead, the Court should hold that the CFPB lacks authority to treat a company's supposed efforts to "subvert[]" state law as "unfair, deceptive, or abusive act[s] or practice[s]" under Section 5536.

To be sure, the phrase "unfair, deceptive, or abusive" is, in isolation, potentially very broad. But even "extremely broad[]" language "does not constitute a clear statement that Congress meant [a] statute to reach" conduct that is already regulated by state law. *Bond*, 134 S. Ct. at 2090. Moreover, the rest of the CFPA's text confirms that the CFPB's authority to enforce Section 5536 is limited to "unfair, deceptive or abusive act[s] or practice[s] *under Federal law*." 12 U.S.C. § 5531(a) (emphasis added); *see also id.* § 5511 ("The Bureau shall seek to implement and, where applicable, enforce *Federal* consumer financial law[.]") (emphasis added). Thus, the statute not only allows the Court to interpret Section 5536 to avoid upsetting the balance between state and federal law, the statute confirms that Section 5536 "does not take a state-law dispute and move it to federal court." *Beler*, 480 F.3d at 474 (discussing the prohibition on "unfair or unconscionable" debt-collection practices in 15 U.S.C. § 1692f).

The Court should adopt a narrow interpretation of the CFPB's authority under Section 5531 for the additional reason that the CFPB's overbroad interpretation of Section 5536 exacerbates the agency's constitutional infirmities by dramatically expanding the reach of the CFPB and,

therefore, the Director's unilateral power. *See Bond*, 134 S. Ct. at 2089; *INS v. St. Cyr*, 533 U.S. 289, 299–300 (2001) (courts should avoid interpretations of statutes that would raise "serious constitutional problems"). As shown above, the Director's unilateral power violates the separation of powers by allowing an unaccountable agency to exercise vast legislative, executive, and judicial authority. The CFPB's interpretation of Sections 5531 and 5536 makes that problem even worse by expanding the Director's authority even further and allowing him to upset the balance of power between the states and the federal government.

At bottom, this case is about All American's compliance with state and local laws regulating the check-cashing industry. The CFPB may not use Sections 5531 and 5536 to convert those state-law questions into federal violations. Appropriately interpreted, those statutes do not reach the conduct alleged in the CFPB's complaint. Thus, the CFPB's claims necessarily fail, which means that All American is entitled to judgment on the pleadings. At minimum, the Court should dismiss Counts I, III, and V, which are premised on attempts to convert alleged violations of state law into federal violations.

## CONCLUSION

For these reasons, All American respectfully requests that the Court enter judgment on the pleadings in All American's favor. All American respectfully requests oral argument on this motion.

Dated:  May 24, 2017

/s/ Helgi C. Walker
Theodore B. Olson, *pro hac vice* (DC 367456)
Helgi C. Walker, *pro hac vice* (DC 454300)
Joshua S. Lipshutz, *pro hac vice* (DC 1033391)
Lochlan F. Shelfer, *pro hac vice* (DC 1029799)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
Telephone:  (202) 955-8500
Facsimile:  (202) 530-9575
Email:  tolson@gibsondunn.com
hwalker@gibsondunn.com
jlipshutz@gibsondunn.com
lshelfer@gibsondunn.com

Respectfully submitted,

/s/   Robin H. Rasmussen
Robin H. Rasmussen (MSB 104729)
Peter D. Baskind, *pro hac vice* (TN 019962)
DINKELSPIEL RASMUSSEN & MINK, PLLC
1669 Kirby Parkway, Suite 106
Memphis,  TN 38120
Telephone:  (901) 754-7770
Facsimile:  (901) 756-7772
Email: rrasmussen@drmlawmemphis.com

Dale Danks, Jr. (MS 5789)
DANKS, MILLER & CORY
213 S. Lamar Street
P.O. Box 1759
Jackson,  MS  39215-1759
Telephone:  (601) 957-3101
Facsimile:  (601) 957-3160
Email: ddanks@dmc-law.net

Bentley E. Conner (MS 6465)
164 E. Center Street
P.O. Box 563
Canton,  MS 39046
Telephone:  (601) 859-6306
Facsimile:  (601) 589-6307
Email:  bentleyeconner@gmail.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via the Court's ECF system on the following counsel of record on May 24, 2017:

Mitzi Dease Paige
Assistant United States Attorney
Chief, Civil Division
Southern District of Mississippi
501 E. Court Street, Suite 4.430
Jackson, MS 39201
mitzi.paige@usdoj.gov

Emily Mintz
Michael Favretto
Stephanie Brenowitz
Consumer Financial Protection Bureau
1700 G St. NW
Washington, D.C. 20522
emily.mintz@Government.gov
michael.favretto@Government.gov

/s/   Robin H. Rasmussen