**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU,<br>Plaintiff, | ) | |
| v. | ) | No. 3:16 – cv-00356-<br>WHB-JCG |
| ALL AMERICAN CHECK CASHING, INC.;<br>MID-STATE FINANCE, INC.; and<br>MICHAEL E. GRAY<br>Defendants. | ) | |

MEMORANDUM SUPPORTING PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR A JUDGMENT ON THE PLEADINGS

ANTHONY ALEXIS
Enforcement Director

R. GABRIEL D. O'MALLEY
Acting Deputy Enforcement Director for Litigation

EMILY MINTZ
MICHAEL FAVRETTO
STEPHANIE BRENOWITZ
DANIEL ABRAHAM
Enforcement Attorneys

LAWRENCE DeMILLE-WAGMAN
CHRISTOPHER DEAL
Senior Litigation Counsel

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
(202) 435-9582
christopher.deal@cfpb.gov
Facsimile: (202) 435-7722

**TABLE OF CONTENTS**

**PAGE**

Statutory Background ... 1

Procedural Background ... 3

Legal Standard ... 3

Argument ... 4

I. THIS COURT SHOULD NOT ADDRESS THIS MOTION AT THIS TIME ... 4

II. THE BUREAU'S STATUTORY STRUCTURE IS CONSTITUTIONAL ... 6

A. The limited restrictions Congress placed on the President's power to remove the Bureau's Director do not impede the President's ability to perform his constitutional duty ... 7

B. The Bureau's single-director structure does not make it more difficult for the President to oversee the agency ... 10

C. The Bureau's other statutory attributes are consistent with the separation of powers and are commonplace among independent agencies ... 16

III. THE CFPA'S PROHIBITION OF UNFAIR, DECEPTIVE, AND ABUSIVE ACTS OR PRACTICES DOES NOT VIOLATE DUE PROCESS ... 18

IV. THE CFPA DOES NOT VIOLATE THE NON-DELEGATION DOCTRINE ... 25

V. THE BUREAU'S COMPLAINT DOES NOT VIOLATE PRINCIPLES OF FEDERALISM ... 27

CONCLUSION ... 32

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**CASES** **PAGE(s)**

*A.B. Small Co. v. American Sugar Refining Co.*,
267 U.S. 233 (1925)....................20

*A.L.A. Schechter Poultry Corp. v. United States*,
295 U.S. 495 (1935)....................25

*Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*,
388 F.3d 405 (3d Cir. 2004)....................17

*Am. Fin. Servs. Ass'n v. FTC*,
767 F.2d 957 (D.C. Cir. 1985)....................23

*Am. Power & Light Co. v. SEC*,
329 U.S. 90 (1946)....................25, 26

*Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*,
480 F.3d 470 (7th Cir. 2007)....................24, 28

*Bond v. United States*,
134 S. Ct. 2077 (2014)....................30

*Bowsher v. Synar*,
478 U.S. 714 (1986)....................14

*Buckley v. Valeo*,
424 U.S. 1 (1976)....................12

*CFPB v. ITT Educational Services, Inc.*,
2015 WL 1013508 (S.D. Ind. Mar. 6, 2015)....................18, 24

*CFPB v. Morgan Drexen, Inc.*,
60 F. Supp. 3d 1082 (C.D. Cal. 2014)....................11

*CFPB v. NDG Fin. Corp.*,
2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016)....................5

*Christopher v. SmithKline Beecham Corp.*,
132 S. Ct. 2156 (2012)....................21

*Collins v. Morgan Stanley Dean Witter*,
224 F.3d 496 (5th Cir. 2001)....................3

*Connally v. General Construction Co.*,

269 U.S. 385 (1926) .......................................................................................... 24

*Doe v. Hillsboro Indep. Sch. Dist.*,
81 F.3d 1395 (5th Cir. 1996) ............................................................................... 3

*Exxon Corp. v. Busbee*,
644 F.2d 1030 (5th Cir. 1981)........................................................................ 19, 20

*FCC v. Fox Television Stations, Inc.*,
132 S. Ct. 2307 (2012)........................................................................................ 20

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ............................................................................................ 18

*Fee v. Herndon*,
900 F.2d 804 (5th Cir.1990) ................................................................................. 3

*Ford Motor Co. v. Texas Dep't of Transp.*,
264 F.3d 493 (5th Cir. 2001) .............................................................................. 20

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
561 U.S. 477 (2010)................................................................ 6, 9, 11, 12, 13, 16, 17

*FTC v. Neovi, Inc.*,
604 F.3d 1150 (9th Cir. 2010).................................................................... 29, 30

*FTC v. Wyndham Worldwide Corp.*,
799 F.3d 236 (3d Cir. 2015)................................................................................ 20

*Gates & Fox Co. v. OSHRC*,
790 F.2d 154 (D.C. Cir. 1986) ............................................................................ 24

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
313 F.3d 305 (5th Cir. 2002) .............................................................................. 3, 4

*Gregory v. Ashcroft*,
501 U.S. 452 (1991) ............................................................................................ 30

*Hale v. King*,
642 F.3d 492 (5th Cir. 2011)................................................................................. 4

*Harris v. Forklift Sys, Inc.*,
510 U.S. 17 (1993) .............................................................................................. 22

*Humphrey's Executor v. United States*,
295 U.S. 602 (1935) ...................................................................... 6, 7, 8, 13, 30

*Illinois v. Alta Colleges, Inc.*, *No. 14 C 3786*,
2014 WL 4377579 (N.D. Ill. Sept. 4, 2014)....24

*Jebaco Inc. v. Harrah's Operating Co.*,
587 F.3d 314 (5th Cir. 2009) .... 19

*John Doe Co. v. CFPB*,
849 F.3d 1129 (D.C. Cir. 2017)....5

*Jones v. Greninger*,
188 F.3d 322 (5th Cir. 1999)....3

*Lewis v. BT Inv. Managers, Inc.*,
447 U.S. 27 (1980) ....27, 28

*Lyng v. Northwest Indian Cemetery Protective Ass'n*,
485 U.S. 439 (1988)....4

*Machete Prods., LLC v. Page*,
809 F.3d 281 (5th Cir. 2015) ....5

*Marquez v. Weinstein, Pinson & Riley, P.S.*,
836 F.3d 808 (7th Cir. 2016)....28

*Mistretta v. United States*,
488 U.S. 361.... 12

*Morrison v. Olson*,
487 U.S. 654 (1988) ....7, 8, 9, 10, 14

*Myers v. United States*,
272 U.S. 52 (1926).... 13

*Nat'l Broad. Co. v. United States*,
319 U.S. 190 (1943)....26

*Nat'l Petroleum Refiners Ass'n v. FTC*,
482 F.2d 672 (D.C. Cir. 1973)....9

*Orkin Exterminating Co. v. FTC*,
849 F.2d 1354 (11th Cir. 1988) ....29, 30

*Panama Refining Co. v. Ryan*,
293 U.S. 388 (1935) ....25

*PHH Corp v. CFPB*,
839 F.3d 1 (D.C. Cir. 2016) ....5, 10, 15

*Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*,
531 U.S. 159 (2001) .....................................................................................30

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ........................................................................2, 3

*Touby v. United States*,
500 U.S. 160 (1991).......................................................................................26

*Tuchman v. DSC Comm. Corp.*,
14 F.3d 1061 (5th Cir. 1994)...............................................................................3

*United States v. Brooks*,
681 F.3d 678 (5th Cir. 2012)...............................................................................20

*United States v. Clinical Leasing Serv., Inc.*,
925 F.2d 120 (5th Cir. 1991) ..............................................................................19

*United States v. Mazurie*,
419 U.S. 544 (1975) .......................................................................................20

*United States v. Murphy*,
96 F.3d 846 (6th Cir. 1996) ...............................................................................27

*United States v. Quinn*,
235 Fed. Appx. 431 (9th Cir. 2007) ........................................................................27

*United States v. Whaley*,
577 F.3d 254 (5th Cir. 2009) ..............................................................................25

*United States v. Yousef*,
327 F.3d 56 (2d Cir. 2003) ...........................................................................26, 27

*Vail v. SEC*,
101 F.3d 37 (5th Cir. 1996)................................................................................20

*Whitman v. Am. Trucking Ass'ns*,
531 U.S. 457 (2001).......................................................................................25

*Wiener v. United States*,
357 U.S. 349 (1958)........................................................................................12

*Yakus v. United States*,
321 U.S. 414 (1944) .......................................................................................26

