# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
## NORTHERN DIVISION

**CONSUMER FINANCIAL PROTECTION BUREAU**                    **PLAINTIFF**

**VS.**                    **CIVIL ACTION NO. 3:16-cv-00356-WHB-JCG**

**ALL AMERICAN CHECK CASHING, INC.;**
**MID-STATE FINANCE, INC.; and**
**MICHAEL E. GRAY, individually**                    **DEFENDANTS**

---

## MEMORANDUM IN SUPPORT OF

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................... 1

SUMMARY JUDGMENT STANDARD.............................................................................. 1

THE PARTIES...................................................................................................................... 2

THE STATE ADMINISTRATIVE PROCEEDING........................................................... 3

COUNTS I-IV: DEFENDANTS' CHECK CASHING BUSINESS .................................... 4

   I.    Undisputed Facts Concerning Defendants' Check Cashing Business................................. 4

      A.   "Never Tell the Customer the Fee" ...................................................................... 4

      B.   Defendants Locked Consumers into Check Cashing Transactions................................. 9

      C.   Defendants' Key Check Cashing Personnel Trained Employees and Implemented Check Cashing Policies and Practices ................................................................... 12

  II.   Defendants' Check Cashing Acts and Practices Violated the CFPA ............................... 14

      A.   Counts I and II: Defendants Engaged in Abusive Acts or Practices............................. 14

      B.   Count III: Defendants Engaged in Deceptive Acts or Practices .................................... 17

      C.   Count IV: Defendants Engaged in Unfair Acts or Practices.......................................... 20

COUNT V: DEFENDANTS' DECEPTIVE REPRESENTATIONS TO CONSUMERS PAID MONTHLY........................................................................................................................ 22

   I.    Undisputed Facts Concerning Lending to Consumers Paid Monthly.............................. 23

      A.   Lending to "Monthly Customers" ...................................................................... 23

      B.   Defendants Routinely Made Deceptive Statements to Monthly Customers ................. 26

      C.   Defendants' Representations to Monthly Customers Were False................................. 27

      D.   Defendants Profited Greatly from 1st and 3rd Lending .................................................. 30

  II.   Defendants' Deceptive Representations Violated the CFPA (Count V) ........................... 32

COUNT VI: DEFENDANTS RETAINED CONSUMERS' OVERPAYMENTS ..................... 33

   I.    Undisputed Facts Concerning Overpayments.................................................................. 33

      A.   Defendants Collected Duplicate Payments, Did Not Provide Consumer Refunds........ 33

      B.   Defendants Erased Credit Balances Showing Overpayments in eCash......................... 35

  II.   Defendants' Retention of Overpayments Violated the CFPA (Count VI) ....................... 38

GRAY'S INDIVIDUAL LIABILITY ................................................................................. 40

   I.    Undisputed Facts Concerning Gray's Role...................................................................... 40

  II.   Gray is Individually Liable .............................................................................................. 43

REMEDIES....................................................................................................................45
   I.   The Court Should Order Restitution and Disgorgement....................................45
   II.  The Court Should Impose Injunctive Relief ....................................................47
   III. The Court Should Impose Civil Money Penalties against All Defendants........48
CONCLUSION..............................................................................................................49

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957 (D.C. Cir. 1985) ..........................................21, 22, 39

*Am. Home Prods. Corp. v. FTC*, 695 F.2d 681 (3d Cir. 1982)......................................................32

*Arthur Murray Studio of Wash., Inc. v. FTC*, 458 F.2d 622 (5th Cir. 1972) ...........................21, 22

*Bakers Franchise Corp. v. FTC*, 302 F.2d 258 (3d Cir. 1962) ......................................................33

*CFPB v. D&D Mktg.*, No. CV 15-9692, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)........21, 44

*CFPB v. Gordon*, 819 F.3d 1179 (9th Cir. 2016) ........................................................ 17, 32, 44-47

*CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878 (S.D. Ind. 2015) ...............17, 20, 21, 38, 44

*CFPB v. Morgan Drexen, Inc.*, No. SACV 13-1267-JLS (JEMx), 2016 WL 6601650
   (C.D. Cal. Mar. 16, 2016) ..........................................................................................................49

*CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016).....16, 44

*CFPB v. Orion Processing, LLC et al.*, No. 1:15-CV-23070, 2017 WL 2230705
   (S.D. Fla. 2017)...........................................................................................................................49

*CFPB v. Siringoringo*, No. SACV 14 01155 JVS (AJWx), 2016 WL 102435
   (C.D. Cal. Jan. 7, 2016) .............................................................................................................49

*Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240 (5th Cir. 2002) ...........................14

*Exposition Press, Inc. v. FTC*, 295 F.2d 869 (2d Cir. 1961) .........................................................18

*FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564 (7th Cir. 1989)..................................................44, 45

*FTC v. BlueHippo Funding, LLC*, 762 F.3d 238 (2d Cir. 2014) ....................................................46

*FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35 (D.C. Cir. 1985)................................18

*FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048 (C.D. Cal. 2012) ...........................20, 46, 47

*FTC v. Consumer Collection Advocates Corp.*, No. 14-CIV-62491, 2015 WL 12533013
   (S.D. Fla. Sept. 9, 2015).............................................................................................................45

*FTC v. Cyberspace.com LLC*, 453 F.3d 1196 (9th Cir. 2006).................................................18, 32

*FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285 (D. Mass. 2008)............................16, 21

*FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611 (6th Cir. 2014)......................................32

*FTC v. Figgie Int'l, Inc.*, 994 F.2d 595 (9th Cir. 1993)...............................................46

*FTC v. Fin. Freedom Processing, Inc.*, 538 F. App'x 488 (5th Cir. 2013) ............18, 19

*FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192 (10th Cir. 2005)............................46

*FTC v. Gem Merch. Corp.*, 87 F.3d 466 (11th Cir. 1996) ..........................................44

*FTC v. Gill*, 71 F. Supp. 2d 1030 (C.D. Cal. 1999) .....................................................32

*FTC v. Hispanic Global Way, Corp.*, No. 14-22018-CIV-ALTONAGA/O'Sullivan, 2014 WL 12531538 (S.D. Fla. July 1, 2014)..........................................................20

*FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228 (11th Cir. 2014) ...............................45

*FTC v. Inc21.com Corp.*, 745 F. Supp. 2d. 975 (N.D. Cal. 2010)........................22, 46

*FTC v. Kennedy*, 574 F. Supp. 2d 714 (S.D. Tex. 2008)........................................20, 45

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283 (S.D.N.Y. 2008)..................19

*FTC v. Nat'l Bus. Consultants, Inc.*, 781 F. Supp. 1136 (E.D. La. 1991) ...................46

*FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010)................................................21, 39

*FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974 (N.D. Ill. 2007)........................48

*FTC v. Peoples Credit First, LLC*, 244 F. App'x 942 (11th Cir. 2007) .......................32

*FTC v. Stefanchik*, 559 F.3d 924 (9th Cir. 2009).......................................................45

*FTC v. Sterling Drug, Inc.*, 317 F.2d 669 (2d Cir. 1963) ...........................................32

*FTC v. Think Achievement Corp.*, 144 F. Supp. 2d 1013 (N.D. Ind. 2000) ................46

*FTC v. Think All Publ'g, LLC*, No. 4:07-cv-011, 2008 WL 687456 (E.D. Tex. Mar. 11, 2008)...................................................................................45, 46

*FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247 (M.D. Fla. 2012) .........................18, 33

*FTC v. Windward Mktg., Ltd.*, No. CIV.A. 1:96-CV-615F, 1997 WL 33642380 (N.D. Ga. Sept. 30, 1997) .......................................................................20, 21, 33

*Gugliuzza v. FTC*, 137 S. Ct. 624 (2017) ...................................................................20

*Holland Furnace Co. v. FTC*, 295 F.2d 302 (7th Cir. 1961) .......................................22

*In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319 (1984)........................................18

*In re Greenway*, 71 F.3d 1177 (5th Cir. 1996) ...............................................................15

*In re Peacock Buick, Inc.*, 86 F.T.C. 1532, 1975 WL 172233 (1975)............................................19

*Lawsky v. Condor Capital Corp.*, No. 14 Civ. 2863(CM), 2014 WL 2109923
  (S.D.N.Y. May 13, 2014).........................................................................................40

*McGregor v. Chierico*, 206 F.3d 1378 (11th Cir. 2000)................................................46

*Novartis Corp. v. FTC*, 223 F.3d 783 (D.C. Cir. 2000)..............................16, 18, 20, 33

*Orkin Exterminating Co. v. FTC*, 849 F.2d 1354 (11th Cir. 1988) ...............20, 21, 39

*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) .........15

*SEC v. Apuzzo*, 689 F.3d 204 (2d Cir. 2012) ................................................................44

*SEC v. Halek*, 537 F. App'x 576 (5th Cir. 2013)..........................................................47

*SEC v. U.S. Sustainable Energy Corp.*, No. 5:08-cv-245 (DCB)(JMR), 2011 WL 2980549
  (S.D. Miss. July 21, 2011) ......................................................................................47

*Tashof v. FTC*, 437 F.2d 707 (D.C. Cir. 1970)..............................................................33

*United States v. Commercial Recovery Sys., Inc.*, 179 F.Supp.3d 728 (E.D. Tex. 2016).............45

*United States v. Graham*, 305 F.3d 1094 (10th Cir. 2002)..........................................44

*United States v. W.T. Grant Co.*, 345 U.S. 629 (1953)..................................................47

**Statutes**

12 U.S.C. § 5481..........................................................................................................43

12 U.S.C. § 5491............................................................................................................2

12 U.S.C. § 5531..................................................................................14, 16, 20, 38

12 U.S.C. § 5536......................................................................................................14, 42

12 U.S.C. § 5565......................................................................................................45, 48

La. Rev. Stat. § 6:1009..............................................................................................4, 8

La. Rev. Stat. § 9:3530..............................................................................................8, 21

La. Rev. Stat. § 9:3578............................................................................................23, 25

**Rules & Regulations**

12 C.F.R. § 1083 ......................................................................................................48

Ala. Code § 5-18A-12 ..........................................................................................23, 25

Ala. Code § 5-18A-13 ...............................................................................................23

Fed. R. Civ. P. 56 .......................................................................................................1

Miss. Code Ann. § 75-67-515 .....................................................................................8

Miss. Code Ann. § 75-67-517 .....................................................................................4

Miss. Code Ann. § 75-67-519 ................................................................................23, 25

Miss. Code Ann. §§ 89-12-1 to -59 ...........................................................................36

Mississippi Check Cashers Act, Rule 3.4 ...................................................................8

## INTRODUCTION

The Consumer Financial Protection Bureau ("Plaintiff" or "Bureau") brought this action to halt the illegal business practices of Defendants All American Check Cashing, Inc., Mid-State Finance, Inc., and Michael E. Gray ("Defendants"). The uncontroverted evidence collected by the Bureau—drawn from Defendants' own documents and discovery responses, sworn testimony, and declarations from 10 former employees and 8 harmed consumers—supports the Bureau's motion for summary judgment on all of its claims. Specifically, the factual record establishes that Defendants concealed the fee they charged consumers for cashing a check. If consumers did learn and object to the fee, Defendants deceived consumers about their ability to cash the check elsewhere and made it difficult or impossible for consumers to cancel or reverse the check cashing transaction. Defendants also made deceptive statements to lure consumers into expensive loans and failed to refund consumers who made overpayments. Defendant Michael E. Gray ("Gray"), the president and sole owner of Defendants All American Check Cashing, Inc. and Mid-State Finance, Inc., paid himself more than $13.5 million in salary, bonuses, and owner draws between 2011 and 2017. During that time, he directed the illegal business practices that are the subject of the Bureau's Complaint. The Bureau requests that this Court order that Defendants (1) return fees and overpayments paid by consumers as a result of Defendants' illegal schemes; (2) cease engaging in any check cashing or payday lending business; and (3) pay a civil money penalty.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Here, the

---

[1] Fed.R.Civ.P. 56(a).

record demonstrates that there is no genuine issue as to any material facts, and the Bureau is entitled to judgment on all counts.

## THE PARTIES

The Bureau is an agency of the United States charged with regulating the offering and provision of consumer financial products or services.[2]

Defendants All American Check Cashing, Inc. and Mid-State Finance, Inc. (together "AACC") are Mississippi corporations that offered and provided short-term, high-cost loans ("payday loans") and check cashing services to consumers in Mississippi, Alabama, and Louisiana from at least 2011 until 2017, when the state of Mississippi revoked their lending and check cashing licenses.[3] In May 2016, when the Bureau filed its Complaint, All American Check Cashing had approximately 50 stores, all but ten of which were in Mississippi, and Mid-State Finance had a single store in Mississippi.[4] Mid-State Finance's policies, procedures, and systems were identical to those of All American Check Cashing.[5]

Defendant Michael E. Gray ("Gray") resides in Madison, MS and is the president and sole owner of AACC.[6] At all times material to the Complaint, Gray formulated, directed, controlled, or participated in the acts and practices of AACC, including the acts and practices set forth in the Complaint.[7]

---

[2] 12 U.S.C. § 5491(a). The Bureau may bring civil actions against persons violating these laws and "seek all appropriate legal and equitable relief including a permanent or temporary injunction as permitted by law." 12 U.S.C. § 5564(a).

[3] Def. Answer ("Ans."), ECF No. 26 ¶¶ 6-7; Complaint ("Compl.") ¶¶ 6-7; Ex. 25, at 1 & 36. Citations to "Ex." refer to exhibits to the Bureau's Motion for Summary Judgment. An exhibit list is available at the end of the Mintz Declaration, filed herewith.

[4] Ans., ECF No. 26 ¶¶ 6-7; Compl. ¶¶ 6-7; Ex. 29, Interrog. 2(g), at 12-13.

[5] Ex. 33, 21:17-22:8.

[6] Ans. ¶ 8; Compl. ¶ 8. Gray founded All American Check Cashing in 1999, and purchased Mid-State Finance approximately ten years later. *Id.*

[7] *Id.*

AACC's corporate headquarters, called the "home office," was located in Madison, MS.[8] At the store level, AACC managers and manager trainees provided loans to and cashed checks for consumers.[9] Managers reported to supervisors, who oversaw and directed the business operations of multiple stores.[10] Supervisors managed approximately 8 stores at a time, sometimes more, and reported to a General Supervisor who reported to Gray.[11] Ten former AACC employees—including managers, manager trainees, and four supervisors who collectively oversaw more than 33 stores—have provided the Bureau with declarations detailing the Defendants' business practices described herein.[12]

## THE STATE ADMINISTRATIVE PROCEEDING

In June 2014, the Mississippi Department of Banking and Consumer Finance ("DBCF") began an investigative examination of AACC due to "substantive concerns expressed through consumer and industry complaints, and the sworn testimony of former employees."[13] In May 2017, following a twenty-four day hearing, the DBCF issued an Order revoking Defendants' licenses to cash checks and extend payday and title loans in the state of Mississippi.[14] Defendants subsequently sold all assets and ceased operating all stores, except for one in Louisiana.[15]

---

[8] Ex. 36A, 35:14-20; Ex. 34A, 35:6-35:15.

[9] Ex. 36A, 43:22-46:25.

[10] *Id.* Supervisors were also referred to as area supervisors, regional managers, and district managers. *Id.*

[11] Ex. 36A, 101:3-8. AACC also employed supervisor-level employees in business development for check cashing and training. *See* Ex. 29, Interrog. 9, at 45 (Jason Stabbs was "Bus. Dev. Supervisor"); Ex. 5 ¶ 2.

[12] Declarants include: Jason Stabbs, former business development supervisor for check cashing (Ex. 5 ¶ 2); four former supervisors – Sean Palmedo (Ex. 2 ¶ 2), David Peters (Ex. 3 ¶ 2), Susan Seymour (Ex. 4 ¶ 2), and Nathan Williams (Ex. 6 ¶ 2) – who collectively oversaw more than 33 stores in MS, AL, and LA (*id.*, Ex. 43, 25:7-22; Ex. 47, 29:17-34:9; Ex. 179); and five former managers and manager trainees who collectively worked in more than 8 stores (Ex. 7 ¶ 2; Ex. 8 ¶ 2; Ex. 9 ¶ 2; Ex. 10 ¶ 2; Ex. 11 ¶ 2).

