Case 3:16-cv-00356-DPJ-JCG   Document 221-13   Filed 09/15/17   Page 1 of 9

# In the Matter of:

# CFPB v. All American Check Cashing, Inc., et al.

*June 15, 2017*
*Michael Gray*
*Vol. 1*

**Condensed Transcript with Word Index**



For The Record, Inc.
(301) 870-8025 - www.ftrinc.net - (800) 921-5555

**EXHIBIT M**

**Page 41**

```
 1   just ask you can you name the individuals who
 2   worked at the corporate headquarters prior to --
 3        MR. CONNER: You mean last Wednesday,
 4   not just all -- at all times prior?
 5        MS. MINTZ: Sure. The last ones he
 6   said.
 7        THE WITNESS: Let's go down your
 8   list. Can you read them off to me?
 9   MS. MINTZ CONTINUED:
10   Q.  Did Sonya Teasley work at the corporate
11   headquarters last Wednesday?
12   A.  Yes.
13   Q.  Dianne Valladares?
14   A.  Yes.
15   Q.  Sherri Warrell?
16   A.  Yes.
17   Q.  Susan Carney?
18   A.  Yes.
19   Q.  Jeremy Hoskinson?
20   A.  Yes.
21   Q.  Scott Cain?
22   A.  Yes.
23   Q.  Becky Sumrall?
24   A.  Yes.
25   Q.  Michael Gray?
```

**Page 42**

```
 1   A.  Yes.
 2   Q.  Did anyone else work at the corporate
 3   headquarters last Wednesday?
 4   A.  Greg Wood.
 5   Q.  Okay.
 6   A.  And Karen Bacon.
 7   Q.  What was Karen's Bacon's role?
 8   A.  Compliance.
 9   Q.  What was her title?
10   A.  Director of compliance.
11   Q.  Did Community Choice Financial purchase
12   All American Check Cashing's title loan business as
13   well?
14   A.  Yes.
15   Q.  Did the amount of consumer debt that you
16   stated earlier -- or discussed earlier include
17   title loans?
18   A.  It did.
19        MR. CONNER: We object. That's not
20   relevant to the lawsuit. All American Title Loans
21   is an LLC. I don't think it's named as a defendant.
22        MS. MINTZ: Okay.
23   MS. MINTZ CONTINUED:
24   Q.  What was Sonya Teasley's title?
25   A.  Human resource director.
```

**Page 43**

```
 1   Q.  How long did she work at All American
 2   Check Cashing?
 3   A.  I don't recall.
 4   Q.  More than five years?
 5   A.  Somewhere in that area.
 6   Q.  What was Becky Sumrall's title?
 7   A.  Payroll clerk.
 8   Q.  Can you describe the management structure
 9   at All American Check Cashing from 2011 onward?
10   A.  I had executives in place that worked and
11   ran departments.
12   Q.  Who were those executives?
13   A.  At one time Alan Crancer was the chief
14   administrations officer. Jeremy Hoskinson was the
15   chief financial officer. Sonya Teasley was the
16   director of human resource. And then at one time I
17   had Michael Law, who was the -- over Sonya in human
18   resource. Mandi Hearn was in compliance -- over
19   compliance until Alan Crancer was moved over
20   compliance. I had an IT department, and that was
21   Greg Wood.
22   Q.  Who worked in the stores?
23   A.  Managers.
24   Q.  Anyone else?
25   A.  The supervisors would supervise and direct
```

**Page 44**

```
 1   the stores.
 2   Q.  Was "supervisor" the title for the people
 3   who oversaw the stores?
 4   A.  The store managers oversaw the stores.
 5   Supervisors oversaw the store managers.
 6   Q.  Were they referred to as "area
 7   supervisors" sometimes?
 8   A.  Sometimes at some point they were area
 9   supervisors. At some point they were district
10   managers.
11   Q.  If I refer to them as "supervisors" today,
12   will you know I'm talking about area supervisors
13   and district managers?
14   A.  I would.
15   Q.  Okay. Approximately how many stores did
16   each supervisor oversee?
17   A.  Approximately eight.
18   Q.  Was that the case from 2011 onward?
19   A.  It's always been the case.
20   Q.  Approximately how many supervisors worked
21   at All American Check Cashing?
22   A.  Five, six. Maybe seven.
23   Q.  It's been approximately five to seven
24   since 2011?
25   A.  Yes.
```

