**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

---

**CONSUMER FINANCIAL PROTECTION BUREAU,**

**PLAINTIFF,**

**v.**                                                        **Case No. 3:16-cv-356-WHB-JCG**

**ALL AMERICAN CHECK CASHING, INC.;**
**MID-STATE FINANCE, INC.; and**
**MICHAEL E. GRAY, individually;**

**DEFENDANTS.**

---

**DEFENDANTS' MEMORANDUM IN RESPONSE TO PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT**

---

Defendants, All American Check Cashing, Inc., Mid-State Finance, Inc., and Michael E. Gray (hereinafter collectively referred to as "All American"), by and through counsel, file this their Memorandum in Response to Plaintiff's Motion for Summary Judgment, and in support thereof would show as follows:

**I.      INTRODUCTON**

The Defendants, All American Check Cashing, Inc. and Mid-State Finance, Inc., are Mississippi Corporations that provided payday loans and check cashing services. Michael Gray founded All American Check Cashing in 1999. He purchased Mid-State finance ten (10) years later. At all times relevant herein, Michael Gray was the President and owner of All American Check Cashing, Inc. and Mid-State Finance, Inc.

In June of 2014, the Mississippi Department of Banking and Consumer Finance ("DBCF") began investigating All American. After an administrative hearing in May of 2017,

the DBCF found that the Defendants had violated the Mississippi Check Cashers Act and the Mississippi Title Pledge Act. The Defendants appealed this finding to the Hinds County Chancery Court. However, before any briefing was done, a settlement was reached. As part of the settlement, the Defendants agreed to: (1) pay customer refunds in the amount of $134,609.00; and, (2) pay a total fine in the amount of $889,350.00. *See* Exhibit "A" to Defendants' Response to Plaintiff's Motion for Summary Judgment, Settlement and Absolute Release with Covenants.

The Consumer Financial Protection Bureau (hereinafter "CFPB" or "Government") filed its Complaint against the Defendants in May of 2016. *See* Exhibit "B" to Defendants' Response to Plaintiff's Motion for Summary Judgment, Plaintiff's Complaint. The CFPB has now filed a Motion for Summary Judgment representing to the Court that there are no genuine issues of material fact in this case, and that it is entitled to the entry of summary judgment on all six counts/claims alleged in the Complaint. However, for the reasons set forth below, the Government's Motion for Summary Judgment must be denied as there are multiple disputed material issues of fact.

## II.   <u>MATTERS NOT PROPERLY BEFORE THIS COURT</u>

Before addressing the substance of the Government's Motion, as a procedural matter the Government did not seek summary judgment on the following issues: (a) Whether or not Michael Gray is individually liable; (b) Whether or not restitution and disgorgement in the amount of $8,364,334.59 is proper; (c) Whether or not imposition of injunctive relief is proper; and, (d) Whether or not civil money penalties are proper. *See* Plaintiff's Motion for Summary Judgment. However, the Government argued these issues in its Memorandum Brief. It is the Defendants' position that these issues are not properly before this Court for summary judgment purposes. Rule 56(a) provides in part that "[A] party may move for summary judgment,

identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought." Fed. R. Civ. P. 56(a).  The only claims identified by the CFPB in its Motion for Summary Judgment were the 6 counts identified above.  The other four issues, (a)-(d), were not identified in Plaintiff's Motion, only in its legal Memorandum, and consequently these issues should not be considered by this Court. Fed. R. Civ. P. 56(a).  See, *Washburn v. Harvey*, 504 F.3d 505, 509-510 (5th Cir. 2007)(holding that they would not consider for summary judgment three *prima facie* elements of the of the Plaintiff's case when the Plaintiff had only moved for summary judgment on one of those issues); citing, *Baker v. Metropolitan Life Ins. Co.*, 364 F.3d 624, 632 (5th Cir. [A] district court may not grant summary judgment *sua sponte* on grounds not requested by the moving party).

### III.   ARGUMENT AND AUTHORITIES

### A.   Summary Judgment Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Royal v. CCC & R Tres Arboles, L.L.C., 736 F.3d 396, 400 (5th Cir. 2013) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party succeeds, the onus shifts to "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine

issue for trial.'"  Id. at 324. The court must "draw all reasonable inferences in favor of the nonmoving party" and "refrain from making credibility determinations or weighing the evidence." Turner, 476 F.3d at 343 (citation and internal quotation marks omitted).  The facts asserted by the party opposing a summary judgment motion, if supported by affidavits or other evidentiary material, are regarded as true *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).  Finally, the burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial.  *Lujan v. Defend*ers of Wildlife, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

> ### B.      The Fee was Properly Disclosed

The Government has alleged that there is no genuine issue of material fact with respect to its claim that All American's fee disclosures were abusive. For purposes of this case, the subject fee disclosure is "abusive" if it (1) materially interfered with the ability of a consumer to understand a term or condition of a consumer financial service, or (2) took unreasonable advantage of the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service.  12 U.S.C. § 5531(d)(1), (d)(2)(B). This Court must find that 12 U.S.C. § 5531(d)(1), (d)(2)(B) is unconstitutionally vague as it is being applied in this case.  The first problem with the Government's attempt to have this Court find that there is no genuine issue of material fact that All American's fee disclosures were "abusive" is that doing so would be a violation of All American's due process rights. As this honorable Court knows well, due process is violated when a statute "fails to provide a reasonable person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  *Hill v. Colorado,* 530 U.S. 703, 732, 120 S.Ct. 2480, 147 L.Ed.2d 597 (U.S. 2000).  As the U.S. Supreme Court explained in *BMW v.*

*Gore*, 517 U.S. 559, 116 S.Ct. 1589 (U.S. 1996), "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receives fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."   The 5th Circuit Court of Appeals has also specifically held that "[c]ivil statutes or regulations that contain quasi-criminal penalties may be subject to the more stringent review afforded criminal statutes."   *Ford Motor Co. V. Texas Dept. Of Transportation,* 264 F.3d 493, 508 (5th Cir. 2001).

In looking at the operative statutory language, it is unclear what specific elements or acts must be proven in order to establish a violation. The terms themselves are subjective in the extreme. Moreover, All American did not have fair notice that its disclosures violated any federal law.  For these reasons alone, summary judgment is not appropriate on Count I.

