# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 2, 2022

Lyle W. Cayce
Clerk

No. 18-60302

---

Consumer Financial Protection Bureau,

*Plaintiff—Appellee*,

*versus*

All American Check Cashing, Incorporated;
Mid-State Finance, Incorporated;
Michael E. Gray, *Individually*,

*Defendants—Appellants*.

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 3:16-CV-356

---

Before Richman, *Chief Judge*, and Higginbotham, Jones, Smith, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Duncan, Engelhardt, Oldham, and Wilson, *Circuit Judges*.[*]

Per Curiam:

This civil enforcement matter comes to the en banc court on interlocutory appeal under 28 U.S.C. § 1292(b).  The action and its history are

---

[*] Judge Ho is recused.

accurately described in the panel majority and separate opinions, *Consumer Financial Protection Bureau [CFPB] v. All American Check Cashing, Inc.*, 952 F.3d 591 (5th Cir. 2020).

In the district court, the defendants ("All American") moved for judgment on the pleadings per Federal Rule of Civil Procedure 12(c), urging that the CFPB is unconstitutionally structured because the Bureau is led by a single director removable by the President only for cause.[1] The district court denied the motion "[f]or the same reasons stated in" *PHH Corp. v. CFPB*, 881 F.3d 75 (D.C. Cir. 2018) (en banc), finding "that the Bureau is not unconstitutional based on its single-director structure." On All American's request, the court, in accordance with § 1292(b), certified, and this court accepted, the question "Does the structure of the [CFPB] violate Article II of the Constitution and the Constitution's separation of powers?"

Answering the question in the negative, the panel majority affirmed the denial of judgment on the pleadings. 952 F.3d at 594. Judge Smith dissented. *Id.* at 602. The court *sua sponte* voted to rehear the matter en banc, thus vacating the panel opinion. 953 F.3d 381 (5th Cir. 2020) (en banc). Three months later, in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2192 (2020), the Supreme Court held that the CFPB's single-director structure "violate[d] the separation of powers."

The ruling in *Seila Law* decides the pure question of law raised by All American in this interlocutory appeal.[2] Moreover, the Supreme Court, in a

---

[1] The motion for judgment included a second question, not relevant here, that the district court declined to certify.

[2] The scope of our interlocutory review is circumscribed:

> When an interlocutory appeal is taken, the circuit court generally goes no further in exploring the merits of the action than is necessary to decide the matter before it. The court considers the order appealed from as well as . . . any other questions, although themselves interlocutory and not otherwise appealable, that underlie and that are inextricably involved with the order being appealed. This scope of review is made necessary by the fact that the circuit court must consider all the legal issues necessary to dispose of

holding speaking for seven Justices, found "the Director's removal protection severable from the other provisions of Dodd-Frank that establish the CFPB." *Id.* at 2211 (opinion of Roberts, C.J.). That holding means that, although the district court erred insofar as it declined to find the removal provision infirm, a judgment of dismissal on the pleadings is not called for under the present state of this record.

The interlocutory order denying judgment on the pleadings is therefore VACATED. The absence of a dismissal on the pleadings leaves the CFPB free to continue the enforcement action against All American, subject to further order of the district court.

We therefore REMAND for such proceedings as the district court, in its wide discretion, may find appropriate. In its order of certification, the court wisely directed its Clerk of Court "to stay all proceedings . . . until the interlocutory appeal is concluded." The time has arrived for the district court to proceed. We place no limitation on the matters that that court may consider, including, without limitation, any other constitutional challenges, and

---

the order being appealed.

The jurisdiction of a circuit court in an appeal under § 1292(b) extends only to the questions of law raised by the order certified by the district court. Appellate review is not limited, however, to the precise question certified by the district court, because it is the order that is appealable, and not the controlling question identified by the district court. The controlling question is the reason for the interlocutory appeal, but the thing under review is the order.

A circuit court may, therefore, exercise jurisdiction over any question that is included within the order certified by the district court and is not tied to the particular question identified by the district court. . . .

While the circuit court may address any issue necessary to decide the case before it, the circuit court may not reach beyond the certified order to address . . . those not yet ruled on by the district court.

19 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 203.32[3][a], at 203-132 to 203-133 (Matthew Bender 3d ed. 2021) (footnotes and citations omitted).

we express no view on the actions it should take in accordance with this opin-
ion or otherwise.

No. 18-60302

Edith H. Jones, *Circuit Judge*, joined by Elrod, Duncan, Engelhardt, and Oldham, *Circuit Judges*, concurring:

As this nation careens past $30 trillion in national debt, risking bankruptcy during our or our children's lifetimes, one may ask: is there no institutional check on government spending?  In fact, there is.  The Constitution commands that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  U.S. Const. art I, § 9, cl. 7.  The Constitution vests Congress not only with the power to tax and spend, but also removes "the option *not* to require legislative appropriations prior to expenditure."[1]  The Appropriations Clause embodies a fundamental separation of powers principle—subjugating the executive branch to the legislature's power of the purse.  And separation of powers is at the heart of our constitutional government in order to preserve the people's liberty and the federal government's accountability to the people.  As Justice Kennedy explained, "Concentration of power in the hands of a single branch is a threat to liberty."  *Clinton v. City of New York*, 524 U.S. 417, 452, 118 S. Ct. 2091, 2019 (1998) (Kennedy, J., concurring).

A critical issue yet undecided in this appeal is whether the historically unique structure of the Consumer Financial Protection Bureau violates the Constitution because its funding is doubly removed from congressional review.  "[O]ur job as judges is to enforce the law, not abdicate to the political branches . . . ."  *PHH Corp. v. CFPB,* 881 F.3d 75, 196 (D.C. Cir. 2018) (en banc) (Kavanaugh, J., dissenting) (citation omitted), *abrogated by Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).  I would hold that the CFPB's funding

---

[1] Kate Stith, *Congress' Power of the Purse,* 97 Yale L. J. 1343, 1349 (1988).

No. 18-60302

structure violates the separation of powers principle enshrined in the Appropriations Clause.

Created in 2009, the Consumer Financial Protection Bureau is an administrative agency that was expressly designed to answer to neither of the politically accountable branches. Unlike other agencies, Congress put the CFPB's staggering amalgam of legislative, judicial, and executive power in the hands of a single Director serving a five-year term and removable by the President only for cause; and Congress insulated the agency from the ordinary congressional appropriations process. In *Seila Law LLC v. CFPB,* 140 S. Ct. 2183 (2020), the Supreme Court had no difficulty holding the presidential removal restriction inimical to the Constitution's separation of powers. *Id.* at 2192. The Supreme Court was not asked to decide whether CFPB's budgetary independence also violates the separation of powers. That issue is posed squarely to our court.[2]

I write to show that the CFPB's budgetary independence is antithetical to the constitutional origins of the Appropriations Clause;

---

[2] The district court's certified question asks whether the CFPB's structure violates Article II and the separation of powers. The latter clause of that question encompasses the budgetary independence issue. Even so, because this interlocutory appeal stems from an order in which the district court also rejected All American's budgetary independence argument, that issue is within the scope of this court's review. As 28 U.S.C. § 1292(b) explains, "appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Yamaha Motor Corp. v. Calhoun*, 516 U.S. 199, 205, 116 S. Ct. 619, 623 (1996). And in interlocutory appeals this court routinely considers questions other than those certified by the district court. *Spong v. Fid. Nat'l Prop. & Cas. Ins. Co.*, 787 F.3d 296, 304 (5th Cir. 2015); *Luera v. M/V Alberta*, 635 F.3d 181, 186 (5th Cir. 2011); *United States v. Caremark, Inc.*, 634 F.3d 808, 815 n.8 (5th Cir. 2011); *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 398-99 (5th Cir. 2010) (en banc); *Melder v. Allstate Corp.*, 404 F.3d 328, 330-31 (5th Cir. 2005); *Brabham v. A.G. Edwards & Sons Inc.*, 376 F.3d 377, 380 n.2 (5th Cir. 2004); *Rsrv. Mooring Inc. v. Am. Com. Barge Line, LLC*, 251 F.3d 1069, 1070 n.4 (5th Cir. 2001). Thus, the scope of this court's review comfortably includes the budgetary independence issue.

contrary to the Constitution's structural allocation of powers; unsupported by the funding structure of any previous federal agency; and indefensible by the CFPB.

## I. Introduction

### A. The Consumer Financial Protection Bureau

Following the 2008 financial crisis, Congress established the CFPB as an independent agency and tasked it with "implement[ing]" and "enforcing" consumer protection laws to "ensur[e] that all consumers have access to markets for consumer financial products and services and that markets for consumer financial products and services are fair, transparent, and competitive." 12 U.S.C. § 5511(a). Congress transferred to the CFPB administrative and enforcement authority over eighteen existing federal statutes, which broadly include consumer loans, mortgages, credit cards, and other financial products. *See* 12 U.S.C. §§ 5512(a), 5481(12), (14). Additionally, Congress made it unlawful "to engage in any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1)(B), a vague command that gave the CFPB a veritable blank check for broad regulation.[3] *See* 12 U.S.C. §§ 5531(a), (b).

The CFPB can "conduct investigations, issue subpoenas and civil investigative demands, initiate administrative adjudications, and prosecute civil actions in federal court." *Seila Law*, 140 S. Ct. at 2193 (citing 12 U.S.C. §§ 5562, 5564(a), (f)). In administrative adjudications and civil actions, the CFPB can seek a dizzying array of penalties, including

---

[3] Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace*, 81 Geo. Wash. L. Rev. 856, 918-23 (2013).

restitution, rescission of contracts, disgorgement, injunctive relief, and civil penalties (up to $1,190,546 per day[4]). 12 U.S.C. § 5565.

Further, "[t]he CFPB has a unique structure among federal agencies."[5] Congress took unprecedented steps to insulate the CFPB against control by the elected branches. Indeed, more than anything else, the floor statements supporting the CFPB touted the supposed need for "independence" from the whims of politics.[6] Unlike virtually every other independent agency, Congress put a single Director at the CFPB's helm rather than a balanced, multi-member commission. 12 U.S.C. § 5491(b)(1). That Director was to serve a five-year term during which the President could remove him for only "inefficiency, neglect of duty, or malfeasance in office." 12 U.S.C. § 5491(c). Until rejected as unconstitutional in *Seila Law,* the for-cause removal protection vastly circumscribed the President's control and thus the ultimate political accountability of the agency to the people through the President. *Seila Law*, 140 S. Ct. at 2204.