**STATUTORY AND CONSTITUTIONAL PROVISIONS**

12 U.S.C. § 16 .......... 17

12 U.S.C. § 242 .......... 14, 15

12 U.S.C. § 243 .......... 17

12 U.S.C. § 244 .......... 15

12 U.S.C. § 250 .......... 17

12 U.S.C. § 1462a(i) (2010) .......... 17

12 U.S.C. § 1755 .......... 17

12 U.S.C. § 1814(b) .......... 17

12 U.S.C. § 4516 .......... 17

12 U.S.C. § 5481(14) .......... 8

12 U.S.C. § 5491(a) .......... 1

12 U.S.C. § 5491(b) .......... 2

12 U.S.C. § 5491(c)(1) .......... 2

12 U.S.C. § 5491(c)(2) .......... 2

12 U.S.C. § 5491(c)(3) .......... 2, 6, 7

12 U.S.C. § 5492(c)(4) .......... 17

12 U.S.C. § 5497(a) .......... 2

12 U.S.C. § 5497(a)(1) .......... 2

12 U.S.C. § 5497(a)(2) .......... 2

12 U.S.C. § 5511 .......... 8, 26

12 U.S.C. § 5511(a) .......... 26

12 U.S.C. § 5511(b) .......... 2, 20, 26

12 U.S.C. § 5511(c) .......... 8

12 U.S.C. § 5512 ........ 1

12 U.S.C. § 5512(b) ........ 20

12 U.S.C. § 5512(b)(4) ........ 18

12 U.S.C. § 5514 ........ 1

12 U.S.C. § 5515 ........ 1

12 U.S.C. § 5516 ........ 1

12 U.S.C. § 5531(a) ........ 8, 28

12 U.S.C. § 5531(c) ........ 23, 26

12 U.S.C. § 5531(c)(1) ........ 23

12 U.S.C. § 5531(d) ........ 26

12 U.S.C. § 5531(d)(1) ........ 21

12 U.S.C. § 5531(d)(2)(A) ........ 21

12 U.S.C. § 5531(d)(2)(B) ........ 21, 22, 28

12 U.S.C. § 5531(d)(2)(C) ........ 21

12 U.S.C. § 5536(a) ........ 8

12 U.S.C. § 5536(a)(1)(B) ........ 28

12 U.S.C. § 5551 ........ 31

12 U.S.C. § 5551(a) ........ 2

12 U.S.C. § 5552 ........ 2

12 U.S.C. § 5563 ........ 1, 8

12 U.S.C. § 5564 ........ 1, 8, 14

15 U.S.C. § 41 (1934) ........ 7, 15

15 U.S.C. § 45 ........ 8

15 U.S.C. § 45 (1934) .......................................... 8, 18

15 U.S.C. § 45 (1940) .......................................... 18

15 U.S.C. § 45(n) .......................................... 23

15 U.S.C. § 46(a) (1934) .......................................... 8

15 U.S.C. § 46(f) .......................................... 8

15 U.S.C. § 1601 .......................................... 31

15 U.S.C. § 1666 .......................................... 31

15 U.S.C. § 1681 .......................................... 31

15 U.S.C. § 1692 .......................................... 31

Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................... 1

U.S. Const. art I, § 8, cl. 12 .......................................... 17

U.S. Const. art I, § 9, cl. 7 .......................................... 17

U.S. Const. art. VI, cl. 2 .......................................... 27

**Rules**

Fed. R. Civ. P. 12(c) .......................................... 3

**Other Authorities**

S. Rep. No. 111-176 .......................................... 2, 31

**MEMORANDUM SUPPORTING PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR A JUDGMENT ON THE PLEADINGS**

Plaintiff Consumer Financial Protection Bureau ("Bureau" or "CFPB") files this Memorandum in Opposition to both Defendants' Motion for a Judgment on the Pleadings ("Motion"), and to Defendants' Memorandum of Law in Support of their Motion for a Judgment on the Pleadings ("Mem."). This Court should not address the issues raised by the Motion at this time since the Motion raises only constitutional issues, and it is well settled that a court should avoid addressing constitutional issues until it becomes necessary to address them. It is not necessary to address constitutional issues now because Defendants' Answer, which disputes the central facts of the Bureau's Complaint, seeks the same relief—dismissal—as the Motion. But if this Court were to address the four constitutional arguments raised by the Motion, it should reject them all because they are meritless.

**Statutory Background**

In 2010, Congress enacted the Dodd-Frank Wall Street Reform and Consumer Protection Act to, among other things, "protect consumers from abusive financial services practices." Pub. L. No. 111-203, 124 Stat. 1376, 1376 (2010). Title X of that Act, the Consumer Financial Protection Act ("CFPA"), established the Bureau and charged it with primary responsibility for "regulat[ing] the offering and provision of consumer financial products or services under the Federal consumer financial laws." 12 U.S.C. § 5491(a). To carry out this responsibility, the Bureau is empowered to promulgate regulations, bring enforcement actions, and supervise certain entities for compliance with Federal consumer financial law. *E.g.*, *id.* §§ 5512, 5514-5516, 5563-5564. Congress intended the Bureau to "establish a basic, minimum federal level playing field" for

companies "that sell consumer financial products and services to American families." S. Rep. No. 111-176, at 11 (2010); *accord* 12 U.S.C. § 5511(b).

The Bureau is headed by a Director who is appointed by the President with the advice and consent of the Senate for a term of five years. *Id.* § 5491(b), (c)(1).[1] "The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office." *Id.* § 5491(c)(3).

Congress funded the Bureau's operations by authorizing the Bureau to receive transfers from the combined earnings of the Federal Reserve System each quarter. *Id.* § 5497(a). By statute, the Bureau may obtain transfers in amounts that the Director deems "reasonably necessary to carry out the authorities of the Bureau," up to a statutorily specified annual cap. *Id.* § 5497(a)(1), (2).

While the CFPA establishes the Bureau as the primary federal regulator tasked with protecting consumers in the financial marketplace, it ensures that "State[s]"can supplement the Bureau's efforts. For example, the Act authorizes "State regulator[s]" and "the attorney general (or the equivalent thereof) of any State" to enforce the CFPA and related regulations within the states' respective jurisdictions. *Id.* § 5552. In addition, the Act specifies that the CFPA does not preempt the laws "in effect in any State" that afford consumers greater protection than the CFPA, thereby ensuring that "State" governments can enact and enforce such laws within their own jurisdictions. *Id.* § 5551(a).

---

[1] Defendants mistakenly suggest that the holdover provision contained in 12 U.S.C. § 5491(c)(2) allows the Senate to "prevent the President from appointing a new Director for as long as it wants." Mem. at 8. While that provision permits the Director to hold over beyond his five-year term, the President may remove the Director at will during the hold-over period. *See, e.g.*, *Swan v. Clinton*, 100 F.3d 973, 986-87 (D.C. Cir. 1996).

**Procedural Background**

On May 11, 2016, the Bureau filed its Complaint in this action. *See* Complaint, Dkt. 1. Defendants chose not to file a Fed. R. Civ. P. 12(b)(6) motion to dismiss, instead opting to answer the Bureau's Complaint on July 29, 2016. *See* Def. Answer, Dkt. 26. The Answer disputed many of the facts alleged in the Complaint, and denied each of the six counts. *See id.* The Answer also raised the issues that Defendants have now repeated in their Motion. *See id.* at 2-3 (alleging that Bureau is unconstitutional, any actions by Bureau are void, compliance with state law is a defense to the Bureau's federal claims, and the Bureau's authority to bring actions for 'abusive' or 'deceptive' practices is vague on its face or as applied).

**Legal Standard**

When a defendant files a motion pursuant to Fed. R. Civ. P. 12(c):

> "the [district] court may dismiss a claim when it is clear that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam) (citing *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir.1990)). "In analyzing the complaint, we will accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Id.* (citing *Doe v. Hillsboro Indep. Sch. Dist.*, 81 F.3d 1395, 1401 (5th Cir. 1996)). We will not, however, "accept as true conclusory allegations or unwarranted deductions of fact." *Collins*, 224 F.3d at 498 (addressing Rule 12(b)(6) standard) (quoting *Tuchman v. DSC Comm. Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994)). "The issue is not whether the plaintiff will ultimately prevail, but whether he is entitled to offer evidence to support his claim. Thus, the court should not dismiss the claim unless the plaintiff would not be entitled to relief under any set of facts or any possible theory that he could prove consistent with the allegations in the complaint." *Jones*, 188 F.3d at 324 (citations omitted).

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 312-13 (5th Cir. 2002). "Rule 12(b)(6) decisions appropriately guide the application of Rule 12(c)

because the standards for deciding motions under both rules are the same." *Id.* at 313 n.8.