[13] Ex. 25, pp. 3-4.

[14] Ex. 25, pp. 1 & 36.

[15] Ex. 36A, 17:2-7; 20:8-22.

<u>**COUNTS I-IV: DEFENDANTS' CHECK CASHING BUSINESS**</u>

**I. Undisputed Facts Concerning Defendants' Check Cashing Business**

Between July 21, 2011, and June 1, 2017, Defendants charged consumers more than $5.4 million in check cashing fees.[16] Defendants charged consumers a two-tiered, fixed-fee percentage for cashing checks.[17] Defendants determined the fee amount by applying a fee percentage to the face amount of the check.[18] The applicable fee percentage depended solely on whether or not the check was government-issued.[19] In Mississippi and Alabama, Defendants charged 3% of the face amount for government-issued checks (*e.g.* U.S. Treasury checks), and 5% for all other checks, with a $5.00 minimum.[20] These rates were the statutory maximum allowable in Mississippi for licensed check cashers.[21] In Louisiana, Defendants charged 2% of the face amount for government-issued checks, and 5% for all other checks, with a $5.00 minimum.[22] The 2% rate for government checks was the statutory maximum allowable in Louisiana for licensed check cashers.[23] AACC employees received bonuses based on the check cashing fees generated in their stores.[24]

A. <u>"Never Tell the Customer the Fee"</u>

Central to Defendants' check cashing policies and practices was the directive to "[n]ever

---

[16] Ex. 23 ¶ 6. Defendants began offering check cashing services to consumers in Mississippi in March 1999, in Louisiana in July 2012, and in Alabama in October 2013. *See* Ans. ¶¶ 6, 9; Compl. ¶¶ 6, 9; Ex. 29, Interrog. 5.

[17] Ex. 29, Interrog. 5(b); Ex. 71, at AACC00700373; Ex. 59, at ALL AMERICAN 001297.

[18] Ex. 45, at 53:1-54:11.

[19] *Id.*

[20] Ex. 29, Interrog. 5(b).

[21] Miss. Code Ann. § 75-67-517; Ex. 21 ¶ 50; Ex. 20 ¶¶ 1-5; Ans. ¶ 12; Compl. ¶ 12. Defendants did not cash personal checks. *See* Ex. 60, at AACC00474371.

[22] Ex. 29, Interrog. 5(b).

[23] La. Rev. Stat. § 6:1009(A); Ex. 21 ¶ 46.

[24] Ex. 70, at AACC00706026; Ex. 39, 19:12-18, 28:20-25, 70:17-74:21 (deposition testimony of Stephanie Mitchell, a former AACC employee who worked in 5 stores over two-plus years).

tell the customer the fee."[25] Defendants enshrined this fundamental rule in their policies and

procedures manual.[26] The rule was the subject of company-wide and store-level training on

check cashing over the course of years.[27] Gray also promoted the rule.[28] "Never tell the customer

the fee" meant what it said, in plain terms: Defendants instructed employees not to state the fee

for cashing a check—either the fee amount or the percentage—at any point in the transaction,

without exception.[29] Defendants did not orally disclose the fee to a consumer during the

transaction even if the consumer asked directly about Defendants' check cashing fees.[30]

Defendants trained employees to deflect consumer inquiries about fees by stating that

they were unable to determine the fee until the check was verified, sent to the home office, or put

into the system or computer.[31] Defendants also instructed employees to respond to fee inquiries

---

[25] Ex. 60, at AACC00474371; Ex. 71, at AACC00700373.

[26] *Id.*

[27] Ex. 61, at AACC00471778 ("Back 2 Basics" training instructing "never quote the fee"); Ex. 81, at AACC00554490 (store audit stating, "[r]emember we NEVER quote any fees") ; Ex. 84, at AACC00013088 (check cashing training presentation stating, "[n]ever quote the fee or the percentage of the fee when cashing a customers check"); Ex. 63, at CFPB00056540 (company-wide training identifying "top mistakes," including "quoting the fee we charge").

[28] Ex. 120, at AACC00384627 (Gray instructing "NEVER spout off the fee in dollars or percent and "[n]ever tell fee or percent"); Ex. 5 ¶ 6.

[29] Ex. 60, at AACC00474371 (March 2013 P&P); Ex. 62, at AACC00146304 ("we discussed that under no circumstances do we quote the fee % to the customer"); Ex. 98 (training document writing up employee for disclosing fee to the customer); Ex. 84, at AACC00013088; Ex. 45, 29:19-30:7, 53:1-56:25; Ex. 52, 62:12-25.

[30] Ex. 26, No. 19 (AACC Adm.); Ex. 27, Nos. 21-23 (AACC Supp. Adm.); Ex. 63, at CFPB 00056541-542 (company-wide training on how employees can evade customer inquiries about check cashing fee); Ex. 91, at AACC00790601 (consumer complaint re not disclosing fee); Ex. 44, 22:20-23:11, 24:14-25:13, 31:10-22 & Ex. 88, at AACC00785818 (testimony of consumer Chad Sheiner, and complaint); Ex. 87 (complaint that AACC employee was "not doing [his] job correctly because [he] waited until the transaction was complete to tell . . . how much [AACC] charged."); Ex. 89 (consumer complaint re not disclosing fee); Ex. 54 (transcribed consumer complaint from Defendants' automated "customer hotline," *see* Ex. 72 at AACC00012896); Ex. 58 (same); Ex. 142 (same); Ex. 13 ¶¶ 4-5 (consumer decl.); Ex. 12 ¶¶ 4-8 (same).

[31] Ex. 96 (in response to consumer fee inquiry, supervisor instructs employee to "play it cool like we have talked about, you never know the fee, its based on the type of check and the amount, you will not know until it has been verified and entered into the system); Ex. 8 ¶ 5; Ex. 10 ¶¶ 3-4; Ex. 3 ¶ 12; Ex. 43, 150:5-151:8, 181:10-182:18, 186:25-193:3; Ex. 88, at AACC00785818 (Sheiner complaint that AACC employee said she had to "get word back from headquarters" before telling him the fee, but completed the

by stating that "every check is different" and that the cost "depends on the company/maker."[32] Defendants' employees followed these instructions and made these statements to consumers.[33]

None of these statements was true. In fact, because check cashing fees were fixed, when a consumer presented a check to cash, store employees easily could have told consumers the fee charged.[34] Store employees knew the fee structure (*e.g.* 3% for government checks and 5% for all other checks).[35] In addition, Defendants trained store employees to distinguish government checks from non-government checks to determine the applicable fee percentage.[36] Moreover, Defendants' stores all contained calculators, and store employees had the means to determine the exact fee amount with a simple calculation.[37] Employees acknowledge that—had they been permitted—they could have determined the exact fee for cashing a check when asked.[38]

Contrary to their representations to consumers, store employees did not need to contact the home office, verify the check, or put the check in the system or computer to determine the fee. The verification process was not related to fee determination; the purpose was to make sure the check was not fraudulent.[39] Moreover, the home office did not verify all checks: for example,

---

transaction without ever stating the fee); Ex. 180 (second Sheiner complaint); Ex. 73, at AACC00204168 (store training that "[a]t **NO** point in cashing a check do we in a conversation with any customer should the amount of the fee ever be spoken. The proper phrase is **I'll have to put it in the system to see how much you'll BE GETTING BACK.**"); Ex. 64, at AACC00554490 (store audit stating "always tell the customer that the checks are all sent to our Home Office in Jackson and the fees are determined once we put it in our system").

[32] Ex. 61, at AACC00471778; Ex. 63, at CFPB00056542; Ex. 34B, 202:4-203:25.

[33] Ex. 8 ¶ 5; Ex. 10 ¶¶ 3-4; Ex. 11 ¶¶ 8-9; Ex. 7 ¶¶ 5-6.

[34] The only information the AACC employee needed to know was whether or not the check was a government check, which the employee determined by looking at the face of the check. Ex. 33, 116:25-118:14 (discussing Ex. 33F); Ex, 51, 45:22-46:15; Ex. 45, 53:1-56:25, 101:5-102:16; Ex. 43, 158:11-159:21; Ex. 8 ¶ 6.

[35] Ex. 45, 53:1-25; Ex. 39, 41:6-48:1; Ex. 11 ¶ 4.

[36] Ex. 45, 56:18-25; Ex. 51, 45:22-46:15; Ex. 65, at AACC00015028-029; Ex. 78, at AACC00150643-658; Ex. 70, at AACC00706009-021; Ex. 66, at AACC00013739-759.

[37] Ex. 34A, 58:1-21; Ex. 43, 159:9-160:25; Ex. 8 ¶ 5.

[38] Ex. 43, 158:11- 160:15; Ex. 7 ¶ 5; Ex. 11 ¶ 8; Ex. 8 ¶¶ 4-7.

[39] Ex. 45, 101:5-102:16, 124:15-125:15; Ex. 35, 140:16-141:1; Ans. ¶ 17; Compl. ¶ 17.

store employees verified and cashed all checks for less than $1000 (or, in some cases, $2000) without contacting the home office.[40] Nearly 70% of all checks cashed by Defendants were for under $1000.[41] It was also store employees, not the home office, who determined whether the consumer's check was government-issued or not, and therefore which fee percentage applied.[42] On the occasion when a store employee did submit a check to the home office for verification, the employee completed and sent a "check cashing questionnaire" that indicated whether the consumer's check was "government or state," or some other category.[43] Further, eCash, Defendants point-of-sale software, required store employees to select the "check type" (indicating if the check was government or not) from a drop down menu when cashing the check.[44] Store employees were also able to view the exact fee charged in eCash prior to completing a check cashing transaction and printing the receipt,[45] but were not permitted to tell the consumer the fee amount.[46] One of the Defendants' "10 Rules of Check Cashing" ("10 Rules")—a mandatory policy[47]—dictated that, upon presenting the receipt, employees were only to indicate the amount of cash the consumer would receive rather than the fee or fee percentage charged.[48]

Defendants also trained employees to distract consumers in order to divert their attention

---

[40] Ex. 33, 118:7-14; Ex. 71, at AACC00700376; Ex. 82, at AACC00015030; Ex. 72, at AACC00012865 (April 2014 policy that managers can cash checks up to $2000 without home office approval).
[41] Ex. 23 ¶ 7.
[42] Ex. 49, 119:2-7; Ex. 33, 116:25-118:6 (discussing Ex. 33F).
[43] Ex. 74, at AACC00058870-576 (company-wide circulation of "check cashing questionnaire"); Ex. 72, at AACC00012865.
[44] Ex. 97, at AACC01776010 (email instructing stores to "select government under the check type" in eCash if processing a government check); Ex. 75, at CFPB00060895-897 (eCash user manual); Ex. 133, at CFPB00063037 (eCash employee user guide).
[45] *Id.*; Ex. 69 (processing transaction in eCash immediately after verification).
[46] Ex. 8 ¶ 7; Ex. 11 ¶ 8.
[47] Ex. 33, 116:15-17; Ex. 43, 173:15-24; Ex. 45, 92:18-93:20, 94:22-95:11.
[48] Ex. 69 (Rule 7 of the 10 Rules); Ex. 84, at AACC000013084-088; Ex. 70, at AACC00706004-010. *See also* Ex. 27, Nos. 21, 24 (AACC Supp. Adm.).

from the check cashing fee charged.[49] Store employees accomplished this by "keeping the customers mind busy, talking, asking questions, to keep [the] customer busy thinking about something other than the fee,"[50] and keeping the customer "overwhelmed with info."[51]

Defendants also instructed employees to draw attention away from, or directly conceal, fee disclosures mandated by law. In Mississippi, state law requires consumers to sign an acknowledgment of the fee charged,[52] and in both Mississippi and Louisiana, state law requires check cashers to display a sign listing the fee percentages charged.[53] Defendants asked consumers to sign a receipt listing the fee amount and percentage at the end of the transaction, but Defendants trained employees to block the fee information from consumers by counting cash over the receipt or otherwise covering the receipt at the time of signature.[54] Defendants further instructed employees to keep the consumer at the counter for as short a time as possible, and to take the receipt off the counter as soon as it was signed.[55] Employees followed Defendants'

---

[49] Ex. 68, at AACC02061950 (check cashing presentation instructing employees to "[b]e quick…Constant information given to customer" so "they are overwhelmed with info"); Ex. 123, at AACC00417896 (check cashing training "on keeping customers mind busy, talking, asking questions, to keep customer busy thinking about something other than fee"); Ex. 67, at AACC00239245 (training on "good customer service by communicating with that customer to take their mind off any fee's etc."); Ex. 34B, 212:17-215:14; Ex. 45, 138:8-139:7.

[50] Ex. 123, at AACC00417896.

[51] Ex. 45, 138:8-139:7; Ex. 68, at AACC02061950; Ex. 6, ¶ 8; Ex. 4, ¶¶ 4-7. Rule 3 of the 10 Rules of Check Cashing, *see* Ex. 69, counseled employees to "make small talk with the customer occupying their time and offering them giveaways" while the check was verified.

[52] See Mississippi Check Cashers Act, Rule 3.4, *available at* http://www.dbcf.state.ms.us/documents/cons_finance/checkcasherregs120112.pdf.

[53] *See* Miss. Code Ann. § 75-67-515(4); La. Rev. Stat. § 6:1009(B).

[54] Rule 9 of the 10 Rules, Ex. 69 ("Count money out over receipt."); Ex. 61, at AACC00471783 (instructing employees to "count out cash over receipt" before obtaining the customer's signature); Ex. 45, 65:20-68:11 & Ex. 5 ¶ 3; Ex. 47, 77:12-80:1; Ex. 35, 142:24-143:16; Ex. 2 ¶ 13; Ex. 6 ¶¶ 9-11; Ex. 7 ¶ 6; Ex. 11 ¶¶ 10-12; Ex. 8 ¶¶ 7-10.

[55] Rule 6 of the 10 Rules, Ex. 69 ("The time that the customer is at the counter should be as minimal as possible."); Ex. 8 ¶ 10; Ex. 76, at AACC00034499-501 (October 2012 company-wide meeting participant survey feedback about Laura Faulkner check cashing training presentation, including "keep receipt away from customer as much as possible"; "to keep the paper for them to sign on the counter for only a second"; "remove receipt and check as quickly as possible"; "make sure to have money counted out and

instruction by speeding through transactions, counting cash over the receipt or otherwise covering the fee amount listed, and taking the receipt from the counter as soon as it was signed.[56] In some cases, employees did not provide consumers with a copy of the receipt at all.[57]

In most of Defendants' stores, the state-mandated signs with fee percentages were located under the front counter and not visible to a consumer standing at the counter.[58] In some instances, Defendants obstructed consumers' view of the signs, including by placing holiday decorations over the signs.[59] Not surprisingly, consumers did not see the fee percentages on the signs and often, as a result, asked about the fee.[60] Defendants did not train employees to direct consumers to the sign if the consumer asked about the fee,[61] and employees stated that they were not permitted to do so[62] or otherwise state the fee.[63]

## B. Defendants Locked Consumers into Check Cashing Transactions

As a result of Defendants' practices, many consumers did not learn the fee charged for cashing a check until the end of the transaction, and others did not learn the fee charged at all.[64]

---

count over the receipt to customer and put check right away in drawer before presenting receipt and money").

[56] Ex. 7 ¶ 6; Ex. 41, 87:8-90:1; Ex. 8 ¶ 8-10; Ex. 10 ¶ 5; Ex. 47, 79:13-80:1, 217:22-218:13; Ex. 43, 149:10-152:5, 177:9-20; Ex. 39, 58:18-59:9; Ex. 35, 142:24-143:16; Ex. 11 ¶ 10; Ex. 91, at AACC00790601 (complaint stating that employee blocked fee amount on receipt).

[57] Ex. 57, at AACC00225998 (consumer complaint about not receiving receipt); Ex. 57 (transcribed consumer complaint stating, "I cashed a check here today, and I asked for a receipt for how much it was, and she couldn't give me a receipt showing me how much it cost to cash the check."); Ex. 142 (transcribed consumer complaint stating, "I called [AACC employee] back and realized I didn't have a receipt and I still didn't know exactly how much I was charged[.]").

[58] Ex. 43, 162:4-163:10; Ex. 39, 76:17-77:18; Ex. 3 ¶ 11; Ex. 10, ¶ 7; Ex. 77, at AACC02119777 (compliance audit form identifying fee signs as "under front counter"); Ex. 22 ¶¶ 3-4, Exs. A-F.