Case 3:16-cv-00356-DPJ-JCG   Document 221-13   Filed 09/15/17   Page 3 of 9
Gray
CFPB v. All American Check Cashing, Inc., et al.                         6/15/2017

Page 45

1  Q. Did anyone work for managers in stores?
2  A. Manager trainees.
3  Q. How many manager trainees were in each
4  store?
5  A. Some stores had one, some stores had two,
6  and a few stores would have three.
7  Q. Who did supervisors report to?
8  A. The director of operations.
9  Q. Was that the case since 2011?
10 A. There has been a director of operations
11 since '11, yes.
12 Q. Was that ever referred to as the "general
13 supervisor"?
14 A. Yes.
15 Q. Do "director of operations" and "general
16 supervisor" mean the same thing?
17 A. Serve the same duties.
18 Q. Can you tell me the names of the general
19 supervisor/director of operations since 2011?
20 A. Kelvin Hall was one. Currently is -- was
21 Mike Corey. Those are who come to mind. There's a
22 possibility there's others.
23 Q. What was Mr. Hall's title?
24 A. General supervisor.
25 Q. What was Mr. Corey's title?

Page 46

1  A. Director of operations, I believe. I'm
2  not positive of that. It could have been general
3  supervisor.
4  Q. Were their duties the same?
5  A. Yes.
6  Q. Can you describe those duties?
7  A. They oversaw the supervisors. Hiring,
8  coaching, training. Involved in terminations with
9  HR.
10 Q. When you say hiring, what positions
11 specifically did the general supervisor or director
12 of operations hire for?
13 A. They would hire for manager trainees,
14 managers. They would assist in that. I mean...
15 Auditors. They would assist in hiring a lot of --
16 they would sit in in panel interviews in hiring
17 situations. Managers, of course, if I didn't say
18 that. Their -- their regional managers or district
19 managers or supervisors underneath them.
20 Q. "Regional manager" means the same thing to
21 you as "supervisor"?
22 A. Yes.
23 Q. And "district manager" means the same
24 thing as "supervisor" too?
25 A. (Nods head affirmatively.)

Page 47

1  Q. Yes?
2  A. Yes.
3  Q. Who did the general supervisor and
4  director of operations report to?
5  A. During say maybe '11, '12, when Alan
6  Crancer was there, they reported to Alan. We've
7  been void of that position since 2014, and they
8  would have reported to me.
9  Q. What about 2013?
10 A. Alan Crancer.
11 Q. So your testimony is that Kelvin Hall
12 reported to Alan Crancer from 2011 or 2013?
13 A. If those were -- if those were his
14 employment dates. He had dual responsibility.
15 Some things he would report to me, some things to
16 Alan.
17 Q. Well, let's start in 2011. You believe
18 Kelvin Hall was the general supervisor then, or
19 someone else?
20 A. I really don't know when I hired Kelvin.
21 Q. Okay. When Kelvin worked for the company,
22 who did he report to?
23 A. He would have reported to Alan Crancer for
24 certain things, and then to me for other things.
25 Q. What things would he have reported to Alan

Page 48

1  Crancer for?
2  A. I believe they would have worked on things
3  like marketing, employment issues that would
4  involve HR ultimately.
5  Q. What would Kelvin Hall have reported to
6  you for?
7  A. You know, I was gone so much during the
8  time, that Kelvin would -- when I would return, it
9  would be things he would report to me, maybe
10 another company that was for sale that he thought
11 we should purchase, or a location that we needed to
12 move.
13 Q. And when were -- you said you were gone.
14 Can you -- what do you mean by that?
15 A. Just -- I have other things that I do.
16 Just other things. Just gone.
17 Q. You mean gone from All American Check
18 Cashing?
19 A. Yeah. Yeah, just doing what I do.
20 Q. During what time periods were you not
21 involved with All American Check Cashing on a
22 weekly basis?
23 A. I don't recall on a weekly basis. I don't
24 recall.
25 Q. Were you always involved in All American