A second problem with the Government's argument is that All American's signage was conspicuously posted and complied with Mississippi law. The businesses of Check Cashing and Payday Lending involves business activities performed under a statutory scheme enacted by the Mississippi Legislature and which are strictly regulated by the Mississippi Department of Banking and Consumer Finance (hereinafter "DBCF") which has enacted its own regulations. All American's check cashing business transactions were authorized by the Mississippi Legislature which along with the DBCF mandated certain disclosures. *Miss Code Ann.* §75-67-515(4). These mandated disclosures specifically require that a sign disclosing fees for check cashing be "posted conspicuously" in easy view of all persons entering the business and that the sign must be at least 20" by 20" with print large and bold enough in order for the customers to easily read the information. *See* Composite Exhibit "C" to Defendants' Response to Plaintiff's Motion for Summary Judgment photos of these signs at various locations of the Defendants and

Rule 3.5 Disclosure of Fees and Rates Mississippi Check Casher Act Administrative Regulation and Exhibit "D", Michael Gray's Affidavit. While the Government contends that All American's signage was abusive, the signage conformed at all times to Mississippi law. Mike Garrard, an examiner for the Mississippi Department of Banking and Consumer Finance, testified that over a hundred DBCF banking examinations confirmed that the signs conformed to Mississippi law and were posted conspicuously. *See* Exhibit "E" to Defendants' Response to Plaintiff's Motion for Summary Judgment, Mike Garrard's testimony during the DBCF Hearing regarding the Defendants, pgs.1847-48, lines24-25,1-13, pgs.2679-2680,  lines4-25,1-5.  The Defendants were never cited by the DBCF for any failure to post these signs. *See* Exhibit E.  The pictures of the actual signage clearly show that the signage was conspicuously placed.  Under these circumstances, as a matter of law there is nothing **abusive, deceptive, or unfair** about All American's signage.  Furthermore, Mike Garrard, testified in his deposition that there was nothing dishonest, deceptive or illegal about the Defendants' signs.   *See* Exhibit "F" to Defendants' Response to Plaintiff's Motion for Summary Judgment, the deposition of Mike Garrard, p.123, lines8-14.

All American's check cashing fee was also disclosed to each of its customers when the receipt was presented to the customer.  *See* Exhibit "G" to Defendants' Response to Plaintiff's Motion for Summary Judgment, the deposition of Laura Faulkner, p.75, lines19. When giving the customers their money, All American's employees would present the customer with the receipt and indicate the amount they were getting back. *See* Exhibit "G", p.127, lines 8-12. These receipts disclosed the face amount of check, the Defendants' fee percentage, the Defendants' fee amount, and the amount of cash being paid to the customer.  *See* Exhibit "H" to Defendants' Response to Plaintiff's Motion for Summary Judgment, check cashing receipts executed by

Defendants' customers and Exhibit D.  Prior to finalizing the transaction the Defendants' customers signed the receipt and received a copy of the receipt. *See* Exhibit "H".  There is nothing "abusive, deceptive, or unfair" about a customer signing and receiving a copy of a receipt. Following execution of the receipt, the Defendants' employee counted out the cash to each customer.  Again, there is nothing "abusive, deceptive, or unfair" about counting the money out to each customer. Before executing the receipt, the Defendants' customers could have walked away from the transaction.

The Government contends that its statute required All American to have verbally told its customers the fee percentage, or to calculate the fee amount, prior to providing the receipt. Presumably, this is just something that All American should been able to infer or deduce from a plain reading of the applicable statutory language.  The problem of course with this contention is that is nothing in the operative language which would put anyone on notice of any such duty or obligation. Moreover, All American had legitimate reasons for the way it disclosed its fees which were in part designed to minimize human error in calculating the terms of these transactions, All American had a contract with the industry's leading software company for check cashing, eCash. Data from all of All American's stores was migrated into a sole database called "eCash." This cloud based program allowed synchronization of all locations and centralization of oversight at the home office in Madison, Mississippi. All Americans' employees used eCash to confirm the type of fee for that particular check, calculate the actual amount of said fee and calculate the amount owed to the customer less said fee.  *See* Exhibit "I" to Defendants' Response to Plaintiff's Motion for Summary Judgment, the eCash Software Handbook; Exhibit "G", pgs.77-78, lines 12-25,1-14. The eCash system was used so that the Defendants' customers would be provided the correct fee and the correct amount of said fee.  *See* Exhibit "G", p.101, lines12-15.

The Government cites this court to *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008), *aff'd*, 624F.3d 1 (1st Cir. 2010), *quoting Novartis Corp. v. FTC,* 223 F.3d 783, 786 (D.C. Cir. 2000) as support for its claim that All American's failure to verbally communicate the fee was "material."  However, in *FTC v. Direct Mktg. Concepts, Inc.*, the Court also held that materiality "is measured by whether a representation is likely to affect the consumer's conduct with regard to a product or service." *Id.*  Using this definition of materiality it is clear that there are issues of fact with regard to whether All American's failure to verbally disclose a fee to its customers was material. The fee was always disclosed prior to the conclusion of the transaction as all statutory and regulatory components of the transaction were not completed until the customer signed the receipt, gave it back to All American, and was given a copy of the receipt along with their money.

Material questions of fact exist for the jury on this issue.  *Beneficial Corp v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976)(whether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law); *Giant Food Inc. v. FTC*, 322 F.2d 977, 982, n. 12 (D.C. Cir. 1963)(the meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive are questions of fact).

### C.     The Defendants did not take Unreasonable Advantage of Customers

In Count II the government argues that All American took unreasonable advantage of consumers' inability to protect their interests when cashing checks. 12 U.S.C. § 5531(d)(2)(B). For the same reasons already addressed in responding to Count I, the first problem is that this statutory provision, both on its face and as it is being applied, also amounts to a due process violation because it fails to provide a reasonable person of ordinary intelligence with fair notice of what is prohibited, and/or is so standardless that it authorizes or encourages seriously

discriminatory enforcement. Nevertheless, the Government argues that All American unfairly exploited its customers by doing things to make them believe that their only option was to pay <u>any fee</u> All American charged. This argument has no evidentiary or legal support. At any time, a customer could back out of or walk away from the transaction.   Moreover, the fee was conspicuously posted and the receipt was signed and acknowledged by the customer.   *See* Exhibits C-F and H.