Congress also severed any line of accountability between it and the CFPB by giving the CFPB a perpetual source of funding outside the appropriations process. Rather than plead with Congress for funds, the

---

[4] CFPB, Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2021, 109 (2021).

[5] Adam J. Levitin, *The Consumer Financial Protection Bureau: An Introduction*, 32 REV. BANKING & FIN. L. 321, 339 (2013).

[6] *See, e.g.*, 156 CONG. REC. 2052 (2010) (statement of Rep. Tsongas); *id.* at 3187 (statement of Sen. Kaufman); *id.* at 6237, 6365, 7015 (statements of Sen. Whitehouse); *id.* at 6240 (statement of Sen. Franken); *id.* at 6990 (statement of Sen. Reid); *id.* at 7481, 7485-86, 8931 (statements of Sen. Dodd); *id.* at 9447 (statement of Rep. Kilroy); *id.* at 9839 (statement of Rep. Holt); *id.* at 11814 (statement of Rep. Lee); *id.* at 12434 (statement of Rep. Maloney); *id.* at 13135 (statement of Sen. Cardin).

CFPB Director simply requisitions from the Federal Reserve "the amount determined by the Director to be reasonably necessary," subject to a cap of twelve percent of the Federal Reserve's budget. 12 U.S.C. § 5497(a)(1).[7] In fiscal year 2021, for example, the CFPB Director could demand up to $717.5 million, without justifying the amount or use of those funds in any way.[8] The CFPB can further supplement that largesse with civil penalties recovered through enforcement actions. 12 U.S.C. § 5497(d).[9]

Congress does not even retain indirect control over the agency's funding because the Federal Reserve's budget is based on semiannual levies on banks within the Federal Reserve System, 12 U.S.C. § 243; and the Director's collection and use of funds is not subject to review by congressional appropriations committees, 12 U.S.C. § 5497(d).

In the eyes of the agency's architects, self-funding was "absolutely essential" to prevent future congresses from influencing the CFPB. S. Rep. No. 111-176, at 163 (2010); *see also* 156 Cong. Rec. 8931 (statement of Sen. Dodd) ("[T]he [CFPB's] funding will be independent and reliable so that its mission cannot be compromised by political maneuvering."). Self-funding would ensure that future congresses could not use budget cuts to stymie the

---

[7] To request funds, the CFPB Director need only send a perfunctory letter to the Federal Reserve with the amount requested. *See* Rohit Chopra, Director of Consumer Financial Protection Bureau, Letter to Jerome Powell (Dec. 20, 2021), https://files.consumerfinance.gov/f/documents/cfpb_fy-2022-q2_transfer-request_2021 - 12-20.pdf (requesting 276 million dollars for second quarter of 2022) (last visited April 25, 2022).

[8] CFPB, Financial Report of the Consumer Financial Protection Bureau, Fiscal Year 2021, 8 (2021).

[9] To get the agency started, Congress also pre-authorized up to $200 million in additional funds for the first five years of its existence. 12 U.S.C. § 5497(e)(2). The funds were to become accessible following a mere report to the President and congressional appropriations committees. 12 U.S.C. § 5497 (e)(1).

CFPB, unlike its administrative progenitor, the Consumer Product Safety Commission. *See* Elizabeth Warren, *Unsafe at Any Rate: If It's Good Enough for Microwaves, It's Good Enough for Mortgages. Why We Need a Financial Product Safety Commission*, Democracy: A Journal of Ideas, Summer 2007, https://democracyjournal.org/magazine/5/unsafe-at-any-rate/; Rachel E. Barkow, *Insulating Agencies: Avoiding Capture Through Institutional Design*, 89 Tex. L. Rev. 15, 66-67, 78 (2010) (reporting that sixty-percent budget cuts left the CPSC "if not a do-nothing, a do-very-little agency" and that the CFPB's architects learned an important lesson from the CPSC's downfall).[10] The CFPB agreed, as it stressed in an early report that its entitlement to "funding outside the congressional appropriations process" ensures "full independence" from Congress. CFPB, *The CFPB Strategic Plan, Budget, and Performance plan and Report* 81 (Apr. 2013).

## B. Procedural History

In 2016, the CFPB brought a civil action against Appellant All American Check Cashing and its founder for engaging in "unfair," "deceptive," and "abusive" acts and practices under 12 U.S.C. § 5331(a). All American moved for judgment on the pleadings, arguing, among other things, that the CFPB's unprecedented structure doubly contravenes the Constitution's separation of powers by insulating the CFPB from the President with removal protections and shielding the CFPB from Congress on account of its funding structure. Because the agency's structure is

---

[10] See also, Creating a Consumer Financial Protection Agency: A Cornerstone of America's New Economic Foundation: Hearing Before the S. Comm. On Banking, Housing, & Urban Affairs, 111th Cong. 87 (2009) ("Recent history has demonstrated that even an agency with an undiluted mission to protect consumers," i.e. the CPSC, "can be undermined by hostile or negligent leadership or by Congressional meddling on behalf of special interests.").

unconstitutional, All American asserted, the enforcement action must be declared void.

The district court denied All American's motion and simply adopted the D.C. Circuit's reasoning in *PHH Corp. v. CFPB*. The petitioners and their amici in *PHH Corp.* argued, as All American does here, that both the CFPB's funding structure and the CFPB Director's removal protections pose constitutional problems. *See PHH Corp.*, 881 F.3d at 92-101. Thus, in adopting the D.C. Circuit's reasoning, the district court rejected both of All American's theories of unconstitutionality. The district court certified the order rejecting All American's structural arguments for interlocutory appeal under 28 U.S.C. § 1292(b). A divided panel of this court affirmed, and the court voted to rehear the case en banc.[11] Although the Supreme Court resolved one of the theories of unconstitutionality in *Seila Law*, the constitutionality of the CFPB's budgetary independence remains undecided.

With respect to funding, All American argues that the CFPB's budgetary independence contravenes the Constitution's separation of powers by violating the principles enshrined in the Appropriations Clause.[12] All American emphasizes that the Framers, drawing from British experience, crafted the Appropriations Clause because they well understood the importance of exclusively vesting the legislative branch with the power of the

---

[11] *See CFPB v. All Am. Check Cashing, Inc.*, 952 F.3d 591 (5th Cir. 2020) (affirming district court); *CFPB v. All Am. Check Cashing, Inc.*, 953 F.3d 381 (5th Cir. 2020) (granting petition for rehearing en banc).

[12] Defendants-Appellants' Supplemental En Banc Reply to CFPB Supplemental En Banc Response Br. at 14-19, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 516005541 (Sept. 8, 2021); Defendants-Appellants' Supplemental Opening En Banc Br. at 37-40, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515953075 (July 26, 2021); Defendants-Appellants' Supplemental En Banc Br. at 60-65, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515508835 (July 30, 2020).

purse as a check on the executive. Congress ran afoul of that foundational principle "by abdicating its exclusive power of the purse and insulating the CFPB from congressional oversight with an unprecedented two layers of fiscal independence."[13]  Moreover, *Seila Law* exacerbates the constitutional problem by making the CFPB Director accountable to the President and thereby uniting in the executive the powers of the purse and sword.

The CFPB responds that Congress did not violate the separations of powers principle enshrined in the Appropriations Clause because it can always eliminate or alter CFPB's perpetual funding source by amendment.[14] Further, the CFPB asserts that Congress's choice to fund the CFPB outside the appropriations process is hardly unprecedented because other agencies, like the Federal Reserve, also enjoy some level of budgetary independence. The following discussion evaluates the contending propositions.

## II. Discussion

It is not mere happenstance that Congress is the chief guardian of the purse strings. Drawing on the British experience, the Framers placed the national government's fiscal powers in Congress's hands to check the propensity for aggrandizement and consequent loss of liberty endemic to a powerful executive branch. The CFPB's budgetary independence violates this essential maxim of separated powers. Indeed, just as the CFPB Director's removal protections unconstitutionally insulated the agency from executive control, so, too, does its budgetary independence

---

[13] Defendants-Appellants' Supplemental En Banc Br. at 60, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515508835 ( July 30, 2020).

[14] Supplemental En Banc Brief of Plaintiff-Appellee CFPB at 22-24, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No.515994476 (Aug. 25, 2021); Supplemental En Banc Brief of Plaintiff-Appellee CFPB at 39-43, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No.515546446 (Aug. 31, 2020).

unconstitutionally eliminate legislative control over the CFPB. This is not just "'extra icing on' an unconstitutional 'cake already frosted.'" *PHH Corp.*, 881 F.3d at 198 (Kavanaugh, J., dissenting) (quoting *Yates v. United States*, 574 U.S. 528, 557, 135 S. Ct. 1074, 1093 (2015) (Kagan, J., dissenting)). Importantly, the CFPB's funding structure is wholly unprecedented. No executive agency with broad legislative, adjudicative, and law-enforcement powers has ever enjoyed complete funding independence. That Congress enacted and can amend the provision giving the CFPB budgetary independence does nothing to alleviate the affront to the separation of powers. A feature so subversive to the Constitution's separation of powers as the CFPB's budgetary independence cannot withstand scrutiny.

### A. The historical origins of Congress's control over the purse strings.

The Constitution commits power over fiscal matters to Congress. In addition to vesting Congress with the positive authority to tax and spend for various ends, U.S. Const. art. I, § 8, the Constitution's Appropriations Clause commands that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law," U.S. Const. art. I, § 9, cl. 7. The Appropriations Clause eliminates "the option *not* to require legislative appropriations prior to expenditure."[15] Congress must assume a supervisory role over the executive branch and its administrative functionaries. This understanding, forged in the struggles between parliament and the crown during the seventeenth century, was well-established and widely accepted before, at, and after the Constitution's ratification. The same history confirms that appropriations for executive

---

[15] Stith, *supra* note 1, at 1349.

operations must be temporally limited to maintain the boundaries between the executive and legislative branches.