## Argument

### I. THIS COURT SHOULD NOT ADDRESS THIS MOTION AT THIS TIME

As explained below, there is no merit to any of the constitutional challenges that Defendants raise in their Motion. For that reason, the Motion should be denied. But for two other reasons, this Court should not even address Defendants' Motion at this time. First, the Motion raises several constitutional arguments that this Court should not resolve unless it cannot otherwise provide Defendants with the dismissal they seek. In particular, Defendants argue that the Bureau is unconstitutionally structured, see Mem. at 5-15, that the CFPA's prohibition of unfair or abusive acts or practices is unconstitutionally vague, Mem. at 15-19, that 12 U.S.C. § 5531 violates the Constitution's non-delegation doctrine, Mem. at 19-20, and that the Bureau's interpretation of 12 U.S.C. § 5536 "overrides the usual constitutional balance of federal and state powers," Mem. at 20. Based on all of these constitutional arguments, Defendants ask this Court to dismiss the Bureau's complaint. Defendants' Answer likewise seeks a dismissal because Defendants dispute many of the facts alleged by the Bureau as well as the legal conclusion that Defendants violated the law. "'A fundamental and long-standing principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them.'" *Hale v. King*, 642 F.3d 492, 504 n.38 (5th Cir. 2011) (quoting *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988)). So if Defendants can show on summary judgment or at trial that there is no merit to the allegations in the Bureau's Complaint, this Court could

award Defendants all the relief they seek—dismissal of the Bureau's claims—without having to address the constitutional issues raised in the Motion. Accordingly, this Court should not address the constitutionality of the Bureau's structure until it first determines the Bureau would otherwise be entitled to relief in this case.[2]

Second, "'[a] motion brought pursuant to Rule 12(c) is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts.'" Mem. at 5 (quoting *Machete Prods., LLC v. Page*, 809 F.3d 281, 287 (5th Cir. 2015)). The problem for Defendants is that they base at least two of the arguments in their Rule 12(c) motion not just on facts alleged in the complaint, but on new facts that they introduce. In connection with their argument that they lacked fair notice, Defendants contend that "the CFPB has chosen to remain silent on what constitutes 'unfair' or 'abusive' acts or practices," Mem. at 18, and that "[t]he CFPB has not, and cannot, identify any agency guidance or other warning signs that could have put All American

[2] In any event, even if the Court were to eventually identify a constitutional flaw in the Bureau's structure, Defendants' "argument that the alleged separation-of-powers violation requires that the Bureau be stopped in its tracks ignores traditional constraints on separation-of-powers remedies." *John Doe Co. v. CFPB*, 849 F.3d 1129, 1133 (D.C. Cir. 2017). Even if the Bureau were unconstitutional (it is not), severance would be the proper remedy. *See PHH Corp v. CFPB*, 839 F.3d 1, 39 (D.C. Cir. 2016), *vacated, reh'g en banc granted*, No. 15-1177 (D.C. Cir. Feb. 16, 2017) (holding that proper remedy for unconstitutionality is severance of "for cause removal" provision, and that finding Bureau unconstitutional would "not halt the CFPB's ongoing operations" or its ability to hold wrongdoers liable). And that fact militates against dismissal, as courts confronting challenges to the Bureau's constitutionality have found. Order Denying Defendants' Motion to Dismiss at 7-8, *CFPB v. D&D Mktg., Inc.*, No. 2:15-9692 (C.D. Cal. Nov. 17, 2016) (ECF No. 57), *interlocutory appeal pending*, No. 17-80049 (9th Cir.); *CFPB v. NDG Fin. Corp.*, No. 15-CV-5211, 2016 WL 7188792, at *21 (S.D.N.Y. Dec. 2, 2016) (declining to address challenge to Bureau's constitutionality because "even if Defendants are correct that the CFPB's structure is unconstitutional, the only appropriate remedy would not prevent or delay this suit").

on notice that the practices at issue here violated federal law," *id*. Then, in connection with their argument that the Bureau violated principles of federalism, they argue that they are subject to a proceeding brought by the Mississippi Department of Banking & Consumer Finance that will apply to "the conduct at issue in this case." Mem. at 21. Even if this were relevant, *but see* Argument V, *infra*, it raises a factual issue that has no place in this proceeding. The Bureau is entitled to dispute these newly-introduced facts (to the extent they are relevant), but cannot do so in response to a Rule 12(c) motion.

So as explained below, not only is there no merit to Defendants' arguments, but also they have chosen the wrong procedure, and the wrong time, for presenting them.

## II. THE BUREAU'S STATUTORY STRUCTURE IS CONSTITUTIONAL

When Congress created the Bureau, it exercised its power under the Necessary and Proper Clause to impose a limited restriction on the President's ability to remove the Bureau's Director: The President may remove the Bureau's Director only for "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). The Supreme Court has never held unconstitutional this kind of "limited restriction[] on the President's removal power." *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 495 (2010). Nevertheless, Defendants ask this Court to break new constitutional ground and declare that, contrary to more than eighty years of precedent, Congress transgressed the separation of powers when it gave the Bureau's Director the same for-cause removal protection that the Supreme Court approved for commissioners of the Federal Trade Commission (FTC) in *Humphrey's Executor v. United States*, 295 U.S. 602, 620-1, 632 (1935).

**A. The limited restrictions Congress placed on the President's power to remove the Bureau's Director do not impede the President's ability to perform his constitutional duty.**

Congress may restrict the President's power to remove an official so long as it does not "impede the President's ability to perform his constitutional duty" to faithfully execute the laws. *Morrison v. Olson*, 487 U.S. 654, 691 (1988).

The Supreme Court has held that Congress does not impede this ability when it establishes for-cause removal protection for the head of an agency with functions like the Bureau's. In *Humphrey's Executor*, the Supreme Court approved for-cause removal protection for FTC commissioners identical to that afforded the Bureau's Director. 295 U.S. at 620-21, 632. As *Morrison* later explained, *Humphrey's Executor* reflected the Court's "judgment" that, in light of the FTC's functions, "it was not essential to the President's proper execution of his Article II powers that [the agency] be headed up by individuals who were removable at will." *Morrison*, 487 U.S. at 691. This is because the ability to remove an official for cause gives the President "ample authority to assure that the [official] is competently performing his or her statutory responsibilities." *Id.* at 692. So too here. The removal restrictions and official functions established by the Bureau's organic statute are not materially different from those established by the FTC Act.

***First***, the restrictions on removal of the Bureau's Director are identical to the limits on removal of FTC commissioners. *Compare* 15 U.S.C. § 41 (1934) ("Any Commissioner may be removed by the President for inefficiency, neglect of duty, or malfeasance in office."), *with* 12 U.S.C. § 5491(c)(3) ("The President may remove the Director for inefficiency, neglect of duty, or malfeasance in office."). Therefore, "[t]his is not a case in which the power to remove an executive official has been completely

stripped from the President, thus providing no means for the President to ensure the 'faithful execution' of the laws." *Morrison*, 487 U.S. at 692.

***Second***, the Bureau's functions are remarkably similar to those of the FTC at the time of *Humphrey's Executor*. At that time, the FTC had the power to prohibit "unfair methods of competition in commerce" by "persons, partnerships, or corporations, except banks and [certain common carriers]." 15 U.S.C. § 45 (1934). To carry out that power, the FTC had "wide powers of investigation," *Humphrey's Ex'r*, 295 U.S. at 621, into the practices of any corporation engaged in commerce, 15 U.S.C. § 46(a) (1934). If the FTC believed that a party was engaged in an unfair method of competition, it could bring an administrative cease-and-desist proceeding and enforce any resulting order in court. *Id.* § 45. The FTC could also gather information regarding corporate practices and report that information to Congress. *Id.* § 46(f). The FTC exercised its broad authority over virtually the entire economy. *See id.* § 45.

The Bureau performs similar functions, but within a narrower slice of the economy. The Bureau enforces the "Federal consumer financial laws" that pertain to "consumer financial products and services," 12 U.S.C. §§ 5481(14), 5511, and, like the FTC, may prohibit "unfair" (as well as deceptive and abusive) acts or practices—but only against "covered persons" or "service providers" who engage in those practices in connection with consumer financial products or services. *Id.* §§ 5531(a), 5536(a). The Bureau may initiate administrative proceedings or actions in court to enforce the laws within its authority. *Id.* §§ 5563, 5564. And it may collect and publish information relevant to the functioning of markets for consumer financial products and services; conduct financial education programs; collect and respond to consumer complaints; and issue rules and guidance to implement consumer financial laws. *Id.* § 5511(c).