[59] Ex. 11 ¶ 7; Ex. 22 ¶¶ 3-4, Exs. A-F.

[60] Ex. 44, 31:5-22, 63:9-15; Ex. 43, 162:4-163:16; Ex. 12 ¶ 5 (consumer decl.); Ex. 15 ¶ 5 (same); Ex. 7 ¶ 7; Ex. 3 ¶ 11; Ex. 89 (consumer "did not see signs on the front of the counter").

[61] Ex. 26, No. 29 (AACC Adm.).

[62] Ex. 43, 162:4-163:16; Ex. 7 ¶ 7; Ex. 6 ¶¶ 4-9.

[63] Ex. 45, 29:19-30:7; Ex. 13 ¶¶ 4-5 (consumer decl.); Ex. 3 ¶¶ 10-12; Ex. 7 ¶¶ 4-6.

[64] Ex. 43, 161:13-162:3, 181:12-193:3; Ex. 47, 76:4-80:1; Ex. 44, 100:6-23; Ex. 14, ¶¶ 3-6 (consumer decl.); Ex. 12, ¶¶ 4-6 (same); Ex. 10, ¶¶ 4-6; Ex. 89 (consumer complaint); Ex. 56 (transcribed consumer

Defendants engaged in a concerted effort to lock consumers into transactions before Defendants presented consumers with the receipt. First, Defendants trained employees to "always keep the check" because it "keeps you in control of the situation" and the "customer can't just walk out and leave without talking to you."[65] Following this directive, employees made a copy of the check at the beginning of the transaction and then put the original check in a drawer.[66] According to Defendants' documents and employee testimony, this practice kept the check "out of sight" and "out of mind," lessening the likelihood that consumers would change their mind.[67]

Defendants also trained employees to stamp consumers' checks with a stamp that read "For Deposit Only: All American Check Cashing, Inc." before presenting the receipt to the consumer.[68] Consumers complained about this practice.[69] Some employees falsely told consumers that the employees had to stamp the check to verify it.[70] Once employees stamped the check, they told consumers who asked to cancel the transaction that consumers could not cash the check elsewhere as a result of the stamp.[71] And, the stamp did in fact render checks uncashable at many other stores and financial institutions.[72]

Defendants used a similar lock-in strategy during tax refund season. For refund checks issued to consumers by tax preparers, store employees often verified checks by calling a toll-free

---

complaint); Ex. 57 (same); Ex. 58 (same); Ex. 142 (same); Ex. 178, at AACC00225997.

[65] Ex. 61, at AACC00471778.

[66] Ex. 45, 135:3-136:11.

[67] Ex. 43, 198:1-16; Ex. 68, at AACC02061947; Ex. 99, at AACC02127832 (store training).

[68] Ex. 39, 36:18-38:22, 53:23-56:1; Ex. 45, 28:7-29:18, 181:23-182:6; Ex. 43, 164:11-24, 165:4-13, 166:5-167:21; Ex. 100 & Ex. 101 (training documents instructing employees to stamp the check prior to cashing it for consumer); Ex. 5 ¶¶ 3-4; Ex. 8 ¶ 7; Ex. 21 ¶¶ 55-62; Ex. 11 ¶ 13; Ex. 7 ¶ 10.

[69] Ex. 13 ¶¶ 6-9 (consumer decl.); Ex. 44, 33:18-34:9, 44:9-45:8; Ex. 55 (transcribed consumer complaint stating that "I came to get three checks cashed . . . and they were stamped without my approval, before I was told how much percentage would be taken.").

[70] Ex. 39, 54:10-56:1.

[71] Ex. 43, 164:11-167:21; Ex. 92, at AACC01047517; Ex. 13 ¶ 7; Ex. 14 ¶¶ 6-9 (consumer decl.); Ex. 7 ¶ 10; Ex. 5 ¶ 4; Ex. 44, 43:15-45:8.

[72] Ex. 21 ¶¶ 56-61; Ex. 78, at AACC00150658 (AACC presentation identifying as a "red flag" a check that comes in "endorsed already"); Ex. 26, Nos. 9-10 (AACC Adm.); Ex. 55.

number to obtain a "verification number" or "authorization number" that was necessary to cash the check.[73] Defendants trained employees to record the number on a "Post-It" or other piece of paper, rather than the check itself, until after the transaction was complete and the consumer left the store.[74] Laura Faulkner, tasked with check cashing training company-wide, explained the reasons in an e-mail to Gray:

> Writing the authorization number on a post-it, in the event that the customer changes their mind and takes their tax check back they do not have the authorization number to carry to another check casher. Most Tax banks will only verify checks once. If it is already verified and we have the verification number, they usually come back to us to cash. After check is cashed we write the authorization number on the check. We have done this for years.[75]

By obtaining the verification number and withholding it from the consumer, Defendants ensured that unsuspecting customers lost the ability to take their check cashing business elsewhere if, for example, they later objected to the fee.[76]

If a consumer learned the check cashing fee at the end of the transaction and wanted to void the transaction, employees, following instruction from Defendants, made misleading statements to pressure the consumer and create the impression that the consumer had no choice but to cash the check with Defendants, even when that was not true.[77] First, employees overstated the difficulty of voiding a transaction by claiming that it could take a long time or that

---

[73] Ex. 121, at AACC00023700-701, 728-730 (tax check verification process); Ex. 26, No. 13 (AACC Adm.); Ex. 27, No. 14 (AACC Supp. Adm.); Ex. 85, at AACC00278241, -248-250; Ex. 6 ¶ 15.

[74] Ex. 45, 136:14-137:23; Ex. 68, at AACC02061949; Ex. 85, at AACC00278275.

[75] Ex. 122, at AACC00277205-206.

[76] Ex. 6 ¶ 15; Ex. 15 ¶¶ 6-10 (consumer decl.); Ex. 141 (in regard to consumer hotline complaint, Defendants' employee in charge of handling states "Dude is not going to go away . . . He wants ½ of his fee back because of the way we tricked him into cashing it by verifying it when we knew he couldn't take it anywhere else and he told us not to cash it at 5%."); Ex. 90 (email recounting tax refund check consumer complaint, stating that the consumer "thinks the person on the phone said to give her the check back but then she was told she couldn't cash it anywhere else."); Ex. 93 ("[t]he customer is upset because [the AACC employee] verified her tax check and decided she didn't want to cash it and now she can't get it cashed anywhere else").

[77] Ex. 3 ¶ 14; Ex. 43, 165:4-13; Ex. 39, 42:13-43:23.

it was not possible,[78] even when these statements were false.[79] Defendants also stated that the consumer could not take the check elsewhere because Defendants had verified the check, even when verification did not render the check unable to be cashed elsewhere.[80] Defendants also told consumers, without knowing whether or not it was true, that if consumers brought the check to a bank instead, it could take up to 14 or 21 days to get cash.[81]

C. Defendants' Key Check Cashing Personnel Trained Employees and Implemented Check Cashing Policies and Practices

At various times during the relevant period, Jason Stabbs, Laura Faulkner, and Randy Kirby were the supervisors responsible for check cashing training and auditing in stores and company-wide.[82] The presentations, emails, and audits that they prepared reflect training and implementation of the policies and practices described above.[83]

---

[78] Ex. 3 ¶ 15; Ex. 39, 66:6-25, 68:10-25, 69:18-70:10; Ex. 43, 171:14-18; Ex. 102, at AACC00420300-301 (employee not "pushing the customer to cash the check" when they try to change their mind after finding out about the fee).

[79] According to Defendants, it generally should only take store employees working with the home office 5-10 minutes to void a check cashing transaction. Ex. 31, Interrog. 10.

[80] Ex. 39, 67:25-69:23; Ex. 45, 136:14-137:23; Ex. 11 ¶ 13. Although for some tax refund checks, verification could lock a consumer into a transaction, that was not the case with all checks. Ex. 45, 134:9-138:7; Ex. 4 ¶ 5.

[81] Ex. 63, at CFPB00056544; Ex. 43, 180:6-23; Ex. 7 ¶ 8; Ex. 79, at All American 003399 (ad stating that banks could make consumer wait up to 21 days for cash); Ex. 80, at All American 003916 (14 days); Ex. 49, 181:14-17 (bank hold of 7-14 days "not always true"); Ex. 21 ¶ 64.

[82] Ex. 45, 27:19-30:7, 30:12-34:24, 35:24-36:19, 38:5-40:16, 40:21-42:25; Ex. 34A, 39:18-41:15, 42:7-21; Ex 34B, 170:8-14.

[83] *See, e.g.*, **Stabbs:** Ex. 95, at AACC00022211 (email instructing entire company "DO NOT UNDER ANY CUIRCUMSTANCE [sic] QUOTE THE FEE"); Ex. 81, at AACC00554490 ("[r]emember we NEVER quote any fees, always tell the customer that the checks are all sent to our Home Office in Jackson and the fees are determined once we put it in our system."); Ex. 68, at AACC02061947 (companywide training to place "check in drawer after copying, out of sight out of mind"), -949 (withholding of authorization code during tax refund season), -950 (overwhelm consumers with information other than fee); **Faulkner:** Ex. 98 (admonishing store employee for not following 10 Rules by informing customer of the fee during transaction; *see also* Ex. 7 ¶ 13); Ex. 123, at AACC00417896 (store training to keep the customer's "mind busy, talking, asking questions, to keep customer busy thinking about something other than the fee"); Ex. 63, at CFPB00056540-546 (companywide training on check cashing identifying "quoting the fee we charge" as a mistake; teaching ways to evade disclosing check cashing fee to customers; training on deceptive statements about how long banks will hold checks);Ex. 70, at AACC00706010 (companywide training on "Key Points to Remember," including

The way Defendants' supervisors and employees reacted to consumer complaints demonstrates that Defendants expected employees to engage in the harmful and illegal conduct described herein. In reporting an incoming complaint from a consumer,[84] a store manager notified her supervisors: "the boyfriend or husband got extremely upset with the fee, demanded the check back, which I gave back but since I stamped it he knew nobody else would cash it . . . You can pull it on tape, I did everything by the book…."[85] The consumer ended up cashing the check with Defendants because she thought she had no other option.[86] In another e-mail, Faulkner recounted the experience of a consumer who was upset after being subjected to one of Defendants' lock-in techniques:

> [t]his customer is upset because [Defendants' employee] Heather verified her tax check and decided she didn't want to cash it and now she can't get it cashed anywhere else. She is CRAZY . . . I did have a talk with Heather about never ever quoting fees, or giving any indication what our fee is without the customer and the check being in the office and first verifying it and then running it through our system like our policy states.[87]

Another example of Defendants' policies in action, with the full knowledge and approval of the highest levels of management, is Defendants' handling of the "Black Farmer Litigation" checks. In September 2013, Defendants became aware of litigation settlement checks in the amount of $50,000 being issued to African-American farmers in and around Mississippi.[88] Stabbs sent an email to all stores informing them of the settlement checks and the policies to

---

"never quote the fee or the percentage to the customer, always refer to the 'amount they are getting back'"); **Kirby:** Ex. 83, at AACC00426061 (instructing new manager to follow the 10 Rules and "never quoting the fee either in a percentage or dollar amount."); Ex. 84, at AACC00013088 ("never quote the fee or the percentage of the fee when cashing a customers check"); Ex. 85, at AACC00278248-250, -275 (companywide training discussing tax refund checks and withholding authorization code), -273 (check in drawer "out of sight out of mind"); Ex. 86, at AACC00026720 (overwhelm customer with info).
[84] *See generally* Ex. 13 (Logan decl.).
[85] Ex. 92, at AACC01047517. The supervisor responded "[t]hat is a little funny right there." *Id.*
[86] Ex. 13 ¶¶ 7-9.
[87] Ex. 93.
[88] Ex. 94. Gray ordered stores to cash these checks if consumers brought them in. *Id.*

follow in cashing them. Stabbs wrote "[t]he fee for cashing these is 5%, DO NOT UNDER ANY CUIRCUMSTANCE [sic] QUOTE THE FEE. Follow the 10 Rules of Check Cashing."[89] In emails, Stabbs identified for every store: the face amount of the settlement checks ($50,000); the applicable fee percentage (5%); and the amount the customer should get back ($47,500).[90] Notwithstanding that employees were provided all relevant fee information prior to cashing these checks, Defendants still prohibited them from telling consumers the fee.[91]

## II. Defendants' Check Cashing Acts and Practices Violated the CFPA

Under the Consumer Financial Protection Act ("CFPA"), it is unlawful for any covered person "to engage in any unfair, deceptive, or abusive act or practice."[92] The overwhelming weight of the factual record demonstrates that Defendants' check cashing acts and practices were unfair, deceptive, and abusive. Consequently, the Court should grant summary judgment to the Bureau on Counts I-IV of the Complaint.

### A. Counts I and II: Defendants Engaged in Abusive Acts or Practices

An act or practice is "abusive" if, among other things, it (1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service, or (2) takes unreasonable advantage of the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service.[93] Courts interpret statutes according to their plain meanings.[94] "In determining a statute's plain meaning, [courts] assume that, absent any contrary definition, 'Congress intends the words in its

---

[89] Ex. 95, at AACC00022211-213.
[90] *Id.*; Ex. 45, 83:1-23, 88:7-24.
[91] *Id.*
[92] 12 U.S.C. § 5536(a)(1)(B).
[93] 12 U.S.C. § 5531(d)(1), (d)(2)(B).
[94] *See Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 260 (5th Cir. 2002).

enactments to carry their ordinary, contemporary, common meaning."[95]

1. Count I: Defendants materially interfered with the ability of consumers to understand the terms or conditions of Defendants' check cashing services.

Defendants materially interfered with the ability of consumers to understand the terms and conditions of Defendants' check cashing services by and through their policy and practice of never telling consumers the fee to cash a check, even when the consumer asked, and by training employees to make false and misleading statements about the availability of information about the fee.[96] Defendants' fee structure depended only on whether the check was government-issued or not, and determining the fee amount involved only applying the applicable fee percentage to the face amount of the check. At every step of the transaction, employees had the ability to tell customers the fee percentage or to calculate the fee amount, but Defendants' policies forbade employees from providing any information to consumers about the fee.[97] Defendants' handling of the "Black Farmers Litigation" settlement checks is instructive: even though Defendants knew the fee to cash these $50,000 checks was $2,500 prior to any being cashed, Defendants' expressly prohibited employees from disclosing the fee to consumers.[98]

Defendants further materially interfered with the ability of consumers to understand the terms and conditions of Defendants' check cashing services by and through their policy and practice of physically covering the fee amount listed on the receipt and minimizing the amount of time the consumer had to see the receipt.[99] This physical interference kept consumers from learning the amount of the fee even at the end of the transaction. Defendants also materially

---

[95] *In re Greenway*, 71 F.3d 1177, 1179 (5th Cir. 1996), *quoting Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 388 (1993).
[96] *See* pp. 4-7, *supra*.
[97] *See* pp. 4-9, *supra*.
[98] *See* pp. 13-14, *supra*.
[99] *See* pp. 7-9, *supra*.

interfered by prohibiting employees from directing consumers' attention to signs listing check cashing fees, even if asked about fees by the consumer, and obscuring those signs.[100]

The nature of Defendants' interference is material because it concerns the very essence of the transaction: the fee charged for cashing checks. In the context of deceptive practices, "information has been found material where it 'concerns the . . . cost, of the product or service.'"[101] Defendants' purposefully designed their policies to ensure that their employees would withhold material fee information from consumers – and that is exactly what AACC employees did.

2. Count II: Defendants' took unreasonable advantage of consumers' inability to protect their interests in check cashing transactions.

Defendants also took unreasonable advantage of consumers' inability to protect their interests when cashing checks.[102] Consumers were unable to protect their interests because Defendants unfairly exploited the existing information asymmetry during the check cashing transaction to make consumers believe that their only option was to pay any fee Defendants charged them. Defendants' employees were intimately familiar with their own processes and policies, check cashing regulations, and industry norms, while consumers were not.[103] Defendants improperly used this informational edge to: (1) make false and misleading statements about the availability of fee information; and (2) create a situation where consumers believed they were locked into transactions with Defendants, such as by stamping checks "For Deposit

---

[100] *See* pp. 8-9, *supra*.
[101] *See, e.g.*, *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010), *quoting Novartis Corp. v. FTC*, 223 F.3d 783, 786 (D.C. Cir. 2000).
[102] 12 U.S.C. § 5531(d)(2)(B).
[103] *Cf. CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *15 (S.D.N.Y. Dec. 2, 2016) ("It should be patently obvious to any lender that most consumers will be completely unaware of the details of their state's usury laws, such that misrepresenting the nature of those laws will interfere with the consumer's ability to understand . . . and make an informed choice[.]").