Case 3:16-cv-00356-DPJ-JCG   Document 221-13   Filed 09/15/17   Page 4 of 9
Gray
CFPB v. All American Check Cashing, Inc., et al.                    6/15/2017

Page 49

1  Check Cashing on at least a weekly basis?
2     A. There's been times that I was absent for
3  more than a week. So no.
4     Q. And when were those times?
5     A. I don't remember specifically, but there's
6  been times that I was not there for weeks at a time.
7     Q. Do you know how often it's occurred that
8  you've not been involved in All American Check
9  Cashing for weeks at a time?
10    A. I don't recall, to be honest.
11    Q. Okay. Was there ever a time between 2011
12 and 2017 where there was not a general supervisor
13 or director of operations in place?
14    A. I don't recall.
15    Q. You don't recall if there ever was a time,
16 or you don't recall when the time was?
17    A. I don't recall when the time was.
18    Q. Was there a time when there was no general
19 supervisor or district manager since 2011?
20    A. I'm not certain of that. Someone else may
21 have stepped up and taken those responsibilities in
22 the absence of someone, but I just don't recall
23 when or who.
24    Q. When you say there were times when you
25 were not involved with All American Check Cashing

Page 50

1  for a period of weeks, were you in Mississippi
2  during those times?
3     A. Could have been.
4     Q. What were you doing that you weren't
5  involved with All American Check Cashing?
6     A. It could have been anything that I could
7  have been doing. I don't -- I just don't recall
8  what I was doing. But it doesn't mean I went to
9  work.
10    Q. Can you be more specific about what you
11 were doing, give some examples?
12    A. I don't remember what I did for what
13 times. I mean, I may have just chose not to go to
14 work for a week. I mean, I just -- I can't give
15 you examples.
16    Q. Are there other businesses or enterprises
17 that you've been involved with since 2011 that kept
18 you away from All American Check Cashing for more
19 than a week?
20    A. I don't know what specifically would have
21 kept me away for more than a week.
22    Q. You can't think of any specific examples?
23    A. I can't.
24    Q. But you may just not have shown up to work
25 for a week?

Page 51

1     A. That's very accurate.
2     Q. What is Mid-State Finance?
3     A. That is the Pearl location, check cashing
4  location.
5     Q. Do they offer payday loans as well?
6     A. Yes.
7     Q. It's a separate corporation from All
8  American Check Cashing?
9     A. I think so. I think it has its own
10 federal ID and -- yes. I believe it is, yes.
11    Q. Was the Pearl location purchased as part
12 of the recent sale of All American Check Cashing's
13 assets?
14    A. Yes.
15    Q. Are you planning to keep Mid-State
16 Finance, the corporation, in existence?
17    A. No.
18    Q. Do you own any other companies that offer
19 payday loans?
20    A. No.
21    Q. Do you own any other companies that offer
22 check cashing services?
23    A. No.
24    Q. Do you own any other companies that offer
25 any financial product or service?

Page 52

1     A. No.
2     Q. Do you own any other companies that do
3  debt collection?
4     A. I closed Integrity Account Solutions. I
5  terminated those people on Friday and closed, and
6  will be dissolving that business as well.
7     Q. What is Integrity Account Solutions?
8     A. It was a debt collection.
9     Q. It was a debt-collection company?
10    A. Uh-huh (affirmative response).
11    Q. That you owned?
12    A. Yes.
13    Q. Solely?
14    A. I think so.
15    Q. When was it opened?
16    A. Maybe 2015.
17    Q. How many people did it employ?
18    A. Fifteenish.
19    Q. What debt did it collect?
20    A. All American's debt.
21    Q. Any other debt?
22    A. I'm not -- I'm not certain.
23    Q. Who ran the company?
24    A. A girl named Christy Ward.
25    Q. When you say you closed it, what happened

Case 3:16-cv-00356-DPJ-JCG   Document 221-13   Filed 09/15/17   Page 5 of 9
Gray
CFPB v. All American Check Cashing, Inc., et al.                                6/15/2017