The government's reliance on *Cf. CFPB v. NDG Fin. Corp.*, No. 15-cv-5211, 2016 WL 7188792, at *15 (S.D.N.Y. Dec. 2, 2016) is without merit for a number of reasons.  First, *CFPB v. NDG Fin. Corp.*, involved a motion to dismiss as opposed to a summary judgment motion. Moreover, *Cf. CFPB v. NDG Fin. Corp* is factually distinguishable in that the defendants in that case improperly represented to its customers that U.S. laws did not apply, when U.S. laws clearly applied.   However, in this case, there are no such allegations.   There were no improper representations.  As such, there are valid question of fact that need to be addressed by a jury and summary judgment on Count II would be improper.

> **D.   All American's Practices were not Deceptive**

An act or practice is deceptive if "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." For the same reasons already addressed in responding to Count I, this statutory provision, both on its face is being applied, amounts to a due process violation because it fails to provide a reasonable person of ordinary intelligence with fair notice of what is prohibited, and/or is so standardless that it authorizes or encourages seriously discriminatory enforcement.

In Count III the Government argues that there is no material issue of fact with regard to their claim that All American deceived its customers as to the availability of the check cashing fee. The government claims that All American's employees made the following false deceptive oral statements:

1. that they did not know the fee amount;

2. that additional steps were necessary to determine the fee, by verifying the check, sending the check to home office, or putting the check into the computer; and,

3. that "every check is different" that "it depends on the company/maker as to the cost."

Despite the Government's arguments, there are issues of fact with regard to whether these statements when combined with all other disclosures and circumstances, were likely to mislead customers. First, the customer was free at any time to calculate the fee that would be owed simply by looking at the conspicuously posted signage.  Second, the customer could back out of the transaction before signing the receipt. Third, All American had standardized policies for the purpose of preventing human errors in determining the check cashing fees. Under these circumstances, there are disputed issues of material fact that can only be determined by the fact finder after hearing all of the evidence and testimony.

The Government also argues that it "is no defense that the check cashing fee percentages were posted on a sign and the fee amount and percentage was listed on receipts". This argument again ignores the fact that All American's disclosures and signage complied with state law and the regulations adopted by the DBCF. As further support of this argument the Government cites a long list of cases each of which is distinguishable from the facts in the instant case. The Government cited *FTC v. Cyberspace.com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) for the proposition that a representation "may be likely to mislead by virtue of the net impression it

creates," even when it is accompanied by truthful information.   However, *Cyberspace.com LLC*,

is distinguishable.   In *Cyberspace.com LLC*, the court found that the deceptive act was a

solicitation for internet services in the form of a refund check.   *Id.*   The solicitation was

deceptive because it was hidden on the back of the check in fine print that most consumers could

not read.   *Id.* at 1200.   The instant case is completely distinguishable.   The facts clearly show that

there was no fine print, that there were large visible signs showing the fee percentage and that the

Defendants' customers signed receipts that specifically showed the fee percentage and fee

amount.   Any reliance on *Cyberspace.com LLC*, should be rejected.   In the case sub judice,

disclosure is made in compliance with the mandates of state law.   There is no artifice that can be

implied by compliance with law.

The Government also cited *FTC v. Fin. Freedom Processing, Inc.*, 538 F. App'x 488, 489

(5th Cir. 2013) to support its contention that the law is violated when the first contact is secured

by deception, even though the true facts are made known to the buyer before he enters into the

contract of purchase.   However, *Fin. Freedom Processing, Inc.'s.* holding does not state that but

instead held the opposite.   In this case the district court found against the FTC and for the

financial debt companies and the Fifth Circuit affirmed the decision.   Importantly, the Fifth

Circuit rejected the Government's argument and found the following:

> And while the Companies' radio ads and websites may be
> misleading-indeed, it is difficult to conclude that the
> websites are not deceptive-we are satisfied that substantial
> evidence supports the district court's finding that reasonable
> consumers were no longer deceived at the time of purchase.

*Id.* at 490; see also FN 5, *citing Beneficial Corp v. FTC,* 542 F.2d 611, 617 (3d Cir.

1976)(whether particular advertising has a tendency to deceive or mislead is obviously an

impressionistic determination more closely akin to a finding of fact than to a conclusion of law);

*Giant Food Inc. v. FTC*, 322 F.2d 977, 982, n. 12 (D.C. Cir. 1963)(the meaning of

advertisements or other representations to the public, and their tendency or capacity to mislead or deceive are questions of fact).   Based upon the holding in *Fin. Freedom Processing, Inc.*, the Government's motion for summary judgment should be rejected because the evidence shows that at the time of purchase, All American's customers signed receipts that specifically showed the fee percentage and fee amount and hence, they were not deceived at the time of purchase. *In Re Cajun Electric Power Cooperative, Inc.,* 791 F.2d 353, 359 (5th Cir.1986)(explaining the general prevailing law that "one is presumed to have read a contract (or any other document) that one signs").

The Government's reliance on *FTC v. Brown & Williamson Tobacco Corp.*, 778 F.2d 35, 42-43 (D.C. Cir. 1985) is equally without merit.   In *FTC v. Brown & Williamson Tobacco Corp*, the Court found that a tobacco company's advertisement regarding tar percentage was misleading despite a disclaimer.  *Id.*  The court found that the disclaimer was misleading because it was in fine print, in an illegible form and placed in an inconspicuous corner of the ad and therefore would likely not be read by a consumer.  *Id.*  Hence, the advertising was misleading. *Id*.  Again that is not the case here.  The sign stating the fee was conspicuously displayed, as confirmed by 102 reports of examination by the Mississippi Department of Banking, and All American's customers signed receipts that specifically showed the fee percentage and fee amount, a copy of which is attached to each eCash electronic check cashing record of the transaction.  See Exhibits C-F and H.

*FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008) is another case cited by the Government. In *Med. Billers Network, Inc.*, the district court found that summary judgment was not proper for either party.  *Id.* at 308.  Moreover, the Court in part held that a "court should focus on the overall impression created by the advertising, not its literal truth

or falsity." *Id* at 305.   The holding supports All American's position in that the overall impression of the customer interaction was not deceptive because its customers were provided the fee after the check was processed.

CFPB argues that the sign placement, on the face of the front of the counter, rendered the disclosures ineffective because the sign was not visible to consumers standing at the counter during a transaction. Again, the signs were easily visible when the customer walked in and the placement was proper under Mississippi law. *See* Exhibits C-F.  The alternative argument that the signs were sometimes obscured ignores the fact that the DBCF found on over one hundred occasions that the sign was conspicuously placed and never found it obscured. *See* Exhibits C-F.

CFPB's contention that customers "did not know the fee" must also be rejected. Whether the failure to verbalize the fee was or was not deceptive when looking at any specific transaction as a whole is a disputed issued of fact.  Furthermore, it is a gigantic leap, by the Government to assume that any specific customer, or that customers generally, did not know the check cashing fee. Again, knowledge of the fee is actually imputed by law to every customer who signed the receipt. *In Re Cajun Electric Power Cooperative, Inc.,* 791 F.2d 353, 359 (5th Cir.1986)(explaining the general prevailing law that "one is presumed to have read a contract (or any other document) that one signs").

### D.        Reversing or Cancelling Transactions was not Deceptive

Although the Government argued that the customers never knew the fee amount, the Government alternatively argues that when a consumer objected to the fee amount, All American's employees would commit violations and mislead its customers by telling them that it was difficult or time-consuming to cancel or reverse the transaction and that consumers could not cash their check elsewhere. First, any statement that it would take some time to reverse a transaction was true.  Second, it is true that in certain circumstances a customer may not be able

to cash their checks at other financial institutions. For instance, some banks won't cash checks for people who do not have an account at that bank. Banks may also require that check be deposited. Also, grocery stores will sometimes cash a payroll check but insist that customer spend some of it in the grocery store. Grocery stores and liquor stores often will cash payroll checks but will not cash any other kind of check. Those check cashers are not regulated by DBCF and CFPB. Furthermore, if a customer says he wants to check on fees with another regulated casher, it is not unfair, deceptive, or deceitful to tell them that other regulated cashers can charge the same fees that the Defendants do. Unfortunately for the Government's attempt to have this issue decided on summary judgment – context matters. Finally, regardless of whether reversing a transaction took additional time or not, a customer could at any time receive their check back after the transaction was cancelled by a supervisor. See Exhibit "G", p.79, lines16-20. The Defendants had in place a procedure to reverse or cancel a transaction. After the phone call was placed and the verification process occurred, the check was returned to the customer. Exhibit G, p.80, lines9-11.  This is not coercion.  It was a simple and fair business process. For all these reasons, the entry of summary judgment on this issue is not appropriate.

The Government's reliance on *FTC v. Hispanic Global Way, Corp.*, 2014 WL 12531538 to support this argument is without merit.  In *Hispanic Global Way, Corp.*, there was a finding that the defendants expressly lied to its customers about their refund and exchange policies.  *Id.* at 3.  That is simply not the case here and this argument must be rejected for summary judgment purposes because a question of fact exists whether or not these statements were deceptive. *Beneficial Corp v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976)(whether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law); *Giant Food Inc. v. FTC*, 322 F.2d 977, 982, n.

12 (D.C. Cir. 1963)(the meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive are questions of fact).

### E.      All American did not Engage in Unfair Acts or Practices

In Count IV the Government alleges that All American engaged in unfair acts or practices.  Courts have held that an act or practice  is unfair if: "[1] the act or practice causes or is likely to cause substantial injury to consumers [2] which is not reasonably avoidable by consumers; and [3] such substantial injury is not outweighed by countervailing benefits to consumers or competition." *ITT*, 219 F. Supp. 3d at 913, *quoting* 12 U.S.C. § 5531(c)(1) (alterations in original).  For the same reasons already addressed in responding to Count I, this statutory provision, both on its face and as being applied, amounts to a due process because it fails to provide a reasonable person of ordinary intelligence with fair notice of what is prohibited, and/or is so standardless that it authorizes or encourages seriously discriminatory enforcement.

In support of its motion for summary judgment on Count IV the Government again argues that customers did not learn the fee until after the transaction was completed, if at all.  For reasons previously discussed, this is a disputed issued.  The Government also sets out various conclusions that are nothing more than supposition and self-serving characterizations. For instance, the Government opines that the "cornerstone of Defendants' check cashing policies and practices was that employees must never tell the customer the fee." However, the cornerstone of All American's policies and practices was creating loyalty with its customers -- a goal completely inconsistent with the Government's allegations of widespread deception. Furthermore, as previously explained, All American had a legitimate reason for not verifying the fee until the end of the transaction, i.e., having the fee verified first by its check cashing software. This process eliminated human error and provided customers with a 100% accurate fee percentage. This fact alone shows the existence of disputed issues of material fact.

In support of the request for summary judgment on Count IV, the Government cited numerous cases that are factually and legally distinguishable. The Government cites *FTC v. Kennedy*, 574 F. Supp. 2d 714, 720 (S.D. Tex. 2008) for the proposition that charging unauthorized fees could cause substantial injury to consumers. In *FTC v. Kennedy* the court found that the defendants violated the FTCA by allowing consumers telephone bills to be charged without their consent.  The evidence showed that consumers were billed for a service they did not want and in fact refused.  *Id.* at 721.  The facts in the present case are completely opposite. In this case, All American's customers were aware or should have been aware of the check cashing fee. *In Re Cajun Electric Power Cooperative, Inc.,* 791 F.2d 353, 359 (5th Cir.1986)(explaining the general prevailing law that "one is presumed to have read a contract (or any other document) that one signs").  For this reason, there is no injury as a matter of law.

The government also cites *FTC v. Commerce Planet, Inc.*, 878 F. Supp. 2d 1048, 1078 (C.D. Cal. 2012), *aff'd in part, rev'd in part*, 815 F.3d 593 (9th Cir. 2016), *cert. denied subnom. Gugliuzza v. FTC*, 137 S. Ct. 624 (2017); *FTC v. Windward Mktg., Ltd.*, No. CIV.A. 1:96-CV-615F, 1997 WL 33642380, at *13 (N.D. Ga. Sept. 30, 1997) for the proposition that there is substantial injury when consumers are charged a fee when they were unaware that any fee would be charged. Once again, that is simply not the case. As a matter of law, no reasonable person taking a check to a check cashing business would have any expectation that no fee would be charged.