Restraining unruly executive power by giving the legislature control of the purse strings has its pedigree in the English Revolution. Before the seventeenth century, parliament had little control over the how the king spent money. As one notable English historian observed, "throughout the Middle Ages the king's revenue had been in a very true sense the king's revenue, and parliament had but seldom attempted to give him orders as to what he should do with it."[16] During that era, much of the crown's revenue came from "ordinary" revenue sources that "either subsisted time out of mind in the crown; or else ha[d] been granted by parliament, by way of purchase or exchange for such of the king's inherent hereditary" rights. 1 William Blackstone, Commentaries *271. By the seventeenth century, however, the king's revenue from ordinary sources did not satisfy the needs of royal governance[17] and the king had to turn to "extraordinary" sources of revenue, which meant taxation and, therefore, required parliamentary consent.[18] *Id.* at *297. But the king found petitioning parliament for resources disagreeable, at least in part, because parliament exercised a concomitant power to limit how the king could spend the funds

---

[16] F. W. Maitland, The Constitutional History of England 309 (H. A. L. Fisher ed., 1908).

[17] Josh Chafetz, Congress's Constitution: Legislative Authority and the Separation of Powers 47 (2017) (citation omitted).

[18] Sir John Baker, An Introduction to English Legal History 218 (5th ed. 2019) ("In 1340 the king conceded the principle that no taxation should be imposed without [the House of Commons'] consent.") (citing Stat. 14 Edw. III, sess. ii, cl. 1). *Cf. id.* at 217 n.90 (observing that Magna Carta cl. 12 "provided that no taxation should be imposed except by the common council of the realm").

so raised.[19]   The ensuing struggle between the crown and parliament over extraordinary revenues (and the king's attempts to extract revenues through prerogative taxation) contributed to one king's beheading, another's deposition, and, eventually, the English Revolution.[20]

In the Revolutionary Settlement, parliament solidified its supremacy over the purse by eliminating virtually all of the crown's sources of ordinary revenue and, in the English Bill of Rights, prohibiting prerogative taxation. *Id*. at *296, *323.   Eliminating the crown's ordinary revenue, Blackstone declared, was "fortunate[] for the liberty of the subject."   *Id*. at *296.   In so doing, "the Commons took good care that . . . the Crown should be altogether unable to pay its way without an annual meeting of Parliament. . . .   Every year he and his Ministers had to come, cap in hand, to the House of Commons, and more often than not the Commons drove a bargain and exacted a quid pro quo in return for supply."[21]   During this transition, parliament also adopted a more rigid practice of appropriating for specific purposes and threatening severe punishment for crown officers who

---

[19] *See* Maitland, *supra* note 16, at 309-10; Thomas Pitt Taswell-Langmead, English Constitutional History, From the Teutonic Conquest to the Present Time 487 (6th ed. 1905) ("The complete authority exercised by the Commons, during the late Civil War and the Commonwealth, over the whole receipts and expenditure of the national treasury, had accustomed the House to regulate the disbursement of the sums which they granted; the advantage to the nation from their control of its finances was self-evident; and from the date of the Appropriation Act of Charles II. it became 'an undisputed principle, recognised by frequent and at length constant practice,' that 'supplies granted by Parliament are only to be expended for particular objects specified by itself.' ").

[20] *See generally*, Chafetz, *supra* note 17, at 47-51.

[21] G. M. Trevelyan, The English Revolution: 1688-1689, at 96 (1965).

disobeyed.[22]   In sum, parliament secured the crown's subservience by eliminating non-appropriated funding sources, imposing time limits on appropriated funds, and specifying how the crown could spend appropriated funds.  Legislative control over fiscal matters thus became a cornerstone of the separation of powers.

Given the primacy of that separation of powers principle in England, it is unsurprising that American colonial assemblies likewise claimed authority over appropriations.  Indeed, by one scholar's account, mid-eighteenth-century colonial assemblies exercised an appropriations power "greater even than that of the British House of Commons."[23]  To colonial Americans, the "power of the purse was . . . determinant of sovereignty and upon its location and extent depended the power of government, the existence of civil rights, and the integrity of representative institutions."[24]  In practice, their ideal held true; colonial legislatures regularly exploited the provincial governor's "financial dependence to enhance their powers at the expense of the governors' prerogatives by withholding needed revenues unless the governors acceded to the conditions attached to them."[25]  Among the colonial legislatures' favorite tools for controlling royal authority was the elimination of executive and judicial salaries and, in the South Carolina

---

[22] MAITLAND, *supra* note 16, at 310, 433, 446; *see also id.* at 385 (commenting that parliament appropriated "supply with great minuteness, to say, that is, how much of it may be spent for this purpose, how much for that").

[23] JACK P. GREENE, THE QUEST FOR POWER: THE LOWER HOUSES OF ASSEMBLY IN THE SOUTHERN ROYAL COLONIES, 1689-1776 at 106 (1963).

[24] E. JAMES FERGUSON, THE POWER OF THE PURSE: A HISTORY OF AMERICAN PUBLIC FINANCE 1776-1790 xv (1961).

[25] Richard D. Rosen, *Funding Non-Traditional Military Operations: The Alluring Myth of a Presidential Power of the Purse*, 155 MIL. L. REV. 1, 46 (1998); *see also* CHAFETZ, *supra* note 17, at 53-55.   Colonial legislatures, for example, regularly withheld the governor's salary.

House of Commons, refusing to pay rent on the royal Governor's mansion.[26] And it must not be forgotten that the Declaration of Independence specifically charges against royal rule that the king's payment of colonial judges' salaries using royal funds interfered with colonial legislatures' fiscal powers.

Around the same time, Baron Montesquieu, the man most associated with the doctrine of the separation of powers, observed that the legislature's control of the purse strings would be meaningless if it appropriated money without a time limitation. Montesquieu surmised that "[i]f the legislative power was to settle the subsidies not from year to year, but forever, it would run the risk of losing its liberty, because the executive power would be no longer dependent; and when once it was possessed of such a perpetual right, it would be a matter of indifference whether it held it of itself or of another." Baron de Montesquieu, The Spirit of the Laws, bk. XI, ch. VI (1748). Montesquieu influenced the American Colonists' view on the separation of powers, in general, and the necessity of making the legislative branch supreme in fiscal matters, in particular.

After the American Revolution, the Colonists translated their hostility toward unbridled executive power and incorporated the lessons from the British experience into their state constitutions by giving state legislatures control of the purse strings. Del. Const. of 1776, art. 7 (The president "may draw for such sums of money as shall be appropriated by the general assembly, and be accountable to them for the same . . . ."); Mass. Const. of 1780, pt. 2, ch. 2, § 1, art. 11 ("No moneys shall be issued out of the treasury of this commonwealth, and disposed of (except such sums as may be appropriated for the redemption of bills of credit or treasurer's notes, or for

---

[26] Rosen, *supra* note 25, at 47; Greene, *supra* note 23, at 138, 173-75.

payment of interest arising thereon) but by warrant under the hand of the governor for the time being, with the advice and consent of the council, for the necessary defence and support of the commonwealth; and for the protection and preservation of the inhabitants thereof, agreeably to the acts and resolves of the general court."); N.H. CONST. of 1784, pt. 2, Executive, ¶ 14 (similar); N.C. CONST. of 1776, art. 19 ("[T]he Governor, for the time being, shall have power to draw for and apply such sums of money as shall be voted by the general assembly, for the contingencies of government, and be accountable to them for the same."); PA. CONST. of 1776, Plan or Frame of Gov't for the Commw. or State of Pa., § 20 (The president and the council may draw upon the treasury for such sums as shall be appropriated by the house [of representatives] . . . ."); S.C. CONST. of 1778, art. 16 ("[N]o money [shall] be drawn out of the public treasury but by the legislative authority of the State."); VT. CONST. of 1786, ch. 2, § 11 (The governor and council "may draw upon the Treasurer for such sums as may be appropriated by the House of Representatives.").

Ultimately, the same separation of powers principle was embedded in the Constitution's Appropriations Clause. Among delegates to the Constitutional Convention, that Congress would exercise power over both taxation and appropriations was wholly uncontroversial. The idea, of course, was "that the money of the people should not be voted out of their pockets without giving them the utmost satisfaction, for passing the laws to this effect."[27] An early draft of the Constitution required that all appropriation bills originate in the House of Representatives, the chamber closest to the people, and prohibited the Senate from altering those bills.[28] The

---

[27] 5 ANNALS OF CONG. 448 (1796) (statement of Rep. Heath).

[28] 2 THE RECORDS OF THE FEDERAL CONVENTION OF 1787, at 131 (Max Farrand rev. ed. 1937).

Constitution's final text reflects the same concern for "ensuring that only those representatives closest to the people [would] initiate legislation to wrest money from the people," *Sissel v. U.S. Dep't of Health & Hum. Servs.*, 799 F.3d 1035, 1052 (D.C. Cir. 2015) (Kavanaugh, J., dissenting from denial of reh'g en banc), by requiring that "[a]ll bills for raising Revenue shall originate in the House of Representatives," U.S. Const. art. I, § 7, cl. 1. And "[u]nder immemorial custom the general appropriations bills . . . originate in the House of Representatives."[29]  Indeed, "[o]n more than one occasion, the House has returned to the Senate a Senate bill or joint resolution appropriating money on the ground that it invaded the prerogatives of the House."[30]  James Madison aptly explained why the Constitution vested the House with the origination power.  The "principal reason," he said, is that members of the House of Representatives are "chosen by the People," "best acquainted with their interests," and "more frequently" elected.[31]  Delegates at the Constitutional Convention also worried about the executive's encroaching on Congress's fiscal powers.  For instance, Benjamin Franklin opposed an absolute presidential veto on the ground that the President might use it "to influence [and] bribe the Legislature into compleat subjection to" his will.[32]  In the Framers' view,

---

[29] Clarence Cannon, Cannon's Procedure in the House of Representatives 20, § 834 (4th ed. 1944).

[30] Wm. Holmes Brown et al., House Practice: A Guide to the Rules Precedents, and Procedures of the House 73 (2011); *see also* 3 Lewis Deschler, Deschler's Precedents of the United States House of Representatives 1882-85, ch. 13, §§ 20.2, 20.4 (1994) (identifying examples).

[31] 1 Annals of Cong. 347 (1789) (statement of Rep. Madison).

[32] 1 The Records of the Federal Convention of 1787, at 99 (Max Farrand rev. ed. 1937); *see also id.* (statement of Benjamin Franklin) ("He had had some experience of this check in the Executive on the Legislature, under the proprietary Government of Pena.  The negative of the Governor was constantly made use of to extort

then, firmly placing the new government's fiscal powers in the hands of the people's representatives and protecting the purse from executive control were commensurate with preserving liberty.