Defendants attempt to distinguish the Bureau's functions from those of the FTC at the time of *Humphrey's Executor* by pointing out that the Bureau can promulgate rules and seek civil penalties. Mem. at 9-10. But this ignores that, based just on its power to engage in administrative adjudication, the FTC could "exert[] a powerfully regulatory effect on those business practices subject to its supervision." *Nat'l Petroleum Refiners Ass'n v. FTC*, 482 F.2d 672, 685 (D.C. Cir. 1973). Moreover, in the years since *Humphrey's Executor*, the Supreme Court has recognized that rulemaking and recovery of civil penalties are entirely appropriate functions for independent agencies. *See Morrison*, 487 U.S. at 692 n.31 (emphasizing "that various federal agencies whose officers are covered by 'good cause' removal restrictions exercise civil enforcement powers that are analogous to the prosecutorial powers wielded by an independent counsel" and citing the FTC's authority "to bring civil actions to recover civil penalties for the violations of rules respecting unfair competition"); *id.* at 724-25 (Scalia, J., dissenting) ("[R]emoval restrictions have been generally regarded as lawful for so-called 'independent regulatory agencies,' such as the Federal Trade Commission, the Interstate Commerce Commission, and the Consumer Product Safety Commission, which engage substantially in what has been called the 'quasi-legislative activity' of rulemaking…." (internal citations omitted)). Indeed, as discussed more fully below, in *Free Enterprise*, the Supreme Court held that the Public Company Accounting Oversight Board—even with its authority to issue rules and seek penalties as "the regulator of first resort and the primary law enforcement authority for a vital sector of our economy"—did not violate the separation of powers so long as the Board was separated from the President "by only a single level of good-cause tenure." 561 U.S. at 508-09.

In the end, "[t]he real question" in determining whether removal restrictions are constitutional is whether they "are of such a nature that they impede the President's ability to perform his constitutional duty, and the functions of the officials in question must be analyzed in that light." *Morrison*, 487 U.S. at 691. The answer to that question is straightforward in this case: Just as with the FTC, the removal restrictions in the Bureau's organic statute do not unconstitutionally impede the President's ability to perform his duties.

**B. The Bureau's single-director structure does not make it more difficult for the President to oversee the agency.**

The Bureau's single-Director leadership does not change this conclusion. *Humphrey's Executor* upheld the constitutionality of for-cause removal for the leadership of an independent agency with functions similar to the Bureau. *Morrison* reaffirmed that holding, and *Free Enterprise* faithfully applied it to a financial regulator with broad authority. Those precedents apply with full force whether an independent agency is headed by a single individual or a multi-member commission. The limited restriction on the President's authority to remove the Bureau's Director does not impede the President's ability to execute the laws any more than the identical restriction Congress placed on the President's ability to remove the five FTC commissioners (or the heads of the many other independent regulators).

Even the two judges who held in the D.C. Circuit's now-vacated panel decision that the Bureau was unconstitutional acknowledged that, as between the single-Director Bureau and a multimember commission, there was "no meaningful difference in responsiveness and accountability to the President." *PHH Corp. v. CFPB*, 839 F.3d 1, 32 (D.C. Cir. 2016), *vacated, reh'g en banc granted*, No. 15-1177 (D.C. Cir. Feb. 16, 2017). If

anything, the Bureau's single-Director leadership only *increases* the President's power—for it enables the President to identify more easily the official responsible for any problems. *See CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1088 (C.D. Cal. 2014). The Bureau's Director is at least as responsive and accountable to the President as the leadership of the FTC (not to mention the other independent financial regulators). Congress did not violate the separation of powers when it imposed a limited restriction on the President's ability to remove the Bureau's Director. [3]

Because Defendants cannot show that the Bureau's statutory structure conflicts with the Supreme Court's separation of powers decisions, Defendants try to remake those precedents in two related ways.

***First***, Defendants claim that *Free Enterprise* so narrowed *Humphrey's Executor* and *Morrison* that Congress violates the separation of powers if it establishes a removal restriction in a "new situation" that limits (to any degree, apparently) the President's control over and accountability for an agency. *See* Mem. at 7-8 & n.1. Defendants misstate the law. In *Free Enterprise* the Supreme Court did not narrow *Humphrey's Executor* and *Morrison*. Rather, the Court decided not to "reexamine … these precedents" and instead applied them to the removal restrictions that Congress created for the members of the Public Company Accounting Oversight Board. *Free Enterprise,* 561 U.S. at 483. Congress had established two levels of for-cause removal between the Board's members and the President: Board members could only be removed for cause

[3] Defendants' derivative claim that the Bureau's structure threatens state sovereignty because the Bureau's structure is unconstitutional, Mem. at 13, fails for the same reason. Because the Director is responsible for all of the Bureau's operations and is sufficiently accountable to the President, the Bureau is as responsive to the national political process as other independent agencies (if not more so).

by the Securities and Exchange Commission and the Commission's members could only be removed by the President for cause. In holding that structure unconstitutional, the Supreme Court held that Congress had "stripped [the President] of the power" that cases like *Humphrey's Executor* and *Morrison* had "preserved." *Id.* at 495. The resulting constitutional problem was that "[n]either the President, nor anyone directly responsible to him, nor even an officer whose conduct he may review only for good cause, ha[d] full control over the Board." *Id.* at 496. The second level of for-cause removal protection meant that the President's "ability to execute the laws—by holding his subordinates accountable for their conduct—[was] impaired." *Id.*

*Free Enterprise* did not "take issue with for-cause limitations in general."[4] *Id.* at 501. And it certainly did not establish one constitutional rule for existing independent agencies, and an entirely different rule for new agencies with statutory structures that differ in any way from that of the FTC in 1935. *See Mistretta v. United States*, 488 U.S. 361, 385 (1989) ("Our constitutional principles of separated powers are not violated ... by mere anomaly or innovation."). Instead, the Court premised its constitutional holding on a proposition that applies to new and old independent agencies alike: that the President "*can* oversee" officials he can remove for cause, but he cannot oversee officials who are insulated by two levels of tenure protection. *Free Enterprise*, 561 U.S.

[4] This is not surprising. The Supreme Court has consistently upheld the constitutionality of for-cause removal protections and recognized the validity of the constitutional holding in *Humphrey's Executor* and, later, *Morrison*. *See, e.g.*, *Wiener v. United States*, 357 U.S. 349, 352, 355-56 (1958) (holding that President could not remove members of the War Claims Commission at will in light of the "philosophy of *Humphrey's Executor*, in its explicit language as well as its implications"); *Buckley v. Valeo*, 424 U.S. 1, 136 (1976) (applying *Humphrey's Executor* and describing it as holding that "Congress could circumscribe the President's power to remove members of independent regulatory agencies"); *Mistretta v. United States*, 488 U.S. 361, 410-11 & n.33 (1989) (relying on *Morrison* and *Humphrey's Executor*).

at 496 (emphasis in original). That is why the Court remedied the constitutional problem in *Free Enterprise* by making Board members removal at will by the Commission, thereby "leav[ing] the President separated from Board members by only a single level of good-cause tenure" (i.e., the for-cause removal protection for SEC commissioners). *Id.* at 509.

***Second***, Defendants attempt to retrofit the constitutional holding in *Humphrey's Executor* with new reasoning that the Supreme Court has never before endorsed. Defendants emphasize that *Humphrey's Executor* noted that the FTC was intended to be "non-partisan" and a "body of experts." Mem. at 7. Defendants fail to note that the Court made that observation only in that portion of the decision in which it addressed the statutory question of whether the removal provision of the FTC Act was intended "to limit the executive power of removal to the causes enumerated." *Humphrey's Ex'r*, 295 U.S. at 624, 626. The Supreme Court never mentioned the FTC's multi-member structure in assessing the *constitutionality* of the for-cause removal provision, nor did it even suggest that structure mattered. *Id.* at 626-32. This silence is telling. If the Supreme Court in *Humphrey's Executor*—or any other case after it—believed that the number of officials who lead an agency made a difference to the constitutionality of removal limitations, the Court surely would have said so. Indeed, it would have been a natural way for *Humphrey's Executor* to distinguish the Court's earlier decision in *Myers v. United States*, 272 U.S. 52 (1926), which disapproved a provision requiring the President to obtain the Senate's advice and consent before removing a (single) postmaster.