Only," withholding the verification number obtained from tax refund checks, and overstating the difficulty of voiding transaction.[104] Defendants employed these practices to pressure consumers into finalizing the transaction[105] and took unreasonable advantage of consumers' inability to protect their interests: Defendants' profited handsomely (in the form of millions of dollars in fees) as a result of their pressure tactics and the excessively strong position that their own inequitable conduct created.[106] This abusive practice violated the CFPA.

### B. Count III: Defendants Engaged in Deceptive Acts or Practices[107]

An act or practice is deceptive if "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material."[108]

#### 1. Defendants' deceptive representations about the fee.

Defendants misrepresented to consumers that information about the check cashing fee was not available or that the fee could not be readily determined. When consumers asked about the fee, Defendants' employees stated—as they were trained to do—that they did not know the fee amount and needed to take additional steps to determine it, such as verifying the check, sending the check to home office, or putting the check into the computer.[109] Employees also stated that "every check is different" and that "it depends on the company/maker as to the

---

[104] *See* pp. 5-7, 9-12, *supra.*

[105] Even if consumers had "theoretical power" to walk away, "a reasonable reading of the statutory language . . . is that it refers to oppressive circumstances—when a customer is unable to protect herself not in absolute terms, but relative to the excessively strong position of the defendant." *CFPB v. ITT Educ. Servs., Inc.* (*ITT*), 219 F. Supp. 3d 878, 919-920 (S.D. Ind. 2015).

[106] *See id.* at 918 (discussing ordinary meaning of "to take advantage of" as including "profit by"; when combined with unfair practices, allegations showed "unreasonable advantage").

[107] Because Section 5 of the FTC Act contains a nearly identical prohibition, cases interpreting the FTC Act are relevant when analyzing an act or practice that may be unfair or deceptive under the CFPA. *See CFPB v. Gordon*, 819 F.3d 1179, 1193 n. 7 (9th Cir. 2016), *cert. denied*, 2017 WL 2722468; *ITT*, 219 F. Supp. 3d at 904.

[108] *Gordon*, 819 F.3d at 1192 (quotation marks omitted).

[109] *See* pp. 5-6, *supra.*

cost."[110] These statements were false. Employees always knew how to determine the fee: not only did employees know the fee structure (e.g. 3% or 5%), they also knew the applicable fee percentage just by looking at the check and could have calculated the exact fee amount from the face of the check.[111]

Defendants' representations regarding the fee amount were likely to mislead consumers acting reasonably. A consumer's interpretation is "presumed reasonable if it is the one the respondent intended to convey."[112] Here, Defendants intended to convey that they did not know the fee for cashing the check or that it could not be readily determined and consumers could reasonably believe that Defendants meant what they said. Defendants' representations were also material. "[A] material claim is one that involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."[113] Claims are presumed to be material if they are made expressly or are about a central characteristic of a service, such as its cost.[114] Defendants' claims were express and concerned the cost of cashing the check.

It is no defense that the check cashing fee percentages were posted on a sign and the fee amount and percentage was listed on receipts. A representation "may be likely to mislead by virtue of the net impression it creates," even when it is accompanied by truthful information.[115]

---

[110] *Id.*
[111] *Id.*
[112] *FTC v. Wash. Data Res.*, 856 F. Supp. 2d 1247, 1272 (M.D. Fla. 2012), *quoting* FTC Policy Statement on Deception ("Deception Statement"), *appended to In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 1984 WL 565319, at *47 (1984), *aff'd*, 704 F.3d 1323 (11th Cir. 2013).
[113] *Novartis*, 223 F.3d at 786 (quotation marks omitted).
[114] *Id.*; Deception Statement at *49.
[115] *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (affirming grant of summary judgment where solicitation created a misleading net impression). Courts have found in a variety of contexts that deceptive statements were not cured by truthful disclosures. *See e.g.*, *FTC v. Fin. Freedom Processing, Inc.*, 538 F. App'x 488, 489 (5th Cir. 2013) ("'[T]he law is violated if the first contact is secured by deception, even though the true facts are made known to the buyer before he enters into the contract of purchase.'"), *quoting Exposition Press, Inc. v. FTC*, 295 F.2d 869, 873 (2d Cir. 1961)); *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985) (finding that a claim about the

Indeed, disclosures are particularly ineffective if a seller's conduct "may direct consumers' attention away from the qualifying disclosures,"[116] as was the case here.[117] Defendants placed disclosure signs under the front counter in most stores.[118] The sign placement rendered the disclosures ineffective: the sign was not visible to consumers standing at the counter during a transaction.[119] In addition, Defendants sometimes obscured the signs, and employees were not allowed to direct consumers' attention to them.[120] Unsurprisingly, consumers frequently did not see the sign: that consumers asked about the fee amount—prompting Defendants to make the deceptive statements at issue—makes clear that consumers did not know the fee.[121] The fact that a consumer could learn the amount of the fee from the receipt at the end of the transaction does not absolve Defendants either. By then, the deception had served its purpose as the transaction was completed and Defendants made it onerous to reverse.[122]

2. <u>Defendants' deceptive representations about cancelling or reversing transactions.</u>

If a consumer objected to the fee amount, Defendants misrepresented to consumers that it was difficult or time-consuming to cancel or reverse a check cashing transaction and that consumers could not cash their check elsewhere because it had already been verified, when these

---

tar content of cigarettes was deceptive despite a less visible disclaimer); *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) ("[E]ach representation must stand on its own merit, even if other representations contain accurate, non-deceptive information.") (quotation marks omitted).
[116] Deception Statement at *48; *In re Peacock Buick, Inc.*, 86 F.T.C. 1532, 1975 WL 172233, at *21-22 (1975) (car dealer's employees' deceptive statements about credit life insurance caused consumers to ignore written disclosures).
[117] *See* pp. 8-9, *supra*.
[118] *See* p. 9, *supra*.
[119] *Id.*
[120] *Id.*
[121] *See* pp. 8-9, *supra*.
[122] *See* pp. 11-12, *supra*; *cf. Fin. Freedom Processing*, 538 F. App'x at 489-490 (noting "there is an argument with considerable purchase," not raised by the parties, that the district court erred by considering "critical disclosures made only when consumers arrived at the bargaining table").

statements were not true.[123] These statements were misleading, and Defendants clearly intended to convey them.[124] The statements were material because they were made expressly and to affect a consumer's choice of whether to cash a check with Defendants or take it elsewhere.[125]

## C. Count IV: Defendants Engaged in Unfair Acts or Practices

An act or practice is unfair if: "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or competition."[126] The cornerstone of Defendants' check cashing policies and practices was that employees must "never tell the customer the fee."[127] Throughout the transaction, Defendants made a concerted effort to conceal the fee.[128] As a result, consumers did not learn the fee until after the transaction was completed, if at all.[129]

Defendants' practice of charging unauthorized fees caused substantial injury to consumers.[130] An injury is substantial "if it does a small harm to a large number of people."[131]

---

[123] *See* pp. 11-12, *supra*. Although Defendants' actions did, in some cases, thwart consumers' ability to cash their checks at other check cashers or financial institutions (*e.g.*, as a result of the "For Deposit Only" stamp or one-time authorization code), simply verifying a check typically did not make it impossible for a consumer to cash their check elsewhere. *See* pp. 9-12, *supra*.

[124] *See* pp. 11-14, *supra*.

[125] *See Novartis*, 223 F.3d at 786; *FTC v. Hispanic Global Way, Corp.*, No. 14-22018-CIV-ALTONAGA/O'Sullivan, 2014 WL 12531538, at *3 (S.D. Fla. July 1, 2014) (express claims about refund and exchange policies are presumed material and deceptive)

[126] *ITT*, 219 F. Supp. 3d at 913, *quoting* 12 U.S.C. § 5531(c)(1) (alterations in original).

[127] *See* pp. 4-5, *supra*.

[128] *See* pp. 4-5, *supra* (policy not to tell consumers the amount of fee), pp. 5-7 (misrepresentations to evade consumer questions), pp. 8-9 (obscuring signs and receipts), pp. 7-8, *supra* (distracting consumers and overwhelming them with information).

[129] *See* p. 9, *supra*.

[130] *FTC v. Kennedy*, 574 F. Supp. 2d 714, 720 (S.D. Tex. 2008). There is substantial injury both when consumers are unaware that any fee would be charged, *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1078 (C.D. Cal. 2012), *aff'd in part, rev'd in part*, 815 F.3d 593 (9th Cir. 2016), *cert. denied sub nom. Gugliuzza v. FTC*, 137 S. Ct. 624 (2017); *FTC v. Windward Mktg., Ltd.*, No. CIV.A. 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997), and when the amount charged exceeds the bargained-for amount, *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1364-65 (11th Cir. 1988).

Consumers who would not have done business with Defendants had they known the fee from the start were robbed of that choice.[132] Defendants implemented these harmful policies and practices companywide from at least 2011 to 2017.[133] Since July 21, 2011, Defendants charged more than 46,000 consumers more than $5.4 million in check-cashing fees.[134] Given the number of consumers and amount of fees, the injury is substantial.

The harm to consumers was not reasonably avoidable because Defendants took affirmative steps to prevent consumers from making a "free and informed choice."[135] Consumers can reasonably avoid an injury if "they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end."[136] Here, Defendants' entire strategy centered on imposing obstacles to prevent customers from learning the fee.[137] Consequently, consumers could not reasonably "anticipate the impending harm" or avoid it.[138] Moreover, if consumers did learn the amount of the fee and sought to reverse or cancel the transaction, Defendants stated that it would

---

[131] *Am. Fin. Servs. Ass'n v. FTC* (*AFSA*), 767 F.2d 957, 972 (D.C. Cir. 1985) (quotation marks omitted); *Windward Mktg.*, 1997 WL 33642380, at *11; *Orkin*, 849 F.2d at 1365.

[132] *Cf. Arthur Murray Studio of Wash., Inc. v. FTC*, 458 F.2d 622, 625 (5th Cir. 1972) (deceptive, high-pressure sales techniques that "added up to cajolery and coercion" were unfair); *ITT*, 219 F. Supp. 3d at 915-16 (denying motion to dismiss where complaint alleged students were unfairly rushed through a loan-application process that left them unaware of disadvantageous terms).

[133] *See* p. 4, *supra*.

[134] *See* p. 4, *supra*; Ex. ¶¶ 23, 5-6.

[135] *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010), *citing AFSA*, 767 F.2d at 976; *Direct Mktg. Concepts*, 569 F. Supp. 2d at 300 (under the "reasonably avoidable" prong, "corrective action is taken not to second-guess the wisdom of particular consumer decisions, but rather to halt some form of seller behavior that unreasonably creates or takes advantage of an obstacle to the free exercise of consumer decisionmaking") (quotation marks omitted).

[136] *Orkin*, 849 F.2d at 1365 (quotation marks omitted).

[137] *See* pp. 4-14, *supra*.

[138] *See, e.g.*, *CFPB v. D&D Mktg.*, No. CV 15-9692, 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016) ("In short, because Defendants' system… was designed to deceive, it is unreasonable for Defendants to now argue that consumers could have avoided injury by wising up to the scheme earlier on.").

be difficult—or impossible—to do so and placed procedural obstacles in consumers' paths.[139] The practical effect of Defendants' practices was to create the impression that consumers were locked into the transaction and could not take the check elsewhere.[140]

Lastly, Defendants' conduct provided no benefits to consumers or competition. Consumers and competition both benefit from honest and upfront exchanges regarding pricing so that consumers can compare options and make informed decisions. Defendants' policy and practice of "[n]ever tell the customer the fee," aided only Defendants in the form of fees extracted from unwitting consumers. Defendants undermined market participants acting lawfully and harmed consumers.

## COUNT V: DEFENDANTS' DECEPTIVE REPRESENTATIONS TO CONSUMERS PAID MONTHLY

Unlike Defendants' competitors that offered 30-day loans to consumers who received income once per month, Defendants offered these consumers a series of 14-day loans each month. Defendants represented to these consumers, many of whom were on social security and disability, that borrowing from Defendants in this manner was a better deal than a 30-day loan, when in fact it was more expensive and resulted in less cash and less liquidity for the consumers.

---

[139] For example, Defendants immediately took control of checks to coerce consumers into finishing transactions, stamped checks "For Deposit Only" prior to presenting the receipt to the customer, and withheld the "verification number" necessary to cash tax refund checks. *See* pp. 11-12, *supra*.

[140] *See AFSA*, 767 F.2d at 980 n.27 (coercion can prevent a consumer from making a free and informed choice); *cf. Holland Furnace Co. v. FTC*, 295 F.2d 302, 305 (7th Cir. 1961); *Arthur Murray*, 458 F.2d at 625. Moreover, the existence of fee disclosures does not provide Defendants any safe harbor from unfairness liability. *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d. 975, 1004 (N.D. Cal. 2010) (as a matter of law, the presence of government-mandated price disclosures on telephone bills did not negate liability for charging unauthorized fees because "the burden should not be placed on defrauded customers to avoid charges that were never authorized to begin with"), *aff'd*, 475 F. App'x 106 (9th Cir. 2012).

## I. Undisputed Facts Concerning Lending to Consumers Paid Monthly

### A. Lending to "Monthly Customers"

Defendants provided payday loans to, among others, consumers who received income once a month, such as social security and disability benefit recipients.[141] Defendants referred to these consumers as monthly customers.[142] Defendants also referred to these consumers as "1st and 3rd customers;"[143] historically, the government made social security and disability payments on the 1st and 3rd day of each month.[144] Defendants offered only payday loans with terms of up to 14-days to monthly customers,[145] charging the maximum fees permissible under state law for these loans.[146] Defendants' competitors, on the other hand, offered 30-day loans to monthly customers, following the industry practice of setting payday loans due on a borrower's payday.[147] To obtain a loan, a consumer wrote a check to Defendants for the amount of the principal plus the fee, which Defendants held as collateral until the consumer's due date.[148]

---

[141] Ex. 36B, 291:16-21; Ex. 7 ¶¶ 16-17. Ex. 11 ¶¶ 17-18; Ex. 21 ¶ 145. Defendants required loan applicants to disclose their paydays and pay frequencies. *See* Ex. 131 (application).

[142] Ex. 36B, 291:16-21; Ex. 26, No. 31 (AACC Adm.).

[143] Ex. 26, Nos. 32-33 (AACC Adm.); Ex. 28, No. 7-8 (Gray Adm.). Defendants also called customers who received benefits once a month "SSI customers," "SS customers," "Social Security customers," and "disability customers." Ex. 26, No. 34 (AACC Adm.).

[144] Ex. 21 ¶ 148.

[145] Ex. 36B, 290:2-8 (Gray Dep.); Ex. 71, at AACC00700367; Ex. 72, at AACC00012861. State law expressly permitted 30- or 31-day loans. *See* Miss. Code Ann. § 75-67-519(1) (30 days); La. Rev. Stat. § 9:3578.3(2)(b) (30 days); Ala. Code § 5-18A-13(c) (31 days).

[146] In Mississippi, the maximum fee for a loan of $250 or less is $20 per $100 borrowed and the maximum fee for a loan above $250 is $21.95 per $100 borrowed, but Mississippi law also requires loans above $250 to have a term of 28 to 30 days. *See* Miss. Code Ann. § 75-67-519(1)(b); (4)(a)-(b). Defendants did not provide loans for longer terms than 14 days, but still loaned consumers more than $250 at a time by providing two simultaneous 14-day loans for smaller amounts; for example, rather than provide a single $400 loan, Defendants provided two simultaneous $200 loans. *Compare* Ex. 71, at AACC00700367 (LA & MS loans offered and fees charged); Ex. 29, Interrog. 4(b) (fees charged), at pp. 21-22; Ex. 130 (AL fees charged), *with* Miss. Code Ann. § 75-67-519(4)(a)-(b); La. Rev. Stat. §§ 9:3578.4(A)(1); 9:3530(C); Ala. Code § 5-18A-12(a).