### Page 53

1  to the debt that it was collecting?
2  A. I have -- I don't know. I didn't -- I was
3  -- sent HR over there to send everyone home and
4  lock the doors, and we haven't been back inside
5  there.
6  Q. Where is it located?
7  A. In Ridgeland, Mississippi.
8  Q. Is it a property -- does it own the
9  property that it's located in?
10 A. No.
11 Q. Who owns the property that it's located
12 in?
13 A. Some real estate company. I'm not
14 certain.
15 Q. Do you plan to abandon the lease on that
16 property?
17 A. I plan to work out an amicable solution.
18 Q. What else was involved in the process of
19 closing Integrity Account Solutions?
20 A. Turning off the light.
21 Q. Locking the door?
22 A. Locking the door.
23 Q. Are there computers in there?
24 A. There are.
25 Q. What's going to happen to the computers

### Page 54

1  and other assets of the company?
2  A. I haven't thought that far ahead.
3  Q. Did -- was it considered as part of the
4  purchase agreement that recently happened for All
5  American Check Cashing?
6  A. No.
7       MS. MINTZ: Let's -- we've been going
8  about an hour, so why don't we take a break. We'll
9  go off the record.
10      THE VIDEOGRAPHER: Off the record.
11 The time is 10:01.
12      (OFF THE RECORD.)
13      THE VIDEOGRAPHER: Back on the
14 record. The time is 10:16.
15 MS. MINTZ CONTINUED:
16 Q. I just have one followup question about
17 the purchase of All American Check Cashing by
18 Community Choice Financial.
19 A. Okay.
20 Q. All American Check Cashing offered title
21 loans, right?
22 A. Correct.
23 Q. Did Community Choice Financial purchase
24 the titles to the automobiles that All American was
25 holding?

### Page 55

1       MR. CONNER: We'll object to that
2  question. That title loan company is an LLC. It's
3  not a defendant.
4       MS. MINTZ: I'm just trying to
5  understand the scope of the purchase agreement.
6  MS. MINTZ CONTINUED:
7  Q. So go ahead, Mr. Gray.
8  A. I'm going to say that they purchased the
9  receivables, and the titles would secure the
10 receivables, so I'm assuming they purchased the
11 titles as well. I think it's probably stipulated
12 and spelled out in the purchase agreement.
13 Q. Okay.
14      MR. CONNER: And for your benefit,
15 Mississippi is a title state. The title is pledged
16 as a security. It's not like a mortgage or the
17 title itself is transferred.
18      MS. MINTZ: Thank you.
19 MS. MINTZ CONTINUED:
20 Q. What was your role at All American Check
21 Cashing?
22 A. I was the president, CEO at one point.
23 Q. Can you describe your duties at the
24 company in that capacity?
25 A. Well, I kind of feel like my duties were

### Page 56

1  the -- you know, overall. Choosing locations,
2  choosing employees. You know, just running the
3  company.
4  Q. Were you involved in business strategy?
5  A. Early on, I was.
6  Q. Did you continue to be involved over time?
7  A. As I hired directors, they began to
8  strategize and build the strategy, if you will.
9  Q. Did they run things by you, your directors
10 that you hired?
11 A. Yes, they would run things by me.
12 Q. Were you involved in determining when to
13 open and close a new location?
14 A. Yes.
15 Q. Were you involved in determining what
16 products to offer?
17 A. Yes.
18 Q. Was there a board of directors at All
19 American Check Cashing?
20 A. I think at two different times we had two
21 different attempts at having a board of directors.
22 Q. What time periods were those?
23 A. One was early on, and I don't remember the
24 years.
25 Q. Before 2011?