The Government's also cited *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1364-65 (11th Cir. 1988) for the proposition that there exists substantial injury when the amount charged to the customer exceeds the bargained-for amount. Once again, this case is inapplicable. The bargained for amount did not change. The percentages and fees were conspicuously posted and

the final amount was included on the receipt that was created by the Defendants' check cashing software. It never changed.

Importantly, in *Orkin Exterminating Co.*, the court found that "consumers may act to avoid injury before it occurs if they have reason to anticipate the impending harm and the means to avoid it." *Id.* at 1366. All American's customers had multiple opportunities to avoid paying All American's fee. They could have gone to some other institution or business who would cash the check. They could have read All American's conspicuously posted signage and calculated the fee themselves and simply walked out. If they were not satisfied with the answers to any questions concerning the All American's fee, they could have walked out. When they were presented the receipt for signature, they could have read it and asked to cancel the transaction. As such, at the minimum, there exists a question of fact, as to whether the Defendants' alleged injuries were reasonably avoidable.

The Government also cited *Cf. Arthur Murray Studio of Wash., Inc. v. FTC*, 458 F.2d 622, 625 (5th Cir. 1972) for the proposition that customers would not have done business with All American if they knew the fee from the start and were robbed of that choice due to All American's deceptive, high pressure sales techniques that "added up to cajolery and coercion." There is nothing but generalized supposition and opinion in these sweeping conclusions. Moreover, the facts in *Cf. Arthur Murray Studio of Wash., Inc.*, are nothing like the facts in the instant case. For instance, in *Cf. Arthur Murray Studio of Wash., Inc.*, the court found that the defendants engaged in advertising that was replete with tricks to draw prospects, sham analysis, relay salesmanship, promises of social status and companionship, and psychological attacks on the consumer. In fact, one woman begged on her knees to be allowed to contract for dance

lessons. *Id.* at 625.  All American engaged in no cajolery or coercion. To argue otherwise and to compare the two cases is disingenuous argument at best.

Finally, the Government argues that FTC *v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010), supports its position that that the harm to consumers was not reasonably avoidable because All American took affirmative steps to prevent consumers from making a "free and informed choice." However, at any point in the transaction the customers could back out. In *CFPB v. D&D Mktg.*, No. CV 15-9692, 2016 WL 8849698, at *10 (C.D. Cal. Nov. 17, 2016), another case cited by the government, the court found that the "the law generally requires consumers to understand their legal obligations" but that even diligent actors could be misled. *Id.*  The Defendants' customers were not misled.  Applying this logic, the Defendants' customers had a duty to use reasonable diligence to look at the fee sign and to look at the receipt, prior to signing it.  Had these customers taken these reasonable steps, which most did, these steps would have allowed a reasonable customer to understand their legal obligations.

Ironically the Government even argues that the existence of fee disclosures (which the Government argued did not occur) does not provide any safe harbor from unfairness liability. *FTC v. Inc21.com Corp.*, 745 F. Supp. 2d 975, 1004 (N.D. Cal. 2010).  Again the instant case is distinguishable, because in *FTC v. Inc21.com Corp.*, only 5% of the customers  were aware that they had been billed for the defendants' services. That is simply not the case here. The customers of check cashing business understand that there was a fee involved and that said fee was provided to them prior to the conclusion of the transaction.

### F.    All American provided Benefits to its Customers

All American provided benefits to its customers. Customers were able to cash checks and get immediate money that they otherwise would be unable to get. All American's customers understood or should have understood the pricing, were able to compare options, if they chose to

do so, and thus reach an informed decision. For this reason alone, as well as the others argued above, summary judgment on Counts I-IV should be denied.

### G.      The 14 Day Loan Product was not Deceptive

All American offered its customers a 14-day payday loans. Customers of this product had the option of obtaining a second 14-day payday loan if they chose to do so. There was nothing illegal about offering a 14-day loan product. All American's 14-day loan product was authorized by the Mississippi Legislature. Miss Code Ann. Section 75-67-515(4).   In regard to these transactions, the signage that was required had to disclose the amount advanced, the fee, and the face amount of the check.   *See* Exhibit C.   Mike Garrard, an examiner for the Mississippi Department of Banking and Consumer Finance, testified that over a hundred DBCF banking examinations confirmed that the signs conformed to Mississippi law and were posted conspicuously. *See* Exhibit E. There is nothing abusive, deceptive, or unfair about meeting the state statutory regulation with respect to the "conspicuous" disclosure of the loan amounts, the fee rate, fee amount, the APR for a 14-day term and the amount of the total payments. *See* Exhibit C.   The 14-day loan sign also stated that "you have the right to read the Agreement before you sign it.   You have the right to ask questions of the provider's staff until you thoroughly understand everything in the Agreement.   You also have a right to walk away from the Agreement before you sign it."  *See* Exhibit C.

All American's customers entered into written contracts (i.e., Deferred Presentment Services Agreement) for their 14-day loans. As previously stated, the law presumes that All American's customers read these contracts. *In Re Cajun Electric Power Cooperative, Inc.,* 791 F.2d 353, 359 (5th Cir.1986)(explaining the general prevailing law that "one is presumed to have read a contract (or any other document) that one signs"). The contracts disclosed the "ANNUAL PERCENTAGE RATE (The Cost of your credit as a yearly rate), FINANCE CHARGE (The

dollar amount the credit will cost you), Amount Financed (The amount of credit provided to you on your behalf), and Total Payment (The amount you will have paid after you have made all payments as scheduled)." *See* Exhibit "J" to Defendants' Response to Plaintiff's Motion for Summary Judgment, 14-day loan contracts executed by customers and All-American employees and Exhibit D. The contracts also showed the number of payments, the amount of payments and when the payment is due.  Exhibit J.  There is nothing "abusive, deceptive, or unfair" about a customer signing and entering into an agreement that specifically sets forth the terms of the transaction.