During the ratification debates, Congress's control over the public fisc was paramount to the Federalists' defense of the Constitution and critical to dispelling the Anti-Federalist fears that a strong national government, and particularly an energetic unitary executive, would invite tyranny and oppression of the states. At the Virginia ratifying convention, for example, Patrick Henry famously declared that "Your President may easily become king"[33] and that the Constitution created a national government without "a single federal feature in it."[34] Madison rebuffed those arguments by stressing, in general, that the Constitution adequately separated the powers of government and further, that the "purse is in the hands of the representatives of the people" who "have the appropriation of all moneys."[35] Other supporters of the Constitution, highlighting the British experience and emphasizing how legislative supremacy in fiscal matters served as a vital restraint on unruly executive power, noted that "[a]ny branch of government that depends on the will of another for supplies of money, must be in a state

---

money. No good law whatever could be passed without a private bargain with him. An increase of his salary, or some donation, was always made a condition; till at last it became the regular practice, to have orders in his favor on the Treasury, presented along with the bills to be signed, so that he might actually receive the former before he should sign the latter.").

[33] 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 59 (Jonathan Elliot 2d ed., 1891); *see also* Rosen, *supra* note 25, at 79 n.421 (collecting other Anti-Federalist statements to the same effect).

[34] 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution 395 (Jonathan Elliot 2d ed., 1891).

[35] *Id.* at 393.

of subordinate dependence, let it have what other powers it may."[36]  Similar arguments appeared in the Federalist Papers.[37]

Founding-era scholars also stressed the importance of Congress's power of the purse as a bulwark of the separation of powers.  Joseph Story explained that "to preserve in full vigor the constitutional barrier between each department," the Constitution vests Congress with "a controlling influence over the executive power, since it holds at its own command all the resources by which a chief magistrate could make himself formidable."  JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 531 (1833).  Indeed, Story posited, Congress's "power to control and direct appropriations constitutes a most useful and salutary check . . . upon corrupt influence and public peculation."  *Id.* at § 1348.  St. George Tucker likewise characterized Congress's power of the purse as "a salutary check, not only upon the extravagance, and profusion, in which the executive department might otherwise indulge itself . . . but also against any misappropriation, which a rapacious, ambitious, or otherwise unfaithful executive might be disposed to make."  ST. GEORGE TUCKER, VIEWS

---

[36] *Id.* at 17 (statement of George Nicholas).

[37] *See, e.g.*, THE FEDERALIST NO. 48 (J. Madison) ("[T]he legislative department alone has access to the pockets of the people, and has in some constitutions full discretion, and in all, a prevailing influence over the pecuniary rewards of those who fill the other departments; a dependence is thus created in the latter . . . .");  THE FEDERALIST NO. 58 (J. Madison) ("The house of representatives can not only refuse, but they alone can propose the supplies requisite for the support of government.  They, in a word, hold the purse; that powerful instrument by which we behold, in the history of the British Constitution, an infant and humble representation of the people, gradually enlarging the sphere of its activity and importance, and finally reducing, as far as it seems to have wished, all the overgrown prerogatives of the other branches of the government.  This power over the purse may, in fact, be regarded as the most complete and effectual weapon, with which any constitution can arm the immediate representatives of the people, for obtaining a redress of every grievance, and for carrying into effect every just and salutary measure.").

OF THE CONSTITUTION OF THE UNITED STATES 298 (1803) (Clyde
N. Wilson ed. 1999). Security against such executive overreach, he
suggested, marked "the difference between governments, where there is
responsibility, and [governments] where there is none." *Id.*

Early congresses understood and scrupulously performed the
constitutional role prescribed by the Appropriations Clause. Soon after
ratification, the First Congress inaugurated a practice of funding executive
departments through an annual appropriations process—a practice that
exists to this day.[38] The cyclical nature of the process allows Congress regular
opportunities to evaluate and exert control over executive branch activities.
Using those regular opportunities, Congress directly controls the object and
extent of executive branch activities. And, at times, Congress even wields the
purse strings for collateral, substantive ends.

In the early days of the Republic, as Congress's contentment with
executive branch officials ebbed and flowed, Congress adjusted the
specificity of its yearly appropriations laws to circumscribe or expand the
executive branch's spending discretion. The earliest appropriations laws,
which closely tracked the estimates prepared by Treasury Secretary
Alexander Hamilton, were nonspecific and therefore did little to cabin
executive discretion. The first appropriations act, for instance, divided
Hamilton's $639,000 budget estimate into only four broad categories.[39] But

---

[38] *See, e.g.*, An Act Making Appropriations for the Service of the Present Year, ch.
23, 1 Stat. 95 (1789); An Act Making Appropriations for the Support of Government for the
Year One Thousand Seven Hundred and Ninety, ch. 4, 1 Stat. 104 (1790); An Act Making
Appropriations for the Support of Government During the Year One Thousand Seven
Hundred and Ninety-One, and for Other Purposes, ch. 6, 1 Stat. 190 (1791); 2 U.S.C. § 631
(establishing a timetable for the modern annual appropriations process).

[39] An Act Making Appropriations for the Service of the Present Year, ch. 23, 1 Stat.
95 (1789).

as acrimony between the nascent Federalist and Jeffersonian parties escalated, Congress began increasing the specificity of appropriations to keep a tighter leash on Federalist executive officers.[40] After the Jeffersonians came to power, President Jefferson, in a message to Congress transparently aimed at slighting the Federalists' handling of public funds, extolled the virtue of "multiply[ing] barriers against [the] dissipation [of public monies] by appropriating specific sums to every specific purpose susceptible of definition; by disallowing all applications of money varying from the appropriation in object or transcending it in amount . . . and thereby circumscribing [the executive's] discretionary powers over money" and "bringing back to a single department all accountabilities for money."[41] Perhaps as a response to Jefferson's message, the 1802 appropriations bill itemized the funding in considerable detail, including allocations as mundane as a three-hundred dollar appropriation for "stationery and printing in the Treasurer's office."[42]  In practice, however, executive officers, particularly military and naval officers, often ignored the specific line items in

---

[40] Gerhard Casper, *Appropriations of Power*, 13 U. ARK. L. R. 1, 12-14 (1990) (discussing the increasing specificity of appropriations bills in the 1790s); 6 ANNALS OF CONG. 2040 (1797) (statement of Rep. Gallatin); An Act making Appropriations for the Support of Government for the year one thousand seven hundred and ninety-two, ch. 3, 1 Stat. 226 (1791).

[41] President Thomas Jefferson, First Annual Message (Dec. 8, 1801), *reprinted in* 1 A COMPILATION OF THE MESSAGES AND PAPERS OF THE PRESIDENTS 329 (James D. Richardson ed. 1897); *see also* Letter from Albert Gallatin to Thomas Jefferson (Nov. 1801), *reprinted in* 1 THE WRITINGS OF ALBERT GALLATIN 68 (J.B. Lippincott ed. 1879) ("There is but one subject not mentioned in the message which I feel extremely anxious to see recommended.  It is, generally, that Congress should adopt such measures as will effectually guard against misapplication of public moneys.").

[42] An Act making appropriations for the support of Government for the year one thousand eight hundred and two, ch. 47, 2 Stat. 184, 185 (1802).

appropriations bills and treated the appropriation as an aggregate sum.[43] President Jefferson's Treasury Secretary, Albert Gallatin, who had championed strong legislative control over appropriations as a member of the House of Representatives,[44] played a role in bringing the executive under control by supporting legislation that required that "the sums appropriated by law for each branch of expenditure in the several departments . . . be solely applied to the object for which they are respectively appropriated, and to no other."[45]

In addition to using its powers of the purse to directly control the object and extent of executive activities, Congress used those powers to achieve substantive ends. An 1810 appropriations bill, for example, made certain diplomatic officials' salaries contingent on their being appointed by the president and confirmed by the Senate, even though no substantive law required Senate confirmation.[46]

---

[43] 6 ANNALS OF CONG. 2322 (1797) (statement of Rep. Gallatin).

[44] Casper, *supra* note 40, at 16-20 (outlining Gallatin's efforts to circumscribe executive branch's practice of using funds appropriated for one purpose for another one); LUCIUS WILMERDING JR., THE SPENDING POWER: A HISTORY OF THE EFFORTS OF CONGRESS TO CONTROL EXPENDITURES 20-49 (1943) (similar).

[45] An Act further to amend the several acts for the establishment and regulation of the Treasury, War and Navy departments, ch. 28, 2 Stat. 535, 535 (1809); NOBLE E. CUNNINGHAM JR., THE PROCESS OF GOVERNMENT UNDER JEFFERSON 115-17 (1978) (describing Gallatin's muscular use of his position as Treasury secretary to oversee military expenditures and ensure compliance with appropriations acts, which the 1809 act essentially codified); WILMERDING, *supra* note 44, at 72-75 (outlining Gallatin's role in the events leading to the 1809 act and suggesting that that it reflected Gallatin's influence). *Cf.* 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

[46] An Act Fixing the Compensation of Public Ministers and of Consuls Residing on the Coast of Barbary, and for Other Purposes, ch. 44, 2 Stat. 608 (1810).

No. 18-60302

Two interconnected and axiomatic principles flow from this rich history.  First, the Constitution arms Congress with and mandates that it use potent fiscal powers designed to maintain the boundaries between the branches and preserve individual liberty from the encroachments of executive power.  Indeed, by most accounts, Congress's fiscal powers are its most formidable tool.[47]  One early congressman described it as the "sinew of [the legislature's] strength."[48]  Congress's supremacy in fiscal matters makes the executive branch dependent on the legislative branch for subsistence, thereby forging a vital line of accountability between the executive branch and the legislative branch and, therefore, the people.  Recent history confirms that Congress's appropriations powers have proven a forcible lever of accountability:  Congress has tightened the purse strings to express displeasure with an agency's nefarious activities and even to end armed combat.[49]

Second, for Congress's power of the purse to meaningfully restrain the executive,  appropriations to the executive must be temporally bound.  A

---

[47] *See, e.g.*, 2 Study on Federal Regulations: Congressional Oversight of Regulatory Agencies, S. Doc. No. 95-26, at 42 (1977) ("The appropriations process is the most potent form of Congressional oversight, particularly with regard to the federal regulatory agencies."); Robert E. Cushman, The Independent Regulatory Commissions 674-75 (1972)  ("The most constant and effective control which Congress can exercise over an independent regulatory commission is financial control. . . .  Viewed broadly,  the financial control exercised by Congress over the commissions is a necessary and desirable form of supervision.").

[48] 30 Annals of Cong. 958 (statement of Rep. Calhoun).