Defendants' reliance on a related argument that the Department of Justice has made on behalf of the current Administration[5]—if a "bipartisan" multi-member commission has staggered terms for commission members, then it is more likely that the President will be able to appoint some members of the commission and that some previously-appointed members may share the President's views—fails as well. *See* Mem. at 9. Defendants cite no authority for the proposition that the constitutionality of a restriction on the President's removal authority turns on whether at some point during his term the President will be able to appoint one or two members of a five- or seven-member body. Instead, the Supreme Court has taught that it is the power to remove—not the power to appoint—that ensures that the President can hold officials accountable and thereby take care that the laws are faithfully executed.[6] *See Bowsher v. Synar*, 478 U.S. 714, 726 (1986). And it turns the separation of powers on its head to posit that a

[5] Defendants suggest that, because during the en banc proceeding in *PHH v. CFPB* the Department of Justice filed an amicus brief opposing the Bureau's position, this somehow supports their contention that the Bureau "exists outside the Constitution's design." Mem. at 13. Not at all. The Bureau, like many other independent agencies, has authority to represent itself before the courts of appeals. 12 U.S.C. § 5564. The Bureau exercised this authority to defend the duly-enacted CFPA in *PHH* just as the independent counsel defended the independent counsel provisions of the Ethics in Government Act in *Morrison*. *See Morrison*, 487 U.S. at 658-59. In *Morrison*, the Supreme Court upheld the constitutionality of the independent counsel provisions, *see id.* at 696-97, even though the Solicitor General filed a brief arguing that those provisions were unconstitutional, Brief for the United States as Amicus Curiae Supporting Appellees, *Morrison v. Olson*, 487 U.S. 654 (1988) (No. 87-1279), 1988 WL 1031600 (Apr. 8, 1988).

[6] In any event, just as at the time of *Humphrey's Executor*, the five FTC commissioners serve staggered terms of seven years, so the President is more likely to have an opportunity to appoint the Bureau's Director than he is to appoint a controlling majority of the FTC. And because the seven members of the Board of Governors of the Federal Reserve System serve staggered fourteen-year terms, 12 U.S.C. § 242, the President can appoint a controlling majority in a single term only if Board members do not serve their full terms.

limitation on the President's ability to remove an officer only passes constitutional muster when Congress has also restricted (on the basis of partisan affiliation, no less) whom the President may appoint to the office in the first place.[7] Defendants' further suggestion that the President's power to unilaterally designate a FTC commissioner to serve as the Commission's chair makes a constitutional difference, *see* Mem. at 9 (citing 15 U.S.C. § 41), ignores that the President did not have this authority until 1950, well after *Humphrey's Executor* was decided.[8] *See* Reorg. Plan No. 8 of 1950, § 3, 64 Stat. 1264, 1265.

Defendants fare no better when they rely on the vacated opinion issued by a divided D.C. Circuit panel in *PHH*. That opinion engaged in a free-form assessment of the impact of the "unilateral power" of the Bureau's Director on individual liberty. *See* Mem. at 12 (citing *PHH*, 839 F.3d at 16-17, 26). But as the Department of Justice explained in its initial brief supporting the Bureau's petition for rehearing en banc, the separation of powers does not authorize "a court to undertake an additional inquiry into the extent that an agency's structure might be inimical to individual liberty." Resp. of the United States to Pet. for Reh'g En Banc at 11, *PHH v. CFPB*, (D.C. Cir. Dec. 22, 2016), (No. 15-1177), Doc. 1652666. Instead, in the context of a for-cause removal restriction, the separation of powers safeguards liberty by ensuring that the President can oversee the Director's management of the Bureau. And the fact that the Director has more individual responsibility for the operation of the Bureau than a single FTC

---

[7] Indeed, no such limitation applies to members of the Board of Governors of the Federal Reserve System. *See* 12 U.S.C. §§ 242, 244.

[8] Moreover, the chair of the Federal Reserve Board is not designated unilaterally by the President. *See* 12 U.S.C. § 242 (providing that the President may designate the Chair "by and with the advice and consent of Senate … for a term of 4 years").

commissioner has over the FTC *increases* the Director's accountability to the President: With a single-member agency, the President always knows who is responsible for the agency's actions.[9] Defendants' complaint about the Director's individual responsibility for the Bureau fails because the Director's power makes him more, not less, accountable to the President.

### C. The Bureau's other statutory attributes are consistent with the separation of powers and are commonplace among independent agencies.

Defendants argue further that Congress violated the separation of powers by funding the Bureau through the Dodd-Frank Act as opposed to through the annual appropriations process, by empowering the Bureau to communicate with Congress, and by ensuring that the Bureau's interpretations of ambiguous provisions of federal consumer financial law receive the usual deference. Mem. at 11-12. Defendants' arguments fail as matter of constitutional doctrine and practice. First, as to constitutional doctrine, the *Free Enterprise* Court made clear the "Framers did not rest our liberties on such bureaucratic minutiae" as "who controls the agency's budget requests and funding, the relationships between one agency or department and another, ... [and] Congress' ability to assert influence ...." 561 U.S. at 499-500. And while Defendants attempt to rely on the Constitution's Appropriations Clause to attack Congress' choice to establish the Bureau's funding by a permanent statute rather than as part of the annual appropriations process, they cannot escape the fact that the

[9] The argument that in a multimember commission, the individual commissioners' check on one another can substitute for presidential control conflicts with the Constitution's command that the *President* take care that the laws be faithfully executed. *Cf. Free Enterprise*, 561 U.S. at 500 (rejecting the argument that "whether particular *unelected* officials support or 'resist' the President's policies" could substitute for the President's removal power (emphasis in original)).

Constitution does not require *annual* appropriations.[10] *Compare* U.S. Const. art I, § 9, cl. 7 ("No money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law.), *with id.* art. I, § 8, cl. 12 (authorizing Congress "[t]o raise and support Armies" but providing that "no Appropriation of Money to that Use shall be for a longer Term than two years."); *see also Am. Fed'n of Gov't Emps., AFL-CIO v. Fed. Labor Relations Auth.*, 388 F.3d 405, 409 (3d Cir. 2004) (explaining that "Congress may . . . decide not to finance a federal entity with appropriations," but rather through some other funding mechanism). It is therefore not surprising that, as a matter of constitutional practice, Congress has chosen to fund a number of independent financial regulators outside of the annual appropriations process.[11]

Likewise, while Defendants complain that under 12 U.S.C. § 5492(c)(4) the President cannot control the Bureau's communications with Congress regarding legislation or testimony, Mem. at 11, they fail to note that a virtually identical statutory provision restricts the President's authority to control the communications of the SEC, the Federal Reserve Board, the FDIC, the Comptroller of the Currency, the Director of the (former) OTS, the Director of the FHFA, and the NCUA, *see* 12 U.S.C. § 250. In any event, this in no way restricts either the President's own ability to communicate with

---

[10] Although Defendants contend that the statutory funding mechanism Congress chose for the Bureau involves an "unprecedented two layers of insulation from the appropriations process," Mem. at 11 (citing *Free Enterprise*, 561 U.S. at 497), there is no insulation at all because Congress can modify the source and amount of the Bureau's funding at any time through the normal legislative process.

[11] *See* 12 U.S.C. § 16 (Office of the Comptroller of the Currency); *id.* § 243 (Federal Reserve Board); *id.* § 1755 (National Credit Union Administration (NCUA)); *id.* § 1817(b) (Federal Deposit Insurance Corporation (FDIC)); *id.* § 4516 (Federal Housing Finance Agency (FHFA)); 12 U.S.C. § 1462a(i) (2010) (former Office of Thrift Supervision (OTS)).

Congress or his authority to take care that the laws be faithfully executed. Finally, Defendants' suggestion, Mem. at 10, that 12 U.S.C. § 5512(b)(4) somehow distinguishes the Bureau's rulemaking function misses the mark. That section addresses the deference that courts should accord to the Bureau's interpretation of ambiguous provisions of the consumer financial laws. Courts have long deferred to independent agencies when interpreting ambiguities in agency-administered statutes. *See, e.g.*, *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 523-26 (2009) (plurality op.) (same standards apply to review of actions of independent and other agencies). Section 5512(b)(4) merely ensures that the Bureau is accorded such deference even when other agencies also have enforcement or other authority.

## III. THE CFPA'S PROHIBITION OF UNFAIR, DECEPTIVE, AND ABUSIVE ACTS OR PRACTICES DOES NOT VIOLATE DUE PROCESS

Since 1938, the law has prohibited businesses from using unfair or deceptive practices to harm consumers, *see* 15 U.S.C. § 45 (1940), and for nearly 80 years, case law and agency pronouncements have fleshed out those terms in countless contexts. Nonetheless, Defendants now claim that if the Bureau were to require them to comply with the CFPA's prohibition of unfair, deceptive, or abusive acts or practices, this would somehow violate their "constitutional right to fair notice." *See* Mem. at 15. There is absolutely no merit to this argument since the unfair and abusive conduct challenged in the Bureau's complaint falls squarely within the statutory definitions of those terms. Indeed, this very argument was rejected by the court in *CFPB v. ITT Educational Services, Inc.*, No. 1:14-cv-00292-SEB-TAB, 2015 WL 1013508 at *14 (S.D. Ind. Mar. 6, 2015).