[147] Ex. 21 ¶ 146; Ex. 35, 47:7-19; Ex. 38, 69:5-10; Ex. 40, 45:12-25; Ex. 41, 48:10-22; Ex. 47, 131:25-132:2; Ex. 49, 90:7-90:24; Ex. 51, 125:14-17; Ex. 2 ¶ 9; Ex. 7 ¶ 20; Ex. 9 ¶ 9; Ex. 11 ¶ 21.

[148] On the due date, the consumer could buy back the check with cash, or Defendants would deposit it or

When loaning to monthly customers, Defendants instructed employees to originate a sequence of multiple 14-day loans each month, structured as follows: (1) in the beginning of the month, loan the customer *less than the full amount* for which the customer has been approved (*i.e.* only part of their "credit limit"[149]) for a 14-day term, and then (2) two weeks later, in the middle of the month when the initial loan is due, loan the customer *the full amount for which the customer had been approved* (*i.e.* their entire "credit limit") for a 14-day term.[150] The customer's final payment was then due two weeks after that, approximately four weeks after the initial loan.[151] While the amounts varied,[152] Defendants instructed employees that mid-month loans should always be *larger* than the initial loans at the start of the month.[153] Gray and his supervisors instructed employees to loan to monthly customers in this manner,[154] referred to herein as "1st and 3rd lending" and "1st and 3rd lending program."[155]

As Defendants were aware, many monthly customers had no reasonably foreseeable source of income to pay back loans mid-month.[156] As a result, monthly customers paid back the

---

[149] debit the consumer's bank account. *See* Ex. 71, at AACC00700367-372, 386-391.
[149] Defendants determined a "credit limit," *i.e.*, the maximum amount to lend a consumer, by dividing a consumer's net monthly income by four. *See* Ex. 71, at AACC00700363.
[150] Ex. 152, at AACC01024962-63; Ex. 158, at AACC00896712-14; Ex. 43, 102:2-21; Ex. 39, 128:21-132:9; Ex. 140, at AACC02294197 ("Remember that for customers who are paid once a month we can loan them part of their credit limit on the first of the month and mid-month use their remaining line of credit to pay for the first check and then loan back to them their full credit line."); Ex. 21 ¶¶ 147-150.
[151] Ex. 152, at AACC01024962-63; Ex. 158, at AACC00896712-14.
[152] Ex. 38, 73:20-24; Ex. 6 ¶ 22. Monthly customers also did not always come in on the 1st or 3rd day of the month, but sometimes other days, such as the last day or fourth Wednesday. Ex. 7 ¶ 26; Ex. 19 ¶ 5; Ex. 41, 50:19- 23; Ex. 47, 124:5-13.
[153] Ex. 152, at AACC01024962-63; Ex. 158, at AACC00896712-14; Ex. 145 ("re-lend a portion of their credit limit until the middle of the month, then the customer can get the entire credit limit they qualify for").
[154] **Gray:** Ex. 28, No. 10; Ex. 36B, 294:1-298:3; 304:24-305:4, 306:20-307:9, 311:2-7; Ex. 125; Ex. 144; Ex. 145; Ex. 146; Ex. 148. **Supervisors:** Ex. 126; Ex. 134; Ex. 135; Ex. 136; Ex. 137; Ex. 138; Ex. 139; Ex. 140.
[155] Defendants referred to lending to monthly customers as, *inter alia*, "1st and 3rd lending," "lending on the 1st and 3rd," and "loaning on the 1st and 3rd." Ex. 26, Nos. 35-36 (AACC Adm.).
[156] Payday loans are typically set due a consumer's payday because consumers are more likely to pay

smaller initial loans solely from the proceeds of the larger mid-month loans.[157] Defendants

anticipated this, instructing employees: "Remember that for customers who are paid once a

month we can loan them part of their credit limit on the first of the month and mid-month use

their remaining line of credit to pay for the first check and then loan back to them their full credit

line."[158] This arrangement amounted to a rollover, illegal in Mississippi and Louisiana and

sharply limited in Alabama.[159] One of Defendants' training documents, titled "Loaning On the

1st and 3rd," ("1st and 3rd training document"), provides an example of the scheme for a

hypothetical monthly customer in Mississippi named Mary Smith who has a $400 credit limit:

(1) *Beginning of month*: Provide Mary with a 14-day loan for $200 (*i.e.* part of her credit limit). Mary will owe $240 ($200 in principal plus a $40 fee) in 14 days.

(2) *Middle of month*: Mary brings in only $40. Provide Mary with two 14-day loans[160] for $400 (*i.e.* her entire credit limit). Combine the $40 that Mary brought in with $200 from that day's loans to pay back the $240 due. Mary leaves the store with the remaining $200 from that day's loans. Mary will owe $480 ($400 in principal plus an $80 fee) in 14 days.

(3) *Beginning of next month*: Mary Smith pays back the $480 due.[161]

Defendants implemented 1st and 3rd lending company-wide from at least April 2011 until

---

back the loan then. *See* Ex. 11 ¶ 25; Ex. 36A, 173:4-24; Ex. 38, 66:5-13; Ex. 39, 110:13-111:10; Ex. 41, 46:22-47:21; Ex. 43, 47:9-13; Ex. 47, 118:24-119:5; Ex. 21 ¶¶ 99, 144, 151; Ex. 16 ¶ 4.
For all other customers, Defendants set loans due only on their paydays. *See* Ex. 71, AACC00700367; Ex. 72, at AACC00012861; Ex. 132, at AACC00174250.

[157] Ex. 2 ¶ 7; Ex. 3 ¶ 17; Ex. 4 ¶ 10; Ex. 6 ¶ 20-22; Ex. 9 ¶ 7; Ex. 10 ¶ 10; Ex. 11 ¶¶ 22-24; Ex. 19 ¶ 5; Ex. 21 ¶¶ 151-152. Even when monthly customers did not bring in the full amount due mid-month, employees say they marked that the loan was paid back in full in eCash. *See* Ex. 7 ¶¶ 21-22; Ex. 11 ¶ 23-24; Ex. 35, 59:8-60:10; Ex. 52, 198:21-199:14.

[158] Ex. 140; Ex. 43, 102:2-13. *See also* Ex. 158, at AACC00896713 ("Customer says but I don't get paid again in the middle of the month, how am I going to pay for this check today? Answer – Inform customer that they have an existing line of credit they will be using to pay for their check on the 1st/3rd of the month.").

[159] The DBCF found that Defendants rolled over consumer's loans and revoked Defendants' licenses to make loans. *See* Ex. 25, pp. 26-30 (DBCF Final Order). *See also* Miss. Code Ann. § 75-67-519(5); La. Rev. Stat. § 9:3578.6(7); Ala. Code § 5-18A-12(b).

[160] Mississippi law requires loans above $250 to have a 28- to 30-day term, so rather than providing one $400 loan, Defendants provided two loans for $200 each. *See* note 146, *supra*.

[161] Ex. 158, at AACC00896712-14.

at least June 2014,[162] when the DBCF ordered Defendants to cease.[163] Defendants distributed

versions of the 1st and 3rd training document to employees on multiple occasions,[164] including at

numerous trainings,[165] and posted the document on the employee intranet.[166] Gray himself

emailed the 1st and 3rd training document to supervisors in October 2012.[167] The Expert Report of

Prof. Adam J. Levitin sets forth examples of 1st and 3rd lending in the three states where

Defendants operated, showing the fees paid by Defendants' customers.[168] In total, between July

21, 2011 and June 2014, Defendants charged more than 7,500 monthly customers more than $2.8

million in fees pursuant to the 1st and 3rd lending program.[169]

## B. Defendants Routinely Made Deceptive Statements to Monthly Customers

### 1. Defendants told monthly customers that fees for 30-day loans were higher.

When selling the 1st and 3rd lending program to monthly customers, Defendants told

monthly customers that the 30-day loans offered by competitors were more expensive than

Defendants' 1st and 3rd lending program.[170] Specifically, when a monthly customer asked for a

30-day loan, Defendants instructed employees to say that "the fees are higher for competitors

that offer 30 days"[171] and Defendants were "saving [customers] some money with lower fees."[172]

---

[162] Ex. 2 ¶¶ 7-12; Ex. 3 ¶¶ 16-22; Ex. 4 ¶¶ 8-17; Ex. 6 ¶¶ 18-27; Ex. 7 ¶¶ 21-27; Ex. 9 ¶¶ 7-9; Ex. 10 ¶ 10; Ex. 11 ¶¶ 22-28; Ex. 41, 56:20-61:3; Ex. 43, 44:8-47:3; 69:3-76:2; Ex. 47, 122:17-129:22. In April 2011, Scott Cain, responsible for training, sent a "Social Security Customer Strategy" to supervisors describing the practice. *See* Ex. 152; Ex. 153; Ex. 154; Ex. 155; Ex. 36A, 78:13-16.
[163] Ex. 157, at AACC00139086-92 (Cease & Desist Order).
[164] Ex. 36B, 360:17-361:3; Ex. 151; Ex. 158; Ex. 159; Ex. 160; Ex. 161; Ex. 162.
[165] Ex. 3 ¶ 21; Ex. 6 ¶ 19; Ex. 33, 104:20-106:11; 109:1-114:7 (discussing Ex. 33A, 33B, 33C, 33D, and 33E); Ex. 27, No. 4 (AACC Supp. Adm.).
[166] Ex. 36B, 360:17-361:3 (Gray Dep.); Ex. 163, at AACC02126072.
[167] Ex. 124. At Gray's request, supervisor instructed their employees to implement 1st and 3rd lending. *See* Ex. 126; Ex. 137; Ex. 164; Ex. 165; Ex. 166; Ex. 167; Ex. 168.
[168] Ex. 21 ¶¶ 166-171 (Tables 2a, 2b, 2c, 3a, 3b, 3c).
[169] Ex. 23 ¶ 11.
[170] Ex. 43, 77:23-79:22, 88:14-89:8; Ex. 41, 67:15-69:4; Ex. 53, 48:6-49:20.
[171] Ex. 158, at AACC00896713 (1st and 3rd training document).
[172] Ex. 134, at AACC02323634.

2. Defendants told monthly customers that borrowing pursuant to the 1st and 3rd lending program was better than a 30-day loan because customers received money twice per month.

Defendants also told monthly customers that borrowing from Defendants pursuant to the 1st and 3rd lending program was better than a 30-day loan because monthly customers received money twice a month.[173] When a customer asked for a 30-day loan, Defendants instructed their employees to say that "[c]ompetitors that offer 30 day advances are not able to help their customers twice a month like All American can."[174] Defendants' marketing materials advertised "SSI & Disability Customers Get Cash TWICE a Month."[175] Employees represented that they were helping monthly customers or doing them a favor by providing loans twice a month instead of once.[176] One training tip reminded employees: "Unlike our competition we can get our customers more money in the middle of the month which is when they need it most."[177]

C. Defendants' Representations to Monthly Customers Were False

1. Monthly customers paid more in fees than they would have for a 30-day loan.

Contrary to Defendants' representations, monthly consumers who borrowed pursuant to 1st and 3rd lending paid *more* in fees for the same or less net cash received than they would have paid for a 30-day loan from any one of Defendants' competitors.[178] The chart below, based on the example in the 1st and 3rd training document, makes this clear: Defendants' hypothetical

---

[173] Ex. 26, No. 39 (AACC Adm.); Ex. 3 ¶ 19; Ex. 4 ¶ 12; Ex. 6 ¶ 24.; Ex. 10 ¶ 10; Ex. 11 ¶ 26; Ex. 16 ¶ 6; Ex. 18 ¶ 6; Ex. 19 ¶ 7; Ex. 38, 74:9-18; Ex. 39, 115:9-117:25; Ex. 40, 47:13-50:4 Ex. 41, 64:15-25, 69:5-18; Ex. 43, 81:10-18; Ex. 47, 160:17-162:2; Ex. 53, 48:6-49:20.
[174] Ex. 158, at AACC00896713 (1st and 3rd training document).
[175] Ex. 26, No. 38 (AACC Adm.); Ex. 173, at CFPB00065030-61; Ex. 174; Ex. 175, at AACC00029198. *See also* Ex. 172, at AACC00689185 ("Monthly Customers Get Cash TWICE a Month"); Ex. 26, No. 37 (AACC Adm).
[176] Ex. 16 ¶ 6; Ex. 18 ¶ 6; Ex. 19 ¶ 7.
[177] Ex. 151, at AACC00433606. *See also* Ex. 3 ¶ 19; Ex. 6 ¶ 24; Ex. 10 ¶ 10; Ex. 11 ¶ 26; Ex. 38, 74:9-18; Ex. 39, 115:9-117:25; Ex. 40, 47:13-50:4.
[178] Ex. 21 ¶¶ 158-159, 162, 166-171. Defendants' former employees acknowledge that 1st and 3rd lending was more expensive for customers. *See* Ex. 2 ¶¶ 8-9; Ex. 4 ¶¶ 8, 12; Ex. 3 ¶ 19; Ex. 6 ¶¶ 22-25; Ex. 40, 47:13-50:4; Ex. 41, 68:8-69:4; Ex. 47, 137:11-138:1, 161:19-162:2.

customer Mary Smith pays $120 in fees to leave the store with $200 at the start of the month and $200 in the middle of the month pursuant to 1st and 3rd lending, rather than paying $87.80 in fees (the maximum fee for a 30-day $400 loan in Mississippi)[179] to leave the store with $400 at the start of the month.[180]

|  | 1st and 3rd Lending | 30-Day Loan |
|---|---|---|
| Beginning of month | (1) Mary borrows $200, due in 14 days; (2) Defendants charge $40 fee, due in 14 days; and (3) Mary leaves store with $200. | (1) Mary borrowers $400, due in 30 days; (2) Lender charges $87.80 fee, due in 30 days; and (3) Mary leaves the store with $400. |
| Middle of month | (1) Mary returns with $40; (2) Mary borrows $400, due in 14 days; (3) Defendants charge $80 fee, due in 14 days; (4) Mary pays back $240 due, using $40 brought in and $200 from new loans, and (5) Mary leaves store with $200. | n/a |
| Beginning of next month | Mary pays back $480 due. | Mary pays back $487.80 due. |
| Total fees paid | Mary pays a total of $120 in fees. | Mary pays a total of $87.80 in fees. |
| Total cash received | $200 in beginning of the month; $200 in middle of the month. | $400 in beginning of the month. |

As set forth in Professor Levitin's report, monthly customers paid more in fees pursuant to 1st and 3rd lending than they would have for any comparable 30-day loan in all three states, including loans with the maximum fees allowed under state law.[181]

2. Monthly customers received less cash and less liquidity than they would have with a 30-day loan.

Defendants represented to monthly customers that getting money twice a month pursuant to 1st and 3rd lending was an advantage, when, in fact, 1st and 3rd lending not only cost customers

---

[179] The maximum fee for loans of more than $250 is $21.95 per $100 in MS. *See* note 146, *supra.*
[180] Ex. 158, at AACC00896712-14.
[181] *See* Ex. 21 ¶¶ 158, 162, 166-171, Tables 2a, 2b, 2c, 3a, 3b, 3c.

more but also resulted in them having less cash—*i.e.* less liquidity—during the first 14 days of the month than they would have with a 30-day loan.[182] This is because, in the beginning of the month, rather than loaning monthly customers the full amount for which the customer qualified, Defendants only loaned customers *part* of that amount for 14 days.[183] Before they could receive the full amount, monthly customers had to return in two weeks and pay back the loan and fee from the beginning of the month, often using new loans to do so.[184] As a result, 1st and 3rd lending always resulted in less liquidity for the customer.[185] Take the example of Mary from the 1st and 3rd training document: Mary borrowed $200 in the beginning of the month and $400 in the middle, which meant that Mary's average daily liquidity during the 28-day 1st and 3rd lending period was $300.[186] If Mary had taken out a 30-day loan for $400 instead, her average daily liquidity would be $400.[187] And, as discussed above, Mary paid more in fees for less liquidity in the 1st and 3rd lending program.[188]

In addition, because monthly consumers had to pay back the loans from the beginning of the month in the middle of the month, they netted less cash during the month under 1st and 3rd lending than from a comparable 30-day loan. One former supervisor summarized how much worse 1st and 3rd lending was for consumers:

> The most common implementation of [1st and 3rd lending] that I saw was that the customer would borrow $300 at the beginning of the month and then return in the middle of the month without any money. The customer would borrow an additional $400 in the middle of the month and use $360 to pay back the loan ($300) plus the fee ($60) from the beginning of the month. The customer would then leave the store with the remaining

---

[182] Ex. 21 ¶¶ 160-162, 171-172.