**Page 61**

1  leadership committee or group that decided the --
2  made decisions for All American Check Cashing?
3      A.  No.
4      Q.  What, if any, regular reports did you
5  receive in writing regarding All American Check
6  Cashing's business activities?
7      A.  The only regular report that I ever
8  received that I can remember for any length of time
9  on a consistent basis was the -- the delinquency --
10  we called it the daily report.
11      Q.  Okay.
12      A.  And that would be a snapshot of the
13  company from 30,000 feet.
14      Q.  What was included?
15      A.  Store volumes. Numbers of new customers.
16  Numbers of inactive customers. Delinquency, who
17  hadn't paid, what the percentages were. Not -- not
18  each individual name of who hadn't paid, but a
19  percentage.
20           That report contained check cashing, how
21  many checks had been cashed for what amount. And
22  that was kind of the daily report. That was kind
23  of an overview of it.
24      Q.  And you requested to see that every day?
25      A.  That was sent to me every day for many

**Page 62**

1  years.
2      Q.  Who else received the daily report?
3      A.  At different times in the company and
4  different times of the history, different people
5  received it. Supervisors might have been copied on
6  it. The general supervisor, certainly. The CEO
7  would have certainly been copied on that. I think
8  that's about it.
9      Q.  Did you also sometimes request one-off or
10  special reports regarding All American's business
11  activities?
12      A.  I don't recall.
13      Q.  What, if any, standing meetings did you
14  attend regarding All American's business activities?
15      A.  We didn't have standing meetings.
16      Q.  What sort of meetings did you attend
17  regarding All American's business activities?
18      A.  Well, early on, we had -- we tried to have
19  weekly supervisor meetings.
20      Q.  When was that?
21      A.  It would have been in, you know, '08, '09,
22  '10. But those wouldn't always happen either. But
23  it was a -- but it would have been a supervisor
24  meeting. I would attend that.
25      Q.  After 2011, what sort of meetings did you

**Page 63**

1  attend regarding All American's business activities?
2      A.  I would attend meetings they would
3  request. Maybe supervisor meeting. That was about
4  it that I can think of.
5      Q.  Who would attend supervisor meetings?
6      A.  It would be the supervisors, the director
7  of operations. When Perry was there, the CEO,
8  Perry. HR might have a part, so HR might come and
9  present something: We need staff in these stores
10  or we're overstaffed in these. Jeremy might
11  present financials, kind of a snapshot of where the
12  company was financially.
13      Q.  Since 2011, how often did you attend
14  supervisor meetings?
15      A.  There was no regularity. I can't tell you
16  how often.
17      Q.  More than ten times a year?
18      A.  Certainly not.
19      Q.  Less than ten times a year?
20      A.  Less than ten times a year, certainly.
21      Q.  More than five times a year?
22      A.  I mean, Emily, you're asking me to
23  remember back to 2011. I just simply cannot do
24  that. I can't tell you how many I've attended this
25  year. What is this, June of '17? I don't know.

**Page 64**

1      Q.  Okay. Did All American have written
2  policies and procedures?
3      A.  Yes.
4      Q.  Were they all in one manual, or were there
5  multiple manuals of All American policies and
6  procedures?
7      A.  I believe HR combined them all into one
8  manual.
9      Q.  When were they developed?
10      A.  They were a work in progress.
11      Q.  Did the policies and procedures relate to
12  payday lending?
13      A.  Sure.
14      Q.  And check cashing?
15      A.  Uh-huh (affirmative response).
16      Q.  How did you, when you first started the
17  company, originally develop All American's policies
18  and procedures?
19      A.  The best word that I can use to describe
20  is "by need."
21      Q.  Can you be more specific?
22      A.  We would have a situation that would arise
23  which created a need to be addressed, and then we
24  would work around that.
25      Q.  So when a need arose, you wrote a policy

Case 3:16-cv-00356-DPJ-JCG   Document 221-13   Filed 09/15/17   Page 7 of 9
Gray
CFPB v. All American Check Cashing, Inc., et al.                                          6/15/2017