The Government contends that despite the signage and the disclosures in the contract, All American still made two deceptive statements to its customers regarding its 14-day payday loans. These allegedly deceptive statements can be summarized as follows:

1.  All American told monthly customers that fees for 30-day loans were higher; and

2.  All American told monthly customers that borrowing pursuant to the 1st and 3rd lending program (14-day pay loan), was better than a 30-day loan because monthly customers received money twice a month.

These statements are subjective opinions – and are not deceptive or unfair statements. The only unfairness is the Government's assertion that All American should have known that such statements were a violation of some ambiguous regulation. Accordingly, the Government's motion for summary judgment on Count V should be dismissed.

In addition, statement by the Defendants to its customers that fees for 30-day loans were higher than a 14-day loan was factually true.  Again, context matters. For example, in comparing the costs of a 30-day loan and a 14-day loan for a $300.00 loan, the fee charged for the 14-day loan was $5.85 lower for the 14-day loan as compared to a 30-day loan. There is no denying that

the actual fee was lower for the 14-day loan. It was a true statement and there was nothing deceptive about it. In fact, the Government in its Memorandum admits this fact in footnote 205, but argues that the difference in fee does not affect its analysis.  Such an admission by the Government, further demonstrate the existence of questions of fact for the jury. Moreover, it was not the policy of All American to state that the fees were "better", but rather that they had a different loan structure. *See* Exhibit D. Customer who used the 14-day lending program could receive cash twice a month. Customers were given a choice, and for those customers who wanted to get money twice a month, this became a method for using payday loans.  *See* Exhibit "K" to Defendants' Response to Plaintiff's Motion for Summary Judgment, the deposition of Jeremy Hoskinson, p.66, lines 13-14. Furthermore, a sign in the store stated that, "[T]here are other payday lenders and check cashers in Mississippi that offer different loan amounts, different payment schedules and different interest fee structures."  Exhibit C.  Under these circumstances there are multiple issues of disputed material facts for the jury.

All American agrees that an act or practice is deceptive if "(1) there is a representation, omission, or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) the representation, omission, or practice is material." *Gordon*, 819 F.3d at 1192 (quotation marks omitted).   However, whether or not the statement(s) is/are deceptive is a question for the jury.  *Beneficial Corp v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976)(whether particular advertising has a tendency to deceive or mislead is obviously an impressionistic determination more closely akin to a finding of fact than to a conclusion of law); *Giant Food Inc. v. FTC*, 322 F.2d 977, 982, n. 12 (D.C. Cir. 1963)(the meaning of advertisements or other representations to the public, and their tendency or capacity to mislead or deceive are questions of fact).

Once again, the Government cites numerous cases that are factually and legally distinguishable. For instance, the Government once again relies on cases that are based upon "fine print deception." *Cyberspace.com*, 453 F.3d at 1200. In *Cyberspace*, the court found that a fine print disclaimer did not cure their deception. In the instant case, the Defendants' employees never deceived their customers and there was no fine print exception. First, the signs and agreements were readily understandable and easy to view. Second, the fees for a 14-day loan compared to a 30-day loan were lower. Third, All American correctly told its customers that they could get money twice a month. *See* Exhibits C and E.

Ironically, in a case cited by the Government, *Am. Home Prods. Corp. v. FTC*, 695 F.2d 681, 686 (3d Cir. 1982) the Third Circuit held that findings of deceptive or misleading advertisements are an impressionistic determination is akin to a finding of fact. Citing, *Beneficial Corp v. FTC*, 542 F.2d 611, 617 (3d Cir. 1976)(quote admitted). As such, whether these statements were or were not deceptive is an issue that is proper for the jury and not for summary judgment. Similarly, in another case, cited by the Government, *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674-75 (2d Cir. 1963), the Court found against the FTC and for the defendants. In *Sterling Drug*, the court wrestled with the issue of whether or not statements were half-truths and/or ambiguous and/or deceptive. Ultimately, both the district court and the court of appeals found that the statements were not deceptive.

The ultimate question of whether or not: (1) statements by All American's employees; (2) All American's contracts; and (3) All American's signage; were likely to mislead reasonable consumers by creating an impression that consumers could benefit financially by borrowing pursuant to 14-day lending compared with a 30-day lending is a question for the jury. Likewise, whether the Mary Smith Example was or was not unfair or deceptive is also a question of fact for

the jury. The fact that the lending practice described in the example may have violated state law does not mean that the conduct violated any CFPB regulation. Whether this lending practice was or was not deceptive would also be an issue of fact for the jury.

### H.    Consumer Overpayments

In Count VI the Government alleges that All American engaged in unfair acts or practices because some customer overpayments may have been retained. All American has admitted that some customers, for one reason or another, paid more than they owed. The primary situation where this occurred was when a customer made a late-cash payment after their check had already been deposited. *See* Exhibit "K", p.191, lines8-13.  When this occurred, All American did not have a written process for identifying and automatically refunding the customer's overpayment. However, All American generally called customers to inform them that a refund was available. *See* Exhibit "L" to Defendants' Response to Plaintiff's Motion for Summary Judgment, the deposition of Diane Valladares, p.58,lines.1-7; p.59,lines 1-5.  Managers would send the refund request to Diane Valladeres who would then verify whether a refund was owed.  Exhibit L, p.61, lines 1-6.   Based upon this testimony alone, a question of facts exists as to whether or not Defendants unfairly failed to disclose to the consumer that the consumer had a credit balance and was owed a refund. Nevertheless, the CFPD contends All American acted unfairly because it had an affirmative duty to disclose the credit balance and provide refunds. But that does not change the fact that whether this was or was not an unfair practice which is a question of fact for the jury. *Beneficial Corp v. FTC,* 542 F.2d 611, 617 (3d Cir. 1976); *Giant Food Inc. v. FTC*, 322 F.2d 977, 982, n. 12 (D.C. Cir. 1963).