[49] Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, 128 Stat. 5, 188-191 (appropriating $11.3 billion to the Internal Revenue Service, reducing its budget by over $500 million, after Congress learned that the IRS engaged in flagrant political targeting); Continuing Appropriations, 1974, § 108, 87 Stat. 130, 134 (1973) ("[N]o funds herein or heretofore appropriated may be obligated or expended to finance directly or indirectly combat activities by United States military forces in or over or from off the shores of North Vietnam, South Vietnam, Laos or Cambodia.").

time limit is inherent in the idea of assigning fiscal matters exclusively to Congress, that is, forcing the executive to come "cap in hand" to the legislature at regular intervals.[50]  If Congress grants a perpetual source of funds to an executive branch agency, the agency is no longer dependent and, as a result, no longer accountable.  Because the CFPB is a perpetually self-funded agency armed with vast executive authority, its structure defies congressional oversight and is incompatible with the Constitution.

### B.  *An administrative agency with extensive executive, legislative, and adjudicative authority and complete budgetary independence has no place in our constitutional system.*

The CFPB's budgetary independence makes it unaccountable to Congress and the people.  An agency that wields vast amounts of executive, legislative, and adjudicatory power and is completely unaccountable to Congress is inimical to the Constitution's structural checks and balances. The Framers created a federal system and divided the national government's power among three branches to disperse power and preserve individual liberty.  But a mere parchment barrier would not guarantee individual liberty. To prevent the "gradual concentration of the several [governmental] powers in the same" branch, the Framers armed each one with "the necessary constitutional means, and personal motives, to resist encroachments of the others"; the idea being to let "[a]mbition . . . counteract ambition."  The Federalist No. 51 (J. Madison).

---

[50] Stith, *supra* note 1, at 1354 n.53.  No doubt the Constitution explicitly limits only the duration of appropriations for raising and supporting armies to two years, U.S. Const., art. I, § 8, cl. 12, but that does not imply that appropriations for any other purpose may be ad infinitum.  Rather, it suggests only that Congress may appropriate an amount of money for other purposes to be used over a timespan longer than two years.

That concern with checks and balances influenced how the Framers divided power within the three branches. Because they believed that "the legislative authority necessarily predominates," the Framers bifurcated it "into different [chambers]; and [made] them, by different modes of election, and different principles of action, as little connected with each other" as possible. THE FEDERALIST NO. 51 (J. Madison). The Framers divided the legislative power to ensure that "differences of opinion" and "the jarrings of parties" would "promote deliberation and circumspection" and "serve to check excesses in the majority." THE FEDERALIST NO. 70 (A. Hamilton).

With the executive power, however, the Framers recognized the need for "[d]ecision, activity, secrecy, and dispatch," and consequently vested all of the executive power in a single President. THE FEDERALIST NO. 70 (A. Hamilton). "To justify and check *that* authority—unique in our constitutional structure—the Framers made the President the most democratic and politically accountable official in Government." *Seila Law*, 140 S. Ct. at 2203. The President is directly accountable to the people through his quadrennial, nationwide election. U.S. CONST., art. II, § 1. But that is not all. Congress's control of the purse strings renders the President and his functionaries directly accountable to the Congress and, therefore, further accountable to the people. That second channel of political accountability, premised on the separation of powers, fills the gap of accountability over the President between elections and any gap of accountability between the President and his functionaries.

The CFPB's budgetary independence illicitly circumvents the second mechanism of accountability. In establishing the CFPB, Congress granted the CFPB Director unilateral, perpetual authority to requisition up to twelve percent annually from the Federal Reserve's budget (over $700 million in 2021), in addition to the money the CFPB generates in civil penalties.

12 U.S.C. §§ 5497(a)(1), (d). By granting the CFPB a substantial entitlement to perpetual funding outside the appropriations process, Congress utterly relinquished its constitutional fiscal role. The default is compounded: Congress forfeited indirect control over the CFPB's budget because the Federal Reserve's annual budget consists of non-appropriated funds levied from banks within the Federal Reserve system. 12 U.S.C. § 243. Congress even renounced its own power to review the CFPB's budget. 12 U.S.C. § 5497(a)(2)(C). Congressional oversight is meaningless without the leverage normally provided by Congress's appropriations power to back it up. Thus, between presidential elections, the people retain virtually no control over an agency that "dictate[s] and enforce[s] policy for a vital segment of the economy affecting millions of Americans." *Seila Law*, 140 S. Ct. at 2204.

The constitutional defect stemming from the CFPB's independence from Congress mirrors the defect flowing from the CFPB Director's past independence from the President. The CFPB director's for-cause removal protections effectively circumscribed the President's control over the agency. The CFPB's budgetary independence nullifies Congress's control. In *Seila Law*, the Supreme Court concluded that the CFPB Director's removal protections violated the separation of powers because "lesser officers" vested with significant executive power, like the CFPB Director, "must remain accountable to the President, whose authority they wield." *Seila Law*, 140 S. Ct. at 2197. By the same token, executive agencies with vast executive, legislative, and adjudicative authority must remain accountable to Congress, the steward of the people's money, which those agencies spend.

This agency's lack of accountability is not just a theoretical worry. Since the CFPB's inception, legislators have sought an accounting of the CFPB's spending and policies. Other agencies must capitulate to such demands or risk reprisal in the form of blistering budget cuts. But not the

CFPB. *See, e.g.*, Letter from Rep. Randy Neugebauer et al. to Richard Cordray (May 2, 2012) (pointing out that the "CFPB has been wholly unresponsive to our requests for additional budget information"); Letter from Sen. Rob Portman et al. to Richard Cordray (Oct. 30, 2013) (noting that the CFPB "has yet to explain its basis for" a controversial policy and requesting "greater transparency for the Bureau's activity"); Rachel Witkowski, *Lawmakers Fume Over Unanswered Questions to CFPB*, Am. Banker (Sept. 12, 2013), https://www.americanbanker.com/lawmakers-fume-over-unanswered-questions-to-cfpb-1062015-1.html. Indeed, on one occasion, the CFPB Director deigned to answer a legislator's question about who authorized renovation projects costing hundreds of millions of dollars with: "And why does [that] matter to you?" *The Semi-Annual Report of the Bureau of Consumer Financial Protection: Hearing Before the H. Comm. On Fin. Services*, 114th Cong. 72 (2015).

Surely, the CFPB is more democratically accountable after *Seila Law* because the Director is removable by the President. If anything, however, the CFPB Director's newfound presidential subservience exacerbates the constitutional problems arising from the CFPB's budgetary independence because it more completely unites the powers of the purse and sword in the President's hands. The Appropriations Clause forbids that.[51] That Clause is directed at the fear that "the executive would possess an unbounded power over the public purse of the nation; and might apply all its monied resources

---

[51] *See, e.g.*, Baron de Montesquieu, The Spirit of the Laws bk. XI, ch. VI (1748) ("Were the executive power to determine the raising of public money otherwise than by giving its consent, liberty would be at an end . . . because the executive power would be no longer dependent."); 2 Elliot's Debates 348-49 (statement of Alexander Hamilton) ("[Y]ou shall not place these powers either in the legislative or executive, singly; neither one nor the other shall have both, because this would destroy that division of powers on which political liberty is founded, and would furnish one body with all the means of tyranny.").

at his pleasure." *U.S. Dep't of Navy v. FLRA*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1342, at 213-14 (1833)). Then-Judge Kavanaugh also quoted Federalist numbers 51 and 58 to support his general statement that, "[t]he power over the purse was one of the most important authorities allocated to Congress in the Constitution's 'necessary'" separation of powers. *Id.* at 1346-47. Yet, at present, the President, through the CFPB, may annually spend many hundreds of million dollars to, among other things, "promulgate binding rules fleshing out 19 federal statutes, including a broad prohibition on unfair and deceptive practices in a major segment of the U. S. economy." *Seila Law*, 140 S. Ct. at 2200.

Moreover, even with a Director appointed and removable by the President, Congress has not modified the provision exempting the CFPB budget from presidential review through the Office of Management and Budget. *See* 12 U.S.C. § 5497(a)(4)(e) ("This subsection may not be construed as implying any obligation on the part of the Director to consult with or obtain the consent or approval of the Director of the Office of Management and Budget with respect to any report, plan, forecast, or other information . . . or any jurisdiction or oversight over the affairs or operations of the Bureau."); Todd Zywicki, *The Consumer Financial Protection Bureau: Savior or Menace*, 81 GEO. WASH. L. REV. 856, 891-93 (2013). The Chief Justice in *Seila Law* pointed out that this "financial freedom makes it even more likely that the agency will 'slip from the Executive's control, and thus from that of the people.'" 140 S. Ct. at 2204 (quoting *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 499, 130 S. Ct. 3138, 3156 (2010)).

Even after *Seila Law,* the CFPB's budgetary independence and resulting unaccountability to Congress subverts the separation of powers foundations of our government.

### C. The CFPB's funding structure is historically anomalous.

Another sign of a "severe constitutional problem" with the CFPB's funding structure "is the lack of historical precedent" to support it. *Free Enterprise Fund*, 561 U.S. at 505, 130 S. Ct. at 3159 (quotation omitted). An executive, law-enforcement agency with complete fiscal independence is unprecedented. Prior to enacting the CFPB, "Congress has utilized self-funding in only a limited number of 'narrowly-focused' independent agencies."[52]

After years of litigating this issue, the CFPB has identified only a handful of other agencies that enjoy some level of self-funding.[53] Specifically, the CFPB points to the Federal Reserve Board, the Federal Deposit Insurance Corporation, and the Office of the Comptroller of the Currency.[54] But those agencies are hardly comparable.

Most critically, the mission and corresponding authority of those agencies is more targeted. The Federal Reserve Board's distinctively non-executive focus is to maintain "growth of the monetary and credit aggregates

---

[52] Charles Kruly, *Self-Funding and Agency Independence*, 81 Geo. Wash. L. Rev. 1733, 1735 (2013).

[53] *See* Supplemental En Banc Response Br. of Plaintiff-Appellee CFPB at 3-4, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515994476 (Aug. 25, 2021); Supplemental En Banc Brief of Plaintiff-Appellee CFPB at 41 n.32, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515546446 (Aug. 31, 2020); *see also PHH v. CFPB*, 881 F.3d 75, 95 (D.C. Cir. 2018) (en banc), *abrogated on other grounds by Seila Law*, 140 S. Ct. 2183.