Because Defendants raised this challenge in a motion for judgment on the pleadings, this Court must accept all well-pleaded facts as true, and view those facts in a light most favorable to the Bureau. *Jebaco Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318 (5th Cir. 2009); *see* Mem. at 5. So this means that, for the purpose of resolving this motion, this Court must assume that, among other things:

> 1. In connection with their check-cashing services, Defendants were aware of the fee percentages they would charge a consumer when that consumer presented a check, but, as a matter of policy, prohibited their employees from disclosing that information, and required their employees to obscure the receipt that disclosed the actual fee amounts. Complaint ¶¶ 12-23.
>
> 2. Once Defendants began the process of cashing a check for a consumer, even though that consumer was still entitled to reverse the process, Defendants made it difficult or impossible for the consumer to cancel or reverse a check-cashing transaction, by, among other things, falsely informing the consumer that a check-cashing transaction could not be reversed. Complaint ¶¶ 24-28.
>
> 3. In connection with their payday lending business, Defendants misrepresented the fees for loans in their "1st and 3rd lending" program, and falsely informed consumers that the fees for loans in that program were lower than fees for comparable 30-day loans offered by their competitors. Complaint ¶¶ 48-53.
>
> 4. Defendants retained overpayments that their customers had made, did not make efforts to refund those overpayments, and took steps to make it more difficult for their store employees to identify and refund overpayments. Complaint ¶¶ 54-58.

Because the CFPA is an economic regulatory statute, and because it is enforced through civil, not criminal, penalties, this Court "must be lenient in evaluating" whether the statute is vague. *Exxon Corp. v. Busbee*, 644 F.2d 1030, 1033 (5th Cir. 1981). Such a statute "is unconstitutionally vague only if it commands compliance in terms 'so vague and indefinite as really to be no rule or standard at all," or if it is 'substantially incomprehensible.'" *United States v. Clinical Leasing Serv., Inc.*, 925 F.2d 120, 122 (5th

Cir. 1991) (quoting *A.B. Small Co. v. American Sugar Refining Co.*, 267 U.S. 233, 239 (1925), and *Exxon v. Busbee*, 644 F.2d at 1033).[12]

Further, "it is also 'well established that vagueness challenges to statutes which do not involve First Amendment freedoms must be examined in light of the facts of the case at hand.'" *United States v. Brooks*, 681 F.3d 678, 696 (5th Cir. 2012) (quoting *United States v. Mazurie*, 419 U.S. 544, 550 (1975)); *see also Vail v. SEC*, 101 F.3d 37, 39 (5th Cir. 1996) (same).[13] This means that Defendants' argument must be evaluated in light of the conduct challenged in the Complaint—conduct that, for the purpose of this motion, this Court must assume Defendants engaged in. *United States v. Brooks*, 681 F.3d at 696. However, "[a] statute is not unconstitutionally vague merely because a company or an individual can raise uncertainty about its application to the facts of their case." *Ford Motor Co. v. Texas Dep't of Transp.*, 264 F.3d 493, 509 (5th Cir. 2001). Defendants come nowhere close to showing that the CFPA is "substantially incomprehensible."

---

[12] Defendants mistakenly suggest that the Bureau cannot challenge practices as unfair, deceptive, or abusive until it first provides "clarity" by issuing a rule further defining those terms because Congress indicated an "express intent" that the Bureau do so. *See* Mem. at 15. But the vagueness analysis does not require "such precision as would eliminate all close calls." *FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236, 256 (3d Cir. 2015). Moreover, Congress did not indicate any "express intent" that the Bureau issue such rules. *See* Mem. at 15. Instead, Congress gave the Bureau discretion to issue such rules as the Bureau believes "may be necessary or appropriate" to enable it to carry out the objectives of the laws it enforces. 12 U.S.C. 5512(b). There was no need for a rule here since the abusive and unfair practices challenged by the Bureau's complaint easily fit within the CFPA's parameters.

[13] Defendants cite *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307 (2012), Mem. at 15, but that case is irrelevant to its vagueness challenge. *Fox* involved a criminal statute, a restriction on speech, and an attempt by the agency to enforce retroactively a revised agency interpretation. None of those factors exists here.

Defendants first contend that the CFPA's prohibition of abusive acts or practices "provides no meaningful guidance." Mem. at 15. In fact, the CFPA itself provides ample guidance as to the meaning of the term "abusive"—it specifically describes in detail four types of abusive conduct, *see* 12 U.S.C. §§ 5531(d)(1), (d)(2)(A), (d)(2)(B), (d)(2)(C). The Complaint alleges that Defendants engaged in two of those four types of conduct. (Complaint Counts I, II.) Again, as explained above, Defendants must make their vagueness argument in the specific, not in the abstract. That is, they must demonstrate that they lacked fair notice as to whether the conduct actually challenged in either Count I or Count II is abusive. Defendants fail to do so—their challenge is merely a nonspecific facial challenge—and for that reason alone, this Court should reject the vagueness argument.

But even if Defendants had made challenges to specific counts of the Complaint, those challenges would have failed because the Bureau challenged conduct that comes squarely within the CFPA's definition of abusive acts or practices. Count I alleges that Defendants violated 12 U.S.C. § 5531(d)(1) by interfering with the consumer's ability to understand a term or condition of their check-cashing services—the fees charged for the service. Complaint ¶¶ 66-68. Section 5531(d)(1) provides that an act or practice is abusive if it "materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service." 12 U.S.C. § 5531(d)(1). That is exactly what the Complaint alleges Defendants did when they made it difficult, or even impossible, for a consumer to understand the costs of their check-cashing services.[14]

---

[14] Defendants cite *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156 (2012), and suggest that they were somehow misled by the Bureau's "silence." Mem. at 15. But that case is irrelevant because it involved a party's attempt to rely on an agency's interpretation of an ambiguous statute. Here, the issue is not whether Defendants had

Count II also challenges abusive acts or practices. It alleges that Defendants violated 12 U.S.C. § 5531(d)(2)(B) by taking steps that made it difficult for consumers to cancel or reverse the check-cashing process. Section 5531(d)(2)(B) provides that it is an abusive act or practice to "take unreasonable advantage of the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." Consumers have an interest in being able to pick where they cash their checks. Count II alleges that Defendants ensured they could keep consumers' business because they made it difficult for consumers to protect their interests by canceling or reversing a check cashing transaction. So once again, Defendants' conduct fits within the CFPA's definition of abusive acts or practices.[15]

Defendants also contend that they lacked fair notice as to the meaning of the term "unfair" in the CFPA. *See* Mem. at 16-19. But once again, Defendants fail to apply their challenge to the facts of this case. The CFPA provides that an unfair act or practice is one that "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers; and ... such substantial injury is not outweighed by

---

notice of the Bureau's interpretation of the CFPA, but whether Defendants had notice of what the CFPA itself prohibits. For the same reason, the mere fact that the Bureau has not attempted to define the term "abusive" in the abstract does not "maximize the Director's power," *see* Motion at 16, because Defendants know what the four prongs of the CFPA's definition of "abusive" prohibit.

[15] Defendants cite a concurrence in *Harris v. Forklift Sys, Inc.*, 510 U.S. 17, 24 (1993), in which Justice Scalia observed that the Court's use of the term "abusive" to describe conduct that violated Title VII of the Civil Rights Act of 1964 did not provide "a very clear standard." But Justice Scalia never said that the term is void for vagueness—indeed, he ultimately agreed that it was appropriate for the Court to use the term. *See* 510 U.S. at 25. In any event, the CFPA does not just use the word abusive—it provides a detailed definition of the term.

countervailing benefits to consumers or to competition." 12 U.S.C. § 5531(c)(1).[16] Two counts of the Complaint allege that Defendants committed unfair acts or practices. Count IV of the Complaint alleges that Defendants caused substantial injury to consumers because, in connection with their check-cashing service, they hindered or prevented consumers from learning the costs of the service and as a result, consumers paid fees that they did not authorize. The Count further alleges that consumers could not reasonably avoid these charges, and the charges were not offset by benefits to consumers or competition. Count VI of the Complaint alleges that Defendants caused substantial injury by failing to notify, or make refunds, to consumers who made overpayments. This injury was not reasonably avoidable, and was not offset by benefits to consumers or competition. Defendants make no attempt to show that they lacked notice that the conduct alleged in these two counts was unfair. Indeed, how could they? There is no need for Defendants to "guess," *see* Mem. at 18, that it was unfair to hinder or prevent consumers from learning the charges for the check cashing service (Count IV), or that it was unfair to retain overpayments that consumers paid inadvertently

[16] Defendants are simply wrong when they contend that the CFPA's definition of unfair acts or practices is "newly minted." *See* Mem. at 18. In fact, the definition was adopted virtually verbatim from the Federal Trade Commission Act. *Compare* 12 U.S.C. § 5531(c), *with* 15 U.S.C. § 45(n). The FTC has had authority to prohibit unfair acts or practices since 1938, and in 1980, it issued a detailed policy statement explaining both the boundaries of unfairness, and the application of the doctrine to specific cases. FTC Policy Statement on Unfairness, https://www.ftc.gov/public-statements/1980/12/ftc-policy-statement-unfairness (Dec. 17, 1980); *see also Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 (D.C. Cir. 1985) (describing the history of the FTC's authority to prohibit unfair acts or practices).