[183] *See* pp. 24-26, *supra*. When monthly consumers asked to borrow their full credit limit at the start of a month, employees told them that they could only borrow part. Ex. 19 ¶ 6; Ex. 17 ¶ 4.

[184] *See* pp. 24-26, *supra*.

[185] *See* Ex. 21. ¶ 160-162, 171-172.

[186] *Id.*, ¶ 171, Table 3c; Ex. 158, at AACC00896712-14.

[187] *Id.*

[188] *Id.*

cash, which was $40. The customer would owe $480 at the beginning of the next month. In this situation, the customer paid $140 in fees during the month. If the customer had taken out a 30-day loan for $400 from a competitor instead, the customer would have paid only $87.80 in fees.[189]

In the scenario above, the customer pays $52.20 more ($140 compared to $87.80) to leave the store with $60 less in cash ($340 compared to $400) during the month. These facts make it clear: there was no benefit to monthly customers in receiving money twice a month under the 1st and 3rd lending program.[190] As described Prof. Levitin's report, instead of receiving more cash or liquidity, monthly customers received less (and paid more for it) than from a comparable 30-day loan, in all three states, and whether the customer paid back nothing at all, only the fee, or the entire amount mid-month.[191]

D. Defendants Profited Greatly from 1st and 3rd Lending

Internally, Defendants' employees referred to 1st and 3rd lending as "a huge income booster" and noted that it increased store profitability by "turn[ing]… money more often."[192] Through 1st and 3rd lending, store employees earned higher bonuses and kept up their "outstanding" (the amount of money loaned), a store metric monitored by Gray.[193] Defendants' employees also discussed internally that even when monthly customers did not return mid-month, Defendants still profited from 1st and 3rd lending by debiting the customer's bank account, and, if the funds were not available, as was often the case, assessing a $30 nonsufficient

---

[189] Ex. 6 ¶ 22.
[190] Ex. 21 ¶¶ 172-177. Defendants' former employees acknowledge this. *See* Ex. 6 ¶ 25; Ex. 4 ¶ 12.
[191] Ex. 21 ¶¶ 158-162, 166-173.
[192] Ex. 47, 162:4-164:21; Ex. 158, at AACC00896712. *See also* Ex. 47, 130:17-24; 134:4-13; Ex. 2 ¶¶ 8-9; Ex. 21 ¶¶ 175-80.
[193] Ex. 158, at AACC00896712 ("[a]llows your office to not have as significant a drop in outstanding on the 1st/3rd of each month because you will be lending money back"); Ex. 147; Ex. 47, 132:18-134:3; Ex. 43, 81:19-84:6; Ex. 40, 79:22-81:14; Ex. 39, 115:23-116:17, 121:1-122:14.

funds (NSF) fee.[194] For example, General Supervisor Kelvin Hall instructed a supervisor to "[e]xplain to [managers] how loaning on the first works, and let them know that an ACH FEE in the middle of the month is almost the same as a regular fee, so either way we will get paid twice in the month."[195]

Former employees stated that monthly customers did not understand the amount of fees that they were paying for 1st and 3rd lending or that 1st and 3rd lending was more expensive than comparable 30-day loans.[196] Former employees also stated that some monthly customers—many of whom were elderly and on social security—did not understand that they were paying fees twice a month, some believing they were simply returning for additional cash mid-month.[197] One former employee said that 1st and 3rd lending felt "disgusting" because "you're cheating people."[198] Another former employee stated that 1st and 3rd lending was "unethical because these customers were among the poorest of the poor and were paying more in fees than if they took out a 30-day loan from a competitor."[199] A third former employee said that "employees were encouraged and basically were told they had to push [1st and 3rd lending] or disciplinary actions would be… taken" and that "[employees], in turn, would deceive and basically lie to the customers about [1st and 3rd lending.]"[200] Even Gray admitted in an email that he was concerned

---

[194] *See* Ex. 170 ("Don't be afraid to lend back to them for fear of them not coming back in… If you lend back… 200 bucks at the 1st of the month until midmonth and for whatever reason they don't come in mid month to get the rest of their money……you will ACH the customer, it is returned adding 30 bucks. On the 1st the customer comes and pays you $270….you made $70 rather than $40…..Do yall get it now???"); Ex. 158, at AACC00896713 ("What if the customer doesn't come in to pay or get the rest of their money on the middle of the month? That's fine, ACH the check and if it bounces we will charge the $30 NSF Fee, increasing the income on that check"); Ex. 52, 141:24-144:6; Ex. 43, 89:9-90:10.
[195] Ex. 171, at AACC02128221.
[196] Ex. 6 ¶ 25; Ex. 7 ¶ 27; Ex. 9 ¶ 9; Ex. 10 ¶ 10; Ex. 11 ¶ 27; Ex. 43, 79:23-81:2; Ex. 47, 138:20-23.
[197] Ex. 6 ¶ 23; Ex. 3 ¶ 19.
[198] Ex. 39, 121:1-122:14.
[199] Ex. 3 ¶ 20.
[200] Ex. 43, 123:23-124:25.

that "Deceptive Business Practices could be associated with writing more than one check[201] in order to lend more money for a shorter term."[202]

## II. Defendants' Deceptive Representations Violated the CFPA (Count V)

An act or practice is deceptive if "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material."[203] The key criterion in determining whether an act or practice is deceptive is the overall net impression created, and even representations that are literally true can be deceptive.[204]

Defendants represented to monthly customers that: (1) the fees for competitor's 30-day products were higher, and (2) borrowing pursuant to 1st and 3rd lending was better because monthly customers received money twice a month.[205] Defendants' representations were likely to mislead reasonable consumers by creating the net impression that consumers could benefit financially by borrowing pursuant to 1st and 3rd lending compared with a 30-day loan because consumers were paying lower fees and getting additional funds mid-month. This was not true: by

---

[201] Writing a check refers to consumers writing a check as collateral for a loan. *See* p. 23, *supra*.

[202] Ex. 176.

[203] *Gordon*, 819 F.3d at 1192 (quotation marks omitted).

[204] *See FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 631 (6th Cir. 2014) ("The important criterion in determining the meaning of an advertisement is the net impression that it is likely to make on the general populace.") (citation and quotation marks omitted)*; FTC v. Peoples Credit First, LLC*, 244 F. App'x 942, 944 (11th Cir. 2007) (fact that representations are "technically or literally true is not persuasive"); *Cyberspace.com*, 453 F.3d at 1200 ("A solicitation may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."); *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 687 (3d Cir. 1982) ("The impression created by the advertising, not its literal truth or falsity, is the desideratum[.]"); *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674-75 (2d Cir. 1963) ("well established that advertising need not be literally false" to be deceptive); *FTC v. Gill*, 71 F. Supp. 2d 1030, 1045 (C.D. Cal. 1999) ("[A]dvertising capable of being interpreted in a misleading way should be construed against the advertiser.") (quotation marks omitted), *aff'd*, 265 F.3d 944 (9th Cir. 2001).

[205] The fact that 30-day loans for above $250 in Mississippi have a slightly higher fee compared to 14-day loans for below $250– *i.e.* $21.95 compared to$20 for every $100 loaned – does not affect the analysis. Defendants' representations concerned the loans made over the course of the entire month. *See* pp. 26-27, *supra*.

borrowing twice per month pursuant to 1st and 3rd lending, monthly customers paid additional fees and obtained less liquidity and less cash.[206] This was the case regardless of the state, the amount borrowed, or whether the customer rolled over their loan mid-month.[207] Courts have repeatedly held that false comparisons to alternative products can be deceptive.[208] A consumer's interpretation is "presumed reasonable if it is the one the respondent intended to convey."[209] Here, Defendants intended to convey that 1st and 3rd lending was a better deal financially for monthly customers than a 30-day loan, and therefore such statements were likely to mislead consumers acting reasonably under the circumstances.

Defendants' representations about the cost and benefits of 1st and 3rd lending were also material. Express claims or deliberately-made implied claims are presumed to be material.[210] Defendants' statements were also material because information about a product's costs and benefits is important to consumers and, hence, likely to affect their choice of, or conduct, regarding a product.[211]

## COUNT VI: DEFENDANTS RETAINED CONSUMERS' OVERPAYMENTS

**I.   Undisputed Facts Concerning Overpayments**

   A.   Defendants Collected Duplicate Payments, Did Not Provide Consumer Refunds

On numerous occasions, when making payments on their loans, consumers paid

---

[206] *See* pp. 27-30, *supra*.
[207] *See* p. 30, *supra*.
[208] *See Novartis*, 223 F.3d at 786-87 (upholding FTC ruling that pill marketer misrepresented that product is superior to other analgesics for treating back pain); *Tashof v. FTC*, 437 F.2d 707, 710-11 (D.C. Cir. 1970) (deceptive practice to falsely advertise that seller provides "discount" eyeglasses when not discounted compared to generally prevailing prices); *Bakers Franchise Corp. v. FTC*, 302 F.2d 258, 261-62 (3d Cir. 1962) (selling bread under trademark 'Lite Diet' deceptively implied that it was a low calorie food, when in fact it contained same number of calories as other white bread but had thinner slices).
[209] *Wash. Data Res.*, 856 F. Supp. 2d at 1272, *quoting* Deception Statement at *47.
[210] *See Windward Mktg.*, 1997 WL 33642380, at *10.
[211] *See Novartis*, 223 F.3d at 786-87.

Defendants more than they owed.[212] The primary reason for this was that Defendants accepted

in-person cash payments from consumers even when Defendants had also initiated the process of

debiting a payment from the consumer's bank account or depositing a collateral check that

Defendants required consumers to provide before Defendants advanced the loan.[213] On those

occasions when the consumer paid in cash and the check or debit cleared, consumers paid

Defendants twice instead of once, resulting in an overpayment and a positive credit balance for

the consumer in eCash.[214]

When consumers made an overpayment, Defendants routinely failed to disclose to the

consumer that the consumer had a credit balance and was owed a refund.[215] In fact, during the

relevant time period, it was Defendants' policy *not* to inform consumers when Defendants owed

them a refund.[216] Employees believed that they would be "written up" or even terminated if they

notified consumers' of unpaid refunds.[217]

Defendants only provided a refund if a consumer actively pursued one,[218] and even then,

---

[212] Ex. 26, No. 51 (AACC Adm.); Ex. 37, 126:5-10, 186:10-14; Ex. 46, 56:9-57:6, 60:22-61:22; Ex. 43, 133:17-134:10; Ex. 7 ¶ 29.

[213] Ex. 26, No. 51; Ex. 30, at CFPB00002314; Ex. 43, 133:17-134:10; Ex. 37, 126:5-10, 166:20-167:19, 186:5-14; Ex. 46, 56:9-57:6, 64:8-65:10; Ex. 7, ¶ 29. Indeed, it was Defendants' goal to get the consumer to come in to the store to pay cash: "Remember- the true goal is always to attempt to receive cash payment from the customer with the hopes of re-writing the account." Ex. 71, at AACC00700378.

[214] Ex. 26 No. 51; Ex. 30, at CFPB00002314 (Defs. CID Responses 3/20/15); Ex. 37, 166:20-167:19, 186:7-14; Ex. 43, 133:17-134:10; Ex. 46, 56:9-57:13, 62:19-25, 64:8-64:20; Ex. 7, ¶ 29.

[215] Ex. 26, No. 53 (AACC did not "routinely disclose to consumers" when they "were owed a refund" but generally relied on consumers to inform AACC); No. 52 (AACC "did not have a policy directing employees to disclose" refunds to consumers); and No. 55 (AACC "did not initiate the process of providing a refund to most consumers"); Ex. 7 ¶ 30; Ex. 43, 134:13-136:8. Defendants have acknowledged this practice lasted until at least October 2013. Ex. 37, 209:4-9.

[216] Ex. 26, No. 52, 53; Ex. 43, 134:13-136:8, 143:16-145:10; Ex. 7 ¶¶ 30-31.

[217] Ex. 43, 136:13-137:10, 146:3-11.

[218] Ex. 26, No. 55; Ex. 7 ¶ 31 (a manager until 2015 related: "Even if the customer came back to the store for another loan or to cash a check, I only provided a refund if the customer specifically asked for one. That was All American's policy.").

Defendants made it difficult for the consumer to obtain one.[219] Even in the event of an

incontrovertible overpayment, store employees could not issue a refund.[220] Consumers

sometimes had to provide documentation, such as a bank statement, demonstrating that a refund

was owed.[221] Defendants required that a store manager get a supervisor's approval and submit a

"refund request for the amount that was on eCash" before she could obtain written authorization

from the home office to make a refund.[222]

   B.  Defendants Erased Credit Balances Showing Overpayments in eCash

      Defendants understood the information in eCash was a key factor in whether a consumer

received a refund for an overpayment.[223] Defendants expected consumers who discovered that

they were owed a refund would inquire in-person in the store where they obtained the loan.[224]

Store employees would then check eCash to see whether the consumer had a positive credit

balance, and for how much.[225]

      In October 2011, however, Defendants began systematically erasing consumers' credit

balances in eCash, making it harder for store employees to confirm an overpayment and creating

another obstacle to obtaining a refund.[226] Defendants started on October 9, 2011, by wiping more

than 3,600 credit balances from consumers' eCash accounts on a single day, totaling

---

[219] Ex. 43, 134:13-136:8; Ex. 46, 55:22-56:8; Ex. 37, 171:15-173:8; Ex. 7 ¶¶ 31-32.
[220] Ex. 71, at AACC00700382 (refunds require approval); Ex. 46, 55:24-56:8, 59:22-61:6; Ex. 43, 134:13-136:8; Ex. 7 ¶ 31.
[221] Ex. 43, 135:4-136:8, 136:13-137:10.
[222] Ex. 46, 55:22-56:8, 60:22-61:6 (home office employee responsible for refunds described request and approval procedure).
[223] Ex. 26, No. 53 (AACC Adm.); Ex. 46, 57:7-13; 60:22-61:22, 66:1-10.
[224] Ex. 37, 171:15-173:8 (finance director testified that consumer had to come to store, know about credit balance, and request refund to receive it); Ex. 30, at CFPB00002314 (AACC did not disclose or provide refunds when "customer did not return to the store").
[225] Ex. 46, 57:7-13; 60:22-61:22, 66:1-10.
[226] Ex. 46, 60:22-61:22, 66:1-10; Ex. 37, 172:10-173:8, 180:6-25; Ex. 43, 134:18-136:3.

approximately $869,000.[227] Defendants asserted that many of these credit balances were not "true" or "actual" refunds because they were not owed to anyone, because they were merely software errors and data entry failures.[228]

After the mass clearing, Defendants began regularly clearing credit balances from consumers' accounts in eCash if a consumer made an overpayment and did not return to the store and request a refund within approximately 30 days.[229] This practice, which Defendants called "Home Office Corrections," and did not inform consumers of, continued until at least October 2013.[230] Dianne Valladares, the home office employee in charge of refunds, and General Supervisor Kelvin Hall, told employees who objected to the clearing of credit balances and failure to provide refunds that this was how Michael Gray wanted it done.[231]

After wiping the credit balances, Defendants retained the funds as income.[232] Defendants also failed to escheat any unclaimed overpayments by consumers to the state, as required by Mississippi law.[233] As a result of their practices of collecting duplicate payments from consumers, and then impeding consumers' ability to obtain refunds by performing Home Office

---

[227] Ex. 24 ¶ 10; Ex. 30, at CFPB00002314; Ex. 37, 135:4-137:17, 140:1-16, 149:4-10; Ex. 46, 103:12-22, 105:8-106:6.

[228] Ex. 30, at CFPB00002314; Ex. 37, 135:4-137:17, 140:1-16, 149:4-10; Ex. 46, 103:12-22, 105:8-106:6, 107:4-14.