**Page 77**

```
 1   rides, ride-alongs, if you will. But I'm -- I'm
 2   just not certain of that.
 3      Q.  Did Randy Kirby's position change?
 4      A.  No. Well, at some point Randy became an
 5   acquisition and facilities manager when we were
 6   opening and buying a lot of stores in 2011, '12,
 7   '13.
 8      Q.  Was that a demotion?
 9      A.  I think it was a lateral move.
10      Q.  Did he request that change?
11      A.  It just kind of rolled into that.
12      Q.  How long was Mr. Kirby with the company?
13      A.  A long time.
14      Q.  Close to ten years or more than ten years?
15      A.  In that timeframe.
16      Q.  Is he someone who you socialized --
17   socialize with outside of work?
18      A.  Not so much. Let me back up. When you're
19   saying to me do I socialize with them outside of
20   work, I'm thinking about the corporate ballgame
21   where we all go. I'm thinking about the picnic.
22   I'm thinking about the corporate picnic. I'm
23   thinking about things of that nature.
24      Q.  Outside of corporate events, did you see
25   Randy Kirby outside of work?
```

**Page 78**

```
 1      A.  I would say no. Again, I'm thinking about
 2   the Susan G. Komen walk where the company goes to.
 3   I'm thinking about supervisor meetings where
 4   everyone else leaves, and four or five of us have
 5   dinner. Maybe Laura stayed behind, maybe Lisa
 6   stayed behind. But if you're asking me if I went
 7   to Lisa Reed's kids' birthday parties, no.
 8      Q.  Okay. So for Laura Faulkner and Lisa
 9   Reed, you -- you're saying you socialized with them
10   only at corporate events outside of work. Is that
11   correct?
12      A.  That would be a more accurate statement.
13      Q.  Okay. Who is Scott Cain?
14      A.  Scott Cain would have been the director of
15   marketing. He's been over training. He's also
16   been a supervisor.
17      Q.  Why has his position changed so much?
18      A.  Just -- Scott's been with the company a
19   long time. He's in that ten year, give or take,
20   and he's just made a lot of lateral moves.
21      Q.  Do you socialize with him outside of work
22   and corporate events?
23      A.  The same stipulation that I gave with all
24   of them. So the answer is no, not outside of
25   corporate events. I don't know where Scott's house
```

**Page 79**

```
 1   is. Scott's never been to my house.
 2      Q.  Have any of your employees ever been to
 3   your house?
 4      A.  Not that I even know of, no. Not that I
 5   recall right off the top of my head, no.
 6      Q.  Was Scott Cain a good employee?
 7      A.  I think Scott was a good employee.
 8      Q.  Who was Mandi Hearn?
 9      A.  She was in compliance. She was an auditor.
10      Q.  Did she have any other positions at the
11   company?
12      A.  She has. She was a supervisor at one
13   time.
14      Q.  Did you receive this email in Exhibit 2?
15      A.  Did I receive the email?
16      Q.  Yes. Did you receive the email?
17      A.  I am on the recipients list.
18      Q.  You're copied on the email?
19      A.  I'm copied, yes.
20      Q.  And what's the importance of the -- of
21   this email?
22      A.  She -- Sonya, the sender, put that it was
23   of high importance.
24      Q.  The email reads, "Effective immediately,
25   any changes to the current policy or procedure must
```