The Government also argues that All American systematically erased customer's balances in eCash to create another obstacle for its clients to receive a refund. That argument does not accurately reflect the reasons for removing credit balances from eCash. On October 9,

2011, over 3600 credit balances were removed. The majority of these credit balances were not the result of actual overpayments, but rather were the result of the conversion from Ideal software to eCash software. Exhibit L, p.105, lines17-23.  Furthermore, after this initial removal of credit balances, credit balances were routinely cleaned up, and identified as a home office correction in the eCash notes. The reason for doing this was to prevent the potential for embezzlement or fraud by employees. All American had previously had a situation where at least one employee took credit balances for himself. Exhibit L, p.124-25, lines22-25 and lines1-2. It is incorrect for the Government to suggest that there was no record of the potential credit balances or that refunds were not paid when a real credit balance was identified. A customer who believed he or she had a credit balance would still be able to obtain a refund of that balance. Once All American verified that there had been a duplicative payment and money was owed to its customers, then "that was something we would automatically refund."  Exhibit L, p.126, lines3-10.   The Government in its Memorandum admitted that refunds were made whenever a "consumer actively pursued one." *See* page 34 FN 218 of Defendants' Memorandum.  For these reasons, questions of fact exist as to whether there was or was not any specific injury and whether or not customers could reasonably have avoided the injury.

Finally, there are no refunds owed. Pursuant to the settlement agreement with the Mississippi Department of Banking and Consumer Finance All American has made $134,609.00 in refund payments.  *See* Exhibits A and D.  As such, this claim is moot and implicates double jeopardy protections.

## I.      Michael Gray is not Individually Liable

As argued infra, the Government's Motion for Summary Judgment did not seek summary judgment on the following issues: (a) Whether or not Michael Gray is individually liable; (b)

Whether or not restitution and disgorgement in the amount of $8,364,334.59 is proper; (c) Whether or not imposition of injunctive relief is proper; and, (d) Whether or not civil money penalties are proper. These issues are not properly before this Court and should not be considered. However, the Defendants will address these arguments in the alternative.

<u>Gray is Not a Covered Person under the CFPA</u>

To be a "covered person" under the CFPA an individual must be (1) "director, officer, or employee charged with managerial responsibility" of AACC, (2) the "controlling shareholder" of AACC, and (3) "materially participate in the conduct of the affairs" of AACC. 12 U.S.C. § 5481(25)(C)(i)-(ii). All American agrees that Michael Gray was an officer charged with managerial responsibility and the controlling shareholder. However, the claim that Michael Gray "materially participates in the conduct of the affairs" of All American involves resolution of disputed issues of fact. A question of facts exists because from 2011 and on Michael Gray had executives in place that worked and ran All American's departments, including a chief administrative officer and chief financial officer.  *See* Exhibit "M" to Defendants' Response to Plaintiff's Motion for Summary Judgment, the deposition of Michael Gray at p.43, lines 10-21. Michael Gray also had managers who ran his stores and supervisors who oversaw these managers.  Exhibit M, pgs.43-44, lines 22-25, 1-17.  Beginning in 2011, Michael Gray testified that he was "gone during much of that time" and there were times when he was gone for weeks at a time. Exhibit M, p.48-49, lines 20-25,1-6.  As CEO of All American, Gray described his duties as choosing locations, choosing employees and that over time his directors took over strategy.  Exhibit M, p.55-56, lines 23-25,1-6.  Michael Gray testified that since 2011 that he met with his supervisors less than ten times a year.  Exhibit M, p.63, lines 19-20.  Michael Gray testified that the Human Resources Department was responsible for the retail store procedures,

including offering loans, check cashing and eCash procedures. Exhibit M, pgs.80-81, lines20-25,1-23. The testimony above demonstrates that there is a question of fact as to whether Michael Gray is a covered person and can be held individually liable under the Act.

Gray has no Individual Liability

Under the CFPA, it is unlawful for "any covered person or service provider… to engage in any unfair, deceptive, or abusive act or practice."  12 U.S.C. Section 5536(a).  Michael Gray was not a "covered person" and did not <u>knowingly</u> engage in any unfair, deceptive or abusive act or practice under the CFPA.   Given the significant fines at issue in this case, due process demands nothing less than <u>proof of actual knowledge</u>. The standard for scienter should be no different in this case than under other similarly penal statutory schemes.   The United States Supreme Court has specifically held that in order to establish liability for a violation of Rule 10b-5, there must be proof that the accused "acted with *scienter*".  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, 96 S.Ct. 1375 (1976).  The 5th Circuit Court of Appeals has gone as far as to require:

> not only that the party make a statement which contains an untrue statement of material fact or omits a material fact necessary in order to make the statement not misleading, but also that the party have done so . . . with 'scienter' meaning an 'intent to deceive, manipulate, or defraud' or that 'severe recklessness' in which the 'danger of misleading buyers . . . is either known to the defendant or is so obvious that the defendant must have been aware of it.'  *Southland Securities Corporation v. Inspire Ins. Solutions, Inc*., 365 f.3d 353, (5th Cir. 2004)(quoting *Brood v. Rockwell Int'l Corp*., 642 F.2d 929, 961-62 (5th Cir. 1981)).

In order for Michael Gray to be liable via summary judgment for any violations of the CFPA the government must prove knowing individual violations by Michael Gray of Counts I-VI. However, questions of fact clearly exist for each of these counts that are for a jury to determine.

Michael Gray did not knowing engage in any of the allegedly unfair, deceptive, and abusive acts and practices at issue. *See ITT*, 219 F. Supp. 3d at 908.  For instance, Michael Gray never authorized the use of rollovers for All American's 14-day loans. Scott Cain, a former employee of All American, testified that it was Alan Crancer who put together an operation manual for the Defendants in October of 2011.  *See* Exhibit "N" to Defendants' Response to Plaintiff's Motion for Summary Judgment, Scott Cain's testimony during the DBCF Hearing regarding the Defendants, pgs.3229-3230, lines21-25,1-15.  The idea to use rollovers in the 14-day lending program was a practice developed by Alan Crancer and not Michael Gray. Exhibit N, pgs.3231, lines 3-16.  In fact, Scott Cain testified that until Alan Crancer created the new policy and procedures, it was never taught or operated "to bring in a fee or take a fee or rollover" for the Defendants' 14-day loans because we know it's illegal and we teach the opposite of that. Exhibit N, p.3232, lines 12-17.  In fact, he admitted that Michael Gray directed him not to forward an email regarding the 1st and 3rd procedures developed by Alan Crancer.  Exhibit N, p.3233, lines 4-14. However, Scott Cain forwarded the email against Michael Gray's advice and during the hearing testified that "I wish so much that I would have read it and looked at it", so that the email would not have been forwarded throughout the company.  Exhibit N, pg.3233, lines19-20.  According to Scott Cain, "I let Michael down. I feel like I let the company down. I didn't read and see that."  Exhibit N, pg. 3234, lines 10-12. Furthermore, Sonja Teasley, another former employee of All American, testified that Michael Gray never demanded that his employees do anything illegal.  *See* Exhibit "O" to Defendants' Response to Plaintiff's Motion for Summary Judgment, Sonja Teasley's testimony during the DBCF Hearing regarding the Defendants, pgs. 4202, lines 12-21.