[54] *See* 12 U.S.C. § 243 (granting Federal Reserve Board "power to levy semiannually upon the Federal reserve banks" an assessment sufficient for its operations), 12 U.S.C. §§ 1815(d) (allowing Federal Deposit Insurance Corporation to prescribe and collect fee sufficient to "establish and maintain" its reserve ratio), 1820(e) (similar for examination fee); 12 U.S.C. § 16 (permitting Comptroller of Currency to collect fee from regulated entities sufficient for its operations).

commensurate with the economy's long run potential to increase production, so as to promote effectively the goals of maximum employment, stable prices, and moderate long-term interest rate." 12 U.S.C. § 225(a). The Federal Deposit Insurance Corporation, as its name connotes, insures bank deposits and, relatedly, examines the banks whose deposits it insures. 12 U.S.C. §§ 1811, 1817. The Office of the Comptroller of the Currency, a Treasury Department entity, supervises national banks and federal savings associations to ensure that they "operate in a safe and sound manner, provide fair access to financial services, treat customers fairly, and comply with applicable laws and regulations."[55] The CFPB, in contrast, "is in an entirely different league. It acts as a mini legislature, prosecutor, and court, responsible for creating substantive rules for a wide swath of industries, prosecuting violations, and levying knee-buckling penalties against private citizens." *Seila Law*, 140 S. Ct. at 2202 n.8.

Moreover, both the Federal Reserve and the Federal Deposit Insurance Corporation operate as independent agencies[56], thereby moderating the threat to the separation of powers created by combining the powers of the purse and sword. Because each organization has multimember leadership deliberately drawn from both parties, there is internal control over and a politically moderating influence on the expenditure of their funds. What is more, the Federal Deposit Insurance Corporation is a mixed-ownership government corporation. The Office of the Comptroller of the Currency, funded by imposing fees on the entities it regulates as an arm of the Treasury Department, "bear[s] the brunt of public disapproval" for the

---

[55] *What We Do*, https://www.occ.treas.gov/about/what-we-do/index-what-we-do.html (last visited Jan. 7, 2022); *see also* 12 U.S.C. § 1.

[56] Jennifer L. Selin & David E. Lewis, Sourcebook of United States Executive Agencies 42 (2d ed. 2018).

No. 18-60302

funds it collects. *New York v. United States*, 505 U.S. 144, 169, 112 S. Ct. 2408, 2424 (1992). As a result, some level of political accountability is preserved.

None of these auxiliary structures constrains the CFPB, which, even with a Director removable by the President, remains doubly insulated from the appropriations process as it still determines its own budget and siphons funds from the appropriations-insulated Federal Reserve. The other regulatory bodies are directed to balance the best interests of targeted financial institutions and the American public, while the CFPB was devised as a watchdog for consumers with a bare minimum of concern for the financial impact of its actions on regulated entities.[57] But given the Director's post-*Seila Law* dependence on the President, the agency's use of funds is apt to reflect the disparate and conflicting policies of successive presidential administrations far more than Congress's intended policy independence. It is telling that, unlike the other agencies' funding structures, the CFPB's funding mechanism is—to this day—hotly contested among members of Congress.[58] One CFPB Director even petitioned Congress to "[f]und the Bureau through Congressional appropriations." *Hearing on the 2018 Semi-Annual Report of the Bureau of Consumer Financial Protection Before the H. Comm. on Fin. Servs.*, 115th Cong. 81 (2018) (written statement of Mick

---

[57] *See* 12 U.S.C. §§ 5513(a), (c)(3).

[58] *See, e.g.*, S. 2790, 117th Cong. (2021) (proposal to eliminate the CFPB's budgetary independence); S. 453, 116th Cong. (2019) (same); H.R. 10, 115th Cong. (2017) (same); S. 387, 115th Cong. (2017) (same); H.R. 5983, 114th Cong. (2016) (same); S. 3318, 114th Cong. (2016) (same); S 1383, 114th Cong. (2015) (same); H.R. 1486, 114th Cong. (2015) (same); H.R. 1261, 114th Cong. (2015) (same); H.R. 3519, 113th Cong. (2013) (same); H.R. 3193, 113th Cong. (2013) (same); H.R. 3192, 113th Cong. (2013) (same); S. 205, 113th Cong. (2013) (same); H.R. 450, 113th Cong. (2013) (same); S. 737, 112th Cong. (2011) (same); H.R. 1640, 112th Cong. (2011) (same); H.R. 1355, 112th Cong. (2011) (same).

Mulvaney, Director of the CFPB); *see also id.* at 39 (statement of Mick Mulvaney).

In short, the CFPB is unique: it is a fully self-funded agency with vast rulemaking, enforcement, and adjudicative authority. None of the agencies identified by the CFPB wields enforcement or regulatory authority remotely comparable to the authority the CFPB may exercise throughout the economy. Thus, the CFPB's budgetary independence is "an innovation with no foothold in history or tradition." *Seila Law*, 140 S Ct. at 2202.

If the CFPB's funding structure is constitutionally ignored, this will not be the last federal agency to assume a level of fiscal independence that shields it from any effective public accountability. Other powerful agencies are already champing at the bit for such budgetary independence. *See, e.g.*, Gina Chon, *CFTC Can Self-Fund Via Fines, Says Chief*, Financial Times, Oct. 9, 2013, at 14 ("[Commissioner Chilton] has called on lawmakers to alter the way the CFTC is funded, an argument supported by CFTC chairman Gary Gensler."); Mary L. Schapiro, Chairman, Sec. and Exch. Comm'n, *Statement Concerning Agency Self-Funding* (Apr. 15, 2010), https://www.sec.gov/news/speech/2010/spch04 1510mls.htm, (arguing that "self funding ensures independence"); Ronald D. Orol, *Five SEC Chairmen and Schumer Push for Self-Funded SEC*, Wall St. J. MarketWatch (Apr. 15, 2010, 3:50 PM), https://www.marketwatch.com/story/five-sec-chairs-and-schumer-want-self-funded-sec-2010-04-15. Although then-judge Kavanaugh was commenting about the for-cause removal restriction on the CFPB Director, his insistence is equally applicable here: "[W]e cannot think of this as a one-off case because we could not cabin the consequences in any principled manner if we were to uphold the CFPB's" self-funding structure doubly insulated from Congress. *PHH Corp.*, 881 F.3d at 196 (Kavanaugh, J., dissenting).

No. 18-60302

### D. The CFPB's contrary arguments are not persuasive.

The CFPB's rejoinder is essentially two-fold. It argues that Congress properly exercised its appropriations power by enacting the law that provides the CFPB's perpetual funding, and that nothing in the Constitution "prevents Congress from appropriating funds in whatever way it sees fit."[59] Moreover, the CFPB contends that its funding structure does not impinge on Article I because nothing "interferes with Congress's authority to alter, at any time, the source of the Bureau's funding, or to eliminate that funding altogether."[60] The CFPB also points to several cases where courts held that the CFPB's budgetary independence is not unconstitutional. The first argument is belied by history. The second argument is illogical, inconsistent with the Appropriations Clause, and blind to reality. And the cases the CFPB invokes are neither binding nor persuasive.

To support the argument that Congress fulfilled its obligation to appropriate funds, the CFPB relies on the Supreme Court's statement that the Appropriations Clause "means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress." *Off. of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 424, 110 S. Ct. 2465, 2471 (1990) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321, 57 S. Ct. 764, 770 (1937)). That dicta, plucked from a discussion about whether a court may grant a money remedy not authorized by Congress, has no bearing on the validity of the CFPB's budgetary independence. As previously explained, the separation of powers idea underlying the Framers' assignment of fiscal matters to Congress requires a time limitation for appropriations to the

---

[59] Supplemental En Banc Brief of Plaintiff-Appellee CFPB at 40-41, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515546446 (Aug. 31, 2020).

[60] Supplemental En Banc Brief of Plaintiff-Appellee CFPB at 42-43, *CFPB v. All Am. Check Cashing* (No. 18-60302), Doc. No. 515546446 (Aug. 31, 2020).

executive branch.[61]  How Congress came to hold the purse strings confirms that much.  In the English Revolution, parliament put an end to the king's ability to govern without parliament by making him regularly dependent on parliament for funds.  The Framers enshrined this principle in the Constitution.  And the First Congress implemented that idea by inaugurating an annual appropriations process for executive departments.  A permanent appropriation to an executive department is thus inconsistent with history and longstanding practice.  Indeed, in many ways, the CFPB's funding mechanism strikingly resembles the ordinary revenues that allowed the king to subsist and govern without assembling parliament.  Thus, even if Congress enacted the law giving the CFPB perpetual funding, that law transgresses the separation of powers.

Moreover, that Congress retains authority to alter the law giving the CFPB perpetual self-funding is of no consequence for three reasons.  First, Congress is always capable of fixing statutes that impinge on its own authority, but that possibility does not excuse the underlying constitutional problems.  Otherwise, no law could run afoul of Article I.  The same theory would sustain the Line Item Veto Act or a statute plainly delegating legislative power to an executive official.  *But see Clinton v. New York*, 524 U.S. 417, 118 S. Ct. 2091 (1998); *Pan. Refin. Co. v. Ryan*, 293 U.S. 388, 55 S. Ct. 241 (1935).  The separation of powers does not depend on whether "the encroached-upon branch approves the encroachment."  *New York v. United States*, 505 U.S. at 182, 112 S. Ct. at 2431.  By the same token, the separation of powers does not depend on whether the encroached-upon

---

[61] *See also* Stith, *supra* note 1, at 1383 ("It is especially important that Congress impose amount and time limitations on spending authority in those areas where the Executive has significant authority to define government policy and has significant discretion in deciding the means of policy implementation.").

branch has the hypothetical wherewithal to rebuff the intrusion. *PHH Corp.*, 881 F.3d at 181 (Henderson, J., dissenting) ("[A]n otherwise invalid agency is no less invalid merely because the Congress can fix it at some undetermined point in the future.").[62]

Second, accepting that defense turns the Appropriations Clause on its head. The genius of the Appropriations Clause is that it guarantees accountability for public expenditures by requiring Congress to appropriate funds and, in doing so, take ownership of fiscal matters. The CFPB's funding structure reverses the baseline; the statute entitles the CFPB to spend public funds—forever—unless *prohibited* by Congress. This allows future congresses to disclaim responsibility and hide behind the burdens of the legislative process.