(Count VI). Defendants fail to demonstrate that they lacked fair notice that their conduct was unfair.[17]

Finally, although Defendants also contend that they did not have fair notice as to the meaning of deception, Mem. at 15, they make no attempt to support that contention.[18] Defendants have therefore waived any such argument. In any event, the conduct challenged by the Bureau's complaint, misstatements regarding cost, regarding the consumer's rights, and regarding value, are the exact sorts of misstatements that the FTC has long recognized as deceptive.

---

[17] Once again, Defendants cite irrelevant cases in support of their argument. *Connally v. General Construction Co.*, 269 U.S. 385 (1926), Mem. at 18, involved a criminal statute, not a civil enforcement action. *Gates & Fox Co. v. OSHRC*, 790 F.2d 154 (D.C. Cir. 1986), Mem. at 19, involved an agency's request for deference to its interpretation of an ambiguous regulation it had issued. As explained above, the issue in this case is not whether Defendants had notice of the Bureau's interpretation of the CFPA, but whether Defendants had notice of what the CFPA itself says. Defendants also cite *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470 (7th Cir. 2007). Mem. at 16. But that case involves the Fair Debt Collection Practices Act, not the CFPA. With respect to the CFPA's prohibition of unfair acts or practices, Defendants' vagueness claim "falters in the face of a century's worth of legislative and judicial guidance establishing and refining the term's meaning" in the context of the FTC Act. *CFPB v. ITT Educ. Servs., Inc.*, 2015 WL 1013508 at *18 (rejecting argument based on *Beler*).

[18] Defendants briefly reference Count V, Mem. at 17, but do not address anywhere why they lacked fair notice as to the meaning of "deception" in the CFPA. Nor is there any basis for such an argument. *See Illinois v. Alta Colleges, Inc.*, No. 14 C 3786, 2014 WL 4377579, at *4 (N.D. Ill. Sept. 4, 2014) ("In fact, the CFPA's general prohibition of 'unfair, deceptive, or abusive act[s] or practice[s],' is virtually identical to the prohibition of 'unfair or deceptive acts or practices' contained in the Federal Trade Commission Act, which the Seventh Circuit held was not unconstitutionally vague nearly a century ago.") (citations omitted)).

## IV. THE CFPA DOES NOT VIOLATE THE NON-DELEGATION DOCTRINE

Defendants attempt to morph their meritless vagueness arguments into a long-shot non-delegation challenge. *See* Mem. at 19-20. But that shot falls far wide of the mark.

In a non-delegation challenge, the question is whether Congress has delegated decisionmaking authority to an agency without providing "an intelligible principle to which the person or body authorized to [act] is directed to conform." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001) (internal quotation marks omitted). "[T]he limits on delegation are frequently stated, but rarely invoked." *United States v. Whaley*, 577 F.3d 254, 263 (5th Cir. 2009). In its history, the Supreme Court has "found the requisite 'intelligible principle' lacking in only two statutes, one of which provided literally no guidance for the exercise of discretion, and the other of which conferred authority to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Id.* at 474 (citing *Panama Refining Co. v. Ryan*, 293 U.S. 388 (1935), and *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)). Thus, the Court has "almost never felt qualified to second-guess Congress regarding the permissible degree of policy judgment that can be left to those executing or applying the law." *Id.* at 474-75 (internal quotation marks omitted). "[D]elegation is 'constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority.'" *Whaley*, 577 F.3d at 263-64 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)).

With respect to the Bureau's authority to prohibit unfair or abusive acts or practices, Congress has provided both the general policy, and boundaries to that authority. The general policy of the CFPA is set forth in 12 U.S.C. § 5511: the Bureau's purpose is "to implement, and where applicable, enforce Federal consumer financial law consistently for the purpose of ensuring that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. 5511(a). This purpose is set forth in even greater detail in 12 U.S.C. § 5511(b). And as discussed above in connection with Defendants' vagueness argument, the CFPA provides boundaries that define the application of the Bureau's authority to prohibit unfair or abusive acts or practices. *See* 12 U.S.C. §§ 5531 (c), (d) (setting forth the limits of the prohibitions of unfair and abusive acts or practices). The Supreme Court has approved far less detailed principles, including instructions for agencies to fix "fair and equitable" commodities prices, *Yakus v. United States*, 321 U.S. 414, 426–27 (1944); to regulate broadcast licensing as "public interest, convenience, or necessity" requires, *Nat'l Broad. Co. v. United States*, 319 U.S. 190, 225–26 (1943); to take action to "avoid an imminent hazard to the public safety," *Touby v. United States*, 500 U.S. 160, 165-66 (1991); and to modify corporate structures so that they are not "unduly or unnecessarily complicate[d]" and do not "unfairly or inequitably distribute voting power among security holders," *Am. Power & Light Co.*, 329 U.S. at 104. In light of these precedents, there can be no doubt that the Dodd-Frank Act lays down "intelligible principles" for the Bureau to follow.[19]

[19] In any event, in this case the Bureau has not exercised the type of decisionmaking authority that could give rise to a non-delegation challenge. The Bureau's only decision has been to initiate this action by filing a complaint alleging that Defendants violated the specific statutory prohibitions of the CFPA. "Exercise of such prosecutorial discretion

## V. THE BUREAU'S COMPLAINT DOES NOT VIOLATE PRINCIPLES OF FEDERALISM

There is no merit to any aspect of Defendants' federalism argument. They urge this Court to apply reverse preemption and to hold that, if the conduct challenged by the Bureau also violates the law of any state, "then it should be up to those states," not the Bureau, to challenge that conduct. *See* Mem. at 21. That is, according to Defendants, state law should preempt application of the federal law. *But see* U.S. Const. art. VI, cl. 2 ("Laws of the United States ... shall be the supreme Law of the Land"). Not surprisingly, Defendants have no support for this argument. Indeed, as the Sixth Circuit explained in *United States v. Murphy*, 96 F.3d 846, 848 (6th Cir. 1996), "there is no conceivable constitutional basis for invalidating federal legislation" merely because the state also prohibits the conduct. *See also United States v. Quinn*, 235 Fed. Appx. 431, 432 (9th Cir. 2007) ("even where a state government has acted, Congress retains the right to vindicate the federal government's interests separately").

So Defendants suggest that the Bureau is attempting to enforce state law—they contend that the Bureau is "intrud[ing] on state law," by "bootstrap[ping] local, state-law issues," *see* Mem. at 21-22; *see also* Mem. at 23 ("[a]t bottom, this case is about All American's compliance with state and local laws regulating the check cashing industry").[20] The Bureau is not enforcing state law. It is enforcing the CFPA, which

involves no rulemaking power on the part of the Executive Branch and, therefore, cannot constitute delegation of legislative power ... let alone an unlawful delegation of such power." *United States v. Yousef*, 327 F.3d 56, 116 (2d Cir. 2003). So Defendants' non-delegation argument is irrelevant as well as meritless.

[20] To the extent that Defendants are suggesting the Congress lacked authority under the Commerce Clause to regulate Defendants' financial practices because this is would constitute a regulation of "purely local conduct," *see* Motion at 21, the Supreme Court has squarely rejected this suggestion. *See Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27,

prohibits unfair, deceptive, and abusive acts or practices. Defendants focus this argument on three counts of the Complaint: Counts I, III, and V. And, although Mississippi and Louisiana specifically regulate check-cashing services (Alabama does not), Defendants cite no statutory provision that prohibits the specific conduct challenged by the Bureau.[21]

With respect to Count I, the Bureau alleges that Defendants engaged in an abusive practice (in violation of 12 U.S.C. §§ 5531(a), 5531(d)(2)(B), 5536(a)(1)(B)) by materially interfering with the consumer's ability to learn a term—the costs—of the checking-cashing services, as well as the consumer's ability to cancel or reverse that transaction. *See* Complaint ¶¶ 66-68. In Count III, the Bureau alleges that Defendants engaged in a deceptive practice by, *inter alia*, falsely representing to consumers that information about the fee for cashing a check was not available. *See* Complaint ¶¶ 72-75. The Complaint recognizes that part of these violations involved interfering with—subverting, *see* Complaint ¶ 19—the cost disclosures required by the laws of some of the states in which Defendants operate.[22] But Defendants also interfered by distracting

38-39 (1980) ("banking and related financial activities are of profound local concern ... [n]onetheless, it does not follow that these same activities lack important interstate attributes").