[229] Ex. 30, at CFPB00002314 (CID response, Defs. describe how they cleared unclaimed credit balances after approximately 30 days per Home Office Correction); Ex. 37, 181:13-16; Ex. 26, No. 53, 55 (AADD Adm.). Valladares regularly notified store managers that she had cleared credit balances from their consumers' eCash accounts by sending emails with the subject: "Home Office Correction." *See*, *e.g.*, Ex. 103, at CFPB00002048-51; Ex. 181, at AACC00788556; Ex. 182, at AACC00788565.

[230] *Id.*; Ex. 37, 154:3-155:1.

[231] Ex. 43, 135:4-141:22, 144:9-24, 149:2-7; Ex. 103. *See also* Ex. 177, at AACC00782481 (Email from Valladares: "This is not according to what Michael [Gray] always said. Did he change his mind and not tell me? We have always been told we do not call and tell customer we owe them a refund.").

[232] Ex. 37, 198:2-199:16, 206:14-208:7; Ex. 43, 134:13-136:8, 141:10-22, 142:2-143:3.

[233] Ex. 37, 155:24-156:8. In Mississippi, as in other states, financial businesses such as AACC are required to remit or "escheat" unclaimed funds to the state after five years. Miss. Code Ann. §§ 89-12-1 to -59. Defendants have never escheated unclaimed funds, as required by state law, since AACC's founding in 1999, and they have failed to turn over at least $190,000 in unclaimed consumer refunds in past six years. *See* Ex. 24 ¶22; Ex. 25, at 21; Ex. 37, 156:2-19.

Corrections, Defendants withheld at least $194,000 from more than 1,050 consumers from 2011-2014.[234]

It was not until 2014 and 2015, after the DBCF and the Bureau began looking into Defendants' handling of refunds,[235] that Defendants conceded that some of the credit balances they had cleared from consumers' accounts in 2011-2013 were actually refunds due to consumers who had been charged twice.[236]

First, with regard to the credit balances Defendants cleared in one fell swoop in October 2011, Defendants identified more than $165,000 that represented overpayments owed to consumers instead of mere software "errors."[237] Defendants only issued refunds to consumers totaling $32,670, however, for which consumers had waited an average of approximately five years.[238] That left another 692 refunds, totaling $132,781.70, which Defendants have still not returned to consumers, even though they concede that their records indicate they are overpayments that should be refunded.[239] On May 11, 2017, the DBCF ordered Defendants to

---

[234] Ex. 24 ¶ 22.

[235] Ex. 25, p. 21 (DBCF Order noting Defendants' review of refunds spurred by Bureau's requests).

[236] Ex. 27, No. 69; Ex. 30, at CFPB00002314 (CID response 3/20/15); Ex. 37, 198:12-18 (regarding "Remaing Prepaids" spreadsheet, Hoskinson acknowledged "the data wasn't there to say that we didn't owe them a refund" because consumers were charged twice—by cash and then by check or debit—and Defendants had no indication that the check or debit did not go through). These refunds were, on average, almost nine years old. Ex. 24 ¶ 16.c.

[237] Ex. 24 ¶¶ 13, 15; Ex. 30, at CFPB00002314.

[238] Ex. 24 ¶ 16.

[239] Ex. 24 ¶¶ 15-16 (describing "Offset Cleanup: Remaing Prepaid Items" spreadsheet); Ex. 37, 189:22-199:3 (Hoskinson testified that "Remaining Prepaid" spreadsheet, in Offset Cleanup Excel file, listed "$132,000" in overpayments that Defendants have not refunded); *id.*, 198:12-18 (regarding "Remaing Prepaids" spreadsheet, Hoskinson acknowledged "the data wasn't there to say that we didn't owe them a refund" because consumers were charged twice – by cash and then by check or debit – and Defendants had no clear indication that the check or debit did not go through).

refund more than $134,000 to the affected consumers.[240] These refunds are, on average, 9 years old, and some have been due and owing to consumers since 2006.[241]

Second, with regard to the Home Office Corrections where Defendants regularly swept credit balances from consumers' accounts from 2011 until at least 2013, Defendants identified approximately $40,000 in overpayments that should have been refunded, and Defendants assert they have made those refunds.[242] Defendants' records of these refunds, however, appear to show that only approximately $28,600 was actually returned to consumers.[243]

## II. Defendants' Retention of Overpayments Violated the CFPA (Count VI)

Defendants' practice of retaining credit balances was an unfair practice under the CFPA.[244] First, it caused substantial injury to consumers: Defendants wrongfully retained more than $194,000 that belonged to more than 1,050 consumers, an average $183 per consumer.[245] A substantial injury may be established by an act or practice that does a "small harm to a large

---

[240] Ex. 25, p. 39 (DBCF Order, requiring Defendants to return all outstanding refunds to consumers, including 692 remaining from 2011 clearing).

[241] Ex. 24 ¶ 16.c.; Ex. 37, 199:4-9. Defendants assert they changed their refund policy in late 2013 or early 2014 to systematically provide refunds to consumers. Ex. 37, 154:6-155:1, 181:17-184:8. Store manager testimony indicates, however, that consumers still had to make a request or complain in order to receive a refund of an overpayment. Ex. 7 ¶¶ 2, 31-32 (manager says no change in refund policy through August 2015); Ex. 43, 14:19-21, 144:21-24 (regional supervisor saw no change in refund policy while at company through Jan. 2014).

[242] Defendants originally represented to the Bureau that their July 2014 review of "Home Office Corrections" resulted in "approximately $40,000 total" refunds being issued. Ex. 30, at CFPB00002314.

[243] Ex. 24 ¶ 18.f. (Hanson Decl., concluding "Home Office Correction" refunds made in 2014 appear to be approximately $28,600). The records Defendants provided to the Bureau contain many duplicate and erroneous entries, sometimes overstating the numbers of refunds made. *Id.* ¶¶ 11, 13, 18. Defendants' financial statements have never been audited, and some assertions that refunds that have been provided by credits, checks, and cash are unverifiable. *See id.*; Ex. 37, 216:17-20.

[244] An act or practice is unfair if: "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or competition." *ITT*, 219 F. Supp. 3d at 913 (quoting 12 U.S.C. § 5531(c)(1)) (alterations in original).

[245] *See* Ex. 24 ¶ 22. Being deprived of $183 is a substantial amount to a typical AACC payday consumer, who is likely in "financial distress," and is in "acute" need of funds just to pay regular monthly expenses. Ex. 21 ¶ 100 (Report of Expert Prof. Levitin). *See generally id.* ¶¶ 100-104.

number of people, or if it raises a significant risk of concrete harm."[246] There is also substantial injury where, as here, the amount charged exceeds the bargained-for amount.[247] In this instance, Defendants acknowledge that they did not disclose or initiate refunds to consumers entitled to them, thus every dollar retained by Defendants exceeded the agreed-upon amount.[248]

Second, consumers could not reasonably avoid the injury. Consumers can reasonably avoid an injury only if "they have reason to anticipate the impending harm and the means to avoid it, or they may seek to mitigate the damage afterward if they are aware of potential avenues toward that end."[249] Consumers had no reason to anticipate that Defendants, a financial services company, would fail to notify them of a positive credit balance they were owed, especially when those consumers returned to the same store for other financial services.[250] Consumers also had no reason to expect that Defendants would retain their overpayments without informing them. Nor did consumers have the means to avoid or mitigate the harm. Not only did Defendants fail to notify consumers when they owed consumers a refund, Defendants also erected barriers making it difficult for consumers to get refunded when they discovered that Defendants had collected payment twice. For example, Defendants intentionally cleared credit balances – in one fell swoop in 2011, and then regularly thereafter – from consumers' accounts.

---

[246] *AFSA*, 767 F.2d at 972; *see* note 131, *supra.*

[247] *Orkin*, 849 F.2d at 1364-65; *see also Neovi*, 604 F.3d at 1157 (where precise number of fraudulent checks created could not be identified, the fact that more than half the total value of all checks drawn with company's help came from accounts later frozen for fraud was a "concrete and quantifiable finding" sufficient to show substantial harm and establish that consumers "were injured by a practice for which they did not bargain") (quotation marks omitted). Here, Defendants have acknowledged that they should have returned more than 800 of the 3,600 credit balances cleared out in October 2011, 692 of which were still being withheld in May 2017, for example, which none of those consumers bargained for. *See* Ex. 24 ¶¶ 15-16.

[248] *See* Ex. 26, No. 51, 53, 55.

[249] *Orkin*, 849 F.2d at 1365 (quotation marks omitted).

[250] *See* Ex. 7 ¶ 31 (even if manager was aware that Defendants owed a particular consumer a refund, manager could not notify that consumer, even if the consumer returned to the store for a new loan or to cash a check).

And even when store employees were aware of the overpayment, they could not authorize a refund without supervisor and home office approval and, at times, proof from the consumer. Indeed, many consumers were apparently either unaware of their overpayment, or were unable to prove it to Defendants' satisfaction, as evidenced by the number of unpaid refunds that Defendants retroactively provided after Bureau and DBCF inquiries.[251]

Finally, there was no countervailing benefit to consumers or competition. It was only Defendants who benefitted from their failure to provide refunds; they retained money they should have returned to consumers. Moreover, there was no significant bar to returning consumers' funds: when Defendants finally returned some withheld refunds after Bureau and DBCF inquiries, they were able to do so easily by issuing checks and credits against consumer's existing balances.[252]

## GRAY'S INDIVIDUAL LIABILITY

### I.   Undisputed Facts Concerning Gray's Role

Gray is the president, CEO, and sole owner of AACC.[253] Defendants admit that, "[a]cting alone or in concert with others, Mr. Gray formulated, directed, controlled, or participated in the acts and practices of AACC, including the acts and practices set forth in [the Bureau's] Complaint."[254] Defendants also admit that Gray "has materially participated in the conduct of

---

[251] *See* p. 37-38, *supra*. In a similar matter, where an auto-loan servicer admitted it retained overpayments unless consumers specifically requested them, and barred online access to accounts which would have informed consumers of their positive credit balances, the court granted a preliminary injunction because the New York Superintendent of Financial Services was likely to succeed on claims that these practices constituted a violation of the CFPA's prohibition against unfair, deceptive or abusive acts or practices. *See Lawsky v. Condor Capital Corp.*, No. 14 Civ. 2863(CM), 2014 WL 2109923, at *2-3, 11-12 (S.D.N.Y. May 13, 2014).

[252] *See* p. 37-38, *supra*.

[253] Ex. 33, 14:6-11; Ans. ¶ 8, admitting first four sentences of Compl. ¶ 8.

[254] *See* Ans. ¶ 8, admitting first four sentences of Compl. ¶ 8.

[AACC's] affairs" and has "some managerial responsibility for [AACC]."[255]

Gray had ultimate authority over AACC's policies and procedures, including AACC's advertising, marketing, offering, and provision of loans and check cashing services, as well as with respect to AACC's compliance with the CFPA and provision of refunds to consumers.[256] Gray and others instructed AACC employees that any changes to policies and procedures required Gray's approval.[257] Although AACC had a nominal board of directors, Gray could not recall anything the board voted to approve and testified that he did not even consult the board about the sale of AACC.[258] Gray monitored store performance and, on many occasions, bypassed his chain of command—in which store managers reported to Supervisors who reported to a General Supervisor who reported to Gray—to communicate directly with Supervisors and even store managers about day-to-day operations in stores.[259] Supervisors felt pressured by Gray to keep their numbers up.[260] Gray sometimes threatened individual Supervisors with termination based on their stores' performance[261] and once fired all of his Supervisors when he was unhappy with their performance.[262]

Gray "formulated, directed, controlled, or participated in" the acts and practices at issue in this litigation.[263] Regarding check cashing, Gray stated that he created the policies of never telling check cashing customers the fee or the percent and of counting cash over the check

[255] *Id.*

[256] Ex. 29, Interrog. 3, at 18-20; Ex. 42, 129:15-130:3; Ex. 45, 47:17-48:5; Ex. 48, 139:24-140:2; Ex. 43, 34:16-18, 198:17-21; Ex. 38, 106:17-23; Ex. 50, 23:20-24:14, 28:6-16; Ex. 52, 20:7-14.

[257] Ex. 104, at AACC01031398; Ex. 105 (Gray: no changes "without my OK"); Ex. 36A, 87:10-19.

[258] Ex. 33, 26:3-23.

[259] Ex. 36A, 101:3-8, 106:10-16, 131:14-19; 135:12-20; Ex. 38, 106:24-107:5; Ex. 41, 35:13-17; Ex. 42, 57:13-17; Ex. 47, 42:7-16, 169:23-25; Ex. 50, 26:13-18, 48:2-10; Ex. 52, 17:18-18:16; Ex. 48, 215:14-22; Exs. 106-117 (Gray emails to supervisors and managers about store performance).

[260] Ex. 47, 168:6-24; Ex. 43, 215:15-25.

[261] Ex. 118, 119 (Gray emails); Ex. 36A, 137:8-14; 181:1-12 (Gray Dep.); Ex. 50, 158:3-14.

[262] Ex. 36A, 126:13-22 (Gray Dep.); Ex. 50, 158:3-22.

[263] Ans. ¶ 8, admitting first four sentences of Compl. ¶ 8.

cashing receipt.[264] Jason Stabbs testified that Gray personally trained him on AACC check cashing methods, including stamping the back of the check before giving the customer the receipt and never telling the customer the fee.[265] Gray admits that he approved the ten rules of check cashing.[266]

As to 1st and 3rd lending, Gray instructed employees to issue multiple 14-day loans to monthly customers beginning with a smaller amount during the first two weeks of the month and a larger amount during the second two weeks.[267] Gray emailed the 1st and 3rd training document—which included instructions to deceive customers about the costs and benefits of the program—to supervisors and directed them to use the document.[268] Gray was copied on emails where supervisors explained the 1st and 3rd lending program in detail and instructed employees to make the deceptive statements at issue.[269]

Gray also had sign-off approval for AACC's policies that unfairly denied customers refunds that were due.[270] Employees stated that Gray was responsible for the policy of clearing credit balances from consumers' accounts instead of providing refunds,[271] and that Gray was notified when the credit balances were wiped in 2011.[272]

Gray personally benefited from AACC's unlawful practices. Gray paid himself more than

---

[264] Ex. 120, at AACC00384626-627 (Gray email); Ex. 28, No. 3 (Gray Adm.).

[265] Ex. 45, 27:19-30:7, 81:20-82:5, 94:22-95:11.

[266] Ex. 51, 96:4-6. Gray also received many training presentations, store audits, and other policy documents about Defendants' check cashing policies and practices. *See, e.g.*, Ex. 121, 122, 123 (emails to Gray); Ex. 28, No. 11 (Gray Adm.); Ex. 27, No. 6-7 (AACC Adm.); Ex. 76, at AACC00034499-509 (October 2012 survey results sent to Gray).

[267] Ex. 28, No. 10; Ex. 36B, 294:1-298:3; 304:24-305:4, 306:20-307:9, 311:2-7; Ex. 125; Ex. 144; Ex. 145; Ex. 146; Ex. 148

[268] Ex. 124. At Gray's request, supervisor instructed their employees to implement 1st and 3rd lending. *See* Ex. 126; Ex. 137; Ex. 164; Ex. 165; Ex. 166; Ex. 167; Ex. 168.

[269] Ex. 126; Ex. 137.

[270] Ex. 29, Interrog. 3(e), at 20.

[271] Ex. 43, 134:13-136:8, 140:12-141:22, 144:9-20, 146:3-148:3; Ex. 103, atCFPB00002048.

[272] Ex. 128 (email to Gray).