**Page 80**

```
 1   have Michael Gray's approval. This includes any
 2   changes to the employee handbook policies, retail
 3   stores procedures, and eCash procedures." Did I
 4   read that correctly?
 5      A.  You did.
 6      Q.  What is the employee handbook?
 7      A.  That would be -- employee handbook would
 8   be a book that would be given to all new hires.
 9      Q.  And who was responsible for updating the
10   employee handbook policies?
11      A.  Human resources.
12      Q.  What was contained in the employee
13   handbook policies?
14      A.  It's -- I mean, I don't know how to answer
15   that -- answer that, Emily. I mean, a lot of
16   stuff.
17      Q.  Can you give us some examples?
18      A.  Clock-in/clock-out procedures. Times.
19   Sexual harassment. A whistleblower policy, per se.
20      Q.  What is the retail store procedures?
21      A.  That sounds to me like the policies --
22   well, the procedure manual.
23      Q.  And who is responsible for updating that?
24      A.  I believe that would fall under HR as well.
25      Q.  And what was contained in the retail store
```

```
                                                            81                                                          83
 1   procedures?                                             1   But these are the retail store procedures that also
 2       A.  I would think that an opening-the-store         2   existed in 2011 that Sonya mentioned in her email
 3   procedure.  How you turn off the alarm, where the       3   in Exhibit 2.  Is that correct?
 4   cash is, closing the store.                             4       A.  Well, these were always changing.
 5       Q.  Offering loans?                                 5       Q.  Okay.
 6       A.  It's possible that's in there.  It's            6       A.  So I can't say that -- that these are
 7   possible.                                               7   exactly what she mentions in '11.
 8       Q.  Check cashing?  Was check cashing in the       8       Q.  Okay.  But are -- is Exhibit 3 All
 9   retail store procedures?                                9   American retail store procedures?
10       A.  If it's -- if it's written down and it's       10       A.  Yes.
11   in there, it was a -- it was a procedure, and it       11       Q.  From October 2012?
12   was -- and then it would be in there.                  12       A.  Correct.
13       Q.  And who was responsible -- excuse me if        13       Q.  Going back to Exhibit 2.  As of January
14   I've already asked you this.  Who was responsible      14   27th, 2011, was your approval required for any
15   for updating the retail store procedures?              15   changes to employee handbook policies, retail store
16       A.  That would have been human resources.          16   procedures, and eCash procedures?
17       Q.  And when you say human resources. . .          17       A.  I don't remember giving that directive.
18       A.  Sonya.                                         18   That's what her email says, but I don't remember
19       Q.  You mean Sonya Teasley?                        19   giving her that directive.
20       A.  Yes.                                           20       Q.  Sonya Teasley was in charge of updating
21       Q.  And what are the eCash procedures?             21   these policies and procedures, though, correct?
22       A.  It sounds to me like that's a --               22       A.  Correct.
23   procedures for using the point-of-sale software.       23       Q.  And she communicated that your approval
24       Q.  Which is?                                      24   was necessary for any changes, right?
25       A.  ECash.                                         25       A.  That was -- that was her communication.

                                                            82                                                          84
 1       Q.  And who was responsible for updating those      1       Q.  And there's no reason she would say
 2   procedures?                                             2   something inaccurate in an email, right?
 3       A.  I think that Sonya was, from this email,       3           MR. CONNER:  We object to the form of
 4   it appears.                                             4   the question.  Calls for him to speculate.
 5           MS. MINTZ:  Could we mark this as              5           THE WITNESS:  Yeah.
 6   Exhibit 3, please?                                     6   MS. MINTZ CONTINUED:
 7           (EXHIBIT 3 WAS MARKED FOR THE RECORD.)         7       Q.  Do you think Sonya Teasley would write
 8   MS. MINTZ CONTINUED:                                   8   something false in an email?
 9       Q.  You've been handed a document that's           9           MR. CONNER:  Object to the form of
10   marked as Exhibit 3, and the Bates number on the      10   the question.  It calls for him to speculate.
11   bottom is AACC00700330.  Do you see that?             11   MS. MINTZ CONTINUED:
12       A.  I do.                                         12       Q.  You can answer that.
13       Q.  Are these the retail store procedures that    13       A.  I don't know why Sonya would write or say
14   Sonya Teasley mentions in Exhibit 2?                  14   something in an email.
15           MR. CONNER:  We object to the form of         15       Q.  Do you think she's an honest person?
16   that question.  That's a trick question.  Sonya      16       A.  I do.
17   sent this email in January of 2011.  This Exhibit 3  17       Q.  Do you know -- do you know her well?
18   is dated October 1 of 2012.                           18       A.  I know her like I know employees.  So yes.
19           MS. MINTZ:  It was -- it was not              19       Q.  You've worked with her for many years?
20   intended to be a trick question.  I'll rephrase.     20       A.  I have.
21   MS. MINTZ CONTINUED:                                  21       Q.  Is she the type of person who would write
22       Q.  Is Exhibit 3 an example of retail store       22   something that's untrue in an email and send it out
23   procedures such as that Sonya mentions in Exhibit 2?  23   at work?
24       A.  This is an example, yes.                      24           MR. CONNER:  We object to the form of
25       Q.  So I understand that these are dated 2012.   25   the question.  "Type of person" is nonspecific and
```