## I.     Remedies

Summary Judgment is inappropriate on the issue of remedies. This is a matter that should be determined by the finder of fact after hearing all the testimony and seeing all the evidence.

Restitution and Disgorgement is Not Proper

While restitution and disgorgement are available remedies under 12 U.S.C. Section 5565, nothing is owed by back from the collected check cashing fees and the 14-day lending program because the fees were legal, properly disclosed and legitimately earned regardless of whether some customers could have found cheaper fees or different loan products somewhere else. Furthermore, All American denies that damages in the amount of $5,423,477.13 is proven or recoverable. The Government's method fails to account for or credit the fees that would have been incurred elsewhere when cashing the checks. Similarly, nothing is owed as a result 14-day payday lending program. For the same reasons, All-American also denies that there are $2,808,075.66 in proven damages from their 14-day lending program. These proposed damages also give no consideration for the fact that All American has already paid refunds to its consumers. *See* Exhibit D.

To the extent that the Government is seeking disgorgement, it is essentially seeking a form of criminal forfeiture which is subject to the Excessive Fines Clause of the Eighth Amendment. Under the Eight Amendment, excessive fines may not be imposed. *Austin v. United States*, 509 U.S. 602, 604, 113 S. Ct. 2801, 2803, 125 L. Ed. 2d 488 (1993). In this case there is no question that a monetary judgment in the amounts proposed by the Government against All American is a putative extraction and not remedial in nature. To the extent that the Government is now attempting to impose its own restitution, disgorgement and fine in addition to the fine and restitution already paid by All American pursuant to its settlement with the DBCF the same

constitutes an excessive fine in violation of the protections afforded by the Eight Amendment. The excessiveness of these additional fines and penalties are also demonstrated by the fact that the Government has not presented evidence that amounts are actually owed on an individual customer by customer basis. Rather it amounts to a sweeping generalization.

**J.      Injunctive Relief is not Proper**

The Government also seeks a permanent injunction and requests that the Court summarily permanently restrain and enjoin Michael Gray from marketing, selling, providing, offering, or arranging for others to market, sell, or provide, payday loans or check cashing services. For the reasons stated above, summary judgment is not proper for there were no violations and hence the injunction is also improper. Furthermore, an injunction is moot given the fact that All American has sold all of their check cashing businesses. *See* Exhibit A.

**K.      Money Penalties are not Warranted**

This Court should not impose civil money penalties in this case for many reasons, much less do so in summary fashion. First, the Government has not shown that summary judgment is proper under any of their counts. Second, liability has been disputed and are questions of fact for the jury to decide. Alternatively, if the Court finds against All American, there must be an inquiry into the tier of civil money penalty. The tier is determined based upon the Defendants' scienter. 12 U.S.C. § 5565(c). Question of fact exists with regard Michael Gray's scienter. Moreover, in deciding on the fine amount the law provides this Court with considerable discretion. Exercising that discretion without a full hearing and trial would amount to a due process violation as a matter of law. In determining the penalty size, if any, the Court must take into account various mitigating factors including the size of financial resources and good faith of the person charged; the gravity of the violation or failure to pay; the severity of the risks to or

losses of the consumer, which may take into account the number of products or services sold or provided; the history of previous violations; and such other matters as justice may require. Clearly summary judgment on this issue is not warranted.

      **L.**    **Clear and Convincing Evidence**

The Defendants have been unable to find any specific rule or authority designating the burden of proof with respect to the various issues. To the extent that the Government is seeking to impose fines, disgorgement and restitution, those claims and entitlement should require proof by clear and convincing evidence.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests that Plaintiffs' Motion for Summary Judgment be denied.

Respectfully submitted this the 15th day of September, 2017.

                          /s/Dale Danks, Jr._____
                          Dale Danks, Jr. (MS 9868)
                          Danks, Miller & Cory
                          213 S. Lamar Street
                          P.O. Box 1759
                          Jackson, MS  39215-1759
                          Telephone:  (601) 957-3101
                          Facsimile:   (601) 957-3160
                          E-mail: ddanks@dmc-law.net

**OF COUNSEL:**

Dale Danks, Jr.(MSB#5978)
Email: ddanks@dmc-law.net
Michael V. Cory Jr. (MSB #9868)
Email: mc@dmclaw.net
Kenneth C. Miller (MSB #10043)
Email: km@dmclaw.net
DANKS MILLER & CORY

213 South Lamar Street
Jackson, Mississippi (39201)
Post Office Box 1759 (39215-1759)
Telephone: 601.957.3101
Facsimile: 601.957.3160

Bentley E. Conner (MS 6465)
E-mail: bentleyeconner@gmail.com
164 E. Center Street
P.O. Box 563
Canton, MS 39046
Telephone: (601) 859-6306
Facsimile: (601) 589-6307

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via electronic

mail on the following counsel of record on September 15, 2017:

       Emily Mintz
       Michael Favretto
       Stephanie Brenowitz
       Christopher Deal
       Daniel David McDonough Abraham
       Lawrence De-Mille-Wagman
       Consumer Financial Protection Bureau
       1700 G St. NW
       Washington, D.C. 20522
       emily.mintz@cfpb.gov
       michael.favretto@cfpb.gov
       Stephanie.Brenowitz@cfpb.gov
       Christopher.Deal@cfpb.gov
       daniel.abraham@cfpb.gov
       lawrence.wagman@cfpb.gov

                        /s/Dale Danks, Jr.