Finally, the barrier to Congress's voluntarily exercising its authority to alter the CFPB's funding structure is nearly insurmountable. Any effort to alter the funding provision "must overcome a crowded [legislative] agenda, obtain the support of congressional leadership and both houses, and survive" an almost certain presidential veto.[63] The modern legislative process displays overwhelming inertia. Indeed, by most accounts, that is exactly what the masterminds behind the CFPB were counting on.[64]

---

[62] *Cf.* Oral Arg. Tr. 34, *Free Enterprise Fund v. PCAOB*, S. Ct. No. 08-861 (Dec. 7, 2009) ( Justice Scalia: "I'm not sure that [Congress's] ability to take away responsibility . . . from an agency is the same as controlling what authority that agency does exercise.").

[63] Note, Independence, Congressional Weakness, and the Importance of Appointment: The Impact of Combining Budgetary Autonomy with Removal Protection, 125 Harv. L. Rev. 1822, 1831 (2012).

[64] *See, e.g.*, Christopher C. DeMuth, Sr. & Michael S. Greve, *Agency Finance in the Age of Executive Government*, 24 Geo. Mason L. Rev. 555, 587 (2017) ("The CFPB and its financing structure was the product of a Congress and administration under the control of a single party, determined to insulate the newly created agency against interference by a president *or a future Congress* under the control of the other party."); Adam Levitin, *The*

Seventeen failed attempts to alter the CFPB's funding structure in just over ten years seem to prove this point. Thus, even though Congress can technically alter the CFPB's funding structure, that does little or nothing to blunt this affront to the separation of powers.

Tellingly, the Supreme Court rejected a similar alternative-means-of-control argument in *Seila Law*. There, an *amicus* for the CFPB argued that, despite the Director's for-cause removal protections, the President maintained constitutionally sufficient control over the Director through the Financial Stability and Oversight Council. The President, *amicus* emphasized, appoints a supermajority of the members of that Council, 12 U.S.C. § 5321(b)(1), and the Council has statutory authority to veto any rule promulgated by the Director that the Council believes will "put the safety and soundness of the United States banking system or the stability of the financial system of the United States at risk," 12 U.S.C. § 5513(a). Therefore, the *amicus* reasoned, the CFPB Director's for-cause removal protections encroach on the executive power less than in other cases where the Court rejected for-cause removal protections. The Supreme Court disagreed, labeling that argument a "narrow escape hatch" that could not render the CFPB's structure constitutional. *Seila Law*, 140 S. Ct. at 2204 n.9; *see also Free Enterprise Fund*, 561 U.S. at 504, 130 S. Ct. at 3158 (rejecting

---

*Political Economy of CFPB Funding*, Credit Slips (Nov. 29, 2010, 8:06 PM), https://www.creditslips.org/creditslips/2010/11/the-political-economy-of-cfpb-funding-.html ("The whole point of giving the CFPB a percentage of the Fed's overall budget was to ensure that the CFPB will always have the financial wherewithal to be effective—consumer financial protection shouldn't be a politically dependent matter. Congress acted deliberately and intentionally to bind its own hands in the future when political winds change."); *Creating a Consumer Financial Protection Agency: A Cornerstone of America's New Economic Foundation: Hearing Before the S. Comm. On Banking, Housing, & Urban Affairs*, 111th Cong. 87 (2009) ("Recent history has demonstrated that even an agency with an undiluted mission to protect consumers can be undermined by hostile or negligent leadership or by Congressional meddling on behalf of special interests.").

contention that the SEC's functional control over the PCAOB somehow "blun[ted] the constitutional impact of the for-cause removal" protection (internal quotation omitted)). So, too, Congress's authority to change the CFPB's structure by legislation is a narrow escape hatch. Or, as Judge Henderson put it more colorfully, "[r]efashioning the agency as a whole is a ham-handed way" to make it accountable. *PHH Corp.*, 881 F.3d at 158 (Henderson, J., dissenting). Thus, that Congress has authority to alter the law giving the CFPB perpetual funding does nothing to abate the separation of powers problem.

Finally, it is true that the D.C. Circuit and several district courts have rejected the argument that the CFPB's funding mechanism is unconstitutional. *See, e.g.*, *PHH Corp.*, 881 F.3d at 95-96; *CFPB v. Citizens Bank, N.A.*, 504 F. Supp. 3d 39, 57 (D.R.I. 2020); *CFPB v. Fair Collections & Outsourcing, Inc.*, No. 8:19-cv-2817, 2020 WL 7043847, at *7-9 (D. Md. Nov. 30, 2020); *CFPB v. Think Finance LLC*, No. 17-cv-127, 2018 WL 3707911, at *1-2 (D. Mont. Aug. 3, 2018); *CFPB v. Navient Corp.*, No. 3:17-cv-101, 2017 WL 3380530, at *16 (M.D. Pa. Aug. 4, 2017); *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 896-97 (S.D. Ind. 2015); *CFPB v. Morgan Drexen, Inc.*, 60 F. Supp. 3d 1082, 1089 (C.D. Cal. 2014). None of the decisions bind this court. More importantly, no decision seriously wrestles with the overwhelming separation of powers problem discussed above. Several of those cases nakedly invoke *Am. Fed'n of Gov't Emps., AFL-CIO, Local 1647 v. Fed. Labor Relations Auth.*, 388 F.3d 405 (3d Cir. 2004), which addressed non-appropriated fund instrumentalities, for the proposition that "Congress itself may choose . . . to loosen its own reins on public expenditure" by, for instance, requiring that an instrumentality be entirely self-supporting. *Id.* at 409. But that case has no bearing on the constitutionality of funding a law-enforcement agency with vast amounts of legislative, executive, and judicial power completely outside the appropriations process. Accordingly, the

CFPB fails to present any persuasive argument sustaining its funding mechanism.

\*       \*       \*

To some, the encroachment on the separation of powers at issue here may seem benign enough. What does it matter that one agency with a relatively small budget (in comparison to total federal spending) escapes meaningful accountability to the people? Perhaps a single agency with complete budgetary independence will not decimate the Constitution's separation of powers. But courts never take such a limited view in assessing structural features that tend to erode the separation of powers. *See, e.g.*, *Stern v. Marshall*, 564 U.S. 462, 503, 131 S. Ct. 2594, 2620 (2011) ("We cannot compromise the integrity of the system of separated powers . . . even with respect to challenges that may seem innocuous at first blush."); *Boyd v. United States*, 116 U.S. 616, 635, 6 S. Ct. 524, 535 (1886) ("It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure.").

Justice Frankfurter's admonition in *Youngstown* remains true: "The accretion of dangerous power does not come in a day. It does come, however slowly, from the generative force of unchecked disregard of the restrictions that fence in even the most disinterested assertion of authority." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 594, 72 S. Ct. 863, 889 (1952) (Frankfurter, J., concurring).[65]  It was thought that the CFPB's "disinterested" exercise of authority would be adversely affected by subjecting the agency to congressional appropriations. Thus, one notable

---

[65] Then-Judge Kavanaugh also relied on Justice Frankfurter's observation in his *PHH* dissent. 881 F.3d at 196 (Kavanaugh, J., dissenting).

defender of the CFPB conceded that the process "may increase agency accountability in certain ways," but he lamented that "the appropriations process instead subjects agencies to the risks of Congressional hostage-taking, brinksmanship, and horse-trading, none of which have anything to do with substantive accountability."[66]    Obviously, every government agency would like to free itself from the restrictions of the appropriations process, the better to exercise authority "disinterestedly."    Self-government in a tripartite system characterized by checks and balances is always messy, but that's the point of constitutional restrictions.

Here, the CFPB's argument for upholding its funding mechanism admits no limiting principle.    Indeed, if the CFPB's funding mechanism is constitutional, then what would stop Congress from similarly divorcing other agencies from the hurly burly of the appropriations process?    Why not make the IRS a self-funded agency?    Why not OSHA, or EPA?    Viewed in this light, the general threat to the Constitution's separation of powers and the particular threat to Congress's supremacy over fiscal matters are obvious. Congress may no more lawfully chip away at its own obligation to regularly appropriate money than it may abdicate that obligation entirely.    If the CFPB's funding mechanism survives this litigation, the camel's nose is in the tent.    When conditions are right, the rest will follow.

### E. The court should dismiss the CFPB's enforcement action.

The only remaining issue is remedial.    In terms of the proper remedy, not every separation of powers violation is created equal.    The Supreme Court made that much clear in *Collins v. Yellen*, 141 S. Ct. 1761 (2021), by distinguishing the remedial inquiry for an impermissible removal protection from other separation of powers defects.    For the separation of powers

---

[66] Levitin, *supra* note 5, at 367-68.

problem arising from the CFPB's budgetary independence, *Collins* is inapt. An agency's funding is the very lifeblood that empowers it to act. Thus, much like Appointments Clause cases, and others, the separation of powers problem flowing from the CFPB's budgetary independence concerns the CFPB's authority to act. Accordingly, All American is entitled to dismissal because the CFPB lacked authority to use the funds necessary to pursue the enforcement action against All American.

The proper remedy in a separation of powers case depends on the nature of the underlying problem. Some separation of powers cases involve "a Government actor's exercise of power that the actor did not lawfully possess." *Collins*, 141 S. Ct. at 1788. For instance, an administrative law judge appointed in violation of the Appointments Clause lacks the authority to wield executive power in adjudicating a dispute. *See Lucia v. SEC*, 138 S. Ct. 2044, 2055 (2018); *see also FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993) (deciding that the FEC lacked "authority to bring [an] enforcement action because its composition violates the Constitution's separation of powers" and dismissing enforcement action). Likewise, a legislative officer cannot exercise executive power and the President cannot exercise legislative power. *See Clinton*, 524 U.S. at 438, 118 S. Ct. at 2103 (concluding that Line Item Veto Act impermissibly allowed the President to exercise legislative power by circumventing the Presentment Clause); *Bowsher v. Synar*, 478 U.S. 714, 727-36, 106 S. Ct. 3181, 3188-93 (1986) (holding that the Comptroller General is legislative officer and therefore cannot exercise executive power even if statutorily granted). In these cases, the remedy, invalidation, follows directly from the government actor's lack of authority to take the challenged action in the first place. That is, winning the merits of the constitutional challenge is enough.