[21] The dictum in *Beler v. Blatt*, 480 F.3d at 474 (the Fair Debt Collection Practices Act's prohibition of unfair practices "does not take a state-law dispute and move it to federal court"), *see* Motion at 22, is thus irrelevant here because, not only are the Bureau's check-cashing claims not based on Defendants' violation of state law, but also those claims challenge Defendants' practices in three states, including Alabama, a state that does not regulate check-cashing services. Indeed, the Seventh Circuit later held that notwithstanding *Beler*'s dictum, a plaintiff could assert a claim that deceptive statements in state court pleadings violated federal law. *Marquez v. Weinstein, Pinson & Riley, P.S.*, 836 F.3d 808, 810-12 (7th Cir. 2016).

[22] Defendants contend that the Complaint alleges they violated the CFPA "by" subverting local law. Motion at 21. The Complaint alleges nothing of the sort. Instead,

consumers from seeking information regarding costs, refusing to answer consumers' questions, and making deceptive statements about the availability of information about the fee. *See* Complaint ¶¶ 13, 18, 22, 23. Regardless of whether this conduct might violate state law, this does not preclude the Bureau from challenging the conduct. *See FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155-56 (9th Cir. 2010) (rejecting argument that if conduct complies with the state's "Little FTC Act" it cannot violate the federal FTC Act); *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1363 (11th Cir. 1988) (same). Moreover, while the Bureau does allege that Defendants *subverted* certain state law disclosure requirements, such as by covering the amount of the fee listed on the check cashing receipt and minimizing the amount of time consumers could see the receipt, *see* Complaint ¶ 20, the Bureau does not allege that Defendants *violated* these requirements, such as by failing to include the fee charged on the receipt entirely.

With respect to Count V, Defendants mistakenly suggest that the Bureau's claim is based on the fact that Defendants' "two-week loans violate statutes in Mississippi, Louisiana, and Alabama regulating 'roll over loans.'" *See* Mem. at 21. In fact, Count V alleges that Defendants deceive consumers by falsely representing that "1st and 3rd lending" would be more beneficial for the consumer than 30-day loans offered by their competitors. *See* Complaint ¶¶ 81-82. While the Bureau does allege that Defendants did frequently rollover consumers' loans in implementing "1st and 3rd" lending," *see* Complaint ¶ 43, the Bureau also alleges that even if Defendants did not rollover

---

the Complaint alleges that, as part of their effort to prevent consumers from learning the costs of the check-cashing service, Defendants subverted Mississippi and Louisiana laws that would have alerted consumers to those costs. *See* Complaint ¶ 19. The Complaint also details other steps that Defendants took to hide the costs. *See* Complaint ¶¶ 13, 18, 21-23.

consumers' loans, their practices were still deceptive, *see* Complaint ¶ 47 ("In addition, monthly customers sometimes have brought in nothing at all *or the entire amount due mid-month*. In these circumstances, monthly customers still pay more in fees for the same or less net cash received than if they had borrowed a 30-day loan from a competitor.") (emphasis added). It may be that the conduct challenged by the Bureau also violates state law, since most states have Little FTC Acts that prohibit the same sort of deception that the CFPA prohibits. However, state prohibitions of deception do not shield Defendants from the CFPA. *See Neovi*, *supra*; *Orkin*, *supra*.[23]

Defendants rely on *Bond v. United States*, 134 S. Ct. 2077 (2014), and argue that "the CFPB's overbroad interpretation" of unfair, deceptive or abusive acts or practices "improperly intrudes on traditional areas of state law."[24] *See* Mem. at 20. *Bond* explains that an ambiguous term in a statute should not be interpreted to reach purely local conduct absent a clear statement from Congress. Based on this, Defendants urge this Court to interpret the terms "unfair, deceptive, or abusive" so that they do not apply to "a traditional state power," by which Defendants apparently mean that the terms should

[23] Nor does the fact that the CFPA's prohibition of unfair, deceptive, and abusive acts or practices reaches some conduct that is also regulated by states somehow render the Bureau's structure unconstitutional. *See* Mem. at 22-23. As explained in Part I, above, the Bureau's authority is quite similar to that of the FTC, whose structure has been held to be constitutional, *see Humphrey's Executor v. United States*, *supra*, and the FTC Act, like the CFPA, reaches conduct prohibited by states.

[24] Defendants also cite *Gregory v. Ashcroft*, 501 U.S. 452, 470 (1991), which holds that "[i]n the face of such [statutory] ambiguity, we will not attribute to Congress an intent to intrude on state governmental functions," and *Solid Waste Agency of Northern Cook County v. U.S. Army Corps of Engineers*, 531 U.S. 159, 172-73 (2001), where the Court refused to apply the statutory term "navigable waters" to isolated ponds located wholly within two Illinois counties. Neither of those cases has any relevance here because the CFPA's text, purpose, and history show that Congress intended the Act to apply to consumer financial products and services, regardless of whether state laws or regulations also applied to those products and services.

not apply to any conduct that is also regulated by a state. Of course, even if states have traditionally regulated consumer financial products and services, so has the federal government—the federal Truth in Lending Act, 15 U.S.C. § 1601, *et seq.*, which mandates the disclosure of the terms of consumer credit transactions, was enacted in 1968. And since that time, Congress has enacted many other laws that regulate consumer financial products and services. *See, e.g.*, Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* (1970); Fair Credit Billing Act, 15 U.S.C. § 1666, *et seq.* (1974); Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.* (1977). In any event, Congress provided a clear indication that the CFPA applies to consumer financial products and services practices that are also regulated by states. When Congress enacted the CFPA, it did so in part to combat the "fragmented U.S. regulatory structure" that it believed had contributed to a failure "to adequately protect consumers and ensure financial stability." S. Rep. 111-176, at 10 (2010). If, as Defendants suggest, the CFPA only applies to conduct that has not been regulated by a state, this would thwart Congress' goal by making a confusing patchwork of the Bureau's authority—a practice that violated the CFPA in one state (because that state did not regulate the practice) might not be a violation in another (because that state did regulate the practice). Moreover, Congress gave a clear indication that the CFPA would apply to conduct that states also regulated. Thus, it specifically provided that the CFPA would not preempt a state law that provided a greater level of protection than the CFPA. *See id.* at 174-75, discussing 12 U.S.C. § 5551. There would have been no need for this provision if, as Defendants contend, Congress had intended the reach of the CFPA to be limited by state law.

## Conclusion

For the reasons set forth above, this Court should deny Defendants' Motion.

Dated: June 23, 2017

Respectfully submitted,

CONSUMER FINANCIAL PROTECTION BUREAU

ANTHONY ALEXIS
Enforcement Director

R. GABRIEL D. O'MALLEY
Acting Deputy Enforcement Director for Litigation

s/ Christopher Deal
CHRISTOPHER DEAL (DC Bar No. 990573)
Phone 202-435-9582
Email: christopher.deal@cfpb.gov
LAWRENCE DeMILLE-WAGMAN
(DC Bar No. 929950)
Phone: 202-435-7957
Email: lawrence.wagman@cfpb.gov
Senior Litigation Counsel

EMILY MINTZ (VA Bar No. 82437)
Phone: (202) 435-9424
Email: emily.mintz@cfpb.gov
MICHAEL FAVRETTO (NY Bar No. 4508727)
Phone: (202) 435-7785
Email: michael.favretto@cfpb.gov
STEPHANIE BRENOWITZ (NY Bar No. 4317418)
Phone: (202) 435-9005
Email: stephanie.brenowitz@cfpb.gov
DANIEL ABRAHAM (CA Bar No. 299193)
Phone: (202) 435-7039
E-mail: daniel.abraham@cfpb.gov
Enforcement Attorneys

Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722

# CERTIFICATE OF SERVICE

I hereby certify that on June 23, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

s/ Christopher Deal
CHRISTOPHER DEAL (DC Bar No. 990573)
Phone 202-435-9582
Email: christopher.deal@cfpb.gov
Senior Litigation Counsel
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722