$13.5 million from AACC between 2011 and 2017.[273] Gray took most of his compensation through owner draws, for which there was no set procedure.[274] Gray used owner draws to fund his other businesses,[275] or "just whenever I make an investment or need money or whatever."[276] In addition to more than $13.5 million in compensation for himself, Gray also used AACC to pay salaries to his wife and children.[277] Gray made his daughter an AACC employee when she was six months old[278] and his son at age seven.[279] Finally, Gray used AACC employees to further non-AACC business ventures.[280]

## II. Gray is Individually Liable

Under the CFPA, it is unlawful for "any covered person or service provider… to engage in any unfair, deceptive, or abusive act or practice."[281] A "related person" is deemed to be a "covered person" under the CFPA.[282] Gray is a "related person" for three independent reasons: (1) he is a "director, officer, or employee charged with managerial responsibility" of AACC, (2) he is the "controlling shareholder" of AACC, and (3) he "materially participates in the conduct of the affairs" of AACC.[283]

---

[273] Ex. 129 (Gray compensation); Ex. 36A, 244:2-23; Ex. 36B, 404:5-405:8; Ex. 32, Interrog. 7, at 4-5.
[274] Ex. 51, 233:6-18; 239:9-241:1.
[275] Ex. 36A, 258:3-259:2.
[276] Ex. 51, 233:6-13.
[277] Ex. 36A, 268:4-6.
[278] Ex. 33, 53:6-54:4.
[279] Ex. 33, 53:13-55:2.
[280] For example, Gray had Jeremy Hoskinson do the books for his other companies, but Hoskinson was only employed by, and only paid by, AACC. Ex. 37, 243:17-25.
[281] 12 U.S.C. § 5536(a).
[282] 12 U.S.C. § 5481(25)(B).
[283] 12 U.S.C. § 5481(25)(C)(i)-(ii). Gray is also liable because a person who knowingly or recklessly provides substantial assistance to a covered person in violation of the CFPA's prohibition against unfair, deceptive, or abusive acts and practices is deemed to have violated the prohibition "to the same extent as the person to whom such assistance is provided." 12 U.S.C. § 5536(a)(3). The undisputed facts establish that Gray knew of, or was at least reckless with respect to, AACC's violations of the CFPA. *See* pp. 40-43, *supra*. Substantial assistance means that the person "in some sort associate[d] himself with the venture, that [he] participate[d] in it as in something that [he] wishe[d] to bring about, [and] that [he

Gray engaged in the unfair, deceptive, and abusive acts and practices at issue.[284] For check cashing, for example, Gray stated that some of the policies and practices at issue were his own creation and reviewed many documents that discussed them.[285] For 1st and 3rd lending, Gray sent and received communications with the deceptive statements at issue.[286] For failure to provide refunds, employees said that Gray directed them to clear credit balances, and Gray had ultimate sign-off approval over refund policy.[287]

Some courts have found case law concerning individuals liable under the FTC Act instructive when analyzing individual liability under the CFPA.[288] Gray is also clearly liable under that standard because: (1) he "participated directly" or "had authority to control" the relevant conduct; and (2) he knew, was recklessly indifferent, or "was aware of a high probability" of the conduct and avoided the truth.[289] First, as described above, Gray both participated directly in AACC's unlawful conduct *and* had authority to control it.[290] Gray's authority to control is especially apparent here, as "[a]uthority to control the company can be evidenced by active involvement in business affairs and the making of corporate policy,

---

sought] by his action to make it succeed," all of which Gray has clearly done, particularly given that "the substantial assistance doctrine does not impose a demanding standard." *D&D Mktg.*, 2016 WL 8849698, at *12 (some alterations in original), *quoting SEC v. Apuzzo*, 689 F.3d 204, 206 (2d Cir. 2012).

[284] *See ITT*, 219 F. Supp. 3d at 908 ("The plainest meaning of the term 'engage' is 'to occupy or involve oneself; take part; be active.'"), *quoting United States v. Graham*, 305 F.3d 1094, 1102 (10th Cir. 2002) (quoting Webster's New World College Dictionary at 450 (3rd ed.1997).

[285] *See* pp. 41-42, *supra*.

[286] *See* p. 42, *supra*.

[287] *See* p. 42, *supra*.

[288] *Gordon*, 819 F.3d at 1193, n. 8 (adopting the standard developed in FTC Act case law).

[289] *Id.*; *FTC* v. *Gem Merch. Corp.*, 87 F.3d 466, 470 (11th Cir. 1996) (to establish a violation of the FTC Act, "'the FTC must show that the individual defendants participated directly in the practices or acts or had authority to control them . . . . The FTC must then demonstrate that the individual had some knowledge of the practices.'" (omission in original), *quoting FTC v. Amy Travel Serv., Inc.*, 875 F.2d 564, 573 (7th Cir. 1989); *NDG*, 2016 WL 7188792, at *17.

[290] *See* pp. 40-42, *supra*.

including assuming the duties of a corporate officer,"[291] and being a corporate officer is particularly probative of authority to control "when the corporate defendants are small, closely held corporations."[292] Second, as described above, Gray indisputably had knowledge of, or was recklessly indifferent to, the unfair, deceptive, and abusive conduct at issue.[293] Notably, "the degree of participation in business affairs is probative of knowledge,"[294] and as explained above, Gray participated in AACC's business affairs on every level.[295] As a result, Gray is individually liable for AACC's corporate violations.[296]

## REMEDIES

The CFPA authorizes this Court to order any appropriate legal or equitable relief, including disgorgement, restitution, limits on a person's activities, and penalties.[297]

### I.   The Court Should Order Restitution and Disgorgement

The proper amount of restitution is the full amount lost by consumers, which is the amount paid to Defendants less any refunds.[298] In order to obtain restitution, the Bureau must

---

[291] *Amy Travel Serv.*, 875 F.2d at 573.

[292] *United States v. Commercial Recovery Sys., Inc.,* 179 F.Supp.3d 728, 736 (E.D. Tex. 2016).

[293] *See* pp. 40-42, *supra*.

[294] *Amy Travel Serv.*, 875 F.2d at 574.

[295] *See* pp. 40-42, *supra*.

[296] *See Gordon*, 819 F.3d at 1193; *FTC v. IAB Mktg. Assocs., LP*, 746 F.3d 1228, 1233 (11th Cir. 2014) (individual liability existed under the "directing" and "authority to control" tests where owner of company continued to employ third-party telemarketers knowing they used deceptive tactics); *FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (affirming summary judgment on individual liability where owner and manager of company who had authority to control marketing was at least recklessly indifferent to deceptive sales claims); *Commercial Recovery*, 179 F. Supp. 3d at 737 (finding the president of a debt collection agency individually liable as a matter of law on the grounds that he set policies and practices that resulted in unlawful behavior, had authority to hire and fire employees for deceptive behavior, and was aware of consumer complaints); *FTC v. Consumer Collection Advocates Corp.*, No. 14-CIV-62491, 2015 WL 12533013, at *6 (S.D. Fla. Sept. 9, 2015) (holding an individual liable for corporate violations when sole officer and president, engaged in day-to-day operations, and participated in illicit practices), *aff'd*, 668 F. App'x 357 (11th Cir. 2016) (per curiam); *Kennedy*, 574 F. Supp. 2d at 724 (holding an individual liable for corporate violations because he was a "key manager").

[297] 12 U.S.C. § 5565(a)(1)-(2).

[298] *See Gordon*, 819 F.3d at 1195; *FTC v. Think All Publ'g, L.L.C.*, No. 4:07-cv-011, 2008 WL 687456, at

demonstrate that the amount it seeks reasonably approximates the amount of consumers' net losses and then the burden shifts to Defendants to show that those figures are inaccurate.[299] When necessary information is lacking, the risk of uncertainty falls on the wrongdoer.[300] Where, as here, the practices at issue are widespread, the Bureau does not need to prove injury for each consumer and transaction,[301] and there is no offset for the value of the products or services.[302]

The Bureau's analysis of the evidence demonstrates that, since July 21, 2011,[303] Defendants collected check cashing fees from consumers using unfair, deceptive, and abusive practices that total $5,423,477.13.[304] The Bureau's analysis of the evidence also demonstrates that, between July 21, 2011 and June 19, 2014,[305] Defendants collected fees pursuant to their 1st

---

[299] *Think Achievement*, 144 F. Supp. 2d at 1019. *See also Commerce Planet*, 815 F.3d at 603-04; *Gordon*, 819 F.3d at 1195.

[300] *Think Achievement*, 144 F. Supp. 2d at 1019; *Commerce Planet*, 815 F.3d at 604.

[301] *Commerce Planet*, 815 F.3d at 604; *Gordon*, 819 F.3d at 1196 (the government is entitled to the presumption that consumers relied on misrepresentations); *FTC v. BlueHippo Funding, LLC*, 762 F.3d 238, 244 (2d Cir. 2014) (no requirement to establish individual reliance or injury); *FTC v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1205-07 (10th Cir. 2005) (FTC not required to show any particular purchaser actually relied on or was injured by unlawful misrepresentations); *McGregor v. Chierico*, 206 F.3d 1378, 1388 (11th Cir. 2000) (proof of individual reliance by each purchasing consumer is not needed); *Nat'l Bus. Consultants*, 781 F. Supp. at 1141-42 (FTC Act liability based on a pattern or practice of unlawful behavior – not necessary to prove individual reliance).

[302] *See Gordon*, 819 F.3d at 1195-96 (no precedent for excluding fees paid by satisfied customers); *McGregor*, 206 F.3d at 1388-89 (value of product irrelevant); *Think All Publ'g*, 2008 WL 687456, at *2 (value of the product or service received is irrelevant), *citing FTC v. Figgie Int'l, Inc.*, 994 F.2d 595, 606 (9th Cir. 1993); *Inc21.com*, 745 F. Supp. 2d at 1011 ("the existence of some satisfied customers does *not* constitute a bar to liability or… restitution").

[303] Although Defendants' violations began earlier, the Bureau seeks damages only from the Bureau's transfer date (July 21, 2011) to present. *See* Designated Transfer Date, 75 FR 57252-02, (Sept. 20, 2010) (setting transfer date).

[304] Ex. 23 ¶ 6.

[305] In June 2014, Defendants instructed employees to cease 1st and 3rd lending. *See* p. 26, *supra*.

and 3rd lending program totaling $2,808,075.66.[306] Finally, the Bureau's analysis of the evidence demonstrates that Defendants unfairly failed to provide refunds to consumers totaling at least $132,781.70.[307]

The Bureau therefore seeks judgment against Defendants jointly and severally in the amount of **$8,364,334.49** for their unlawfully-obtained fees and unlawfully-retained credit balances.[308] If any amounts cannot be returned as restitution, the Bureau asks the Court to order that Defendants pay those portions as disgorgement of ill-gotten gains.[309] With respect to overpayments, the Bureau also requests that the Court order Defendants to return all overpayments not yet returned to consumers and to provide documentation to the Court and the Bureau demonstrating the steps they have taken to return all overpayments they retained after September 2011.

## II. The Court Should Impose Injunctive Relief

The Bureau also seeks a permanent injunction to protect consumers from future harm.[310]

---

[306] Ex. 23 ¶ 11. The Bureau arrived at this amount by identifying all fees paid by consumers with monthly pay frequencies who borrowed some amount in the beginning of the month or the end of the prior month (defined as between the 26th day of the prior month and the 10th day of the month) and some greater amount in the middle of the month (defined as between the 11th day and the 25th day of the month). *Id.* at ¶ 9. *See* n. 152, *supra* (consumers borrowing pursuant to 1st and 3rd lending came to Defendants' stores on a variety of days and sometimes at the end of the previous month).

[307] Ex. 24 ¶ 15.

[308] *See Gordon*, 819 F.3d at 1196 (affirming decision to hold individual and company jointly and severally liable for full amount of sales because, *inter alia*, individual had control over and approved deceptive marketing materials); *Commerce Planet*, 815 F.3d at 600 ("If an individual may be held personally liable for corporate violations . . . nothing more need be shown to justify imposition of joint and several liability for the corporation's restitution obligations.").

[309] Should the Court determine that disgorgement is appropriate, the Bureau is available to provide the Court will information in its possession about Defendants finances. *See Gordon*, 819 F.3d at 1195 (disgorgement requires "a wrongdoer to turn over all profits obtained by violating the law"); *SEC v. Halek*, 537 F. App'x 576, 581 (5th Cir. 2013) (plaintiff carries initial burden to prove amount of disgorgement is a reasonable approximation of profits, and then burden shifts to defendant to prove amount is unreasonable); *SEC v. U.S. Sustainable Energy Corp.*, No. 5:08-cv-245 (DCB)(JMR), 2011 WL 2980549, at *17 (S.D. Miss. July 21, 2011) (same).

[310] *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953) (holding that a permanent injunction is

Defendants injured more than 50,000 consumers by extracting high fees by unfair, deceptive, and abusive means.[311] Moreover, there is no evidence that Defendants ever voluntarily discontinued their illegal check cashing policies and practices, and they only discontinued 1st and 3rd lending after the DBCF issued a Cease and Desist Order.[312] The Bureau requests that the Court permanently restrain and enjoin Defendants from marketing, selling, providing, offering, or arranging for others to market, sell, or provide, payday loans or check cashing services.

## III. The Court Should Impose Civil Money Penalties against All Defendants

Any person who violates "any provision of Federal consumer financial law shall forfeit and pay a civil penalty[.]"[313] The CFPA provides for three tiers of civil money penalties depending on levels of scienter.[314] The current civil money penalty amounts are not to exceed $27,631 per day for reckless violations and $1,105,241 per day for knowing violations.[315] The record demonstrates that Defendants violated federal consumer financial laws from at least July 21, 2011 through at least June 8, 2017,[316] which is 2,149 days. Defendants instructed employees to hide the cost of their services from consumers, intentionally targeted consumers paid monthly—including those who received social security and disability—with deceptive statements, and kept consumers' overpayments for themselves. The evidence before the Court makes clear that Defendants violated the law knowingly, or at least recklessly. The Bureau

---

justified when there is a "cognizable danger of recurrent violation"); *FTC v. Pac. First Benefit, LLC*, 472 F. Supp. 2d 974, 981 (N.D. Ill. 2007) (granting a permanent injunction for violating elements of the FTC Act and Telemarketing Sales Rule).
[311] Ex. 23 ¶¶ 5, 11.
[312] *See* p. 26, *supra*.
[313] 12 U.S.C. § 5565(c)(1).
[314] *Id.* at (c)(2).
[315] 12 U.S.C. § 5565(c)(2); 12 C.F.R. § 1083.1(a) (effective Jan. 15, 2017). For violations that are neither reckless nor knowing, the penalty amount is not to exceed $5,526 per day. *Id.*
[316] All but one of Defendants' stores was sold on June 8, 2017. *See* Ex. 36A, 17:2-18:3.

requests that the Court impose significant monetary penalties against Defendants.[317]

## CONCLUSION

For the reasons stated above, the Court should grant summary judgment for the Bureau

on all counts.

Dated: August 4, 2017     Respectfully submitted,

CONSUMER FINANCIAL PROTECTION BUREAU

ANTHONY ALEXIS
Enforcement Director

R. GABRIEL D. O'MALLEY
Acting Deputy Enforcement Director for Litigation

RICHA DASGUPTA
Acting Assistant Litigation Deputy

_s/Emily Mintz_
EMILY MINTZ (VA Bar No. 82437)
(202) 435-9424; emily.mintz@cfpb.gov
MICHAEL FAVRETTO (NY Bar No. 4508727)
(202) 435-7785; michael.favretto@cfpb.gov
STEPHANIE BRENOWITZ (NY Bar No. 4317418)
(202) 435-9005; stephanie.brenowitz@cfpb.gov
DANIEL ABRAHAM (CA Bar No. 299193)
(202) 435-7039; daniel.abraham@cfpb.gov
Enforcement Attorneys
1700 G Street NW, Washington, DC 20552
Facsimile: (202) 435-7722

---

[317] *See, e.g.*, *CFPB v. Morgan Drexen, Inc.*, No. SACV 13-1267-JLS (JEMx), 2016 WL 6601650, at *3 (C.D. Cal. Mar. 16, 2016) (awarding $40 million penalty against defendants for reckless violations); *CFPB v. Orion Processing, LLC et al.*, No. 1:15-CV-23070, 2017 WL 2230705, at ¶ 49 (S.D. Fla. 2017) (assessing $20,000,000 penalty as part of a stipulated final judgment); *CFPB v. Siringoringo*, No. SACV 14 01155 JVS (AJWx), 2016 WL 102435, at *7 (C.D. Cal. Jan. 7, 2016) (agreeing to the $12 million penalty proposed by the Bureau).

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2017, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to all counsel of record.

   s/Emily Mintz                 
EMILY MINTZ (VA Bar No. 82437)
Phone: (202) 435-9424
Email: emily.mintz@cfpb.gov
Enforcement Attorney
Consumer Financial Protection Bureau
1700 G Street NW
Washington, DC 20552
Facsimile: (202) 435-7722