Case 3:16-cv-00356-DPJ-JCG   Document 221-13   Filed 09/15/17   Page 9 of 9
Gray
CFPB v. All American Check Cashing, Inc., et al.                                                    6/15/2017

                                                                    89

1    Q. Going back to the third paragraph. "I
2  have several examples, but one that comes to mind
3  is the debit card authorization." Are you stating
4  that you have several examples of policies that
5  were rolled out without your approval?
6    A. I don't recall.
7    Q. If you saw a policy that was rolled out at
8  All American Check Cashing without your approval,
9  would you object to that?
10   A. No.
11   Q. If you saw a policy that was rolled out
12 without your approval that you disagreed with,
13 would you object to that?
14   A. Well, no. No. The answer would be still
15 be no.
16   Q. Then why are you instructing your
17 employees to get your approval before they roll out
18 new policies?
19   A. Because at the time, reading this email,
20 they had rolled out some things that -- that
21 evidently they were changing stuff on the fly, and
22 no one knew, according to this email, what was
23 being changed out there.
24   Q. And you didn't want them to do that
25 anymore, right?

                                                                    90

1    A. Well, I didn't want confusion.
2    Q. Okay. So you wanted them to run new
3  policies by you before they were rolled out?
4    A. Well, exactly what I wanted was for --
5  scenarios are played out. The policy is discussed
6  among top employees, and the policy is then brought
7  back to the table next meeting in a completed
8  format with a PowerPoint and screenshots. Policy
9  is finalized and given to me for ultimate approval,
10 and we roll out based on predetermined policy
11 rollout date assigned to any and all new policies.
12 So don't shoot from the hip.
13   Q. Okay. And you wanted ultimate approval
14 over --
15   A. I wanted to see what their --
16       MR. CONNER: That question's been
17 asked and answered three or four times now.
18       MS. MINTZ: Okay.
19 MS. MINTZ CONTINUED:
20   Q. And you wanted ultimate approval over
21 policies before they were rolled out?
22       MR. CONNER: We still object. That
23 question's been asked and answered three or four
24 times.
25 MS. MINTZ CONTINUED:

                                                                    91

1    Q. Please answer, Mr. Gray.
2    A. I didn't need ultimate authority. What I
3  needed was for them to do exactly what I said here,
4  "Chief administration offer -- officer applies his
5  understanding to the policy. HR reviews for
6  general, clerical, and HR correctness. Auditor is
7  given the policy to review and discuss with
8  operations. Scenarios are played out. The policy
9  is discussed among some top-level employees, and
10 then it's brought back to the table the next
11 meeting." So there should be a formula, not just
12 shooting from the hip.
13   Q. Okay. And what you also needed was the
14 policies finalized and given to you for ultimate
15 approval?
16   A. They can formulate those policies and give
17 them to me, and then we would have a -- an approval
18 process, yes.
19   Q. And you would be in charge of that
20 approval process?
21   A. Some I would need to be, and some I
22 wouldn't need to be.
23   Q. But just to be clear, the policy is
24 finalized and given to you for ultimate approval.
25 Is that right?

                                                                    92

1        MR. CONNER: We object. That answer
2  has been -- that question has been asked and
3  answered, and his answer is not going to change no
4  matter how many times you ask it.
5  MS. MINTZ CONTINUED:
6    Q. Mr. Gray, you can answer.
7    A. Again, Emily, the chief administration
8  officer should "apply his understanding of the
9  policy. HR reviews for general, clerical, and HR
10 correctness. Auditor is given policy to review and
11 discuss with operations. Scenarios are played out.
12 The policy is discussed among top-level employees."
13   Q. And what's the next couple lines, since
14 you're reading?
15   A. "Is then brought back to the table the
16 next meeting in a completed format with a
17 PowerPoint and screenshots. Policy is finalized
18 and given to me for ultimate approval with rollout
19 based on predetermined policy rollout date assigned
20 to any and all new policies."
21   Q. Okay. And that paragraph describes how
22 you want your staff to roll out new policies. Is
23 that right?
24   A. Well, I think it's better than shooting
25 from the hip in the example that's -- that's up