Cases involving an improper removal restriction, however, present a distinct remedial question because "the unlawfulness of [a] removal

provision does not strip [a government actor] of the power to undertake the other responsibilities of his office." *Collins*, 141 S. Ct. at 1788 n.23. Except for Justice Gorsuch, the Court unanimously agreed that a case involving only an improper removal restriction is, remedially speaking, unique. *See id.*; *id.* at 1791-93 (Thomas, J., concurring); *id.* at 1801 (Kagan, J., concurring); *but see id.* at 1795 (Gorsuch, J., concurring in part). In removal restriction cases, the Court opined, the remedial question is "less clear-cut" because the challenging party must show not only that the removal restriction transgresses Article II and the Constitution's separation of powers but also that the "unconstitutional provision . . . inflict[ed] compensable harm." *Id.* at 1789.

Here, the CFPB's structure doubly contravenes the Constitution's separation of powers. First, "the CFPB's leadership by a single individual removable only for inefficiency, neglect, or malfeasance violates the separation of powers." *Seila Law*, 140 S. Ct. at 2197. Second, the CFPB's budgetary independence likewise violates the separation of powers. *Collins* drives the remedial inquiry pertaining to the CFPB Director's unconstitutional removal protections, but it says nothing about the remedy for the CFPB's independently unconstitutional funding mechanism.

To remedy the separation of powers violation arising from the CFPB's budgetary independence, I see no other option than dismissing the enforcement action against these appellants. The reason is simple. Just as a government actor cannot exercise power that the actor does not lawfully possess, so, too, a government actor cannot exercise even its lawful authority using money the actor cannot lawfully spend. Indeed, a constitutionally proper appropriation is as much a precondition to every exercise of executive authority by an administrative agency as a constitutionally proper appointment or delegation of authority. Accordingly, as in cases involving Appointments Clause defects or other separation of powers problems with a

government actor's authority to act, the proper remedy here is to disregard the government action.  Because the CFPB has prosecuted this enforcement action using funds derived without a constitutionally footed appropriation or oversight, the court should dismiss the enforcement action against the appellants.  A dismissal also comports with the Supreme Court's admonition that courts should "create incentives to raise" separation of powers challenges by providing adequate remedies.  *Lucia*, 138 S. Ct at 2055 n.5 (citing *Ryder v. United States*, 515 U.S. 177, 183, 115 S. Ct. 2031, 2035 (1995)).[67]

## III. Conclusion

The CFPB's double insulation from Article I appropriations oversight mocks the Constitution's separation of powers by enabling an executive agency to live on its own in a kingly fashion.  The Framers warned that such an accumulation of powers in a single branch of government would inevitably lead to tyranny.  Accordingly, I would reject the CFPB's novel funding mechanism as contravening the Constitution's separation of powers.  And because the CFPB funds the instant prosecution using unconstitutional self-funding, I would dismiss the lawsuit.

---

[67] Had this enforcement action not lingered in litigation for so long, the CFPB could have re-filed it within a relevant statute of limitations after curing the constitutional problems.  The remedy for the CFPB's unconstitutional structure, submitting a budget through the congressional appropriations process, is simple.

No. 18-60302

Andrew S. Oldham, *Circuit Judge*, joined by Kurt D. Engelhardt, *Circuit Judge*, concurring in the judgment:

I agree with Judge Jones that the CFPB's insulation from the congressional appropriations process is unconstitutional, and we should therefore dismiss the CFPB's enforcement action against All American. I write to explain why the procedural posture of this case gives us jurisdiction to do so.

I.

Our jurisdiction lies in 28 U.S.C. § 1292(b). Congress enacted § 1292(b) in 1958 to provide a discretionary mechanism by which courts of appeal could review dispositive legal questions before final judgment and thereby avoid unnecessary trial court proceedings. *See* Act of Sept. 2, 1958, Pub. L. No. 85-919, 72 Stat. 1770. It states:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however*, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b).

Section 1292(b) creates an exception to the long-established final judgment rule, under which "a party must ordinarily raise all claims of error

in a single appeal following final judgment on the merits." *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981). The final judgment rule advances several important goals. It "emphasizes the deference that appellate courts owe to the trial judge" as the primary official responsible for managing the flow of litigation. *Ibid.* It also prevents litigants from using piecemeal appeals to delay proceedings and harass opponents. *See ibid.*

But the final judgment rule also creates the possibility of unnecessary or repetitive proceedings. Consider a case where the dispositive and most difficult issue is a threshold legal question—say standing, or choice of law, or the existence of a cause of action. If a district court gets a choice-of-law question wrong, for example, the final judgment rule might require parties to proceed through summary judgment and trial—using the wrong law—only to have to do it again once a court of appeals decides the choice-of-law question. Concerned about this sort of inefficiency, the Judicial Conference of the United States proposed, and Congress adopted, § 1292(b)'s discretionary mechanism for interlocutory appeals of controlling questions of law. The requirement that the district court certify the appeal—and the court of appeals accept it—preserves the district court's control over the litigation, and prevents inefficient departures from the final judgment rule.

## II.

Section 1292(b) permits an interlocutory appeal from an "order" but requires the district court to certify that there is a controlling "question" of law. This created some confusion about the proper scope of appellate review under § 1292(b) in the years after its enactment. *See* Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 Harv. L. Rev. 607, 628–29 (1975).

The Supreme Court cleared up this confusion in *Yamaha Motor Corporation, U.S.A. v. Calhoun*, 516 U.S. 199 (1996). *Yamaha Motor* held that

No. 18-60302

"appellate jurisdiction applies to the *order* certified to the court of appeals, and is not tied to the particular question formulated by the district court." *Id.* at 205; *see also United States v. Stanley*, 483 U.S. 669, 677 (1987) (noting that § 1292(b) "brings the 'order,' not the question, before the court"). Accordingly, "the appellate court may address any issue fairly included within the certified order." *Yamaha Motor*, 516 U.S. at 205. But "[t]he court of appeals may not reach beyond the certified order to address other orders made in the case." *Ibid.*; *accord* 16 Charles Alan Wright et al., Federal Practice and Procedure § 3929 (3d ed. Apr. 2021 update) [hereinafter Wright & Miller] ("[T]he scope of the issues open to the court of appeals is closely limited to the order appealed from, but not to the specific stated question."). *See also Gonzalez v. CoreCivic, Inc.*, 986 F.3d 536, 542 (5th Cir. 2021) (Oldham, J., dissenting) ("[T]he text of § 1292(b), *Yamaha*, *Stanley*, *Castellanos-Contreras* [*v. Decatur Hotels, LLC*, 622 F.3d 393, 398–400 (5th Cir. 2010) (en banc)], and Wright & Miller all say that we are not limited to the question identified by the district court.").

After *Yamaha Motor*, there are two and only two limits on an appellate court's scope of review under § 1292(b). First, the court of appeals may only review issues that the district court ruled on below. *See, e.g.*, *United States ex rel. Simoneaux v. E.I. duPont de Nemours & Co.*, 843 F.3d 1033, 1041–42 (5th Cir. 2016) (no jurisdiction over claim not raised in the district court); *United States ex rel. Bain v. Georgia Gulf Corp.*, 386 F.3d 648, 658 (5th Cir. 2004) (no jurisdiction over claim not yet ruled on by the district court); *see also* Wright & Miller § 3929 ("[T]he court of appeals will not consider matters not yet ruled upon by the district court."). This rule precludes a district court from certifying a question without deciding it, and prevents litigants from presenting new claims to the court of appeals in the first instance. *Cf. Cutter v. Wilkinson*, 544 U.S. 709, 718 n.7 (2005) ("[W]e are a court of review, not first view.").

Second, the court of appeals may only review issues "fairly included" in the certified order. *Yamaha Motor*, 516 U.S. at 205; *see also ibid.* ("The court of appeals may not reach beyond the certified order to address other orders made in the case."). A conclusion reached in an earlier order is fairly included if it is "logically interwoven" with a question decided in the certified order. *Kahl v. Bureau of Nat'l Affairs, Inc.*, 856 F.3d 106, 114 n.1 (D.C. Cir. 2017) (Kavanaugh, J.); *see also United States v. Philip Morris USA, Inc.*, 396 F.3d 1190, 1196 (D.C. Cir. 2005) (Sentelle, J.) (holding that § 1292(b) jurisdiction "must include at least issues that are logically interwoven with the explicitly identified issue and which were properly presented by the appellants").

## III.

Section 1292(b) gives us jurisdiction over All American's claim that the CFPB is unconstitutionally insulated from the congressional appropriations process. In the district court, All American moved for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). It identified four reasons why the motion should be granted, the first of which was that "the CFPB's structure violates the Constitution.". In the ten pages of its supporting memorandum devoted to structural arguments, All American argued that (1) the CFPB's leadership by a single Director with removal protection is unconstitutional; and (2) the CFPB's exemption from the congressional appropriations process unconstitutionally insulates it from accountability to Congress.

On March 21, 2018, the district court issued an order rejecting both of All American's structural arguments and denying the motion for judgment on the pleadings. As most relevant here, the court expressly rejected All American's argument that the CFPB's structure is unconstitutional because it is "not accountable to . . . Congress." All American then asked the district

court to certify the question whether the CFPB's structure is unconstitutional for appeal under § 1292(b). The district court agreed and certified the following question: "Does the structure of the [CFPB] violate Article II of the Constitution and the Constitution's separation of powers?" We subsequently granted All American's motion for leave to appeal from the district court's March 21 order. *CFPB v. All Am. Check Cashing*, No. 18-60302, ECF No. 1 (5th Cir. Apr. 24, 2018).

We thus have jurisdiction to consider any issue raised and decided below that is "fairly included" in the district court's March 21, 2018, order denying judgment on the pleadings. *See Yamaha Motor*, 516 U.S. at 205. That plainly includes All American's Appropriations Clause argument, because All American argued it below and the district court rejected it in the precise order on appeal. Moreover, though it has no effect on our jurisdiction, the district court explicitly identified All American's structural challenge—which included both a removal power argument and an Appropriations Clause argument—as a dispositive, uncertain issue warranting immediate appeal.

The majority is thus incorrect to claim that the Supreme Court's decision in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), "decides the pure question of law raised by All American in this interlocutory appeal." *Ante*, at 2. The majority rightly notes that *Seila Law* disposes of CFPB's removal power claim. But *Seila Law* left open the question whether the CFPB's insulation from the congressional appropriations process is constitutional—another pure question of law raised by this interlocutory appeal. Because § 1292(b) gives us jurisdiction to decide this claim, it's ripe for review, and it's included in the district court's certified question, we have jurisdiction over it.